UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

        Plaintiff,

        vs.

Steve Simon in his official capacity as
Secretary of State for the State of
Minnesota, and the State of Minnesota,

        Defendants.

Civil No. 25-cv-03761 (KMM/EMB)

**DEFENDANTS' MEMORANDUM
SUPPORTING DISMISSAL**

      This case involves the federal government's nationwide and unprecedented demand for sensitive private data on registered voters, including millions of Minnesotans, to ostensibly assess compliance with the Help America Vote Act (HAVA). When the Department of Justice (DOJ) asked how Minnesota maintains its voter-registration list, the state provided detailed information. DOJ raised no concerns about Minnesota's list-maintenance system. Instead, the United States sued the state and Minnesota Secretary of State Steve Simon, demanding sensitive private voter data and alleging that the state's safeguarding of these non-public data somehow violates HAVA and the Civil Rights Act. Neither HAVA nor the Civil Rights Act authorize the fishing expedition that the United States seeks to undertake with Minnesotans' personal data. Because the United States does not allege any violation of the law, it fails to state a claim and the Court should dismiss the complaint.

## FACTS

The United States' sole factual allegations arise from two rounds of correspondence exchanged between DOJ and the Minnesota Secretary of State's office from June to August 2025. (Compl. ¶¶ 28-40, ECF 1.) Because these four letters are fairly embraced by the pleadings, the Court may consider them as part of a motion to dismiss. *E.g.*, *Carter v. Ludwick*, 139 F.4th 982, 989 (8th Cir. 2025). That correspondence, and allegations throughout the complaint, repeatedly refer to voter-registration data that the state maintains without providing full context of how the state collects and maintains that data. The defendants therefore provide an overview of Minnesota's voter-registration processes before turning to the events underlying this lawsuit.

### *Data Held by the Secretary*

To carry out its election-administration responsibilities, Minnesota collects an immense amount of data about voters and potential voters. Since 2002, federal law has required states to verify information in voter-registration applications by using either a driver's license number, the last four digits of a social-security number, or—if the applicant has neither—a unique voter-identification number assigned by the state. 52 U.S.C. § 20183(a)(5). When registering to vote in Minnesota, applicants must provide their name, home address, date of birth, and either a state identification number or the last four digits of their social security number. Minn. Stat. § 201.071, subds. 1, 3. Applicants may optionally provide a phone number and email address. *Id.*, subd. 1. Minnesota also maintains a list of which elections people have voted in for the past six years, including

voters' party affiliation if they voted in a presidential-nomination primary. Minn. R. 8215.0300, subp. 2, 8200.9315(E).

These data are put in the Statewide Voter Registration System (SVRS), a database maintained by the Secretary and used by county election officials to store voter-registration records. Minn. Stat. §§ 201.021, .022, subd. 2. Records in the SVRS generally fall into four categories: active (for registered people), inactive (for previously registered people), challenged (for people whose eligibility is disputed), and deceased. *Cilek v. Off. of Minn. Sec'y of State*, 927 N.W.2d 327, 328 (Minn. Ct. App. 2019), *rev'd* 941 N.W.2d 411 (Minn. 2020); *see also* Minn. Stat. §§ 201.12-.145 (identifying conditions under which various statuses apply). State and local election officials routinely update registration records based on extensive reports from state and federal agencies providing information affecting eligibility, such as who has died, moved, been incarcerated for a felony conviction, or otherwise deemed ineligible to vote. *Id*. §§ 201.13, .14, .145; Erickson Decl. Ex. 1, at 8-10.

The Secretary also operates an address-confidentiality program, called Safe at Home, for Minnesotans who have been victims (or are at risk of being victims) of domestic violence, sexual assault, harassment, or stalking. *See generally* Minn. Stat. ch. 5B. Program participants receive a designated mailing address that they can use for all purposes, including absentee voting. *Id*. §§ 5B.03, subd. 5, .05(c); Minn. R. 8290.1300, subps. 3-8. When participants register to vote, the Secretary maintains a record of the participant's residential address, but to protect the participant's safety, this information is not available to anyone else. Minn. Stat. § 5B.06; Minn. R. 8290.1300, subp. 2a.

The United States seeks Minnesota's statewide voter-registration list. (Compl. ¶¶ 47, 53). HAVA defines this list as the name and registration information of every registered voter in Minnesota. 52 U.S.C. § 21083(a)(1)(A)(ii). This list includes two SVRS categories. First, it includes active individuals, who are registered to vote and have no outstanding issues with their qualifications. It also includes challenged individuals. These individuals can fall into a number of categories: individuals who previously registered in Minnesota but then failed a residency verification, individuals who were placed in a guardianship that revoked voting rights, individuals who were found incompetent to vote, individuals who were convicted of a felony and are currently incarcerated, or individuals who were determined to only have temporary lawful status in the United States. Minn. Stat. §§ 201.121, subd. 2, .145, subds. 2-5. Challenged individuals are considered registered, but they may only vote if they provide evidence to polling-place election judges sufficient to show the individual's residence and right to vote. *Id.* § 204C.12. In addition to including sensitive information like social-security numbers, the list that the United States seeks includes the residential information of those whose residential information must remain private to protect their physical safety.

***Executive Orders***

In March 2025, the President issued an executive order, addressing a purported widespread failure within the United States to prevent non-citizens from voting in federal elections. Exec. Order No. 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025). The order directed the U.S. Attorney General to take action against states that fail to comply with HAVA's list-maintenance requirements (which are discussed in greater detail in section II below).

*Id.* § 3(c). It also directed DOJ to enter into information-sharing agreements with state election officials and, if a state refuses, to "prioritize enforcement of Federal election integrity laws" in those states. *Id.* § 5(a), (b)(i). The order directed the Department of Homeland Security and Department of Government Efficiency to review each state's "publicly available voter registration list and available records concerning voter list maintenance activities as required by [HAVA], alongside Federal immigration databases . . . ." *Id.* § 2(b)(iii).

Within the same week, the President issued another executive order, directing federal agencies to maximize inter- and intra-agency data sharing, including any data the federal government obtains from states. Exec. Order No. 14,243, 90 Fed. Reg. 13681 (Mar. 20, 2025). The federal government has since taken numerous steps to collect state-level data (including Supplemental Nutrition Assistance Program (SNAP) and Medicaid data), while publicly acknowledging its intent to share state-collected private information for immigration-enforcement purposes. *See generally California v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-5536, 2025 WL 2356224 (N.D. Cal. Aug. 12, 2025) (challenging federal efforts to compel sharing of Medicaid data); *California v. U.S. Dep't of Agric.*, No. 25-cv-6310, 2025 WL 2678567 (N.D. Cal. Sept. 18, 2025) (challenging federal efforts to compel sharing of SNAP data); *see also* Dep't of Health & Hum. Servs., *Notice of Information Sharing Between Centers for Medicare & Medicaid Services and the Department of Homeland Security*, 90 Fed. Reg. 53324 (Nov. 25, 2025) (stating intent to share state Medicaid data with ICE). The federal government has also reportedly contracted with a company to centralize data, which as of May 2025 included data from the Social

Security Administration and the Internal Revenue Service. *See, e.g.*, Sheera Frenkel & Aaron Krolik, *Trump Taps Palantir to Compile Data on Americans,* N.Y. TIMES June 2, 2025, at B1, available at https://www.nytimes.com/2025/05/30/technology/trump-palantir-data-americans.html.

### *DOJ Data Requests*

In June 2025, DOJ wrote to the Office of the Minnesota Secretary of State, asking fifteen questions about voter registration. (Compl. ¶¶ 28-29; Erickson Decl. ¶ 3, Ex. 1.) Fourteen questions asked about the state's procedures for maintaining the statewide voter-registration list. (Erickson Decl. ¶ 3, Ex. 1 at 1-2.) The fifteenth question asked for all data—on active and inactive voters—underlying the statewide voter-registration list. (*Id.* at 2.) DOJ cited HAVA as the only basis for its requests, claiming that as part of a "nationwide effort," it needed the information to assess Minnesota's list-maintenance processes. (*Id.* at 1.)

In response, the Secretary's office answered the first fourteen questions. It explained Minnesota's list-maintenance procedures in meticulous detail and cited relevant state statutes and rules. (*Id.* at 4-10.) As to the request for all Minnesotans' voter-registration data, the Secretary's office declined to provide it, explaining it was unaware of any federal law that required the sweeping disclosures DOJ sought. (*Id.* at 10-11.) The Secretary further raised concerns about the data's privacy and security, questioning whether DOJ would share the data and how DOJ would protect it. (*Id.* at 11.)

DOJ responded about three weeks later. (*Id.* Ex. 2.) It did not identify any concerns with, or ask more questions about, Minnesota's list-maintenance procedures. (*Id.* at 1-2.)

Rather, it focused only on its demand for Minnesota's raw voter data, again seeking complete, unredacted voter-registration data on active and inactive voters, including each person's full name, date of birth, residential address, full driver's license number, and last four digits of their social-security number. (*Id.*) As authority for its request, DOJ again focused only on compliance with HAVA's list-maintenance requirements. (*Id.*) And, for the first time, it cited a provision of the Civil Rights Act, 52 U.S.C. § 20703, as authority for its request. (*Id.*) But it again referred to HAVA list maintenance as its basis for invoking the Civil Rights Act. (*Id.*)

The Secretary's office again declined to provide voter data, explaining that neither HAVA nor the Civil Rights Act required producing highly personal data on several million voters to assess list maintenance. (*Id.* at 3-5.) It also explained why reviewing registration data from a particular day would not assist DOJ in assessing compliance with HAVA's requirement for a system of ongoing list maintenance. (*Id.* at 5.) And the Secretary's office again raised concerns about how DOJ intended to use the data, noting that DOJ's request appeared inconsistent with the Privacy Act, 5 U.S.C. § 552a, which requires the government to follow certain procedures before collecting data. (*Id.* at 6-7.) While the sources that DOJ cited did not support its broad request, the Secretary's office reminded DOJ that an eligible person could request Minnesota's public-information list. (*Id.*) This list provides a subset of voter-registration data, including names, birth years, and addresses. (*Id.*) Finally, the office offered to meet with DOJ to discuss its request. (*Id.* at 8.)

DOJ did not seek the available public data that the Secretary offered or follow up with any questions. (*Id.* ¶ 5.) Rather, in September 2025, the United States sued the Secretary and the State of Minnesota, citing the President's executive order and alleging that the state violated HAVA and the Civil Rights Act by not providing all data in Minnesota's voter-registration list.[1] (Compl. ¶¶ 45-54.) The United States seeks declaratory and equitable relief requiring the state to turn over all data from its voter-registration list. (*Id.* ¶¶ 53, A-D.)

## ARGUMENT

The Court must dismiss a complaint that fails to allege sufficient facts to state a plausible claim for relief; stating only a "conceivable" claim is insufficient. *Bell Atl. Corp.*

---

[1] Minnesota is not DOJ's only target in its hunt for mass amounts of voter data. To date, the United States has sued twenty-one other states and their elections officials: California, Colorado, Delaware, the District of Columbia, Georgia, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Nevada, New Hampshire, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and Wisconsin. *United States v. Weber*, No. 2:25-cv-9149 (C.D. Cal. Sept. 25, 2025); *United States v. Griswold*, No. 1:25-cv-3967 (D. Colo. Dec. 11, 2025); *United States v. Albence*, No. 1:25-cv-1453 (D. Del. Dec. 2, 2025); *United States v. D.C. Bd. of Elections¸* No. 1:25-cv-4403 (D.D.C. Dec. 18, 2025); *United States v. Raffensperger*, No. 5:25-cv-548 (M.D. Ga Dec. 18, 2025); *United States v. Nago*, No. 1:25-cv-522 (D. Haw. Dec. 11, 2025); *United States v. Matthews*, No. 3:25-cv-3398 (C.D. Ill. Dec. 18, 2025); *United States v. Bellows*, No. 25-cv-468 (D. Me. Sept. 16, 2025); *United States v. DeMarinis*, No. 1:25-cv-3934 (D. Md. Dec. 1, 2025); *United States v. Galvin*, No. 1:25-cv-13816 (D. Mass. Dec. 11, 2025); *United States v. Benson*, No. 1:cv-1148 (W.D. Mich. Sept. 25, 2025); *United States v. Aguilar*, No. 3:25-cv-728 (D. Nev. Dec. 11, 2025); *United States v. Scanlan*, No. 1:25-cv-371 (D.N.H. Sept. 25, 2025); *United States v. Toulouse Oliver*, No. 1:25-cv-1193 (D.N.M. Dec. 2, 2025); *United States v. Bd. of Elections of N.Y.*, No. 1:25-cv-1338 (N.D.N.Y. Sept. 25, 2025); *United States v. Oregon*, No. 6:25-cv-1666 (D. Or. Sept. 16, 2025); *United States v. Schmidt*, No. 2:25-cv-1481 (W.D. Pa. Sept. 25, 2025); *United States v. Amore*, No. 1:25-cv-639 (D.R.I. Dec. 2, 2025); *United States v. Hanzas*, No. 2:25-cv-903 (D. Vt. Dec. 1, 2025); *United States v. Hobbs*, No. 3:25-cv-6078 (W.D. Wash. Dec. 2, 2025); *United States v. Wis. Elections Comm'n*, No. 3:25-cv-1036 (W.D. Wis. Dec. 18, 2025).

*v. Twombly*, 550 U.S. 544, 570 (2007). Whether a complaint states a claim is a question of law. *Jones v. City of St. Louis*, 104 F.4th 1043, 1046 (8th Cir. 2024). Alleging only facts that are consistent with liability "stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). While review on a motion to dismiss is generally limited to the complaint, a court may consider documents necessarily embraced by the complaint without converting the motion to one for summary judgment. *Carter*, 139 F.4th at 989.

The Court should dismiss the United States' complaint for failing to state a claim. The United States' data request is unprecedented for a reason: it has no legal basis. Constitutional principles and federal law give states significant authority over elections and voter-registration data, and federal and state law restrict access to the data sought. The United States cites no authority to overcome those restrictions, and the patchwork of statutes it relies on does not entitle it to any relief.

## I.    STATES RETAIN PRIMARY AUTHORITY OVER ELECTION ADMINISTRATION AND VOTER DATA.

Addressing the United States' specific claims first requires a general overview of the relationship between states and the federal government with respect to election administration. State legislatures have primary authority to decide the time, place, and manner of federal elections. U.S. Const. art. I, § 4. The federal government may impinge this authority only if Congress enacts legislation that displaces a state regulation. *Id.*

States' discretion to set election procedures is broad. *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986); *United States v. Classic*, 313 U.S. 299, 311 (1941). It

encompasses the power "to provide a complete code" for elections. *Smiley v. Holm*, 285 U.S. 355, 366 (1932). This includes authority to establish voter-registration procedures, maintain voter rolls, and protect voter data. *Husted v. A. Philip Randoph Inst.*, 584 U.S. 756, 774 (2018); *Ariz. v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013); *Smiley*, 285 U.S. at 366; *see also Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 822 (2015) (identifying other state procedures that constitute time, place, and manner regulations).

As discussed above, implementing this comprehensive elections system requires collecting an immense amount of data about voters and potential voters. These data necessarily implicate significant privacy interests. *Cilek v. Off. of the Minn. Sec'y of State*, 941 N.W.2d 411, 417 (Minn. 2020); *see also, e.g.*, *Pub. Int. Legal Found. v. Bellows*, 92 F.4th 36, 55 (1st Cir. 2024); *Pub. Int. Legal Found. v. N.C. State Bd. of Elections*, 996 F.3d 257, 266-67 (4th Cir. 2021); *Moore v. Kobach*, 359 F. Supp. 3d 1029, 1049-50 (D. Kan. 2019); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1345 (N.D. Ga. 2016); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 735 (S.D. Miss. 2013). Given the data's sensitive nature, the Minnesota legislature has carefully balanced who may access voter data and for what purposes. Each registered voter's address, year of birth, and voting history (i.e., whether a person voted, not how the person voted) is available to Minnesota voters for election, political-activity, or law-enforcement purposes.[2] Minn. Stat. § 201.091,

---

[2] Nearly every other state similarly dictates what data are public, who can access the data, or what purposes the data can be used for. *E.g.*, Ala. Code § 17-3-53; Alaska Stat. § 15.07.195; Ariz. Rev. Stat. Ann. §§ 16-153, -168(E); Cal. Election Code §§ 2166(b)(2), 2194(a)(2)-(3), (b)(1); Colo. Rev. Stat. § 1-2-302(8); Conn. Gen. Stat. § 9-23h; Del. Code

subds. 4-5. Before receiving this information, recipients must provide identification and agree in writing to use it only for those purposes. *Id.*, subd. 4(c). The chairs of political parties may also obtain a list of voters who voted in their party's presidential-nomination primary. *Id.*, subd. 4a. Beyond these disclosures, Minnesota does not mandate any voter-data disclosures. Nor can anyone receive a Safe at Home participant's address from the public information list. Minn. Stat. § 5B.06; Minn. R. 8290.1300, subp. 2a.

The United States suggests that the state's data-sharing with the Electronic Registration Information Center (ERIC) somehow bears on this case. (Compl. ¶¶ 41-42.) It does not. Consistent with the legislature's express authorization, the Secretary may share certain data with a consortium of states to maintain accurate voter rolls. Minn. Stat. § 201.13, subd. 3(d). That sharing, however, expressly requires the consortium to protect the data consistent with state law. *Id.* Through this authority, Minnesota is a

---

Ann. tit. 15, § 1305; D.C. Mun. Regs. tit. 3, § 510.5; Fla. Stat. § 97.0585; Ga. Code Ann. § 21-2-225(c); Haw. Rev. Stat. §§ 11-14, -97(a); Idaho Code §§ 34-437(1), -437A(3); 10 Ill. Rev. Stat. 5A/1A-25; Ind. Code §§ 3-7-26.4-8, -6, -10; Iowa Code §§ 48A.38(1)(f), .39; Kan. Stat. Ann. §§ 25-2320(b), 2320a; Ky. Rev. Stat. Ann. § 116.095, 117.025(3)(i); La. Stat. Ann. § 18:154(C); Mass. Gen. Laws ch. 51, § 47C; Me. Stat. tit. 21-A, § 196A(1)(K)(2), (6); Md. Code Ann., Elec. Law § 3-506(a)(1); Md. Code Regs. 33.05.02.02(B)(4); Mich. Comp. Laws § 169.168.509gg; 1 Miss. Code R. pt. 10, R. 7.2; Mo. Rev. Stat. § 115.157(3); Mont. Code Ann. § 13-2-122(1); Mont. Admin. R. 44.3.1102(3); Neb. Rev. Stat. § 32-330(3)(b), (4); Nev. Rev. Stat. §§ 293.440(6), .558(2); N.H. Rev. Stat. Ann. §§ 654:31(VI), :31-a; N.J. Stat. Ann. § 19:31-18.1(c); N.M. Stat. Ann. § 1-4-5.4(C), -5.5(B); N.Y. Elec. Law § 3-103(5); N.C. Gen. Stat. § 163-82.10(a1); N.D. Cent. Code § 16.1-02-15; Ohio Rev. Code Ann. § 3503.13(A)(2); Okla. Stat. tit. 26, §§ 4-112(H), 7-103.2(B)(1), (3); Or. Rev. Stat. § 247.948(2), .955; 25 Pa. Cons. Stat. § 1404(b)(3); 17 R.I. Gen. Laws § 17-9.1-21; S.C. Code Ann. § 7-5-170(1); S.D. Codified Laws § 12-4-9; Tenn. Code Ann. § 2-2-127, -138; Tex. Elec. Code Ann. § 18.009; Utah Code Ann. § 20A-2-104(4)(c), (d); Vt. Stat. Ann. tit. 17, § 2154(b)(1), (c)(1); Va. Code Ann. § 24.2-407, -407.1; Wash. Rev. Code § 29A.08.710(2)(a), .720(3)(a); W. Va. Code 3-2-30(a), (f); Wis. Stat. § 6.36(1)(b)(1)(a); Wyo. Stat. Ann. 22-2-113(a), (d).

member of ERIC, a bipartisan consortium that helps the state maintain accurate records by, among other things, tracking whether a voter may have moved to another state or died. *Ass'n for Gov't Accountability v. Simon*, No. 23-3159 (PAM/DTS), 2024 WL 692713, at *1-2 (D. Minn. Feb. 20, 2024) (dismissing challenge to state's participation in ERIC), *aff'd*, 128 F.4th 976 (8th Cir. 2025), *cert. denied* 2025 WL 2823774 (U.S. 2025).[3] Further, that the state *may* share voter data under certain circumstances does not mean it *must* share the data under all circumstances.

When individuals and organizations have sought to disrupt the balance between privacy rights and voter-data access by challenging it in court, they have lost. In the past twelve years alone, courts have repeatedly upheld the legislature's balance between those interests. For example, in 2012, a candidate sought access to voters' email addresses, which voters may optionally include in voter-registration applications. *Carlson v. Ritchie*, 960 F. Supp. 2d 943, 948 (D. Minn. 2013). Because email addresses are not part of the public information list, the court held that the candidate had no right to the data. *Id.* at 954-55; *see also* Minn. Stat. § 201.091, subd. 4(a).

In 2017, a Minnesota voter and executive director of an "election integrity" organization sought information outside the public information list, including the existence and basis of any challenges to registered voters and information on inactive voters. *Cilek*, 941 N.W.2d at 414. In upholding the Secretary's decision not to provide the data, the

---

[3] ERIC receives data through encrypted files, applying a cryptographic one-way hash applied to sensitive data like various identification numbers and dates of birth. Elec. Registration Info. Ctr., *ERIC Tech and Security Brief* 2 (Sept. 29, 2025), https://perma.cc/5DWN-KE78.

Minnesota Supreme Court emphasized the importance of respecting the legislature's policy role in balancing transparency, privacy, and discretion. *Id.* at 417.

On the other hand, courts have also upheld the legislature's discretion to authorize sharing data under appropriate circumstances. As noted above, Minnesota is a member of ERIC. When an organization sought to enjoin the state from sharing voter data with ERIC, courts dismissed the challenge and affirmed that state law authorized the data sharing. *Ass'n for Gov't Accountability*, 2024 WL 692713, at *1-2.

These cases show that courts have consistently upheld the balance struck by the Minnesota Legislature. When state law authorizes the Secretary to share specific data with specific people for specific purposes, courts have not disrupted the exercise of that authority. And when—as here—the legislature has not required the Secretary to share data, courts have not overridden the legislative decision.

The United States' demand for voter data disrespects this balancing, and it does so without congressional authorization. As explained in more detail below, neither HAVA nor the Civil Rights Act provide a basis for the request, and neither statute displaces states' primary authority over registration lists. *See, e.g.*, 52 U.S.C. §§ 21083(a)(5)(A)(iii) (giving states final authority to determine whether applicant provides enough information for verification purposes); 21085 (providing that methods of complying with HAVA's list-maintenance requirements are left to states' discretion). The United States cites the President's executive order as authority for its demand. (Compl. ¶ 3.) But neither the President nor any other executive-branch actor can displace state election laws; only Congress can. U.S. Const. art. I, § 4. Thus, anything the President purports to do by the fiat

of executive order cannot override Minnesota's protections on voter data. *See also California v. Trump*, 786 F. Supp. 3d 359, 373 (D. Mass. 2025) (preliminarily enjoining multiple sections of executive order on elections), *appeal docketed*, No. 25-1726 (1st Cir. Aug. 1, 2025); *League of United Latin Am. Citizens v. Exec. Off. of President*, 780 F. Supp. 3d 135, 159 (D.D.C. 2025) ("Executive regulatory authority over federal elections does not appear to have crossed the Framers' minds . . . ."). Because Congress has not authorized the sweeping requests made here, state law controls access to the state's voter-registration data and the United States has no authority to require its production.

## II.    HAVA DOES NOT MANDATE DISCLOSING VOTER DATA.

The United States alleges that the state must produce all data from its voter-registration list to comply with HAVA's list-maintenance requirements. (Compl. ¶¶ 50-54.) HAVA does not require data production. It requires only that states make reasonable efforts to regularly update their voter-registration lists. Minnesota does and the United States does not allege otherwise. To the extent that the United States claims that the state must produce voter data to determine whether the state is complying with HAVA, Congress did not give DOJ that authority. Because the United States fails to state a HAVA claim, the Court should dismiss this claim.

### A.    HAVA Requires Only that States Make Reasonable Efforts to Maintain Voter-Registration Lists.

Congress enacted HAVA in 2002 to establish minimum election-administration standards for state and local election officials when administering federal elections. Pub. L. No. 107-252, 116 Stat. 1666 (2002). Relevant to this case, section 303 requires states to

create and maintain an electronic statewide voter-registration list. 52 U.S.C. § 20183(a)(1)(A). Congress also created minimum standards for maintaining statewide voter-registration records. *Id.* § 20183(a)(4). States must have a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote" while implementing safeguards to ensure that they do not erroneously remove eligible voters. *Id.* This list-maintenance requirement underlies the United States' complaint and demands for data in this lawsuit and those filed in other states. But HAVA does not support the United States' sweeping demand for data and it fails to allege a violation of HAVA's list-maintenance requirements.

When interpreting a statute, courts look at its plain language. *Cont'l Res., Inc. v. N.D. Bd. of Univ. & Sch. Lands*, 136 F.4th 778, 785 (8th Cir. 2025). Absent a statutory definition, courts give statutory words their ordinary meaning. *Id.* This case starts and ends with HAVA's plain language. HAVA does not establish an independent violation of the law for failing to produce voter-registration data. Rather, HAVA's plain language requires only that states have a "system of file maintenance" that makes a "reasonable effort" to remove ineligible registrants while safeguarding eligible registrants.

Because HAVA does not define these phrases, their ordinary meaning applies. A "system" is "[a] group of interacting, interrelated, or interdependent elements forming a complex whole." *American Heritage Dictionary* 1757 (4th ed. 2000.) "Reasonable" means "rational" or "being in accordance with reason or sound thinking." *Id.* at 1457; *see also Reasonable efforts*, *Black's Law Dictionary* (12th ed. 2024) ("One or more actions rationally calculated to achieve a usu[ally] stated objective, but not necessarily with the

15

expectation that all possibilities are to be exhausted.") HAVA thus requires only that the states have steps in place that provide rational means for removing ineligible voters from statewide voter-registration lists.

While the Eighth Circuit has not yet interpreted HAVA's list-maintenance obligation, other circuits interpreting similar voter-registration-list-maintenance obligations have reached the same conclusion. The National Voter Registration Act of 1993 (NVRA), for example, requires states to make "reasonable effort" to remove from voter-registration lists people who have died or moved. 52 U.S.C. § 20507(a)(4)(A).[4] The Sixth and Eleventh Circuits both concluded that reasonable efforts under the NVRA are just that: reasonable, not perfect, efforts to maintain accurate voter-registration lists. *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025), *petition for cert. filed*, No. 25-437 (U.S. Oct. 7, 2025); *Bellitto v. Snipes*, 935 F.3d 1192, 1205 (11th Cir. 2019). As the Sixth Circuit explained: a reasonable effort "does [not] require the most optimal effort, nor does it even require a very good effort" or exhaustion of all possible methods. *Pub. Int. Legal*, 136 F.4d at 628; *Bellitto*, 935 F.3d at 1205.

Applying these standards, the United States fails to state a claim. It does not allege that Minnesota lacks a system of file maintenance for the statewide voter-registration list. (Compl. ¶¶ 28-44.) Nor does it allege that Minnesota's file-maintenance system lacks reasonable efforts to remove ineligible registrants. (*Id.*) Nor could it: Minnesota's system

---

[4] Minnesota is generally exempt from the NVRA, but HAVA incorporates some of the NVRA's list-maintenance requirements. 52 U.S.C. § 21083(a)(2)(A); *see also id.* § 20503(b)(2) (exempting states that had election-day registration in 1994).

makes reasonable efforts to maintain accurate registration data. *See, e.g.*, Minn. Stat. ch. 201, 203B, 204B; Minn. R. ch. 8200; Erickson Decl. Ex. 1 at 4-10. When DOJ asked, the state explained these processes in detail and received no questions about them. And even in its complaint, the United States alleges no deficiency in Minnesota's file maintenance. It instead rests solely on the state declining to provide underlying voter-registration data. This is contrary to past HAVA litigation in which the United States has specifically alleged facts that could establish a HAVA violation. *See, e.g.*, Compl. ¶¶ 23-45, *United States v. Town of Thornapple*, 2024 WL 6078593 (W.D. Wis. Oct. 4, 2024) (alleging specific facts that towns were violating HAVA), *aff'd*, 143 F.4th 793 (7th Cir. 2025); Compl. ¶ 15, *United States v. N.Y. State Bd of Elections*, N.D.N.Y. No. 06-cv-0263 (filed Mar. 1, 2006) (alleging specific facts that state was violating HAVA).[5]

Because failing to provide voter data does not violate HAVA's list-maintenance requirements, the United States fails to state a claim under HAVA.

**B.    HAVA Does Not Give DOJ Investigative Authority.**

Apparently conceding that it has no evidence of a HAVA violation, the United States asserts that it has broad authority to collect data to determine whether a state is complying with its list-maintenance obligations. (Compl. ¶¶ 52-53.) Again, allegations about data collection do not form a cause of action under HAVA. And Congress did not

---

[5] These complaints and others are available on DOJ's website. U.S. Dep't of Justice, Civil Rights Division, *Voting Section Litigation*, https://www.justice.gov/crt/voting-section-litigation.

authorize this type of fishing expedition; rather, it expressly directed states to prevent unauthorized access to statewide voter registration lists. *Id.* § 21083(a)(3). While giving DOJ authority to enforce HAVA, Congress did not vest DOJ with investigative authority—as it has with other laws—that would mandate producing data.

HAVA has two enforcement mechanisms: a civil action by the U.S. Attorney General and a state administrative-complaint procedure. 52 U.S.C. §§ 21111-12; *Minn. Voters All. v. City of Minneapolis*, No. 20-2049, 2020 WL 6119937 (D. Minn. Oct. 16, 2020); *see also* Minn. Stat. § 200.04 (establishing Minnesota's administrative-complaint process). As to the U.S. Attorney General's enforcement authority, the authority is limited to bringing a civil action "as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under sections 21081, 21082, and 21083." 52 U.S.C. § 21111.

Enforcement authority does not amount to broad investigative authority. The federal government's authority to require data production is a product of statute. *See, e.g.*, *Cudahy Packing Co. of La. v. Holland*, 315 U.S. 357, 360-67 (1942) (scrutinizing statutory authority to conclude that even statutes giving agency subpoena authority did not authorize agency to delegate authority to other staff to sign subpoena); *see also Peters v. United States*, 853 F.2d 692, 696 (9th Cir. 1988) (recognizing agencies' investigative authority must be created by statute); *United States v. Michigan*, 866 F. Supp. 890, 893 (W.D. Mich. 1994) (rejecting argument that enforcement authority implicitly gave U.S. Attorney General broad investigative powers to, among other things, inspect records). When

construing a statute, courts assume that Congress intentionally omitted words that are not in the statute. *Watt v. GMA Mortg. Corp.*, 457 F.3d 781, 783 (8th Cir. 2006).

Congress expressly granted DOJ or other federal agencies broad investigative or subpoena authority in more than 300 provisions of federal law, spanning a variety of contexts. *See, e.g.*, Charles Doyle, Cong. Rsch. Serv., RL33321, *Administrative Subpoenas in Criminal Investigations: A Brief Legal Analysis* 4 (Dec. 19, 2012); *see also* U.S. Dep't of Just., Off. of Legal Pol'y, *Report to Congress on the Use of Administrative Subpoena Authorities by Executive Branch Agencies and Entities* § I.A (2002). As just a handful of examples: the Antitrust Civil Process Act gives DOJ authority to collect evidence when investigating, 15 U.S.C. § 1312(a); the Civil Rights of Institutionalized Persons Act gives DOJ authority to subpoena documents and records, 42 U.S.C. § 1997(a)-1(a); ERISA gives the Secretary of Labor authority to investigate and inspect records, 29 U.S.C. § 1134(a); and the False Claims Act give the U.S. Attorney General authority to issue civil investigative demands for documents, 31 U.S.C. § 3733(a).

The NVRA—which does not apply to Minnesota—similarly provides further evidence that HAVA does not require data production. In contrast to HAVA, the NVRA requires subject states to make certain list-maintenance records publicly available. 52 U.S.C. § 20507(i). Congress could have enacted similar public-disclosure requirements in HAVA, but chose not to. And despite the NVRA's broad directive that those states make public "all records" concerning list maintenance, courts have consistently held that the obligation does not encompass unredacted sensitive personal data like social-security numbers and dates of birth. *E.g.*, *Pub. Int. Legal Found.*, 92 F.4th at 56; *Pub. Int. Legal*

*Found.*, 996 F.3d at 264; *Project Vote*, 208 F. Supp. 3d at 1344-45; *True the Vote*, 43 F. Supp. 3d at 736-39.

These statutes reflect that Congress knows how to give the federal government authority to demand data.[6] Congress made a policy choice not to do so in HAVA. Because the United States' desire for sweeping amounts of unredacted state voter data does not state a claim under HAVA, the Court should dismiss this claim.

### III. THE CIVIL RIGHTS ACT OF 1960 DOES NOT AUTHORIZE DOJ'S DEMANDS FOR PURPOSES UNRELATED TO CIVIL RIGHTS VIOLATIONS.

Faced with its lack of authority under HAVA, DOJ attempts to cobble together a claimed purpose from one statute (here, HAVA compliance) and inspection authority from another statute (the Civil Rights Act of 1960, 52 U.S.C. § 20703). The record-inspection authority conferred by the Civil Rights Act, however, does not create a backdoor mechanism for HAVA investigations. The Civil Rights Act's text and legislative history make clear that Congress created limited inspection authority to enable the federal government to investigate and remediate racially discriminatory voting practices. DOJ's

---

[6] As the Secretary's office explained to DOJ, the static registration list from a single day also would not establish whether Minnesota has a list-maintenance system. (Erickson Decl. Ex. 2 at 5.) Voter-registration lists are inherently dynamic. Voter statuses change as people move, die, or otherwise become disqualified from voting under state law. *E.g.*, Minn. Stat. §§ 201.13, .14, .145. The United States' assertion that it needs data to assess compliance with 52 U.S.C. § 21083(a)(5)(A) is even more baffling. (Compl. ¶ 53.) That provision requires voter-registration applications to solicit a social-security number, driver's license number, or another unique identification number. Minnesota law requires that information, and the application is a public document. Minn. Stat. § 201.071; Minn. R. 8200.1200 (2023); *see also* Off. of Minn. Sec'y of State, *Minnesota Voter Registration Application*, https://www.sos.mn.gov/media/5975/minnesota-voter-registration-application.pdf (last visited Dec. 23, 2025).

demands for records do not even purport to serve that objective. Because it does not allege any civil rights violations impacting Minnesota voters, the United States fails to state a claim under 52 U.S.C. § 20703.

## A.    The Plain Language of the Records-Inspection Provision Requires a Basis and Purpose Tied to Civil-Rights Violations.

In assessing the scope and meaning of the Civil Rights Act inspection authority, the starting point is the statute's language. *United States v. S.A.*, 129 F.3d 995, 998 (8th Cir. 1997). Courts should construe statutory text based on the context in which it appears and the broader context of the statute as a whole. *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2021); *Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*, 9 F.4th 803, 807 (8th Cir. 2021). Courts must also give meaning to all text, assuming that each part has meaning. *United States v. Johnson*, 703 F. 3d 464, 468 (8th Cir. 2013). The Supreme Court has directed that, when possible to reasonably apply a statute consistent with its legislative purpose, courts must avoid literal applications that lead to absurd consequences. *United States v. Ryan,* 284 U.S. 167, 175 (1931). When the plain language contains some indicators of intent, but leaves room for ambiguity, courts should give the statute a "sensible construction" which effectuates the underlying purposes of the law, and should consider "the purpose, the subject matter and the condition of affairs which led to its enactment." *Id.*

The United States asserts a claim under Title III of Civil Rights Act of 1960, which provides:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his

representative directed to the person having custody, possession, or control
of such record or paper, be made available for inspection, reproduction, and
copying at the principal office of such custodian by the Attorney General or
his representative. This demand shall contain a statement of the basis and the
purpose therefor.

52 U.S.C. § 20703. For multiple reasons, the plain language does not give the United States

carte blanche to request state voter data. First, the provision is within the Civil Rights Act,

which prohibits racially discriminatory voting practices. *E.g.*, *id.* §§ 10101 et seq. Second,

when requesting data, DOJ must provide a written demand that includes "a statement of

the basis and the purpose therefor." *Id.* § 20703. A "basis" is "something that supports or

sustains" and a "purpose" is "an object to be attained." *Webster's Third New International*

*Dictionary* 182, 1847 (1993). And the records must be used only for the identified purpose.

*Id.* at 2376 (defining "therefor" as "for that reason"). This reflects that Congress intended

to create some degree of gatekeeping: DOJ needs a specific basis for believing a civil rights

violation has occurred and it can only use the sought records for the stated purpose.

If DOJ could request data for any basis or purpose, the requirement would be

meaningless. It would also render the statute absurd. For example, DOJ could demand

voter-registration records stating that the basis and purpose for its demand is to gather

information about the Attorney General's favorite Minnesota-based author, or to send

antagonistic mailers to voters who abstained from the 2024 election. Under the United

States' present reading in either instance, the state would have to hand over millions of

Minnesotans' sensitive data. Because settled statutory construction requires the Court to

assume that Congress did not intend an absurd result, the only reasonable reading of the

plain language is that Congress limited the records-inspection provision to purposes and

bases related to investigating racially discriminatory conduct prohibited by the Civil Rights Act.

**B.    Legislative History Establishes that the Record-Inspection Provision's Purpose is Combatting Racial Discrimination.**

Even if the Court concludes that the records-inspection provision is ambiguous, its legislative history confirms its limited purpose. The Civil Rights Act's voting protections were achieved incrementally, through years of revisions and expansions. The first round of legislation was adopted in 1957, and although it did not yet require states to maintain voter-registration records or make them available for inspection, it created the bipartisan Commission on Civil Rights. [7] *See* Civil Rights Act of 1957, Pub. L. No. 85-315, 71 Stat. 634 (Sept. 9, 1957) https://perma.cc/TZ2T-9TED*; see also* White House, Exec. Branch Liaison Off., *The Administration and Civil Rights Legislation*, Fact Paper No. 279 (1957) (Middlecamp Decl. Ex. 1).

In its first report, issued in 1959, the Commission made more than 120 pages of findings and recommendations on voting discrimination. U.S. Comm'n on Civil Rights, *Report of the United States Commission on Civil Rights 1959* 19-142 (1959) https://perma.cc/J55Z-VVP8. The Commission understood discrimination to be a central reason for its creation, writing that "[t]he primary concern of Congress in passing the Civil Rights Act of 1957, and the single specific field of study and investigation that it made mandatory for this Commission, was alleged denials of the right to vote." *Id.* at 40.

---

[7] For the Court's convenience, certain excerpts from the relevant legislative history are attached to the Declaration of Lindsey Middlecamp.

Relative to state voter records, the Commission repeatedly bemoaned that states had thwarted the Commission's core purposes by failing to retain or produce rejected voting applications and other registration records. *See, e.g.*, *id.* at 93 (reporting that states destroyed applications about thirty days after rejecting them, making "accurate statistical review of the records impossible."); *id.* at 137 (explaining that midway through review of Alabama counties' records, state legislature authorized counties to destroy denied application forms even though the forms were "essential to any investigation of denials of the right to vote"). Even when states had responsive registration records, states routinely denied the Commission access. *See id.* at 70 (recounting board telling Commission's agents that Alabama Attorney General ordered that it not make records available), 98 (describing Louisiana's refusal to permit inspection of voter records).

Based on these hurdles and other findings related to investigating racial discrimination, the Commission recommended that Congress require states to preserve and retain all registration and voting records for inspection. *Id.* at 138. The Commission was not alone in advocating for this requirement. Even before the Commission's first report was published, President Eisenhower urged Congress to strengthen the federal response to racially discriminatory voting practices and to counter states' obstructive efforts, urging that "[a]ccess to registration records is essential to determine whether the denial of the franchise was in furtherance of a pattern of racial discrimination." Dwight D. Eisenhower, *Special Message to Congress on Civil Rights - Feb. 5, 1959*, Pub. Papers of the Presidents 164-65 (1960) (Middlecamp Decl. Ex. 2 at 3).

As Congress considered the legislation that became the Civil Rights Act of 1960, legislators repeatedly characterized the legislation's general purpose as eradicating racial discrimination in the voting arena. They repeatedly highlighted inspection of voting records as a necessary tool to achieve that purpose. Several examples include the following:

- In August 1959, the Chair of the House Judiciary Committee Peter Rodino described the legislation's purpose as "provid[ing] a more effective protection of the right of all qualified citizens to vote without discrimination on account of race." H.R. Rep. No. 956, Report No. 956, at 7 (1959) (Middlecamp Decl. Ex. 3 at 7.)

- In February 1960, Senator Jacob Javits described the federal government's lack of election-record inspection authority as "a very serious obstacle" to administering the Civil Rights Act of 1957, explaining that the low number of enforcement suits by DOJ reflected not the absence of a discrimination problem, but a lack of access to records essential "to prove racial discrimination." 106 Cong. Rec. 3683, 3692 (1960) (statement of Sen. Jacob Javits) (Middlecamp Decl. Ex. 4 at 2, 11.)

- In March 1960, Representative Ray Madden reiterated that the proposed Title III inspection power was tied to the specific purpose of investigating racial discrimination. He observed that, without the proposed amendment, "[t]here is no existing power for the Department of Justice to require the production of these records during an investigation based on complaint or denial to vote because of race or other reasons." *See id.* at 5192-94 (statement of Rep. Ray Madden) (Middlecamp Decl. Ex. 5 at 2).

- During the same hearing, Representative William McCulloch advocated for the record-inspection authority in even further detail, explaining how proving racial discrimination requires access to detailed election records, and that only those records considered as a whole could allow law enforcement to analyze the breakdown and assess whether denials and allowances of the right to vote had fallen across racial lines. *See id.* at 5208-09 (statement of Rep. William McCulloch) (Middlecamp Decl. Ex. 5 at 4.)

- Also in March 1960, in referring to the proposed record-inspection provision as a "logical step in protecting the right to vote," Representative Seymour Halpern tied it to a "sickening array" of discrimination based on race. *See id.* at 5299-300 (statement of Rep. Seymour Halpern) (Middlecamp Decl. Ex. 6 at 6).

- Representative Emanuel Celler joined the chorus of those calling for record-inspection authority as a tool to prevent racial discrimination, emphasizing that preserving election records for federal elections "*is ancillary to the right to vote, to inspect the records and have the records preserved. They complement each other like the reverse and obverse side of a coin. One is necessary to the other as tongue to cheek.* If the records cannot be inspected, if the records are unavailing, how can you know whether the votes were even actually cast, much less counted." *Id*. at 5450 (statement of Rep. Emanuel Celler) (emphasis added) (Middlecamp Decl. Ex. 7 at 11).

It was against this backdrop that, in 1960, Congress passed the Civil Rights Act of 1960, including the requirement that states preserve voter-registration records and make them available for inspection. Once enacted, the President's signing statement recognized that the statute "requires the retention of voting records, [which] will be of invaluable aid in the successful enforcement of existing voting rights statutes." Dwight D. Eisenhower, *Statement by the President Upon Signing the Civil Rights Act of 1960 - May 6, 1960*, Pub. Papers of the Presidents 398 (1961) (Middlecamp Decl. Ex. 8).

In 1966, the U.S. Supreme Court reflected on this purpose and summarized the legislative tools gradually adopted in the quest to eradicate racial discrimination:

> In recent years, Congress has repeatedly tried to cope with the problem by facilitating case-by-case litigation against voting discrimination. The Civil Rights Act of 1957 authorized the Attorney General to seek injunctions against public and private interference with the right to vote on racial grounds. Perfecting amendments in the Civil Rights Act of 1960 . . . gave the Attorney General access to local voting records, and authorized courts to register voters in areas of systematic discrimination. Title I of the Civil Rights Act of 1964 expedited the hearing of voting cases before three-judge courts and outlawed some of the tactics used to disqualify Negroes from voting in federal elections.

*South Carolina v. Katzenbach,* 383 U.S. 301, 313 (1966) (citations omitted).

After gaining the authority to inspect registration records, the Commission on Civil Rights and DOJ wielded that power precisely how Congress intended: gathering evidence to investigate complaints of racially discriminatory practices, evaluating patterns or practices of disenfranchising Black voters, and seeking legal remedies in the federal courts where negotiations with voting officials were ineffective. *See generally* U.S. Comm'n on Civil Rights, *Civil Rights '63* (1963), https://perma.cc/N2KP-VLKC (detailing investigations, negotiations, and lawsuits initiated by DOJ based on the 1957 and 1960 Civil Rights Acts).

While caselaw construing the records-inspection provision is sparse, the central litigation around it occurred in the Fifth Circuit soon after enactment. Those cases confirm that its aim was to facilitate DOJ protecting the right to vote against unlawful infringement and discrimination. *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962) (explaining that "one of [Title III's] clearest purposes . . . is to enable the Attorney General to assemble all of the voter record information within the time-reach of the statute relating to all persons as to whom there is a question concerning infringement or denial of their constitutional voting rights.") Repeatedly addressing the issue, the Fifth Circuit determined that the government is entitled to a court order authorizing it to inspect the voting records based on DOJ's "reasonable grounds for belief that certain voters are being discriminatorily denied their voting rights in a given county." *United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962). No court has suggested that the record-inspection provision is as sweeping and uncabined as the United States now claims.

Here, DOJ does not claim any civil rights-related purpose for its demands for voter-registration records. Instead, it has claimed that it is entitled to inspect registration records to determine compliance with HAVA—a statute that did not exist when Congress enacted the record-retention provision, and a statute passed under a different set of priorities and congressional authority. The Civil Rights Act does not authorize inspection for this purpose and Minnesota's refusal to produce records for a purpose outside the scope of the Civil Rights Act cannot give rise to a claim under that law.

## CONCLUSION

Because neither HAVA nor the Civil Rights Act support the United States' request for voter data, the United States failed to state any claims. The Court should dismiss the complaint in its entirety.

Dated: <u>December 23, 2025</u>   Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

s/**Angela Behrens**
ANGELA BEHRENS, No. 0351076
LINDSEY MIDDLECAMP, No. 0392589
ALLEN COOK BARR, No. 0399094
Assistant Attorneys General
445 Minnesota Street, Suite 600
St. Paul, MN 55101-2125
(651) 757-1204 (Voice)
(651) 297-1235 (Fax)
angela.behrens@ag.state.mn.us
lindsey.middlecamp@ag.state.mn.us
allen.barr@ag.state.mn.us

ATTORNEYS FOR DEFENDANTS

|#6196899