*Georgia registration statistics*—Continued

| County | Total population, 1950 | 1950, whites over 18 | Whites registered, 1958 | Percent whites over 18 registered | 1950, nonwhites over 18 | 1958, nonwhites registered | Percent nonwhites over 18 registered |
|---|---|---|---|---|---|---|---|
| Twiggs | 8,308 | 2,027 | 2,517 | 100.0 | 2,583 | 348 | 14 |
| Union | 7,318 | 4,245 | 4,944 | 100.0 | 0 | 0 | |
| Upson | 25,078 | 11,698 | 5,437 | 47.0 | 3,827 | 466 | 12 |
| Walker | 38,198 | 22,463 | 23,324 | 100.0 | 1,401 | 1,127 | 80 |
| Walton | 20,230 | 9,024 | 6,873 | 76.0 | 3,199 | 805 | 25 |
| Ware | 30,289 | 13,940 | 11,418 | 82.0 | 4,495 | 2,318 | 52 |
| Warren | 8,799 | 2,152 | 2,006 | 93.0 | 2,823 | 195 | 7 |
| Washington | 21,012 | 8,934 | 6,696 | 79.0 | 6,389 | 1,704 | 27 |
| Wayne | 14,248 | 6,659 | 7,931 | 100.0 | 1,649 | 1,439 | 87 |
| Webster | 4,081 | 949 | 934 | 98.0 | 1,296 | 0 | 0 |
| Wheeler | 6,712 | 2,808 | 3,157 | 100.0 | 1,084 | 435 | 40 |
| White | 5,951 | 3,296 | 3,932 | 100.0 | 193 | 189 | 98 |
| Whitfield | 34,432 | 20,291 | 15,920 | 79.0 | 865 | 857 | 99 |
| Wilcox | 10,167 | 4,003 | 3,059 | 76.0 | 1,836 | 230 | 13 |
| Wilkes | 12,388 | 3,634 | 3,364 | 93.0 | 3,734 | 290 | 8 |
| Wilkinson | 9,781 | 3,260 | 3,041 | 93.0 | 2,619 | 411 | 16 |
| Worth | 19,357 | 5,975 | 5,855 | 98.0 | 4,802 | 296 | 6 |
| Total | 3,444,578 | 1,554,784 | 1,127,939 | 72.5 | 623,458 | 158,082 | 25.3 |

Mr. JAVITS. Mr. President, I should like to finish my remarks, and then I will yield to my colleague from Illinois.

Mr. President, all this shows a pattern, in a number of our States, of deprivation of the right to vote. This, occurring in this day and age, is intolerable and unacceptable, in my opinion, to the American people.

I believe the outcome of this debate must be, inevitably, a law which will eliminate that kind of situation from our body politic. I deeply hope the Senators from each of the States affected will read carefully what is to be printed in the RECORD, again with a view toward telling us how they account for what has happened and what they think ought to be done about it, from their own points of view.

I now yield to my colleague from Illinois.

Mr. DOUGLAS. Would it be appropriate to put in the RECORD at this point a quotation from page 52 of the report of the President's Commission on Civil Rights, as follows:

The figures showing 16 counties where Negroes constituted a majority of the voting-age population in 1950 but where not a single Negro was registered at last report, and showing 49 other Negro-majority counties with a few but less than 5 percent of voting-age Negroes registered, indicate something more than the lower status and level of achievement of the rural southern Negro.

Mr. JAVITS. Mr. President, I wish to invite attention to the pertinent fact that in Alabama in 1950 the Negro voting age population of 516,245 comprised about 30 percent of the total voting age population.

According to the best information we can get, some 73,000 Negroes were registered to vote in 1958, or about 14 percent. Alabama has 67 counties. In 12 counties Negroes constituted a majority of the 1950 voting age population. In two of these counties no Negroes were registered to vote in 1958. In 7 of the other 10 counties, the number of Negroes registered to vote in 1958 was fewer than 5 percent of the county's 1950 voting age population.

At the time of the Alabama hearing before the Federal Civil Rights Commission, a total of 91 legally sufficient complaints had been received from 6 counties, all of which, except Montgomery County, contained majority Negro populations.

Mr. President, I have put that information into the RECORD to provide some color and climate to the nature of our debate and to indicate the urgency, in the fundamental interests of our people, of passage of a bill in regard to what we are discussing.

Mr. DOUGLAS. Mr. President, will the Senator yield?

Mr. JAVITS. I yield.

Mr. DOUGLAS. Will the Senator permit me to quote some figures from page 50 of the report of the President's Commission on Civil Rights. The Commission states that of the total 1950 voting age population of 1,208,063, 497,354, or 41 percent of the voting population, were nonwhite. In 1954, the total of nonwhite registered voters in Mississippi was 22,000, and this represented in that year 3.89 percent of the total 1950 population of voting age nonwhites. So approximately 4 percent of the nonwhites of voting age were registered.

Mr. JAVITS. I thank my colleague for bringing that to my attention.

Mr. KEATING and Mr. HART addressed the Chair.

Mr. JAVITS. I yield first to my colleague from New York, and then I will yield to my colleague from Michigan.

Mr. KEATING. It may well be what I mention is included in the compilation which the Senator is making a part of the RECORD, but whether it is or not, I think two of these items deserve special emphasis.

The first is the voucher system, which is in use at least in Alabama in cases even where registrars are properly functioning.

Under this system a person cannot vote unless he is accompanied by an already registered voter. So this process feeds upon itself. A registered voter can vouch for only two applicants a year; and in at least one county, Macon County, the evidence shows that in recent years not a single white elector has vouched for a Negro applicant.

That is the site of Tuskegee Institute, one of the fine educational institutions of this country, where the proportion of Negroes of age 25 and over who have at least a high school education is the highest of any in the State, and where the percentage of Negro residents holding college degrees is the highest in any of the States.

Let me touch upon one other matter, having to do with the State of Tennessee. In Tennessee, it is true that the intimidation of Negroes in voting has taken place in only three counties, which is a comparatively creditable performance. But I believe the evidence showed that in Fayette County in 1958 there existed a condition which should cause all of us, no matter what our position is on this issue, to be pretty disturbed.

When 12 Negro war veterans endeavored to register they were so intimidated when they appeared to vote that only 1 of the 12 actually voted, and he expressed doubt that his ballot was counted, because he believed that he had handed it to someone instead of dropping it in the box. Two of them were frightened away when some deputy sheriffs approached them. One was told by his banker that something might happen to him if he tried to vote. Another, who was in the hauling business, lost all his customers, and the police threatened to arrest any of his drivers found on the highway in his trucks.

These were men who had fought for their country, men who had fought side by side with their white brothers. When they sought to exercise their franchise they were deprived of that privilege.

I believe that that really distressing situation lends emphasis to the need for some Federal legislation to insure that those who fight for their country and are ready to die for their country should have the right to vote for those who are to conduct the affairs of their country.

Mr. JAVITS. I thank my colleague for his very eloquent and affirmative contribution.

Mr. HART. Mr. President, will the Senator yield?

Mr. JAVITS. I yield to the Senator from Michigan.

Mr. HART. First, let me express the belief that the statement made today by the senior Senator from New York is all to the good in the development of an understanding of the basic issues.

However, with respect to the point he now proposes, and is developing in preliminary fashion, namely, the best and most effective approach to the development of an instrument which will insure

Exhibit 4-1

the broadest possible participation at the ballot box by all our citizens, would it not be fairer to those of us who advocate civil rights legislation to insist at this point, at the very outset, that while we seek a device which is wholly constitutional and efficient, we seek a device aimed at mass disenfranchisement. What we are looking for is a device which will permit mass enfranchisement.

I ask these questions because early in the debate I sensed the development of the thought that if we could find a very refined, precise, and procedurally lengthy system, we would have found the ideal answer.

Is it not the belief of the senior Senator from New York that what we most need is the very simplest approach, which will permit mass enfranchisement, in the face of the figures which the senior Senator from New York and the Senator from Illinois introduced only a few minutes ago?

Mr. JAVITS. I think the Senator is absolutely correct, in that we need that element as one of our elements, but I am not satisfied that we need only that. Certainly we need a technique for mass enfranchisement, in view of the fact that mass enfranchisement has not been afforded by the States. But we also must take account of the fact that we have met mass resistance and mass disenfranchisement, which implies a determination to deny the right to vote somewhere along the line. Therefore we need a piece of machinery which will give us the degree of authority which will enable us to surmount the hard core of the problem.

I believe that the only wise solution, in which the remedy meets the difficulty, is the solution which has been proposed, of some capability for doing either, dependent upon the particular situation.

Mr. HART. I did not want the senior Senator from New York to take a final, ultimate position on the question of devices, but I wished to introduce very early the point that what we face is mass resistance and mass disenfranchisement, and that in evaluating the devices we should welcome one which would permit mass enfranchisement, and not reject it because it proposes mass enfranchisement.

Mr. JAVITS. I thank my colleague.

Mr. President, I was about to call attention to the activities of the Civil Rights Division of the Department of Justice, which were brought into issue last night by the distinguished Senator from Georgia [Mr. TALMADGE]. I shall address myself to that subject in a few minutes. I hope the attachés of the Senate will notify him, so that he may be present to hear what I have to say on the subject.

We have already discussed the matter of an official registrar, a device based upon widespread denials of voting opportunity. I should like to address myself to one other question which has arisen in this respect, and that is the destruction of voting records, which apparently needed the attention of the Civil Rights Commission, and also the Civil Rights Division of the Department of Justice.

CVI——232

As an example of what has occurred in that connection, although there is ample reference to it in the report of the Civil Rights Commission, I am informed of an Alabama law, 17 Alabama Code, 31, providing that voting registration records are not public records, and that registrars might dispose of records pertaining to unsuccessful applicants. We all know what that means. It means that it will be impossible ever to find the evidence of denial of a voting opportunity.

The administration's bill on this subject provides for the retention and preservation of voting records by Federal officials for 3 years, and makes it a crime willfully to destroy any such records. It would also give the Attorney General the right to inspect and copy such records upon written demand. This has been a very serious obstacle even to the administration of the Civil Rights Act of 1957.

Again I point to the general feeling, even among those most opposed to civil rights legislation, that the voting right should be assured. I can hardly see how the destruction of voting records can be condoned, or how anyone could condone denying to the Attorney General, or to a proper Government agency, the right to inspect them. So I believe that the case for this particular provision of the Dirksen substitute is absolutely unquestionable.

Mr. President, I shall wait until the close of my remarks to address myself to the questions raised by the two Senators from Georgia, and shall move on now to two of my final points on the whole question of legislation, one being the Commission on Equal Job Opportunity Under Government Contracts.

This was a part of the recommendations of the President of the United States to the Congress in his message of February 5, 1959. It is a part of the administration's package, and it should be enacted into law.

It seems elementary that where employment is afforded as a result of expenditure by the United States of money of the taxpayers, employment opportunities should be afforded equally, without regard to race, creed, or color.

Unless it be thought that this is a small matter, let us note that the United States executes about 3½ million prime contracts a year, expending about $15 billion in the process. I am informed that since August 1953, when the present Committee on Equal Job Opportunity Under Government Contracts—now headed by Vice President NIXON—was created, it has received about 1,000 complaints.

It has endeavored to do its best by adjusting complaints, largely through the process of conference and mediation.

The lack of a statutory base results in the committee having no real staff of investigators or attorneys, and must rely for its compliance work almost solely upon the contracting agencies, and having a status which can always be questioned by anyone who deals with it. There are no sanctions for noncompliance insofar as the committee is concerned, except the potential risk of a noncomplying contractor being barred from any Government business.

Mr. TALMADGE. Mr. President, will the Senator yield?

Mr. JAVITS. I yield.

Mr. TALMADGE. I regret that I was not on the floor throughout the Senator's address this morning. The Senator stated that he would be prepared to submit this morning in his address the names of people who were legally qualified to vote, had attempted to assert that right in either State or Federal courts, or both, and had been denied their right to do so. Is the Senator prepared to submit any names this morning?

Mr. JAVITS. I am glad the Senator from Georgia is on the floor. I should like to read his question, and then I shall answer it. I refer now to page 2870 of the CONGRESSIONAL RECORD for February 18, 1960, in which the Senator from Georgia asked:

> At this time I should like to ask, if the Senator will permit me to do so, one more question of the Senator from New York: Does the Senator from New York know the name of any qualified individual, anywhere—North, South, East, or West—who claims the right to vote, and has instituted an action in the courts, either State or Federal, and has not been protected in the exercise of that right?

I should like to refer my colleague to the following matters:

In *Sellers* v. *Wilson* (123 F. Stat. 917), decided in Alabama in 1954, four Negroes sued the county board of registrars for a judgment declaring their alleged policy, custom, and usage in refusing to register them because of race or color was unlawful, and asking for a permanent injunction and money damages.

The finding of the court is as follows:

> The supreme law of this Republic is that no tests can be required of a Negro applicant as a prerequisite to registration as a voter that is not required of a white applicant; therefore, let no board of registrars try to devise any scheme or artifice to do otherwise.
>
> The plaintiffs have proven no money damages on account of the illegal and wrongful accounts of these defendants and therefore no award of money damages is made.
>
> By virtue of their resignations as members of the Board of Registrars of Bullock County, Ala., these defendants are now beyond the vale of an injunctive directive from this court in this matter; however, the court retains jurisdiction of the case and will grant the injunctive relief prayed for in plaintiff's petitions in the event either or all of these defendants again become members of this board.

Therefore, Mr. President, I state that, as shown by the case of Sellers against Wilson in these particular pleadings, four Negroes, fully qualified to vote, were frustrated in their right to vote because the court process could not reach an election board which resigned rather than give them the right to vote.

If the Senator wishes me to stop at each case, I will be glad to stop, or I will submit the other cases for the RECORD.

Mr. TALMADGE. The Senator points out, as I understand, in that particular observation, four cases. And the reason therefor is because no registrars are

Exhibit 4-2

available to be sued? Is that the Senator's statement?

Mr. JAVITS. That is correct.

Mr. TALMADGE. Does the Senator have any more than these four individuals, of the 180 million Americans, who come in the same category?

Mr. JAVITS. It seems to me, if I might answer, that I have already fully complied when I named one, because the Senator from Georgia said "Does the Senator from New York know the name of any qualified individual anywhere"— "any qualified individual anywhere," and my answer was that I knew that there were such cases, and that I would dig into them. Now I have produced four qualified individuals. I will go further; but that is enough.

Mr. TALMADGE. 4 out of 180 million.

Mr. JAVITS. It does not make any difference whether it is 4 out of 2½ billion. The Senator has asked for it, and I have produced it.

Mr. TALMADGE. I am very happy the Senator has produced the four. Would the Senator take the position, because there are four rapists or four murderers or four citizens anywhere in America who have violated the law, that we ought to send the U.S. Marines up there to see that the law is enforced?

Mr. JAVITS. The Senator from New York has just put into the RECORD facts and figures, of which the Senator from Georgia is fully aware, as is also the Senator from New York, of the widespread disenfranchisement in other areas of the South of Negroes by various devices, as found by the Civil Rights Commission to be recorded in many cases.

The Senator from New York was only addressing himself to this particular point, to this one question, which he tried to answer in all honesty, where the Senator from Georgia affirmed that I could not find the answer. I do not know whether the Senator really believed I could not find a case in which qualified voters were denied the right to vote. But I have produced such a case, for whatever it means. I think what it means is that it bears upon the fact, and I think it bears upon the fact with reasonable importance, though I believe the Federal Civil Rights Commission's findings are much more important, and cover much more ground; but I think it bears upon the fact that here is an example of how the right to vote was frustrated, though it is an individual case.

Mr. TALMADGE. Mr. President, will the Senator yield?

Mr. JAVITS. I will be happy to yield in just a minute.

True, it is an individual case. True, there are four people. But I was addressing myself to the particular challenge which the Senator from Georgia made. And I respectfully submit, citing even one case, though I have a few others, I have met the issue which was posed to me by the Senator from Georgia.

Mr. TALMADGE. Mr. President, will the Senator yield at this point?

Mr. JAVITS. I yield.

Mr. TALMADGE. Would the Senator also deal in his statement this morning with the alleged hundreds or thousands of Puerto Ricans in New York State who have been disenfranchised?

Mr. JAVITS. I am very happy to state to the Senator that the Senator from New York would be willing to restate what he had discussed with the Senator from Georgia on a previous occasion about Puerto Ricans in New York, and to point out that they are not disenfranchised, but that they are enfranchised equally with whites; and that the only complaint which we can make as the basis for legislation by the Congress is the fact that the laws of the States are not being equally applied. That is what the Federal Civil Rights Commission found. So that I, as a matter of fact, took the precaution, when I introduced the parts of the Federal Civil Rights Commission's report, to introduce the material about New York at the same time.

Mr. TALMADGE. Is it the position of the distinguished Senator from New York that New York State is competent to handle its qualifications statutes?

Mr. JAVITS. I believe New York is competent to handle its qualification statutes. But I believe that New York, like any other State, should be subject to Federal law and scrutiny by the Federal Government where it denies equal opportunity under its own laws to any of its citizens, whatever may be their color. I would accept it for New York, just as I would hope that every southern Senator would accept it for his State, where a violation of basic civil rights is so clearly shown.

Mr. TALMADGE. I agree with the distinguished Senator that New York State is thoroughly competent to handle its qualification of voters. But I would like to state that the other 49 States are equally competent to do so. Is it the Senator's premise that some States are denying this right and, because of that fact, the Federal Government ought to move in and take charge of their election machinery and control it?

Mr. JAVITS. It is my contention that the Federal Government has a right to see that the 15th amendment and the 14th amendment are living and expressive bodies of law, and also that in the elections of Federal officials, like Senators and Representatives, then give every individual who has the qualifications the right to vote. I think that is a duty of the Federal Government, and I do not believe that that constitutes taking over the elective machinery or putting the United States in the place of the States. I believe it refers only to that balance between the powers of the Federal and the State governments, powers which are inherent in the whole security of our Nation.

Mr. TALMADGE. Mr. President, will the Senator yield further at that point?

Mr. JAVITS. Certainly.

Mr. TALMADGE. Would the Senator under that premise think, then, that it was appropriate and proper, if there were a pattern of crime or violence in any particular area of our country, and law and order had broken down, for the Federal Government to move in and take charge of the situation?

Mr. JAVITS. Again the Senator refers to the degree of balance between the Federal and State Governments, and I should like to point out to the Senator that the Federal Government did send troops into Little Rock to suppress a situation of disorder and anarchy. But even the great heroes of the Southern States, like some of our former Presidents, were compelled to use Federal troops in situations of this character, in the South and elsewhere, when problems had gotten beyond the control of local officials.

Again, this is one of the prices which the State pays for the Federal Union. And this involves the balance of powers we all talk about. We accordingly accept it as part of our great democracy, and that is what I am talking about in regard to this voting legislation.

Mr. TALMADGE. Would the Senator yield at that point?

Mr. JAVITS. I yield.

Mr. TALMADGE. Would the Senator think, under that premise, if a pattern of rape or violence or suicide or murder were existing in public schools anywhere in our country, to the extent that it required armed police to protect the teachers and to protect the pupils, that the President ought to send the U.S. Marines to preserve order in such a school?

Mr. JAVITS. The Senator knows very well, being a very competent lawyer, just what are the requirements for the invocation of the Federal power with respect to public disorder or anarchy in a particular community. I think I have made my views on that subject very clear. The Senator knows, as well as I do, that we cannot make the generic decisions such as he would like to have me make upon this subject, because it depends strictly upon the extent to which public order is broken down and whether it has reached the point where the constitutional authority of the United States would be properly applicable.

Mr. TALMADGE. What I am trying to say to the Senator is that I feel that no area of our great country is completely free of crime. We do not live in a utopia. No laws are enforced 100 percent.

But if we are to start casting stones at one great region of our country, when that region has proven itself capable of self-government, I say the Senator lives in a glasshouse, and he ought to be the last man on the floor of the Senate to cast stones of aspersion at any other region of the country about the lack of law enforcement in that area of the Nation.

Mr. JAVITS. The Senator from New York will state that he has no desire to cast either stones or aspersions, but only to look at the record. The record is very clear. And, for whatever it means, I have invited individual Senators from the States which are affected, and the facts about which are set forth in the Federal Civil Rights Commission's report, to tell us what they think ought to be done about the conditions. And I point out to my colleague from Georgia that the 15th amendment, which was adopted

Exhibit 4-3

by the United States as a very hallowed part of our Constitution, specifies voting, speaks of it in so many words. And it does seem to me that we, as a Congress, are here to see that the promises of our Constitution are redeemed. And I certainly made a promise to the people of the United States of the most solemn kind in respect to voting rights.

Mr. TALMADGE. Would the Senator permit me at this point again to ask for unanimous consent to insert in the RECORD 10 full pages of laws, in addition to the Civil Rights Act of 1957, which afford the Federal law guaranteeing the right for any citizen of America to vote under any conditions?

Mr. JAVITS. I have no objection whatever to the introduction by the Senator of that material.

Mr. TALMADGE. There are laws in abundance on that subject. If anyone has been illegally denied his right to vote, he has a remedy in the State court, and he has a remedy in the Federal Court. Those courts are adequate and afford penal remedies, such as fines, and civil remedies, as well.

If in any area of our country any citizen has been deprived of the right to vote, all the Attorney General needs to do is to invoke criminal penalties and move into the case, and action can be obtained immediately.

The Senator from New York is an able lawyer. I believe he knows that these 10 pages of laws, plus the Civil Rights Act of 1957 afford any citizen in this great country adequate remedies to protect his right to vote.

Mr. JAVITS. Obviously the remedies are inadequate, because hundreds of thousands of Americans are denied their right to vote. The Attorney General himself has asked for additional law. The President has asked for additional law. If once we take the position that all the statutes on the books are sufficient, what are we doing here? We are passing laws every day to deal with matters which appeal to us as requiring law, notwithstanding the fact that there is other law on the statute books.

Mr. President, I should like to include three cases relating to the idea that an individual who is qualified to vote only has to sue to get his right to vote. Another case is the *United States* v. *Raines* (172 F. Supp. 552), a case in which the Civil Rights Act of 1957 itself was declared unconstitutional. In that case, four school teachers in the Georgia school system, all graduates of Georgia colleges, and one having a master of arts degree from New York University, were declared unable to pass the literacy tests of the State of Georgia. That matter is before the Supreme Court of the United States.

The third case——

Mr. TALMADGE. Mr. President, will the Senator yield at that point?

Mr. JAVITS. I yield.

Mr. TALMADGE. Mr. President, I ask unanimous consent to have printed at this point in the RECORD the complete decision of the Federal district judge holding that particular phase of the Civil Rights Act of 1957 unconstitutional.

Mr. JAVITS. I have no objection to that.

There being no objection, the decision was ordered to be printed in the RECORD, as follows:

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE MIDDLE DISTRICT OF GEORGIA, AMERICUS DIVISION—UNITED STATES OF AMERICA, PLAINTIFF *v.* JAMES GRIGGS RAINES, DIXON OXFORD, ROSCOE RADFORD, REGISTRARS OF TERRELL COUNTY, GA.; F. LAWSON COOK, SR., AND MRS. F. LAWSON COOK, SR., DEPUTY REGISTRARS, DEFENDANTS—CIVIL ACTION No. 442

ORDER DISMISSING COMPLAINT

In accordance with the opinion filed in the above stated case on this date, it is hereby ordered and adjudged that the complaint in said cause be and the same is hereby, dismissed. Costs are taxed against the United States.

This the 16th day of April 1959.

T. HOYT DAVIS,
*U.S. District Judge.*

District Judge DAVIS. This is an action instituted by the Attorney General of the United States in the name of and on behalf of the United States under the provisions of the Civil Rights Act of 1957. The complaint is one seeking preventive relief against the alleged deprivation of voting rights of certain named persons on account of their race or color. The action is brought against James Griggs Raines, Dixon Oxford, Roscoe Radford, registrars of Terrell County, Ga., F. Lawson Cook, Sr., and Mrs. F. Lawson Cook, Sr., deputy registrars of Terrell County, Ga. It is alleged that these defendants have engaged in wrongful acts and practices, which will deprive otherwise qualified persons of the right to vote because of their race or color. No attack is made upon any State law, but rather, it is alleged that the wrongful deprivation of voting rights will result from the improper and wrongful administration of the Georgia registration laws by the named defendants. It is against this allegedly wrongful administration of the registration laws that this complaint seeks relief.

The complaint was filed on September 4, 1958. On September 23, 1958, a motion to dismiss said action was filed on behalf of all named defendants. This motion was set down for hearing in Americus, Ga., on January 26, 1959. Briefs were subsequently filed by counsel for all parties. Reply briefs and supplemental briefs were likewise filed. The court has given careful consideration so the pleadings, oral arguments and extensive and exhaustive briefs filed with the court.

The motion to dismiss is based primarily upon four main grounds. The first is the unconstitutionality of the section authorizing the Attorney General to file this action. This contention is grounded on two arguments. The defendants argue that the sections involved are not appropriate legislation within the meaning of Section 2 of the 15th amendment to the Constitution of the United States. Secondly, they urge that Congress had no authority to authorize the Attorney General to file a suit of this nature, since it is neither an action in law or equity. This deals in part with the authority of Congress to authorize the grant of an injunction without regard to exhaustion of other available remedies. The second main ground of the motion to dismiss is the failure of the complaint to state a cause of action under the Civil Rights Act of 1957, even if constitutional. The third ground asserts that the cause should be dismissed by the court in the exercise of its sound discretion. Because of the court's ultimate judgment in this matter and to facilitate clarity of presentation, these grounds will be considered in reverse order.

In the third ground of their motion, the defendants argue that the court should exercise its discretion and deny the relief sought, even though it be decided that the act under which it is brought is constitutional and the complaint states a cause of action under the statute. In support of this ground, it was pointed out that no emergency existed, such as that contemplated by Congress when this act was enacted. Though a general election was held in Georgia in November 1958, this complaint did not seek a temporary restraining order, or any other remedy which might have enabled the allegedly wronged parties to vote in that election. It seeks instead to secure an injunction at a time when the next scheduled election is over a year in the future. The defendants argue that the State can afford the desired remedy prior to any election and that no such emergency exists as would justify this court's intervention.

While some of the language of the congressional hearings does indicate that this remedy was primarily designed for emergency use, the wording of the statute imposed no such limitation. This court cannot so limit the applicability of the statute. Similarly, the failure of the complaint to seek such relief as might have protected the voting rights of the allegedly wronged parties prior to the November election does not impede the operation of the statute. It may raise some question as to the motive of the litigation, but the court without hearing any of the evidence would not be disposed to dismiss the proceedings in the exercise of its discretion. It is true that equitable relief may be denied in the exercise of the court's discretion, but it should be a discretion informed by evidence. The court is of the opinion that, based on the complaint alone, it is not in possession of sufficient facts to dismiss the complaint in the exercise of its sound discretion.

The Court next comes to a consideration of the question of whether or not this complaint states a cause of action under the provisions of 42 U.S.C. 1971. The complaint alleges that the defendants, as individuals, acting in the exercise of their State given authority as registrars and deputy registrars of Terrell County, Ga., engaged in certain acts and practices, designed and intended to deny otherwise qualified persons the right to vote because of their race and color. It is alleged that they delayed handling of Negro applications for registration, arbitrarily refused to register Negroes who demonstrated their qualification to vote, and for purposes of discrimination, applied more difficult and stringent registration standards to Negro applicants than to white applicants.

It is further alleged that registration is a legal prerequisite to voting in Georgia, and that this discrimination in administration of registration procedures was on account of the race of the applicants.

There can be no question but that these allegations are sufficient to bring the allegedly wrongful conduct of the defendants within the coverage of 42 U.S.C. 1971. Whether that statute be construed as one limited to State action, as argued by the United States, or as extending to purely individual action, as contended by the defendants, the language of the complaint would state a cause of action. It alleges that these defendants have engaged in certain acts or practices which will deprive others of their right to vote, when otherwise qualified, without distinction as to race or color. The acts and practices alleged are those of the defendants while acting (even though wrongfully) in the exercise of State given authority. Thus, under any reading of the statute, the facts alleged make out a cause of action.

So it is, that this is not a case such as *Collins* v. *Hardyman* (341 U.S. 651) where the

Exhibit 4-4

court can avoid the question of constitutionality. Having determined that none of the other grounds of the motion to dismiss are valid, the court now passes to the final and most important point raised by that motion; to wit, the constitutionality of the act under which this action is brought.

The first prong of the constitutional attack on the statute questions the authority of Congress to authorize the Attorney General to bring an action in this court, which is neither an action in law or equity. It is urged that this is not a legal action, seeking as it does injunctive relief. On the other hand, it is argued that it is not an equitable action, since it violates one of the oldest rules of equity, the unavailability of the injunctive process where other legal remedies are available. The defendants thus contend that this is neither a suit in law or equity, and that Congress had no right to authorize it. This court cannot accept this contention.

While a court may question the wisdom of overruling an old and well-established maxim of equity, the court knows of no limitation on the powers of Congress to legislate in this field. The fact that Congress in subsection (d) of section 1971 provided that the courts shall exercise that jurisdiction "without regard to whether the party aggrieved shall have exhausted any administrative or other remedies that may be provided by law," does not change the nature of this action from one in equity. It merely provides that in such an equitable proceeding a certain well-established principle shall not be applicable. The court knows of no limitation on the rights of Congress to so legislate. It is well known that the Federal courts have often refused to act because the complainants had failed to exhaust their other remedies (*Peay v. Cox*, 190 F. 2d, 123, 125 (5th Cir.)). This rule, however, could hardly be applied where Congress has expressly directed the courts to exercise their jurisdiction without regard to such fact.

The defendants contend that such a limitation of the court's exercise of their jurisdiction is an invasion by the legislative branch of matters properly committed to the judicial branch and thus violative of the separation-of-powers doctrine. The court is far from convinced as to the soundness of this argument, but has not explored it extensively because it does not seem necessary, in view of the ultimate disposition of this motion.

This brings us, finally, to what appears to be the most substantial contention of the defendants; that is, that 42 U.S.C. 1971 is not appropriate legislation within the meaning of section 2 of the 15th amendment and exceeds the jurisdiction of the Congress.

It should be noted at the outset that this action is one brought by the Attorney General in the name of and on behalf of the United States. It is not an action by the allegedly wronged party under the provisions of 42 U.S.C. 1983, and differs materially from those cases. In that type of case, the "self-executing ban" of the 15th amendment proscribes certain conduct and section 1983 provides a remedy therefor, without resort to 42 U.S.C. 1971. It was the availablity of this "self-executing ban" which has heretofore allowed the Supreme Court to apparently bypass a clear ruling on the constitutionality of section 1971–(a) *Terry v. Adams*, 345 U.S. 461, 481).

In the instant case, however, the Attorney General has no standing for the bringing of this action, except the recently enacted provisions of section 1971. Any right that he has to seek preventive relief, where citizens allegedly have been or about to be denied their right to vote on account of race, is based on section 1971 (c). Prior to its enactment, such an action could not have been entertained. Thus, it is that the question of the constitutionality of that section cannot be sidestepped or bypassed. Due to the wording of subsection (c) of the statute and the way in which it is tied to subsection (a), the latter must also be given its first really critical examination.

As originally enacted and as it remained on the statute books of this country from 1870 until 1957, the present subsection (a) (formerly section 1971 in its entirety) was merely a general statement of principle or of rights, without providing any sanction or remedy for its violation (*U.S. v. Reese*, 92 U.S. 214; *U.S. v. Cruikshank*, 92 U.S. 542). For this reason, no action could ever be based upon this section alone. Many actions were filed under sections 1983 and 1971, relying also on the 15th amendment. It will be noted that in any suit filed under section 1983 there could be no question such as is here presented, since section 1983 is applicable only to persons acting "under color of any statute, ordinance or regulation, custom or usage, of any State or territory." By its unmistakably clear language, section 1983 did not authorize any action for purely private acts, even though such practice resulted in a person being deprived of the right to vote on account of his race.

This brings into focus the question which is now presented for determination by this court. Under section 1971, as passed in 1957, is the Attorney General permitted to institute proceedings for preventive relief, where the alleged wrongful deprivation is that of a private citizen, not a State officer, not acting under color of any State law, custom, or usage?

In considering this question, we must close our mind to the allegations of the complaint in the instant case. The question is not what the Attorney General has done here, but what Congress has authorized him to do. As was clearly demonstrated in the case of *United States v. Reese et al.* (92 U.S. 214), where a statute is enacted in general terms sufficiently broad to apply to wrongful acts, outside as well as within the constitutional jurisdiction of Congress, such a statute cannot be limited by judicial construction so as to make it operate only on that which Congress might rightfully prohibit. "To limit this statute in the manner now asked would be to make a new law, not to enforce an old one" (ibid). It is well to note that the Supreme Court was there considering one section of the act of 1870, of which section 1971(a) was a part.

Thus, it is not for this court to decide whether this particular fish is properly within the net, but whether the net is so large as to catch many fish not properly within it.

It is clear beyond question, that the 15th amendment to the Constitution relates "solely to action by the United States or by any State and does not contemplate wrongful individual acts." *James v. Bowman*, 190 U.S. 127. The statute which is here under consideration, as did the one in the above cited case, "on its face * * * purports to be an exercise of the power granted to Congress by the 15th amendment." The Government of the United States is one of delegated, limited, and enumerated powers. Therefore, every valid act of Congress must find in the Constitution some warrant for its passage" (*US. v. Harris*, 106 U.S. 629). The power of Congress to legislate at all upon the subject of voting at State elections rests upon the 15th amendment. Prior to its enactment there was no constitutional guaranty against discrimination on account of race, color, or previous condition of servitude (*U.S. v. Reese*, et al, 92 U.S. 214).

Thus, it will be seen that, if section 1971 (c) is constitutional, it is because of the power given Congress by the 15th amendment. As stated, that amendment relates solely to action by the United States or by any State and does not contemplate wrongful individual acts. The Court is mindful, of course, of the cases holding that a State acts through its lawfully constituted officials and that action by one exercising his State-given authority (even though wrongly exercising it) constitutes State action. Thus, for present purposes, it will be assumed that the 15th amendment authorizes Congress, by appropriate legislation, to prohibit and punish deprivation of voting privileges on account of race or color by any State or by the officers of any State while in the exercise of State-given authority. It does not, however, authorize Congress to prohibit or punish purely individual and private action depriving another of his right to vote on account of his race or color.

This brings us to the meat of the controversy here: What does section 1971(c) seek to do? Is it limited to State action, as previously defined, or is it sufficiently broad to encompass wrongful action by individuals?

In determining the scope of section 1971 (c), the court must first consider the language of that section. Is there any limitation within the section itself? The section, as enacted in 1957, reads, as follows:

"Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b) of this section, the Attorney General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order. In any proceeding hereunder the United States shall be liable for costs the same as a private person" (42 U.S.C. 1971(c)).

It will be noted at the outset that the section itself includes no limitation as to the persons subject to suit under it. It includes any person engaging in or about to engage in a certain type of conduct. By its own terms the section is applicable to any person engaging in the type of action described herein. Thus, it follows that the only limitation, if any there be, must come from the act or practice described therein. In other words, any person capable of engaging in the type of act or practice described would be subject to suit by the Attorney General. If any person other than one clothed with State authority can engage in such act or practice, then the section is broad enough to allow suit against him and is not limited to State action. It will be particularly noted that the section makes no reference to color of law, a phrase with which the Congress is very familiar, having used it in other sections of this, as well as other civil rights acts. More will be said about this later.

Now, what is the proscribed act or practice which brings this section into play? It is not any act or practice which would deprive another of his rights under the 15th amendment. If that were the language, there could be no doubt about its limitation to State action, since a private citizen acting individually cannot deprive another of his rights under the 15th amendment. As argued in *James v. Bowman* (190 U.S. 127, 135), a statute in such general language aimed only at such acts as deprived another of whatever rights he had under the 15th amendment could not be unconstitutional. It would just be up to the courts then to determine in each case whether or not the statute applied to the conduct alleged in the complaint. The statute itself would proscribe only that which violated the amendment. Any set of facts falling short of a violation of the amendment would not state a cause of action under the statute.

Here, however, Congress did not so limit the statute. The action proscribed therein is "any act or practice which would deprive any other person of any right or privilege

Exhibit 4-5

secured by subsection (a) or (b) of this section." Again we come to the question: Can any person other than one clothed with the authority of the State engage in such an act or practice? To properly determine that, we must first determine what rights and privileges are secured by subsection (a) of section 1971. (All parties concede that subsection (b) is not here involved.)

Subsection (a) of 42 U.S.C. 1971 was originally passed in 1870, as a part of what was known as the Enforcement Act, consisting of 23 sections. It was enacted soon after the adoption of the 14th and 15th amendments. It was in some respects a sort of preamble to the Enforcement Act, in that it merely stated a right or privilege, while the sections that followed it sought to establish remedies for specific violations of civil rights. The section, as originally enacted, was reenacted in 1957 as subsection (a) of section 1971. Theretofore it had been the entire section.

The subsection reads as follows:

"All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding" (42 U.S.C. 1971 (a)).

Now, what is the right or privilege secured by this subsection? In this court's opinion, it is the right and privilege of all persons otherwise qualified to vote to be entitled and allowed to vote, without distinction of race or color and to effectuate this right, all State constitutional provisions, laws, customs, usages, and regulations to the contrary are expressly set aside.

But, this right to be entitled and allowed to vote, as stated, is not simply the right to be free of State interference but is the right to be free of interference from any source on account of one's race or color. It may be that the word "entitled," as used, carries with it some idea of State action only, since entitlement to vote can come from the State alone and can be denied only by the State, acting through its officials. Entitlement is a legal status, which can neither be conferred nor denied by a private citizen. But the phrase "allowed to vote" carries with it no such idea of State action or legal status. It denotes the physical action of voting and it may be interfered with or denied to another by any person—State official or private citizen. A person who is kidnaped at the polls and spirited away has been denied his right to be allowed to vote. One who is prevented from voting through threats or intimidation has been denied his right to be allowed to vote, just as completely as if the poll manager had refused to accept his ballot. It thus appears to this court that the right secured by this subsection is such a right of which a person can be deprived, by the act or practice of any other person—State official or private citizen.

This view is strengthened by a look at the other provisions of the Enforcement Act of 1870, of which this subsection, verbatim, was the first section. As previously stated, it was a sort of preamble to that act, in that it stated general principles while the following sections contained the "teeth."

The court feels that it is, therefore, proper to consider the fact that in section 5 of the Enforcement Act of 1870, Congress made it a crime for any individual to hinder, control, or intimidate others by bribery or threats from exercising their right of suffrage guaranteed by the 15th amendment. While this section was declared unconstitutional in the case of *James v. Bowman* (190 U.S. 127), on the same grounds here urged, and is no longer on the books, it does have some bearing, in that it reflects the thinking of the Congress which originally enacted this legislation. In this court's opinion, the imposition of a criminal sanction, for purely private and individual action, indicates that the previous general statement of principle and rights was sufficiently broad to include the right to be free from private as well as State interference.

It is of interest to note that sections 3, 4, and 5 of the act of 1870 have since been declared unconstitutional as in excess of the jurisdiction conferred upon Congress by the 15th amendment. This, to say the least, waters down considerably any presumption that Congress on this occasion was acting within the scope of its legislative authority. Any such presumption is further weakened by the principle that the Government of the United States, being a Government of limited and enumerated powers, every valid act of Congress must find in the Constitution some warrant for its passage (*U.S. v. Harris*, 106 U.S. 629, 636).

In carefully scrutinizing this passage, in order to determine whether the right therein declared is limited to the right to be free from State discrimination, the court is impressed with the reasoning of the dissenting opinion of Justices Burton, Black, and Douglas, in the case of *Collins v. Hardyman* (341 U.S. 651, 663, 664), wherein it was stated: "The language of the statute refutes the suggestion that action under color of State law is a necessary ingredient of the cause of action which it recognizes. R.S. section 1980(3) speaks of 'two or more persons in any State or territory' conspiring. That clause is not limited to State officials. Still more obviously, where the section speaks of persons going 'in disguise on the highway * * * for the purpose of depriving * * * any person or class of persons of the equal protection of the laws,' it certainly does not limit its reference to actions of that kind by State officials. When Congress, at this period, did intend to limit comparable civil rights legislation to action under color of State law, it said so in unmistakable terms."

It is the opinion of this court that this statement applies with equal force to subsections (a) and (c). In 1870, when (a) was first enacted, and in 1957 when (c) was enacted, Congress in other and similar legislation demonstrated its ability to limit such legislation to State officials by the use of clear and unequivocal language. The terms "under color of law" was employed in subsection (b) of the act of 1957. Other sections of the act of 1870 employed the phrase "whenever, by or under the authority of * * * of any State."

It is interesting to note, in this connection, that the complaint of the United States in this case defines the rights and privileges secured by subsection (a) of the statute in paragraph 1, in the following language: "The right and privilege of citizens of the United States who are otherwise qualified by law to vote at any election by the people in the State of Georgia to be entitled and allowed to vote at all such elections without distinction of race or color."

This statement of the right secured completely omits any reference to State constitutions, laws, usage, custom, or regulations. The right is similarly defined in the majority report of the House committee which recommended passage of the act (House Rept. No. 291, United States Code Cong. and Admin. News, 85th Cong., 1st sess., 1957, p. 1977).

The language of the subsection following the semicolon; to wit: "Any constitution, law, custom, usage, or regulation of any State or territory, or by or under its authority, to the contrary notwithstanding," was not intended to qualify and limit all that had gone before it in the section. To so hold would mean that even direct and positive State action of discrimination in voting rights on account of color could not be reached under this statute, unless the State action was based on some constitutional provision, law, custom, usage, or regulation. Clearly, this was not intended when the section was reenacted by Congress in 1957. This point is supported by the testimony of Attorney General Brownell during the House hearings on the Civil Rights Act of 1957, wherein he stated:

"For example, if you have a registrar of voters who arbitrarily strikes off several thousand names of Negro voters shortly before the deadline for qualification of voters and gives no hearing to them or an inadequate hearing, then I would think that would be a case that would alert the Attorney General under this bill to the need for some injunctive action, which would give those people their day in court and allow them, like any other citizen, the right of franchise" (hearings of subcommittee of House on the Civil Rights Act of 1957, Serial No. 1, p. 601).

Clearly, it could not be argued that such conduct by one registrar in contravention of State law was based on any constitutional provision, statute, usage, custom, or regulation. An isolated example could hardly be termed a State custom or usage. Congress did not intend to so limit the application of this section. If it was not an absolute limitation as written, it could hardly be reworded by the courts to limit the section to a deprivation of voting rights by State officials only.

It may be argued, and has been, that the reliance on this section over the years proves its constitutionality. In viewing this contention, it must be remembered that this section was in no wise remedial. It was relied upon only in cases brought under remedial statutes, which included the term "under color of statute, ordinance, regulation, custom, or usage, of any State or territory," and other similar language. When the two sections were construed together * * * individual action. Thus, there was no reason for any attack on subsection (a). Now, however, Congress seeks to tie together two sections, neither of which is limited to State action or action by State authority. This it cannot do. When linked with a remedial statute properly limited, subsection (a) is harmless. But, when linked, as here, with a remedial section which uses the phrase "any person," it renders the remedial section beyond the jurisdiction of Congress and unconstitutional.

Subsection (c) creates a remedy against purely private, as distinguished from State, deprivation of voting rights on account of race or color. The fact that the instant case is a suit against State officials cannot alter the scope of the statute. This illustrates the danger of this type of legislation, which danger was recognized as early as the case of *United States v. Reese, et al.* (92 U.S. 214). There the Court held: "We are, therefore, directly called upon to decide whether a penal statute enacted by Congress, with its limited powers, which is in general language broad enough to cover wrongful acts, without as well as within the constitutional jurisdiction, can be limited by judicial construction, so as to make it operate only on that which Congress may rightfully prohibit and punish. For this purpose, we must take these sections of the statute as they are. We are not able to reject a part which is unconstitutional and retain the remainder, because it is not possible to separate that which is unconstitutional, if there be any such, from that which is not. The proposed effect is not to be attained by striking out or disregarding words that are in the section, but by inserting those that are not now there."

It is true that there the court was dealing with a penal statute. Here we are dealing with a statute authorizing an injunction,

Exhibit 4-6

3688            CONGRESSIONAL RECORD — SENATE            *February 27*

violation of which may carry its own penalty. The same principle would seem applicable.[1] When a person is enjoined from violating a statute, he is entitled to know what that statute proscribes, without awaiting the finality of an authoritative court opinion.

As stated in the Reese case, supra: "It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."

That this is exactly what this section seeks to do is demonstrated by the testimony of Attorney General Brownell in the Senate hearings before the Subcommittee on Constitutional Rights while considering the Civil Rights Act of 1957. On page 25 of those hearings, Mr. Brownell testified: "These sections 4 and 5" (subsections (c) and (d) of the law as enacted) "are added here as machinery to enforce whatever the constitutional authority of the Federal Government may be in this area, and does not add to the substantive provisions of the statute."

Again, at page 51, he testified: "Our guiding principle will be that only those statutes, parts of statutes that are constitutional, would be enforced by us, and we would not act in anyway contrary to a Supreme Court opinion which holds that a statute or any part thereof that is unconstitutional." This indicates that the statute as written is sufficiently broad to include unconstitutional matter, but that the Attorney General expressed his intention of administering it in such a way as to seek no unconstitutional relief. While this is a noteworthy sentiment, the tenure of the Attorney General being what it is, the courts can hardly rely on his intentions as to the administration of an act which in itself would support the grant of unconstitutional relief, if requested.

The court has explored this question with particularity, because it is not unmindful in the least of the seriousness of the problem. This court has never and shall never condone wrongful deprivation of the constitutional rights of any person by a State official or a private citizen. On the other hand, this court is also sensitive to the dual sovereignty system of government under which we operate and is sincerely devoted to its preservation.

It is this court's considered opinion that this statute would allow the Attorney General to seek an injunction against a private citizen for an individual act, divorced completely from State action. It is the province of the several States to protect the rights of one citizen against the wrongful practices of another person (*James* v. *Bowman*, 190 U.S. 127). Congress should not be allowed to extend the authority of the Federal Government into this field. This it has tried to do. The court is of the opinion that, if Congress intended only to authorize the Attorney General to enjoin or seek preventive relief against wrongful State action, it could easily have been accomplished, without resort to such confused legislation. Similar, if Congress wishes to leave the courts some latitude in determining what may and what may not be enjoined, this may be accomplished by tying the remedy directly to the 15th amendment, rather than to another section, the constitutionality of which is far from clear.

For the reasons set forth above, the court concludes that section 1971(c) of title 42 is beyond the jurisdiction of Congress and unconstitutional. It is not appropriate legislation within the meaning of section 2 of the 15th amendment to the Constitution of the United States. There existing no other basis for an action by the Attorney General in the name of the United States seeking the remedy here sought, the motion to dismiss should be, and the same is hereby, granted.

Mr. JAVITS. Mr. President, the next case is that of *Gomillion* v. *Lightfoot* (270 F. 2d 594).

This is a famous case in Alabama, decided in 1958. It is the result of the gerrymandering, as the curbstone saying goes, by the Alabama Legislature of the boundaries of the city of Tuskegee, the city, as my colleague from New York [Mr. KEATING] has just brought out, in which the famous Tuskegee Institute is located. This decision effectively disfranchises all but 10 of the 400 Negroes living in the city.

The reason for their disfranchisement was that they could not vote in Tuskegee in the city election because of the gerrymandering. Although they were perfectly qualified to vote, they could not vote. They were effectively barred from voting.

The minority opinion in that case, which is also before the Supreme Court, was rendered by Judge Brown, who said:

> The effect of the act is clear. The district court so found. As the boundaries are redefined by said act No. 140, the municipality of Tuskegee resembles a sea dragon. The effect of the act is to remove from the municipality of Tuskegee all but four or five of the qualified voters and none of the qualified white voters (167 F. Supp. 407) (p. 608).

\*    \*    \*    \*    \*

> For there can be no relief at the polls for those who cannot register and vote. Significantly the complaint in this case further alleged: "Macon County had no board of registrars to qualify applicants for voter registration for more than 18 months, from January 16, 1956, to June 3, 1957. Plaintiffs allege that the reason for no Macon County board of registrars is that almost all of the white persons possessing the qualification to vote in said county are already registered, whereas thousands of Negroes, who possess the qualifications, are not registered and cannot vote." It was this fact, incidentally, which gave rise to the necessity of the dismissal of a cause of action against the board of registrars of Macon County for discriminatory practices in registration (*United States* v. *State of Alabama* (5 Cir., 1959, 267 F. 2d 808)). In Macon County, of which Tuskegee is a geographical part, neither the Constitution nor Congress nor the courts are thus far able to assure Negro voters of this basic right (p. 611).

\*    \*    \*    \*    \*

> This case differs from all cases involving successful complaints of discrimination under the 14th and 15th amendments in that there is no effective remedy. An injunction will enable a citizen to vote—if he lives in a voting district where an election is held. It is an empty right when he does not live in a voting district. The best that this court could do for the plaintiffs would be to declare Act 140 of 1957 invalid. There is nothing to prevent the legislature of Alabama from adopting a new law redefining Tuskegee town limits, perhaps with small changes, or perhaps a series of laws, each of which might also be held unconstitutional, each decision of the court and each act of the legislature progressively increasing the strain on Federal-State relations (p. 615).

> In short, the situation is unmanageable. If we intervene we shall only intensify the very dispute we are asked to settle. And Federal courts have no mission—from the constitution or from that brooding omnipresence of higher law so often as influence on constitutional decisions—to find a judicial solution for every political problem presented in a complaint that makes a strong appeal to the sympathies of the court. To repeat the words of Chief Justice John Marshall: "If courts were permitted to indulge their sympathies, a case better calculated to excite them can scarcely be imagined. \* \* \* [But] such an interposition by the court \* \* \* savors too much of the exercise of political power to be within the proper province of the judicial department" (p. 616).

Mr. GORE. Mr. President, will the Senator yield?

Mr. JAVITS. I yield.

Mr. GORE. How would the Senator's proposal provide relief in this particular case?

Mr. JAVITS. I know the Senator has asked that question thoughtfully and not lightly. I should like to answer it in that way.

In a case which was actually pending, for example, the Tuskegee case, a voting referee could be appointed, who would then register the particular individuals, who would then be entitled to vote, because elections were being held.

Hence, they would be entitled to proceed. Election officials who denied that right would be subject to the jurisdiction of the court for contempt, and the question could be tested.

There might be some other reason for denying the right to vote, or, as an alternative, the case involved Federal voting, a registrar appointed by the President for that particular area could register the people with the same effect.

If the Macon County registrars had been in this case—which they are not—they could vote. If the voting officials denied them their right to vote, and if they had reason for it, that reason could be tested in court by a suit for declaratory judgment, or the matter could wait until the registrar had been accused of a violation of the act after it became law.

In any case, machinery would be provided by which an individual could not be frustrated—which is what happened in this instance—in his right to vote merely by the fact that there was nobody to talk to or nobody to deal with.

Mr. GORE. Would the Senator believe it necessary to differentiate between Federal elections and local elections?

Mr. JAVITS. The Federal registration proposal is confined to Federal elections. The voting referee proposal, which would come under the cognizance of a court, which then would make an adjudication under the amendments to the Federal Constitution, applies to State elections, as well. Of course the Senator will recall that the 14th and 15th amendments to the Constitution

---

[1] During the subcommittee hearings on the Civil Rights Act of 1957, Senator ERVIN made the following remark: "If Congress has no power to provide any criminal penalties for those acts under the Constitution because it has no right to legislate in that particular area, it certainly would have no right to enact a civil law."

To which Mr. Brownell replied: "That is correct, and we are not asking for it." The difference between the type of remedy provided would not seem to alter the right of Congress to legislate with reference to it (hearings before the Subcommittee on Constitutional Rights of the Committee on the Judiciary, U.S. Senate, Feb. 14, 1957, p. 25).

Exhibit 4-7

assure equal protection under State law. So, Mr. President, on the basis of a proper jurisdictional finding, there is authority for qualifying a voter, through a Federal official, to vote in a State election, as well as in a Federal election.

I shall not argue the mechanics of the matter, because I am sure the Senator from Tennessee and all other Senators will have their own views on that point. But certainly the Congress could pass a constitutional law giving that right. Congress may not choose to do so; Congress may choose to confine the provisions of such law to Federal elections only—in which case Congress might have to deal separately with Jim Crow tactics in connection with ballots in State elections. But certainly equality under State law is guaranteed by those amendments to the Constitution.

Mr. DOUGLAS. Mr. President, will the Senator from New York yield?

Mr. JAVITS. I yield.

Mr. DOUGLAS. In view of the fact that the 15th amendment has been referred to—that amendment frequently has been ignored and, it seems, at times has not been recognized—will the Senator from New York permit me to read into the RECORD the text of that amendment?

Mr. JAVITS. Certainly; and I ask unanimous consent for that purpose, Mr. President.

The PRESIDING OFFICER. Is there objection? Without objection, it is so ordered.

Mr. DOUGLAS. The 15th amendment to the Constitution reads as follows:

AMENDMENT XV

SECTION 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude—

SEC. 2. The Congress shall have power to enforce this article by appropriate legislation.

As I read that amendment, if any State, in either a State election or a Federal election, denies or abridges the right of a citizen to vote because of race, color, or previous condition of servitude, Congress can deal with that subject directly, by legislation. Is that not correct?

Mr. JAVITS. That is correct.

Mr. DOUGLAS. So the 15th amendment gives Congress ample legislative authority to guarantee the right to vote in State elections, as well as in Federal elections, does it not?

Mr. JAVITS. Yes; it does.

Mr. DOUGLAS. And the matter is simply one for the exercise of discretion on our part as to whether we shall extend protection to both of those types of elections or to only one of them.

Mr. JAVITS. That is entirely correct.

Mr. KEATING. Mr. President, in that connection will my colleague yield to me?

Mr. JAVITS. I yield.

Mr. KEATING. Let me say to the Senator from Illinois that the amendment, which I have prepared, is based on the ground he has stated. My Federal voting amendment would apply to both State and Federal elections, because based upon the 15th amendment there is no doubt in my mind about the constitutionality of such a provision.

Now let me ask my colleague whether he has completed his citation of cases, in answer to the distinguished Senator from Georgia?

Mr. JAVITS. Not yet; I have a few more.

Mr. KEATING. There is one which I should like to add, if I may do so.

Mr. JAVITS. I shall be very glad to have my colleague do so.

Mr. KEATING. I do not know whether this one is included in my colleague's list; but it strikes me as a very interesting one. Like one of those the Senator mentioned, this matter is involved in a case now pending before the Supreme Court. Obviously, the Court will have to decide the case; but the facts are set forth as follows:

The matter arose in Louisiana, in connection with the registration card of a Mrs. Ethel A. Smith, a Negro woman. Her ballot was challenged by two of the individual defendants, on the ground of miscomputation of her age. It was claimed that her age was incorrectly figured by 1 day; but, actually, it was incorrect only if the date on which the registration card was executed was counted; otherwise, it was correct.

Right next to it, and in the same ward, was the registration card of a Mrs. William A. Lewis, a white woman. Her registration was not challenged, although she computed her age on exactly the same basis; and, on exactly the same basis, her computation of her exact age was 1 day off. In addition, on the card of Mrs. Lewis, in spelling "'Louisiana,'" she spelled it "Louisiania."

And in the same litigation is shown the registration card of a James D. Cyrus, a Negro, whose registration card was challenged by two of the individual defendants, because of misspelling of the county of his birth. The challenged form is also shown. On his registration card, the name "'Pearl River'" was spelled "Peral River"; and the one who was challenging him for that misspelling stated, as the reason for his challenge, the "mispelling" on his application. In other words, the challenger misspelled the word "misspelling."

Also in connection with this matter there was shown the registration card of a Herman K. Manning, Jr., in exactly the same ward. His registration was not challenged; but on his card appeared a misspelling of his own name; in spelling it, he ran his first name and his last name together, and spelling them "Hermanning"; and he also designated his sex as "female." But he was allowed to vote.

And in the same parish of Washington, in the State of Louisiana, the deputy registrar of voters—one Curtis M. Thomas—who signed the registration of disqualification because the age was not computed correctly, disqualified another individual in the same parish for an error in spelling—spelled by Mr. Thomas "spilling."

I think those facts indicate—and I say this without prejudice to the pending litigation—that the same consideration was not given in the registration of the white voters and in the registration of the Negro voters.

Mr. JAVITS. I thank my colleague; and if he will allow me to finish my presentation of the list of cases, I shall then be glad to yield to him. I am very grateful to my colleague for referring to those cases in so specific and marked a fashion.

The other class of cases to which I should like to refer is composed of cases in which Negroes won on appeal, but the courts found that class actions could not be brought; the courts held that the benefit of the victory in the case was applicable only to the party suing. So the mass problem can immediately be perceived: There would have to be tens or hundreds of thousands of suits, unless there were a more generic case—which is what we are trying to provide for, with relation to persons who had been barred from registration. The cases in that class included Raddix versus Lucky, 148 Federal Supplement 108, from Louisiana, in 1957; and Mitchell versus Wright, 62 Federal Supplement 580, from Alabama, in 1945. Those are fair samples. Those cases went up on appeal. The appeal citations are as follows:

(a) *Raddix* v. *Lucky* (148 F. Supp. 108 (La. 1957)): District court denied all relief and failed to grant summary judgment immediately only because there were open questions whether State law had been violated. Appeal, 252 F. 2d 930 (1958).

Negro plaintiff, won, but class action denied—court must decide each case on individual merits.

(b) *Mitchell* v. *Wright* (62 F. Supp. 580 (Ala.) 1945)): A Macon County case. District court found against plaintiff on the merits; also indicated that whether a person is to be registered is an individual decision and cannot be determined by class actions. Appeal, 154 F. 2d 954 (1946).

Individual plaintiff won an appeal but ruling of court as to class actions affirmed.

Finally, Mr. President, I should like to cite the case of United States against Alabama, 177 Federal Supplement 728, also involving Macon County. These cases were completely frustrated by the fact that the local registrars resigned, and the court held that although the Civil Rights Act of 1957 was constitutional, those actions would not lie, in its opinion, under that act, against the State; and that in view of the fact that the registrars had resigned, the only party defendant left was the State. Therefore, the actions failed. Again, there was no question of qualifications; there was simply frustrating complete frustration of the opportunity to vote.

That case is pending before the Supreme Court, and, indeed, I believe it was argued by the Attorney General.

I yield to my colleague from Tennessee.

Mr. GORE. I would like to return to the question about which I interrogated the Senator earlier. Like the senior Senator from Illinois, I am impressed

Exhibit 4-8

with the 15th amendment. I raised this question earlier with the distinguished senior Senator from North Carolina [Mr. ERVIN], who cited certain authorities holding that this distinction, to which I referred, between Federal elections and local, municipal, county, and State elections, had been clearly drawn. Due to limitations of time, I have not yet researched this question, but knowing that the distinguished senior Senator from New York has done so, I wondered if he would be willing to give to the Senate the benefit of his views with respect to this particular question, which, as I have said, was raised in colloquy between the junior Senator from Tennessee and the senior Senator from North Carolina.

Mr. JAVITS. I thank the Senator, and I shall be glad to give him my views; and I would reserve the right to expand upon those views, as occasion requires, because I am doing it pretty much without having again consulted the individual books and cases. But the authority in Federal elections rests, essentially, upon the time, place, and manner provisions of article I, section 4 of the Constitution, giving the Congress a far more direct route to acting in those cases. Congress could pass a law, without provocation, practically taking away from the States the time, place, and manner of the holding of these elections for Federal officials; that is, the House and the Senate.

When we move into the State area, which is the equal opportunity to vote under the amendments of the Constitution, which relates to the 14th and 15th amendments, there is a need for some preliminary findings of a wrong which is being done before the Congress has a right to implement those particular amendments. Therefore, there is a situation in which the Congress could—it never has and I believe it never will—move to take over the Federal election under the time, place, and manner provision of the Constitution, and is another situation in which there must be a wrong before Congress can act—an amendment is being violated; therefore, we must do something about it.

What my colleagues are saying, really—and my colleague from New York is on his feet, and I know will speak for himself—is that in this case we have a conjuncture of the two. Congress not only could, but should, take over the time, place, and manner of elections in the face of this admitted set of wrongs; and the wrongs having been proved or being easily susceptible of proof, Congress may also invoke the application to State elections which arises from the amendments.

Therefore, though there is a difference in the cases and there is a difference in the constitutional authorities, there is shown such a body of wrong as there is here. So for practical purposes, we can make our remedy applicable to both. That is the answer.

Mr. KEATING. Mr. President, will my colleague yield?

Mr. JAVITS. I yield to my colleague.

Mr. KEATING. This question of constitutionality of the Federal registrar proposal as dealing with State elections was raised in the course of our hearings before the Rules and Administrative Committee. I feel strongly that it is constitutional to apply it to State elections. It is a question of whether we want to do it. I consulted Prof. Arthur E. Sutherland, professor of constitutional law at Harvard Law School, and he fully supports my view in this respect. Later in the debate I shall put some of his statement into the RECORD.

My view is that it is constitutional and completely in order for us to apply a Federal registrar proposal to both State and Federal elections, under the 15th amendment of the Constitution.

If my colleague will allow me to intrude once more, because it is necessary for me to be off the floor for a few moments, I want, before leaving, to express my commendation to him for the very learned and scholarly presentation and the great contribution which he has made to this debate and to our thinking on these important subjects. I commend him for the orderly method which he has suggested as the way to deal with the problems before us. If we can keep our minds and hearts focused on some such orderly procedure we shall be able to allow everyone to be heard in full and still to terminate our determination of the important issues involved here, one way or the other, within a reasonable length of time.

Mr. JAVITS. I am very grateful to my colleague.

Mr. President, if my colleague will remain just one moment more, I wish to say I earnestly emphasize that there is great sobriety on this subject; that we are not being blinded by zeal or passion or anything else. We are very sober about this. We really feel that there are serious wrongs that need to be corrected, and we ought to proceed in an orderly, honorable, loyal-like way to correct them.

I thank my colleague from New York for his contribution.

Mr. COTTON. Mr. President, will the Senator yield?

Mr. JAVITS. I yield.

Mr. COTTON. The question I should like to ask the Senator seems appropriate at this time, although I dislike to interrupt him before he has completed his enumeration of examples.

First, I should like to say I have waited to question the distinguished Senator from New York because, through the years in which I have served with him both in the House of Representatives and in the Senate, I have come to have a profound respect for his objectivity, his legal knowledge, his constitutional knowledge, and his direct fundamental honesty in approaching these matters.

The distinguished Senator from New York has just been speaking about the matter of sobriety, the necessity of proceeding without passion or prejudice in righting certain wrongs. As one who has struggled with this problem in his own mind, forgetting for the moment the constitutional right of the Congress to deal with purely State and local elections, or voting lists used in such elections, forgetting for the moment the moral urge many sincere persons may have as a result of the decisions of the Supreme Court regarding social equality of the races, it has seemed to the Senator from New Hampshire that the logical, effective way of proceeding in this civil rights field is, first, to try to accomplish what for over 90 years the Congress of the United States has failed to accomplish, namely, the bare enforcement of the 15th amendment, the guarantee of the right of all citizens of this country to vote in national elections.

The reason why the Senator from New Hampshire did not sign as a sponsor the so-called Dirksen substitute was the fact that he felt we should first insure these voting rights—the naked voting rights we have been struggling with for 90 years—before we move into a field in which we have been involved 6 years, before we move into a field of local elections.

I hope the Senator will pardon me for prolonging this but I want to give the Senator my picture of the situation. The developments in the Senate in the past week or 10 days, with the threats which have taken place—I do not say "threats" in the obnoxious sense, but refer to the declaration of intent we have heard—have strengthened the feeling of the junior Senator from New Hampshire, who wants to see the Senate have the right to vote, to work its will, and who wants to see us move ahead in this field, in which we have been frustrated for more than 90 long years. The Senator from New Hampshire wonders, if our desire is to accomplish something rather than to create a political issue, if it would not be wiser to take from some of these bills page after page of matter which has to do with segregation or integration in the schools, or perhaps in the buses or in any other public places. Should we not be a little patient for a while, on the purely local and State elections, to make the first step in this field by nailing down definitely, finally, and completely after more than 90 years at least the right of all citizens to vote in national elections, to vote without intimidation, to vote freely and fully and on a fair basis.

On that question the Senator from New Hampshire would greatly value the opinion of the distinguished Senator from New York.

Mr. JAVITS. I must say, first, that I deeply appreciate the fine things said about me by the Senator, because he and I have served for a very long time together and he is a very honest man. I know that he would not say what he did so graciously unless he meant every word of it, and I would like to answer in kind. I respectfully what the Senator has said.

I should like to state to the Senator the two points which motivated me. First, there is no such thing as a pure guarantee of the voting right. It is immediately complicated by the need for other law. For example, the whole bombing business is obviously some throw-off, disastrous in its consequences, of the strains which are here created. That is just one example. The fact that voting records should not be destroyed, where that has interfered with adminis-

Exhibit 4-9

*1960* CONGRESSIONAL RECORD — SENATE 3691

tration of the very process which the Senator talks about, is another illustration.

If we exclude voting registration for State elections from the law, will we be able to identify every man's vote? A certain segment of the community will get only a Federal ballot and others will get only a State ballot, if they are entitled to it, as construed by the State officials. This will induce yet other problems.

This is quite apart from any antilynching provision or anything like that. We may argue as to whether these things have any relation to the fundamental state of mind which has perpetuated these injustices for 90 years.

So the problem is not a pure thing. We cannot do one thing alone and even guarantee that very one right the Senator is talking about.

Mr. COTTON. May the Senator from New Hampshire interpolate that in his question he agreed that the protection against violence, the protection of the law, is an inseparable part of this package. Thus far the Senator from New Hampshire agrees completely with the Senator from New York.

Mr. JAVITS. I thank the Senator. I shall now address myself specifically to his question. I understand it very well. It is, why introduce problems of desegregation in the public schools, and all the things that implies? I shall be glad to tell the Senator why.

In the first place, we could not tolerate a situation of disrespect for law. This has an epidemic effect. It communicates itself to everything else. What Senator in this Chamber does not weep with mortification over sitdowns in cafeterias, the turning of hoses on a group of Americans, or anything else of that type? Yet what Senator in this Chamber does not understand that the minute violence starts, whether it is because of a bombing or something else, there is simply no end to it. We have to be equally strict about suppressing all violence.

So we have the problem of flouting of law. The idea that the Supreme Court has no relation to the Constitution is simply impossible for me to understand, as a lawyer. How else could this Government operate? I assure the Senator, the South did not take that position in regard to the Dred Scott decision. On the contrary, the South fought tooth and nail the other way, and would do the same in regard to any decision on ratemaking or anything else which suited them.

Argument No. 1 is that we have to have respect for the law. This is the law; therefore, we have to see it is all respected.

The second argument is that we simply do not have that kind of time any more. The hot breath of the most grim challenge we have ever faced is right on the backs of our necks. What is happening in Chattanooga and Nashville and Atlanta and every other place in the United States is the "hottest" possible news where it does us the most harm. Fortunately the people in these areas—a billion strong—from what we can see in their press reports, understand if we are trying, but they do not understand if we are not trying.

As I say, I am not trying to state this should necessarily be the view of the Senator, but for me, and I think for many like me, these are the two determining points which make me feel that we have to do more than provide simply a strict voting right, with an antibombing provision and what the Senator said, which really comprises the violence package, as it were.

I yield to my colleague again.

Mr. COTTON. Mr. President, I shall not prolong this colloquy and delay the distinguished Senator from resuming his speech. I cannot refrain from saying to the Senator, however, while I am much impressed by and deeply appreciative of what he has to say, I cannot forget one day, some 3 years ago, when I stood on the shore of the pool near the Lincoln Memorial and listened to speeches by some of the leaders of the Negro race in this Nation. One after another those leaders rose and exhorted their own people, and the others who were there in a very vast audience. This happened after the Supreme Court decision. The theme of the speakers was this: "If you will give to us the right to vote, which you guarantee to us as a matter of reality and not as a matter of form, so that our people can vote without fear of reprisal, without fear of boycotts, without fear of being discriminated against, we will take care of the rest."

The Senator from New Hampshire cannot help but feel rather strongly that in this matter it is not necessary to go the whole way. Every law must be respected. The Supreme Court can interpret the law, but there have been very few times in history when the Supreme Court has made itself an enforcement agency. Usually the Court has at least left to the Congress the field of enforcing decisions which it has made.

It seems to the Senator from New Hampshire that if what we desire is a concrete accomplishment to show the world, rather than a political issue to appeal to the electorate, we would be much wiser to stick to a fundamental principle which has been ignored, defied, and frustrated for 90 years. We should accomplish what is needed in that regard before we move into these other fields.

I thank the Senator for his patience. I appreciate his views, and I appreciate his permitting me to air my views at this point.

Mr. JAVITS. I thank the Senator.

I should like to finish the section on the Commission on Equal Employment Opportunity under Government contracts. In that regard, I trust that Senators who read my remarks will relate what I am now saying to what I said in outlining the proposal.

The administration bill gives the Commission legal status, so that it may receive the authority and the appropriation to which a properly constituted agency is entitled. I point out that in 1945 an amendment called the Russell amendment, named after our colleague from Georgia, barred agencies created by executive order from existing for more than 1 year unless they received a legislative appropriation. This killed the committee which had been functioning at that time, in 1946, and has since inhibited setting up this Commission in an effective way. The Commission needs this kind of statutory backing in order to function effectively and properly in the interests of fairness so far as the American people are concerned; and it should have such authority.

The section which has been submitted by the Senator from Illinois [Mr. DIRKSEN] does not have any particular sanction. All it provides is that the Commission shall make recommendations with respect to contract clauses relating to nondiscrimination, and their enforcement. It is my hope to be able to offer as an addition a new section giving persons discriminated against in violation of those contract clauses relating to nondiscrimination a right of action against the employer, as a third party beneficiary for damages, including costs and reasonable attorneys' fees. Such action would not adversely affect the right of the United States to enforce in other ways the nondiscrimination provisions of such contract clauses.

I move from that subject very briefly to the subject of an antilynching bill. This is not in the administration's package. Such an amendment will undoubtedly be proposed. There are a number of bills pending on this subject, including the bill of the Senator from Illinois [Mr. DOUGLAS] and myself.

For the assistance of Senators, I ask unanimous consent to have printed in the RECORD at this point as a part of my remarks a brief summary analysis, which, I emphasize, is made by me, and not by the authors of the various bills pending on this subject, calling special attention to the item relating to the so-called Javits-Douglas measure, which will be before us in a specific way, and which is printed.

There being no objection, the summary analysis was ordered to be printed in the RECORD, as follows:

PROPOSALS

A. HART: S. 1848.
B. HUMPHREY: S. 2041.
C. JAVITS: S. 2784.
D. JAVITS-DOUGLAS: S. 3045, title IV.
E. KEATING: S. 3039.

DESCRIPTION

A. Federal Antilynching Act: The assemblage of two or more persons which shall, without authority (1) commit violence upon the person of any citizen because of his race, creed, color, national origin, ancestry, language, or religion, or (2) exercise by physical violence any power of correction over any person in the custody of a peace officer or suspected of, charged with, or convicted of the commission of any criminal offense, with the purpose or consequence of preventing the apprehension or trial or punishment not authorized by law, shall constitute lynching. Any person who is a member of a lynch mob or who shall instigate, aid, or commit a lynching, shall be subject to $1,000 fine and/or imprisonment for 1 year. If the lynching results in death or serious physical or mental injury, the maximum penalty shall be $10,000 fine and/or 30 years' imprisonment. A State or local officer knowingly or through neglect, etc., failing to prevent a lynching, or to apprehend or

Exhibit 4-10

prosecute any member of a lynch mob, shall be punished by a $5,000 fine and/or 5 years' imprisonment.

Requires the Attorney General to cause an investigation to be made to determine a violation of this act upon oath that a lynching has occurred and Government officers have failed to prevent the lynching; been negligent in custodial duties of the person lynched; or failed to apprehend or prosecute any person who is a member of a lynch mob.

B. The assemblage of two or more persons which shall, without authority of law (1) commit violence upon the person of any citizen because of his race, creed, color, national origin, ancestry, language, or religion, or (2) exercise by physical violence, any power of correction over any person in the custody of a peace officer or suspected of, charged with, or convicted of the commission of any criminal offense, with the purpose or consequence of preventing the apprehension or trial or punishment not authorized by law, shall constitute lynching. Any person who is a member of a lynch mob or who shall instigate, aid, or commit a lynching, shall be subject to $1,000 fine and/or imprisonment for 1 year. If the lynching results in death or serious physical or mental injury, the maximum penalty shall be $10,000 fine and/or 20 years' imprisonment. A State or local officer knowingly or through neglect, etc., failing to prevent a lynching, or to apprehend or prosecute any member of a lynch mob shall be punished by a $5,000 fine and/or 5 years' imprisonment. The United States or any Government subdivision failing to prevent a lynching, or a seizure and abduction followed elsewhere by a lynching, or persons instigating or participating in a lynching, shall be liable for damages. In cases of death or violent physical or mental injury, the judgment shall be not less than $2,000. The interstate transportation of persons with a view to lynching is made subject to the penalties provided in the Lindbergh kidnapping law (i.e., death or imprisonment) (amending U.S.C. 18:20, 1202).

C. Expresses a congressional finding that willful interference with or obstruction of any process or proceeding in State or territory of a person charged with crime to be a deprivation of rights, privileges, and immunities under the Constitution and that when two or more persons acting in concert willfully interfere with or obstruct any process or proceeding then that such action shall be subject to $1,000 fine and/or imprisonment for 1 year. If such action results in death, or serious physical or mental injury, the maximum penalty shall be $10,000 fine and/or 20 years' imprisonment. A State or local officer knowingly or through neglect, etc., failing to prevent a lynching, or to apprehend or prosecute any member of a lynch mob, shall be punished by a $5,000 fine and/or 5 years' imprisonment.

D. Identical to C.

E. Amends section 241 of title 18 (conspiracy against rights of citizens) to add to existing maximum punishment of not more than $5,000 fine or 10 years of imprisonment, or both, the additional penalty of any term of years to life, and death on jury recommendation, if death to any person results.

Amends section 242 of title 18 (deprivation of rights under color of law) to add to the existing maximum punishment of not more than $1,000 fine or 1 year imprisonment, or both, the additional penalty of not more than $5,000 fine or 10 years' imprisonment, or both, if personal injury results; and any term of years to life, or death on jury recommendation, if death to any person results.

Mr. JAVITS. In that connection, I point out that, as we all know, lynching is condemned by everyone, without exception, including every southern Senator, I am sure. They are as much concerned about it as any of the rest of us.

We have seen an example, in the Poplarville, Miss., situation, of the complete frustration which can come to the legal process. Those who feel as I do are of the opinion that even the FBI reports in that situation did not receive the recognition to which we would expect them to be entitled, in respect to the possible prosecution for crime.

This is an area in which the intervention of the FBI is left almost to local government request and discretion. The crime involved is certainly one of which the United States should take cognizance, within the spirit of the equal protection of the laws.

If, on the other hand, it is said that lynching is by all means a very rare occurrence, let it also be said that when it does occur it is a blot and a shame on the United States, and we ought to have every piece of legal machinery possible, including Federal legal and investigatory machinery, to deal with it. We should not be in the position in which we demonstrated our laws to be in respect to this very tragic Poplarville, Miss., lynching.

One further section of my remarks relates to a question asked by the Senator from Georgia [Mr. RUSSELL]. He is not now in the Chamber. I suggested that it might be well if he heard this presentation, but I am sure it will be before him, so I should like to place it in the RECORD at this time.

It will be remembered that the Senator from Georgia asked why only four suits had been filed under the Civil Rights Act of 1957, if this was such a hot subject.

In the first place, the four suits represent by no means the totality of the complaints encountered in respect of this subject.

First, I ask unanimous consent to have printed in the RECORD at this point as a part of my remarks a list of complaints which has been compiled for me. These complaints were made to the Federal Civil Rights Commission. This compilation updates the list found in the report of the Civil Rights Commission, involving complaints from the States of Alabama, Mississippi, and North Carolina, relating to denials of the voting right.

There being no objection, the list was ordered to be printed in the RECORD, as follows:

Alabama: Since the printing of the report, 44 voting complaints were received from Montgomery County, Ala., all of which have been investigated.

Mississippi: The total voting complaints received to date from Mississippi, and investigated, are as follows: Bolivar, 3; Claiborne, 9; Clarke, 7; Forrest, 11; Jefferson Davis, 26; LeFlore, 1; Sunflower, 3; Tallahatchie, 2; Walthall, 1; Amite, 2.

North Carolina: Since the printing of the report, 20 voting complaints have been received from North Carolina, have been investigated, and are listed as follows: Greene, 2; Halifax, 12; Northampton, 6.

Mr. JAVITS. Mr. President, as to the civil rights division of the Department of Justice, the following has been reported to me: The question has been asked why only four suits have been filed under the Civil Rights Act of 1957, the implication being that no substantial problem exists as to voting discrimination against Negroes, and hence that there is no need for additional legislation.

Nothing could be further from the fact. Each of the cases which have been filed under the act involves a vital aspect of its application. As is often the case with new legislation which is resisted and attacked in the courts, resolution of the legal problems must necessarily precede broadscale application of the statute.

In that connection, I refer to the Internal Security Act of 1950, now 10 years old, which is still pending, in terms of its constitutionality, in connection with the effort to cause to be registered under it those who are believed to be Communists, or to have Communist affiliations. This shows the timelag involved in connection with a statute which is as hotly contested as the instant Civil Rights Act of 1957.

Also, I point out that it took the Senate from January 1958 to August 1958, almost a full legislative year, to confirm the nomination of the first head of the civil rights division, Mr. White. That is a point in respect to the work which this division has been able to accomplish.

Hence it can be assumed that when these pilot cases are ultimately decided by the courts, the act will have a much wider application and many additional suits can be instituted to secure voting rights for Negroes.

In addition, during the initial stages of the Department's administration of the act, various practical problems have manifested themselves which have necessitated recommendations for implementing legislation which are now before the Congress.

==In order to prove racial discrimination it was found essential to have access to registration records. It has for example, become increasingly apparent that local officials are often not willing to make such records available,== and in many cases are even precluded from doing so by State law. This was dramatically illustrated when the Commission on Civil Rights was denied the right to examine records in several counties of Alabama. Indeed, following the Commission's hearing in the State, Alabama hastily enacted a law providing for the destruction of the voting records at the discretion of local registrars. Incidentally, it would normally be those same local registrars who would be the defendants in action, brought under the Civil Rights Act.

Typical of another obstacle in this same area is the statement recently made before the Supreme Court by the attorney general of Louisiana that FBI agents will not be given access to voting records unless they meet the particular residence and other requirements of local law.

Experience has also shown that local registration officials engage in every possible dilatory tactic to delay enforcement of voting rights suits. It is to meet this problem that the Federal voting referee and similar bills have been proposed. Enactment of these bills will in-

**Exhibit 4-11**

sure that persons who are in sympathy with the protection of constitutional rights will fairly administer the registration procedures of State law wherever the problem of racial discrimination exists.

Beyond that, however, it must not be supposed that the four lawsuits filed thus far by the Department of Justice represent merely the complaints of but a handful of individuals, or that they would, if successfully carried through the courts, result in relief on only a limited scale. The fact is that relief in each of these suits will immediately strike down discrimination on at least on a countywide basis and will have incidental benefits of far wider score.

For example, the Supreme Court has just recently heard arguments in a case in which the State of Louisiana is appealing an order of a lower Federal court to restore to the voting rolls of one parish 1,377 Negroes who were purged because of such deficiencies as misspellings, failure to compute age within 1 day and similar trivialities.

This was referred to by my colleague from New York [Mr. KEATING]. At the same time, only 10 white voters out of over 11,000 were challenged for the same reasons, although by the registrar's own admission at least half the registration cards of those on the rolls today have the same defects. This situation has resulted from a wholesale program in Louisiana where the self-proclaimed goal is to reduce the number of Negro voters by 90 percent. It is anticipated that if the Government's contentions with respect to this shocking inequity are upheld, similar suits on a much wider scale can be brought to rectify discriminatory purges of this kind throughout the State of Louisiana and other areas as well.

Another example of the Government's effort to establish a sound basis for dealing with the various types of evasive tactics which have been used is the suit brought in Macon County, Ala. There at the seat of the famed Tuskegee Institute the local registration board for years has engaged in the tactic of ceasing to function for months on end whenever it became apparent that Negroes were about to register in significant numbers. Following the last of a series of such resignations, the Department of Justice brought suit; and upon dismissal of the action, sought immediate appellate review. This case, too, is now pending before the Supreme Court, and it is hoped that it will provide the weapon with which to deal once and for all, and everywhere, with this device of the resignation of voting officials for the very purpose of keeping Negroes from voting.

Finally, it may be mentioned that the very first case brought under the Civil Rights Act—one which involved action by the registrars which prevented Negro schoolteachers, among others, from voting and that on the ground that they could not pass a literacy test—resulted in a holding by the lower court that the Civil Rights Act is unconstitutional. While the Attorney General did not accept this determination by the lower court as conclusive, and himself argued the constitutionality of the act before the Supreme Court, it cannot be denied that the ruling had a deterrent effect upon enforcement efforts. In this case, as in other cases where initial difficulties have been encountered in enforcing the statute, it is perfectly clear that many individuals who would otherwise come forward with regard to their own experience in not being allowed to register to vote are awaiting the outcome of the litigation before doing so.

It is to be expected that as soon as these pilot suits will have led to the registration and voting of many heretofore disfranchised Negroes, others will make application either directly to the Department of Justice or to the newly-appointed voting referees if the pending bill should be enacted and thus accelerate the momentum of the enforcement drive.

It is noteworthy, too, that the three cases presently before the Supreme Court and the case involving the constitutionality of the operation of the Commission on Civil Rights were all brought to the Supreme Court with almost unprecedented speed. The Louisiana case, for example, was heard in the Supreme Court only about 6 weeks after the decision had been handed down by the district court.

Mr. President, it will be noted that there is one subject to which I have not addressed myself, namely, the question of an amendment prohibiting the poll tax.

As I stated in colloquy some time ago, I reserve for myself, and others of my colleagues who are interested, the right to consider that question as we go along in the debate.

Other than that, in all fairness we believe we have set forth in our amendments already filed and printed, directed to the various sections of the Dirksen substitute, the matters upon which we will place our primary case in submitting them to the Senate for action in order to give us a meaningful civil rights bill.

Mr. President, I would like to conclude upon this note. We have gone to considerable pains today—and I must say for myself, into far more debate than I had anticipated—to do what my colleague, the Senator from Illinois [Mr. DOUGLAS] has always done in these debates. We have always been grateful to him. This time he was carrying so many other burdens, that he allowed me to carry this one.

I refer to presenting to the Senate at one time, in one place, the full record, as complete as we can make it. I am sure there are plenty of interstices, but we have tried, in order to bring before the Senate an outline in an orderly way, to show the wrongs which we believe need to be righted, and the techniques which we recommend for righting them.

Finally, we lay out our idea of a form of procedure which, following normal practice of the Senate, will, by the process of entertaining an amendment and voting it up or down, then going to the next one, all of them directed toward the various sections of the Dirksen substitute, will give us a completely orderly way in which the Senate can exercise its will without any confusion and without any undue expense of time.

Mr. President, the civil rights proponents, of whom I have the honor to be one, in this way are trying to demonstrate their fidelity to the proposition that what they are seeking to attain is a result, in the most expeditious time and with full respect not only for the merits of what we are proposing and its urgent need on the part of the country and our country's leadership all over the world, but also with full respect for the views of those on the other side of the question and the sincerity of their espousals.

Mr. DOUGLAS. Mr. President, will the Senator yield?

Mr. JAVITS. I yield.

Mr. DOUGLAS. Mr. President, first I wish to congratulate the Senator from New York for his moving, able, and effective statement. It is important that he has made the record which he has made this morning.

At various times during the period that the Senator was speaking, certain Senators came up to me and asked if we were assisting the opponents of the civil rights by taking up this time. My reply always was no; that just because we believe that we have the votes to pass some kind of civil rights bill should not mean that we should refuse to discuss the issues. We who believe that the Senate should have the right ultimately to decide, also believe that there should be full and thorough discussion of the issues.

We should not depend on immediate political power, but upon basic rights and truth.

Therefore the Senator from New York has performed a great service in indicating some of the steps which he believes should be taken. I expect to vote for every one of the amendments of this tenor which he or others may propose on these matters.

However, I believe one can narrow the objectives somewhat by saying that in my mind there are three which are primarily important.

The first is a further protection of the right to register and to vote. I think much more could and can be done under the voting rights bill of 1957, but I shall not go into that question. Certainly weaknesses have developed in that act as regards registration. I hope that in the provisions which we pass on registration and voting rights we do not get tied up in legal redtape. And this is one reason why I somewhat fear an exclusive resort to the judicial processes in connection with this matter.

If we appoint a referee and confine the activities of that referee to individual cases, and require the applicants first to try to register under a State system which is hostile to them, and then deal with these issues upon appeal to the referee, with the findings of the referee in turn appealed to the district Federal judge, and with the further possibility of appeal to the circuit court and to the U.S. Supreme Court, I think we open up illimitable possibilities for delay and, by delay, the defeat of the fundamental purpose, namely, to enable a person to vote, because the election will have passed and been over for months and perhaps for

**Exhibit 4-12**