a vote is a man without protection. He is virtually helpless—dependent upon the charitable impulses of others.

But a man with a vote immediately acquires status—as every one of my colleagues is well aware. He has his destiny in his own hands and he can do far more to help himself than others can do to help him.

A man with a vote also does something else. He strengthens the unity of America.

Mr. President, tonight, conscious as we are of the Civil Rights Commission report documenting areas in this Nation where great masses of American citizens are not given the opportunity to vote, what we must seek in Congress is a device which permits massive enfranchisement, because we are fighting mass disenfranchisement.

An administrative remedy more effectively reaches that end, rather than the device which lawyers know to be the delight of the side in a lawsuit which wants to drag its feet, namely, getting the court to appoint a referee or master.

## RECESS TO 11 A.M. TOMORROW

Mr. MUSKIE. Mr. President, in accordance with the order previously entered, I move that the Senate now recess until 11 o'clock tomorrow morning.

The motion was agreed to; and (at 9 o'clock and 49 minutes p.m.) the Senate took a recess, under the order previously entered, until tomorrow, Friday, March 11, 1960, at 11 o'clock a.m.

## CONFIRMATIONS

Executive nominations confirmed by the Senate March 10 (legislative day of March 8), 1960:

U.S. CIRCUIT COURT
Clifford O'Sullivan, of Michigan, to be U.S. circuit judge, for the sixth circuit.

U.S. ATTORNEY
William C. Spire, of Nebraska, to be U.S. attorney for the district of Nebraska for the term of 4 years.

U.S. MARSHALS
Robert C. McFadden, of Indiana, to be U.S. marshal for the southern district of Indiana for a term of 4 years.

Santos Buxo, Jr., of Puerto Rico, to be U.S. marshal for the district of Puerto Rico for the term of 4 years.

# HOUSE OF REPRESENTATIVES

THURSDAY, MARCH 10, 1960

The House met at 12 o'clock noon.
The Chaplain, Rev. Bernard Braskamp, D.D., offered the following prayer:

Romans 10: 12: *The same Lord who is over all is rich unto all who call upon Him.*

Almighty God, in this moment of prayer, may we yield our minds and hearts to the promptings and persuasions of Thy holy spirit to be touched to finer and nobler issues.

Teach us the truth, made known in the precepts and example of our blessed Lord, that we are members one of another and that by cultivating the fraternal spirit we shall gain a more vivid sense of Thy divine and universal fatherhood.

Show us how we may close the chasm between the strong and the weak, the prosperous and the unfortunate, the privileged and the handicapped by casting into it our pride and prejudice, our indifference and selfishness, and thus transform it into a highway where we may walk together in liberty and justice and blessedness for all.

Inspire our souls with a longing to achieve for mankind everywhere a life that is more abundant economically, a freedom that is coordinated with discipline and civic responsibility, and a happiness that is more abiding spiritually.

Hear us in the name of the Prince of Peace. Amen.

## THE JOURNAL

The Journal of the proceedings of yesterday was read and approved.

## MESSAGE FROM THE PRESIDENT

A message in writing from the President of the United States was communicated to the House by Mr. Ratchford, one of his secretaries.

## MESSAGE FROM THE SENATE

A message from the Senate by Mr. McGown, one of its clerks, announced that the Senate had passed the following resolution:

S. RES. 286

*Resolved,* That the Senate has heard with profound sorrow and deep regret the announcement of the death of Hon. Richard L. Neuberger, late a Senator from the State of Oregon.

*Resolved,* That a committee of Senators be appointed by the President of the Senate to attend the funeral of the deceased.

*Resolved,* That the Secretary communicate these resolutions to the House of Representatives and transmit a copy thereof to the family of the deceased.

*Resolved,* That, as a further mark of respect to the memory of the deceased, the Senate do now take a recess until 9 o'clock ante meridian tomorrow.

## CALL OF THE HOUSE

The SPEAKER. The Chair recognizes the gentleman from Mississippi [Mr. COLMER].

Mr. WILLIAMS. Mr. Speaker, I make the point of order that a quorum is not present.

The SPEAKER. Evidently a quorum is not present.

Mr. McCORMACK. Mr. Speaker, I move a call of the House.

A call of the House was ordered.

The Clerk called the roll and the following Members failed to answer to their names:

[Roll No. 19]

| | | |
|---|---|---|
| Anderson, Mont. | Ford | Porter |
| Baumhart | Gavin | Powell |
| Bentley | Grant | Randall |
| Blatnik | Gray | Rooney |
| Brewster | Green, Oreg. | Shelley |
| Burleson | Inouye | Sheppard |
| Davis, Tenn. | Jensen | Spence |
| Dent | Mack, Ill. | Ullman |
| Flynn | Multer | Widnall |
| Forand | Mumma | |
| | Norblad | |

The SPEAKER. On this rollcall 400 Members have answered to their names, a quorum.

By unanimous consent further proceedings under the call were dispensed with.

## COMMITTEE MEETING DURING SESSION OF THE HOUSE

Mr. McCORMACK. Mr. Speaker, at the request of the gentleman from Georgia [Mr. BROWN], I ask unanimous consent that Subcommittee No. 2 of the Committee on Banking and Currency may be permitted to sit today during general debate.

The SPEAKER. Is there objection to the request of the gentleman from Massachusetts?

There was no objection.

## ANNUAL REPORT OF U.S. CIVIL SERVICE COMMISSION FOR 1959—MESSAGE FROM THE PRESIDENT OF THE UNITED STATES (H. DOC. NO. 253)

The SPEAKER laid before the House the following message from the President of the United States, which was read and, together with the accompanying papers, referred to the Committee on Post Office and Civil Service and ordered to be printed with illustrations:

*To the Congress of the United States:*

I transmit herewith the annual report of the United States Civil Service Commission for the fiscal year ended June 30, 1959.

DWIGHT D. EISENHOWER.
THE WHITE HOUSE, *March 10, 1960.*

## REPORT OF THE RAILROAD RETIREMENT BOARD FOR FISCAL YEAR ENDED JUNE 30, 1959—MESSAGE FROM THE PRESIDENT OF THE UNITED STATES (H. DOC. NO. 267)

The SPEAKER laid before the House the following message from the President of the United States, which was read and, with accompanying papers, referred to the Committee on Interstate and Foreign Commerce:

*To the Congress of the United States:*

In compliance with the provisions of section 10(b)(4) of the Railroad Retirement Act, approved June 24, 1937, and of section 12(1) of the Railroad Unemployment Insurance Act, approved June 25, 1938, I transmit herewith for the information of the Congress, the report of the Railroad Retirement Board for the fiscal year ended June 30, 1959.

DWIGHT D. EISENHOWER.
THE WHITE HOUSE, *March 10, 1960.*

## CIVIL RIGHTS

Mr. COLMER. Mr. Speaker, by direction of the Committee on Rules, I call up House Resolution 359 and ask for its immediate consideration.

The Clerk read the resolution, as follows:

*Resolved,* That upon the adoption of this resolution, the Speaker shall recognize the chairman of the Committee on the Judiciary, to move that the House resolve itself into the Committee of the Whole House on

Exhibit 5-1

the State of the Union for the consideration of the bill (H.R. 8601) to enforce constitutional rights, and for other purposes. All points of order against said bill are hereby waived. After general debate, which shall be confined to the bill and continue not to exceed two days to be equally divided and controlled by the chairman of the Committee on the Judiciary and the ranking minority member thereof, the bill shall be considered as having been read and open at any point for amendment under the five-minute rule. At the conclusion of such consideration, the Committee shall rise and report the bill to the House with such amendments as shall have been adopted, and the previous question shall be considered as ordered on the bill and amendments thereto to final passage without intervening motion except one motion to recommit with or without instructions.

With the following committee amendments:

Page 1, line 1, strike out the words "the Speaker shall recognize the chairman of the Committee on the Judiciary, to move", and insert "it shall be in order to move."

Page 1, line 7, strike out "All points of order against said bill are hereby waived."

Page 1, line 9, strike out "two days" and insert "fifteen hours."

Page 2, line 2, after the word "rule" insert "It shall be in order to consider, without the intervention of any point of order, the text of the bill, H.R. 10055, as introduced under the date of January 28, 1960, as an amendment to the bill, H.R. 8601."

Mr. COLMER. Mr. Speaker, I yield the usual 30 minutes to the gentleman from Ohio [Mr. BROWN] and, pending that, I yield at this time 5 minutes to the gentleman from Indiana [Mr. MADDEN].

Mr. MADDEN. Mr. Speaker, I wish to commend the chairman and members of the Judiciary Committee for reporting favorably on H.R. 8601, known as the civil rights bill. When this legislation was before the Rules Committee, there was considerable discussion as to the length of time which should be allotted for House debate. It is my firm opinion that, in the final analysis, very few votes will be changed by reason of the long 15-hour period which the Rules Committee allotted as time for debate on this bill. Civil rights legislation has been discussed and rediscussed on the floor of this House in other sessions of Congress and it is my belief that practically all the Members of this legislative body have their minds made up as to how they will cast their vote on the final rollcall. No doubt there will be a number of amendments offered during the 5-minute period, and I look forward to the discussion on amendments during this period to take several days. Any or all Members can have an opportunity to discuss their position on this bill and various amendments thereto during the 5-minute period, and it is my thought that the 15-hour time for debate set aside by the Rules Committee was exorbitant and an unnecessary length of time.

It was mentioned several times at the hearing before the Rules Committee that this was a political bill and was being pressed because of the coming presidential election. I have in my hands copies of the 1952 and 1956 platforms adopted by both the Democrat and Republican conventions. In these two presidential election years both parties unequivocally adopted civil rights planks and promised the American people that if successful their respective parties would enact effective civil rights legislation.

I am satisfied that the vast majority of the people in the United States are aware that the Congress has a moral responsibility to enact legislation that will protect all the constitutional rights of all the people within our Nation's borders. Three years ago the Congress enacted the civil rights bill of 1957, which was the first law placed upon the statute books pertaining to the rights of citizens in over 80 years. No doubt some progress has been made since the 1957 bill was passed. There has been revealed in the hearings conducted by the Judiciary Committee that further legislation is necessary to implement enforcement of voting rights for all citizens. We have observed in the interim disorders and violations in the efforts to enforce the 1954 decision of the Supreme Court on desegregation in our schools; also the fact that great numbers of American citizens are still unable to exercise their fundamental American right to cast their vote in county, State, and Federal elections. The purpose of this legislation is to try to further improve provisions deemed necessary by the law-enforcement branches of our Government in their task of carrying out the legislative provisions on civil rights. The Department of Justice feels that the present laws are not sufficient to effectively impose sanctions on members of mobs who by force or threats willfully obstruct, impede, and interfere with the rights and performance of the duties under the school-desegregation order of the Federal court.

This bill also makes it a felony for anybody convicted of willfully damaging, destroying, attempting to damage or destroy by fire or explosion any building or structure used for religious or educational purposes.

Title III of the bill provides for the preservation of election records involving Federal officials. It also provides a penalty for any official who willfully steals, conceals, or mutilates ballots or records pertaining to these elections. It also provides a more effective protection of the right of all qualified citizens to vote without discrimination on account of race. This bill contains necessary provisions enabling the Government to carry out the legislation of 3 years ago which lacked suitable provisions for access to voting records and for other detailed information concerning voting applications, registrations, tests, and other acts and procedures requisite to voting. There is no existing power for the Department of Justice to require the production of these records during an investigation based on complaint of denial to vote because of race or other reasons.

This bill would also extend the life of the Civil Rights Commission for an additional 2 years. This extension is highly necessary in order to complete the study and analysis of the problems involved in this complex and difficult field. This Commission is also working on programs of research, study, and investigation in the fields of education and housing.

Title IV of this bill permits the Government to provide schooling for children of military personnel who live off Federal property and their children are denied education by reason of certain localities arbitrarily closing their schools in defiance of desegregation regulations.

The members of the Judiciary Committee who spent long hours listening to witnesses, including Government officials, pertaining to the technical phase of this legislation, are highly qualified to outline and explain to the Members detailed facts not only concerning the necessity for this legislation, but also the most practical and simplified provisions set out in this bill which will be constitutional and enforceable by the executive department of our Government.

During my 18 years in Congress, I, along with most other Members of Congress, have constantly carried on and pressed for reasonable and enforceable civil rights legislation which will give all our citizens equal justice under the law as provided for in our Constitution. The 14th amendment of the Constitution provides that every person is entitled to the equal protection of the law. Equal justice for all is also set out under our Bill of Rights. At the beginning of our Government, the Father of our Country, George Washington, emphatically stated that our Government must be based on principles that give freedom and justice to all. Our forefathers wanted to curb bigotry and give persecution no assistance or encouragement. It is also good news to millions throughout our country to realize that our Congress has been annually considering and striving for effective civil rights legislation. We are encouraged that as time marches on, we will succeed to give to all citizens the necessary protection to which they are entitled under the Federal law.

It is unfortunate that part III of the civil rights bill was deleted in the other body 3 years ago. This section protected the wide range of civil rights which the Supreme Court had decreed to be guaranteed by the Constitution. These are rights specifically set out in the 14th amendment. The national organization of the NAACP is a voluntary organization of citizens who by reason of their activities in various States have contributed greatly to bring to national attention facts concerning civil rights violations in various localities. When one reflects back during the last 30 years we can observe that progress has been made by reason of education and publicity. Progress in human relations between the races will be much more rapidly advanced in the future.

This Congress has appropriated billions of dollars since World War II to aid the economy of countries ruined by war. This year the President is asking for about $4 billion for mutual aid for neutral and undeveloped countries in order to win the minds of millions in Africa and Asia for the world democracies. We must overcome Communist propaganda in those areas. About $40

**Exhibit 5-2**

billion will be appropriated for military defense of our Nation and other nations against the Communist aggressor. A small fraction of this money should be diverted into an educational campaign among these new democracies in Africa and Asia, selling our great free democracy to the people of these new undeveloped nations.

Truth, facts, and information about communism and democracy is the greatest and cheapest weapon our Nation has to combat Communist propaganda and aggression. The passage of effective civil rights legislation for all nationalities within the United States would help curb the Communist propaganda and agitators from their greatest weapon against free government.

I hold in my hand a map of Africa, published in the U.S. News & World Report 2 weeks ago. It shows that Morocco, Libya, Sudan, Belgium Congo, Nigeria, Ghana, Guinea, Liberia, Somalia are African nations which won independent government for their people during the last 12 years. A dozen more African nations have won autonomous republics and will win their freedom in the near future.

The time is not too far distant when our Nation will fight in world competition for trade and commerce with these African independent nations. These countries will possess fabulous wealth in production, minerals, oil, and other natural resources. The first step our Government must take to compete in the economic race is to win the minds and good will of these millions in Africa who are launching on a new era of independent government and international relations. We cannot participate in this limitless African international trade resource if millions of their own nationals who are citizens of the United States are submitted to an existence of second-class citizens within our borders.

Great progress has been made in the last 25 years in all areas throughout the United States in overcoming bigotry and prejudice as to employment and other angles of civil rights. Negroes are rendering great service in my congressional district as public officials and in other capacities of civil service to their community and government.

On the national and international scene, to mention but a few, Ralph Bunche of United Nations and Nobel Prize winner; Federal Judge William H. Hastie, former Governor of the Virgin Islands; Ernest Williams, E. Frederick Morrow, Roy Wilkins, Dr. Channing H. Tobias, Charles H. Houston, Frederick Douglas, Carter Woodson, Booker T. Washington, George Washington Carver, Gen. Benjamin O. Davis, and his son, Colonel Davis, commander of the 99th Fighter Squadron in Europe during World War II. Among the distinguished Negro women, Mary McLeod Bethune, Harriet Tubman, Edith Sampson, Marian Anderson, and to the list of both men and women could be added many more Negro names who have made invaluable contributions to their community, State, Nation, and to the peace of the world.

Patriotic Negroes of America only ask that their future generations are not called upon to combat the economic and educational impediments which their ancestors endured.

The enactment of H.R. 8601 will mark a milestone in the long fight to make practical and implement all the provisions of the U.S. Constitution for all humans who are citizens under the American flag.

Mr. BROWN of Ohio. Mr. Speaker, I yield myself such time as I may consume.

Mr. HALLECK. Mr. Speaker, will the gentleman yield to me before he begins his statement?

Mr. BROWN of Ohio. I yield to the gentleman from Indiana, the minority leader.

Mr. HALLECK. Mr. Speaker, I would like to say at this point that I am glad this measure is before us. I am glad it is before us by reason of the action of the Committee on Rules.

Just as a matter of record the measure was reported by the Committee on the Judiciary late in the last session. Time had pretty well run out on the session. When we met in January of this year there was quite a bit of conversation around in different places about bringing up the bill and how it might be brought up. I took the position and many others took the position that it ought to come up under action of the Committee on Rules in the regular way. And that is the way the measure is now before us.

So I just want to say now that I trust that when the time comes to vote on the adoption of the rule it will be adopted. I should like a rollcall vote and I trust the gentleman from Ohio will insist on getting it. Then we will have a chance to demonstrate that we want this bill considered on its merits under an open rule and, in fact, a more than open rule, because the rule provides for the consideration of the latest proposal which has to do with voting reforms.

Mr. BROWN of Ohio. Mr. Speaker, I thank the gentleman from Indiana for his comment.

Mr. Speaker, as I am sure most of us know, House Resolution 359, as amended, makes in order the consideration of H.R. 8601, the so-called civil rights bill—over which there is, of course, much controversy—all under an open rule, with 15 hours of general debate.

Those of you who may have a copy of the resolution, which bears the name of Mr. CELLER, will note his original measure was amended and reported favorably by the Committee on Rules on February 23, last. As a member of the Rules Committee, I moved the adoption of this resolution with the amendments thereto. Under its provisions, the House is authorized to resolve itself into a Committee of the Whole House on the State of the Union for consideration of H.R. 8601, to enforce certain constitutional rights, under general debate which shall be confined to the bill and continue, not to exceed 15 hours, to be equally divided and controlled by the chairman of the Committee on the Judiciary and the ranking minority member thereof. Following this, the bill shall be considered as having been read and open at any point for amendment under the 5-minute rule, at which time it shall be in order to offer and to consider, without the intervention of any point of order, as an amendment, the text of the bill H.R. 10035 as introduced under date of January 28, 1960, by Congressman McCULLOCH, a member of the Judiciary Committee. The rule also provides for the usual one motion to recommit, with or without instructions.

In voting to report this resolution, and the rule it provides, for the consideration of the House, the majority of the membership of the Rules Committee, after long discussion, believed it proper to give all Members full opportunity to express themselves on this legislation. Thus, 15 hours of general debate has been provided for, instead of 2 legislative days, as originally proposed.

Since H.R. 8601 was originally reported from the House Committee on the Judiciary by its chairman and author, the gentleman from New York [Mr. CELLER], in late August, last year, just a short time before the 1st session of the 86th Congress adjourned, it was discovered H.R. 8601 did not provide methods or means to properly protect the right of each qualified citizen to vote in any and all elections. So various new proposals or bills were considered by the Committee on the Judiciary throughout most of February, with that august committee still sitting at the time the Rules Committee took action and reported this resolution.

The question arose as to whether or not any bill, carrying either the Federal registrar or the Federal court referee provision, for enforcing the rights of qualified citizens to vote would be held germane to the original measure, H.R. 8601, as written. So there could be no question of germaneness, the majority of the members of the Rules Committee accepted an amendment, which I offered, to make in order the text of the bill, H.R. 10035 as an amendment to H.R. 8601.

H.R. 10035, or the so-called McCulloch bill, would not only amend H.R. 8601, but also the Civil Rights Act of 1957, so as to provide for Federal court appointment of voting referees. Of course, H.R. 10035, being made in order and offered as an amendment to H.R. 8601, can, in turn, be amended. In other words, an amendment to the amendment can be offered. So, under this rule, which is an open one, the House can work its will on this legislation, which deals with the important issue of constitutional and civil rights.

For many, many years most of the civil rights provided for in this legislation, and especially the right of all qualified citizens to vote, have not created any great problems or issues in many of our so-called Northern States. Instead, as you all know—and there is no reason why we should not discuss this matter frankly—most of this legislation is directed at protecting constitutional rights or civil rights—and especially the right of all qualified citizens to vote—in but a few of our Southern States.

Many of the opponents of this type of legislation feel its enactment will endanger State and local rights. Being well acquainted with the South, as well

**Exhibit 5-3**

As a practical matter, Federal authorities do not now have the authority necessary to do the job. The contempt power is too restrictive, while the obstruction-of-justice statutes are too limited. The dilemma of Federal authorities at Little Rock was described by Attorney General Rogers at the committee hearings last year. Regarding the contempt power, he had this to say:

> A mob was incited to resist the orders of the court concerning the operation of the school. This conduct did not involve contempt of the decree which ordered the school desegregated, since the persons responsible were not parties to that decree, and there was no proof that they acted in concert with those named in the decree.

The limited authority of our present obstruction-of-justice statutes was also commented on by the Attorney General, as follows:

> There is so much doubt as to the scope of the present law that arrests of mob leaders or others by Federal authorities would be precarious and their prosecution probably unsuccessful.

Enactment of title I of H.R. 8601 would serve to fill this enforcement gap. I, therefore, urge favorable consideration for this valuable enforcement tool upon which the Government could rely in dealing with those who would use force and threats of force to obstruct orderly and deliberate school desegregation.

### TITLE II

Title II of H.R. 8601 seeks to deal with another facet of potential lawlessness in the emotionally charged area of civil rights. In recent years, the Nation has been both shocked and outraged by a rash of bombings of churches and schools. While local law enforcement officials have been diligent in their attempts to apprehend and stamp out this type of crime, their efforts have not always been successful. The reason for such failure is that bombings present extremely difficult problems of investigation and detection. Unlike the ordinary type of offense that authorities have to deal with, clues and other evidence are ordinarily destroyed in a bombing. Furthermore, the offenders sometimes flee across State lines to avoid prosecution.

With the best will in the world, local officials have, therefore, been unable to cope with the problem in some States, both North and South. The reason is that they usually do not possess the scientific equipment and training essential to do the job.

Enactment of title II would bring into action the Nation's leading law enforcement organization, the Federal Bureau of Investigation, in partnership with local officials. The Bureau's tremendous resources and scientific skills could be utilized to stamp out this most heinous offense.

Specifically, title II would amend the Criminal Code, title 18, chapter 49, so as to make it a felony to move or travel in interstate or foreign commerce to avoid prosecution for willfully destroying or attempting to destroy real or personal property, public or private, by fire or explosion.

As originally recommended by President Eisenhower, this proposal was limited to bombings of religious and educational institutions. Our hearings last year brought out the fact, however, that the problem of bombings and the difficulties in solving them was not limited to the field of civil rights.

The committee, therefore, objected to restricting the application of the proposal to schools and churches—and I must say, I fully supported their reasoning.

No logical argument was presented, and none occurs to me now, which would justify restricting the coverage of this proposal based upon the type of facility involved. Bombings are universally reprehensible. Since they are all equally difficult of solution, they are all worthy of Congressional cognizance.

A majority of the committee was of the opinion that all citizens are entitled to the protection of life and limb where they live, where they worship, where they learn and where they earn.

The approach of the flight provision is neither new nor novel. It was long ago adopted to deal with the very special problems of law enforcement arising out of our Federal-State system. The Fugitive Felon Act (18 U.S.C. 1073) was enacted in 1934. It outlaws travel in interstate commerce to avoid State prosecution for certain more serious criminal offenses.

The intervening quarter century has shown that this approach works, and works well, to maintain effective law enforcement while, at the same time, keeping responsibility where it belongs, on the local level.

Far from supplanting State enforcement machinery, Federal activities under the act have been complementary in nature—the FBI serving as an adjunct of, rather than as a replacement for, the local agency.

Thus it is, that fugitives apprehended out of the State where the offense was committed, in an overwhelming percent of cases, are returned with dispatch for trial and punishment to the jurisdiction where the offense was committed. In 1957, for example, of the 947 fugitives located by the Bureau, only 9 were ever prosecuted in the Federal courts.

### TITLE III

The subject of voting has been much in the news of late. Universally recognized as the very cornerstone of representative government, few Americans will condone the arbitrary denial of the elective franchise to a qualified citizen. President Eisenhower, in his message to the Congress last year, said:

> The right to vote, the keystone of democratic self-government, must be available to all qualified citizens without discrimination.

In 1957, this body acted to insure that all Americans would be secure in the elective franchise. The Civil Rights Act, passed that year, was directly aimed at protecting the right of all eligible citizens to vote. But events brought to light in the intervening period have shown that our efforts have not been fully effective.

State voting records have, in some instances, been withheld from Federal authorities investigating alleged denial of the elective franchise to qualified citizens. Certain States have condoned or authorized the destruction of election records and have adopted devices calculated to keep qualified Negroes from expressing their will at the polls. Proposed, pending, or passed in the legislatures of some States are measures authorizing the destruction of voting records soon after elections in order to prevent their inspection and use by Federal investigators.

The dilemma faced by law enforcement officials attempting to investigate allegations that the right to vote has been denied was sketched clearly and succinctly by Attorney General William P. Rogers at hearings of the Judiciary Committee last Spring. I should like to quote a brief exerpt from his testimony. It appears on page 211 of the printed transcript:

> Proof of denial or threatened denial of the right to vote because of racial discrimination requires a showing not only that qualified persons are not permitted to register or vote, but that the denial is based on racial discrimination. This calls for evidence that individuals of a particular race had in fact either satisfactorily demonstrated their qualifications under State law or that they were able to demonstrate their qualifications and had offered to do so and were, nevertheless, not allowed to register or vote, while individuals of another race no better qualified, had been permitted to register or vote.
>
> To assemble the necessary proof of discrimination is impracticable, if not impossible, without access to detailed information concerning applications, registrations, or other acts, tests, and procedures requisite to voting. From such information, it becomes possible to determine who has been permitted to register or vote and who has not, and to make a breakdown on the basis of race. The only source of such comparative information—necessary for proper evaluation of complaints and in the preparation of cases—is the records of registrations or other action required for exercise of the franchise.
>
> The Department of Justice has no existing power in civil proceedings to require the production of such records during any investigation it conducts as to complaints that qualified persons have been denied the right to vote in violation of Federal law. The need for this power is evident from the refusal of some State and local authorities to permit inspection.

Title III is designed to fill this need. It would require that Federal election records be preserved by the States for a period of 3 years. General, special or primary elections in which Federal candidates were involved would be covered by the provision.

Willful failure to preserve such records by duly appointed officers, or their willful theft or destruction by any person, would be punishable by a $1,000 fine, a year imprisonment, or both.

Voting records preserved under title III would be subject to inspection and copying upon demand made by the Attorney General or his representative in the district in which said papers were located.

Local U.S. district courts would have jurisdiction to compel the production of demanded documents by appropriate process.

To insure that this provision will be used and not abused, records procured

Exhibit 5-4

under it would be for official use of authorized governmental agencies only.

It is noteworthy that under the proposed title III, no power of removal by subpena is authorized to the Attorney General. Such power was withheld deliberately so that such records would always be available to local officers for official use.

I shall have more to say on the subject of protection of the elective franchise at a later time in this debate.

### TITLE IV

Turning now to title IV of H.R. 8601, I have only a few remarks to make relating to the Commission on Civil Rights.

As reported by the Judiciary Committee last year, title IV of H.R. 8601 not only provided for the extension of the Commission for an additional 2 years, but, in addition, it contained two amendments aimed at assisting it in its assigned duties.

The first amendment would remove any doubt, and doubt apparently exists, as to the authority of members of the Commission to administer oaths. Since the original act setting up the Commission requires that complaints submitted to it be by oath or affirmation, it seems reasonable that we confer such power upon the Commissioners.

The second amendment approved by the committee related to the staffing problems experienced by the Commission as a result of the legislative requirement that personnel be selected in accordance with civil service and classification laws.

The record shows that partisanship in appointments to the Commission have been nonexistent. If anything, the administration has "leaned over backward" to avoid even the appearance of partisan motivation in the selection of personnel.

Therefore, granting this authority can reasonably be supported by everyone interested in seeing that the Commission continues the excellent job it has begun.

### TITLE V

The final provision of H.R. 8601, title V, deals with the important problem of providing education for children of military personnel where State administered schools are closed because of desegregation decisions or orders. President Eisenhower made this compelling observation:

The Federal Government has a particular responsibility for the children of military personnel in federally affected areas, since armed services personnel are located there under military orders rather than of their own free choice.

Under existing statutes, the Commissioner of Education is empowered to provide for the education of children of members of the Armed Forces when local facilities are inadequate or nonexistent. But the law, as it stands contains a serious limitation. Only children of personnel residing on Federal property are eligible for benefits. Such an exclusion from coverage is not justified under present conditions.

Enactment of title V would remedy this defect. Specifically, it would amend the act of September 30, 1950—Public Law 874, 81st Congress—so as to authorize the Commissioner of Education to provide schools for servicemen's children where local schools are closed as a result of official State or local action. Temporary facilities would then be set up, without regard to whether or not the children affected reside on or off the base.

Additionally, future grants to federally impacted areas would be conditioned upon assurance that if schools constructed with such funds were closed, they would be delivered to the Commissioner of Education, upon request, in order that a temporary educational program could be established.

During the period of Federal occupancy a reasonable rental would, of course, be paid. And when the facilities were no longer needed, that is when the local schools had reopened, they would be returned to local authority upon a request approved by the Commissioner.

I believe that enactment of title V is warranted at this time. While the Supreme Court's program of school integration is proceeding satisfactorily, it is far from completed. New crises may arise in the future—some of them affecting children of members of the services.

Title V would provide, in the words of Secretary of Health, Education, and Welfare, Dr. Arthur Flemming, "a practical and promptly usable method, on a standby basis, for meeting a serious problem if it arises." It would give "assurance that military personnel ordered to duty in certain States will not be placed in the impossible situation of having to undertake emergency and makeshift arrangements for the education of their children, with the Federal Government powerless to assist."

The rule which we have just adopted has, in effect, made in order the voting-referee bill, H.R. 10035, which I introduced on January 28, 1960. So that this bill and the improved version thereof, H.R. 10625, which I introduced on February 23, 1960, which will be offered as an amendment or substitute at the proper time, will be on each Member's desk tomorrow, I shall ask unanimous consent in the House that both bills be incorporated in the RECORD at this point:

#### H.R. 10035

A bill to amend the Civil Rights Act of 1957 by providing for court appointment of United States voting referees, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 2004 of the Revised Statutes (42 U.S.C. 1971), as amended by section 131 of the Civil Rights Act of 1957 (71 Stat. 637), is amended as follows:

(a) Add the following as subsection (e) and designate the present subsection (e) subsection "(f)":

"In any proceeding instituted pursuant to subsection (c) of this section, in the event the court finds that under color of law or by State action any person or persons have been deprived on account of race or color of any right or privilege secured by subsection (a) or (b) of this section, and that such deprivation was or is pursuant to a pattern or practice, the court may appoint one or more persons (to be known as voting referees) to receive applications from any person claiming such deprivation as to the right to register or otherwise to qualify to vote at any election and to take evidence and report to the court findings as to whether such applicants or any of them (1) are qualified to vote at any election, and (2) have been (a) deprived of the opportunity to register to vote or otherwise to qualify to vote at any election, or (b) found by State election officials not qualified to register to vote or to vote at any election.

"Any report of any person or persons appointed pursuant to this subsection shall be reviewed by the court and the court shall accept the findings contained in such report unless clearly erroneous. The court shall issue a supplementary decree which shall specify which person or persons named in the report are qualified and entitled to vote at any election within such period as would be applicable if such person or persons had been registered or otherwise qualified under State law. The Attorney General shall cause to be transmitted certified copies of the original decree and any supplementary decree to the appropriate election officials of the State, and any such official who, with notice of such original or supplementary decree, refuses to permit any person, named as qualified to vote in such original or supplementary decree, to vote at any election covered thereby, or to have the vote of any such person counted, may be proceeded against for contempt.

"The court may authorize such person or persons appointed pursuant to this subsection to issue to each person named in the original decree or any supplementary decree as qualified and entitled to vote at an election, a certificate identifying the holder thereof as a person qualified and entitled, pursuant to the court's original decree or supplementary decree to vote at any such election.

"The court may authorize such person or persons appointed pursuant to this subsection (or may appoint any other person or persons) (1) to attend at any time and place for holding any election at which any person named in the court's original decree or any supplementary decree is entitled to vote and report to the court whether any such person has been denied the right to vote, and (2) to attend at any time and place for counting the votes cast at any election at which any person named in the court's original decree or any supplementary decree is entitled to vote and report to the court whether any vote cast by any such person has not been properly counted.

"Any person or persons appointed by the court pursuant to this subsection shall have all the powers conferred upon a master by rule 53 (c) of the Federal Rules of Civil Procedure. The compensation to be allowed to any person or persons appointed by the court pursuant to this subsection shall be fixed by the court and shall be payable by the United States.

"The court shall have authority to take any other actions, consistent with the provisions of this subsection, reasonably appropriate or necessary to enforce its decrees."

(b) Add the following sentence at the end of subsection (c):

"When any official of a State or subdivision thereof has resigned or has been relieved of his office and no successor has assumed such office, any act or practice of such official constituting a deprivation of any right or privilege secured by subsection (a) or (b) hereof shall be deemed that of the State and the proceeding may be instituted or continued against the State as party defendant."

#### H.R. 10625

A bill to amend the Civil Rights Act of 1957 by providing for court appointment of United States voting referees, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of*

**Exhibit 5-5**