district, or other local governmental unit, the Secretary shall handle all proceedings under this subtitle as expeditiously as possible. The Secretary shall complete any proceedings hereunder within one year from the time that a tentative plan is forwarded to the Governor, mayor, or other appropriate official under section 403(a), or, in case a State, municipality, school district, or other local governmental unit agrees to a tentative plan but does not carry it out, within six months from the time that the Secretary determines that such State, municipality, school district, or other local governmental unit is not carrying out such tentative plan.

"SEC. 404. There are hereby authorized to be appropriated for the fiscal year beginning July 1, 1960, and for each of the four succeeding fiscal years, such amounts as may be necessary for carrying out the purposes of this subtitle.

"SEC. 405. The Secretary is authorized to carry out his responsibilities and exercise his authority under this subtitle and under subtitles A and B through designated personnel in his own office or through any existing bureau, division, or agency of the Department of Health, Education, and Welfare or through a new office created by him for the special purpose of exercising the Secretary's responsibilities hereunder, except that the Secretary shall personally review and sign any approved plan issued under section 403(c).

"*Subtitle D*
"Authorization to the Attorney General in the Field of Public Education

"SEC. 501. (a) Whenever (1) the Secretary has published in the Federal Register an approved plan for the elimination of segregation in public education in any State, municipality, school district, or other local governmental unit pursuant to section 403 (c), (2) the State, municipality, school district, or other local governmental unit has rejected the plan or has refused or failed to act in accordance therewith, and (3) the Secretary has certified to the Attorney General that all efforts to secure compliance with the Constitution and the Supreme Court's decisions by conciliation, persuasion, education, and assistance under subtitles A, B, and C have failed, the Attorney General of the United States is authorized to institute for or in the name of the United States a civil action or other proceeding for preventive relief, including an application for an injunction or other order, against the appropriate officials of the State, municipality, school district, or other local governmental unit, and any individual or individuals acting in concert with such officials to enforce compliance with the approved plan.

"(b) The Attorney General is authorized to move to dismiss or discontinue any action brought under subsection (a), or to propose or to agree to a decree adopting a plan for elimination of segregation in public education which is different from the approved plan, whenever he determines that the State, municipality, school district, or other local governmental unit is making, or is prepared to make a prompt and reasonable start toward full compliance with the Constitution and the Supreme Court's decisions in the field of education and to work toward full compliance with all deliberate speed.

"(c) Any interested party may, with the leave of the court, intervene in any action brought under subsection (a), and the court shall consider any proposals by the intervenors, as well as by the defendant or defendants, in determining its final decree.

"TITLE III"
Renumber the remaining sections appropriately.

## ADJOURNMENT UNTIL MONDAY

Mr. JOHNSON of Texas. Mr. President, I move that the Senate stand in adjournment until Monday, at noon.

The motion was agreed to; and (at 6 o'clock and 2 minutes p.m.) the Senate adjourned until Monday, March 14, 1960, at 12 o'clock meridian.

## NOMINATION

Executive nomination received by the Senate March 11 (legislative day of March 8), 1960:

DIPLOMATIC AND FOREIGN SERVICE

Lyndall G. Beamer, of Illinois, for appointment as a Foreign Service officer of class 8, a vice consul of career, and a secretary in the diplomatic service of the United States of America.

## WITHDRAWAL

The following executive nomination was withdrawn from the Senate:

DIPLOMATIC AND FOREIGN SERVICE

Miss Lyndall G. Beamer, of Illinois, for appointment as a Foreign Service officer of class 8, a vice consul of career, and a secretary in the diplomatic service of the United States of America, sent to the Senate on February 19, 1960.

---

# HOUSE OF REPRESENTATIVES

FRIDAY, MARCH 11, 1960

The House met at 12 o'clock noon.
The Chaplain, Rev. Bernard Braskamp, D.D., offered the following prayer:

Ephesians 6: 14: *Stand therefore, having on the breastplate of righteousness.*

O Thou eternal God, who hast blessed us with the gift of a new day, may we seek to make its hours radiant in faith and rich in service.

Grant that in these strange and perilous times when we are tempted to yield to self-pity and discouragement we may have Thy grace to emancipate us from all fear of the future.

Show us how to live the larger and more abundant life of the spirit so that when the evening shadows gather round about us we may have no haunting regrets but only the companionship of happy memories.

Inspire us daily to take the example of Him who went about doing good, helping the troubled heart of humanity toward the higher life and teaching all the members of the human family to love one another and so fulfill Thy commandments.

Hear us in His blessed name. Amen.

## THE JOURNAL

The Journal of the proceedings of yesterday was read and approved.

## MESSAGE FROM THE PRESIDENT

A message in writing from the President of the United States was communicated to the House by Mr. Ratchford, one of his secretaries.

## HON. JACOB H. GILBERT

Mr. McCORMACK. Mr. Speaker, I ask unanimous consent that the gentleman from New York, Mr. JACOB H. GILBERT, be permitted to take the oath of office today. The certificate of election has not arrived, but there is no contest, and no question has been raised with regard to his election.

I have discussed this matter with the distinguished minority leader.

The SPEAKER. Is there objection to the request of the gentleman from Massachusetts?

There was no objection.

## SWEARING IN OF MEMBER

The SPEAKER. The Member-elect will present himself at the bar of the House and take the oath of office.

Mr. GILBERT appeared at the bar of the House and took the oath of office.

## INCREASE IN POSTAL RATES—MESSAGE FROM THE PRESIDENT OF THE UNITED STATES (H. DOC. NO. 357)

The SPEAKER laid before the House the following message from the President of the United States which was read and referred to the Committee on Post Office and Civil Service and ordered to be printed:

*To the Congress of the United States:*
In the budget message I urged the enactment of legislation to increase postal rates in order to eliminate the postal deficit. Several facts indicate the urgency of such action by the Congress.

The Postal Policy Act of 1958 definitely states that postal rates and fees shall be adjusted from time to time as may be required to produce the amount of revenue approximately equal to the total cost of operating the Postal Establishment, less the amount attributable to the performance of public services. That act directed the Postmaster General to submit to the Senate and House of Representatives no later than April 15 of this year the results of his survey of the need for the adjustment of postal rates and fees in accordance with this policy.

Because of the existing inadequate postal rates, the Post Office Department is losing $2 million every working day. In the 13 years from July 1946 to June 1959 the postal deficits have been approximately as much as the entire cost of running the Federal Government in 1938. The cumulative $6.8 billion postal deficit for these 13 years represents nearly one-half of the total increase in the Federal debt during this same 13-year period. Interest charges alone on the debt represented by this cumulative deficit are costing our taxpayers some $200 million each year.

These huge postal deficits are phenomena of the years since World War II. In the years from 1900 to 1940 the losses of the Post Office Department averaged only $33 million a year. Since that time—excluding the war years—



Exhibit 6-1

these losses have increased astronomically. The tremendous losses incurred since World War II have been due to the increases in cost of everything the Department uses or buys, and to the failure of the Congress to enact postal rate increases to pay for the added costs. For example, since the increase in the first-class letter rate in 1932 from 2 cents to 3 cents, costs have more than doubled, but the first-class letter rate has been increased only one-third. The annual losses on second- and third-class mail, now in the hundreds of millions of dollars, are likewise growing.

It is imperative that Congress implement the policy it wisely established in 1958 of providing that the Post Office Department shall operate on a self-supporting basis. The Postmaster General is transmitting to the Congress the administration proposals for increases in postage rates on first-, second-, and third-class mail to yield an estimated $550 million of new postal revenues in the 1961 fiscal year. Responsibility in the handling of our public affairs demands prompt action, in this session, to restore the Post Office Department to its traditional posture of budgetary good sense.

DWIGHT D. EISENHOWER.
THE WHITE HOUSE, *March 11, 1960.*

COMMITTEE ON BANKING AND CURRENCY

Mr. McCORMACK. Mr. Speaker, at the request of the gentleman from Texas [Mr. PATMAN] I ask unanimous consent that Subcommittee No. 3 of the Committee on Banking and Currency may be permitted to sit during general debate today.

The SPEAKER. Is there objection to the request of the gentleman from Massachusetts?

There was no objection.

CALL OF THE HOUSE

Mr. COLMER. Mr. Speaker, I make the point of order that a quorum is not present.

The SPEAKER. Evidently a quorum is not present.

Mr. McCORMACK. Mr. Speaker, I move a call of the House.

A call of the House was ordered.

The Clerk called the roll, and the following Members failed to answer to their names:

[Roll No. 21]

| | | |
|---|---|---|
| Albert | Davis, Tenn. | Mitchell |
| Allen | Derounian | Morris, Okla. |
| Anderson, Mont. | Edmondson | Mumma |
| Barrett | Flynn | Norblad |
| Barry | Forand | Pillion |
| Baumhart | Gavin | Porter |
| Bentley | Grant | Powell |
| Bowles | Green, Oreg. | Randall |
| Brewster | Griffin | Scherer |
| Burleson | Hébert | Shelley |
| Chiperfield | Kearns | Sheppard |
| Coffin | Landrum | Ullman |
| Davis, Ga. | Lesinski | Wharton |
| | Metcalf | |

The SPEAKER. Three hundred and eighty-nine Members have answered to their names, a quorum.

By unanimous consent further proceedings under the call were dispensed with.

CVI——333

CIVIL RIGHTS

Mr. CELLER. Mr. Speaker, I move that the House resolve itself into the Committee of the Whole House on the State of the Union for the further consideration of the bill (H.R. 8601) to enforce constitutional rights, and for other purposes.

The motion was agreed to.

Accordingly the House resolved itself into the Committee of the Whole House on the State of the Union for the further consideration of the bill H.R. 8601, with Mr. WALTER in the chair.

The Clerk read the title of the bill.

The CHAIRMAN. When the Committee rose on yesterday the gentleman from New York [Mr. CELLER] had 2 hours and 52 minutes remaining, the gentleman from Ohio [Mr. McCULLOCH] had 6 hours and 4 minutes remaining, and the gentleman from Louisiana [Mr. WILLIS] had 3 hours and 2 minutes remaining.

The Chair recognizes the gentleman from Ohio.

Mr. McCULLOCH. Mr. Chairman, I yield 20 minutes to the gentleman from New York [Mr. LINDSAY].

Mr. LINDSAY. Mr. Chairman, first of all I should like to express as a new Member of this body my gratification to the other members of the Committee on the Judiciary of the House of Representatives for the careful and lawyerlike consideration that they gave to this all-important matter. I must say that I entered into our deliberations with some concern over the possibility of rising tensions and of professional approaches being overwhelmed by personal attitudes. I was wrong. It was extremely gratifying to work with this committee even though we were often in disagreement.

My colleagues on that committee who were in disagreement with me, and I with them, at all times were professional and lawyerlike in their approach to the problem and to the writing of a bill.

Much time has gone by and a great deal has been said on the subject of a civil rights bill. At long last we finally come to the point where the U.S. Congress must take a leadership position in the continuing struggle to demonstrate that the Constitution means exactly what it says. Mark you well, the impact of what we do here today will be felt not only in the United States but the world over. I would venture to say that no domestic program that we have before us carries the impact abroad that this one does here. Aid to underdeveloped countries, collective security arrangements, and good will tours will have little meaning if we do not demonstrate for all to see our determination to safeguard the equal protection of the laws for every person.

Now, I do not think anyone can stand up here and argue that the committee bill we are now discussing can be called an unwarranted or undue intrusion into the affairs of any State or locality. If anything, the Congress has exercised, over a long period of time, great restraint in this area. The act of 1957 was the first response to the command of the Constitution since 1875. Under that act this Congress created a Civil Rights Commission in order to find the facts and report back to the Congress the facts and figures in respect of the civil rights problem in the United States.

I wonder how many members of this committee have taken the trouble to read the report of the Civil Rights Commission which I hold in my hand at this moment? Much has been said about it; there have been many accusations as to the nature of its impartiality and the factual way in which it went about its investigation.

I can assure you, my friends, if you will take the trouble to read the report, that you will come to a quite different conclusion. But the Commission report clearly demonstrates that there is a need for additional legislation in this area.

Mr. Chairman, I was interested to hear the comment made by the gentleman from Michigan [Mr. MEADER] and others on the floor yesterday commending the Attorney General of the United States for his caution when he testified before the subcommittee of the House Committee on the Judiciary on this subject. The Attorney General was very careful to say that after the enactment of the 1957 Civil Rights Act we should take care that we do not act too hastily with additional measures; yet the Attorney General of the United States has pressed hard for every single measure which is in the committee bill that we now debate. He, like the Civil Rights Commission, has urged the importance of enacting this legislation on the basis of need and necessity.

Now, whose responsibility is it to take action, if it is not ours? If we do not act, no one else can or will, and if anyone doubts that it is our responsibility to take further action in this regard, let me suggest that you reread the Constitution. You will be reminded that it is not a self-executing document; that it constantly stands in danger of being whittled away into a meaningless piece of paper enshrined in the archives of this Capitol.

Mr. CELLER. Mr. Chairman, will the gentleman yield?

Mr. LINDSAY. I yield to the gentleman from New York.

Mr. CELLER. Of course, the gentleman does not want to give the impression, I hope, that all responsibility for this measure is on one side of the aisle. He will admit, of course, that we on this side of the aisle, particularly we on this side of the aisle on the Committee on the Judiciary, did all and sundry to get this bill out.

Mr. LINDSAY. I do not understand the gentleman's question. There was no political implication in my remarks of any sort.

Now, let me continue.

The 14th and 15th amendments of the Constitution, which in this area, of course, are the key, expressly provide that the Congress shall have the power to enforce by appropriate legislation their provisions.

Now, let me just say a brief word about that important phrase "the equal protection of the laws" that appears in the 14th amendment. It is frequently mentioned,

Exhibit 6-2

but seldom explained. This language simply means that no agency or municipality of the State and no person who exercises any State power may deny equal protection to any person within the jurisdiction of that State. It refers to discriminatory legislation in favor of particular individuals as against others in like condition and to the way the law is administered. The clause, like the legislation now proposed, does not require that identical treatment be accorded to all peoples without recognizing differences in relative circumstances. It requires only that equal laws shall be applied to all under like circumstances in the enjoyment of personal and civil rights, in the acquisition and enjoyment of property, and in access to the courts. It is intended to prevent undue favors, individual or class privilege, and hostile discrimination or oppression. It was not intended to interfere with the State's power, sometimes called the police power, to prescribe regulations dealing with the health, morals, education, peace, or to legislate for the purposes of increasing industry, health, and prosperity of the State. This type of regulation may impose greater burdens upon some than upon others, but it is designed to promote the general good rather than impose unnecessary restrictions upon any person. If these differences operate alike on all persons and property under the same circumstances and conditions, they do not violate the equal-protection clause.

Now, everything that we do here today in taking action upon this bill is consistent with what I have just said.

Let us talk about this bill for just a moment. I submit that it is a modest, balanced approach to a very difficult subject. Three out of the five titles in this bill refer only to the civil code. There was a great deal said here yesterday about those portions of the bill that amend the Criminal Code. The suggestion or implication was there, of course, that this bill is a crusher type of thing, opening up the Criminal Code of the United States in a discriminatory way to attack a particular area or group only. Nothing could be further from the truth.

Of the two titles of the committee bill that do make adjustments to the Criminal Code, one, title II, is directed at acts of violence. It is the antibombing measure, and it applies to willful acts which would result in bodily harm or destruction of property. No one denies that this is an interstate problem and that acts of this kind are most difficult to curb. Further, it is not far removed from the Fugitive Felon Act, which has been on the statute books for many years.

The other adjustment to the Criminal Code would make it a misdemeanor, not a felony, willfully to obstruct court orders.

It was demonstrated by the Attorney General, who was exercising restraint and caution, and it has been demonstrated by the Civil Rights Commission, that the contempt power lodged in the Federal courts is not anywhere near broad enough to embrace willful acts directed against the carrying out of court orders. Rather than attempt any broad scale widening of the contempt power, with the concomitant difficulties over lack of jury trial about which we heard so much in 1957, it was suggested that we provide a misdemeanor action, with all of the safeguards that normally attach to any criminal case; trial by a local jury, burden of proof on the Government and all the other procedural safeguards that normally attach to a criminal proceeding. The point was made by my very able and distinguished colleague the gentleman from Louisiana [Mr. WILLIS] that this singled out a particular area, this new adjustment to the Criminal Code, and provided for misdemeanor penalties for obstruction of court orders in this one area. Naturally it does, because this is the area of a demonstrated need. Believe me, if there should be willful obstructions of court orders in other areas we would have before this House legislation to correct the same.

You will recall that the United Mine Workers of America were fined perhaps the most substantial fine that has ever been imposed upon any organized group in the history of this country for a willful obstruction of a court order under the contempt power, without a jury. And this ended the matter. And you may be sure that if it had not ended the matter, where the supremacy of the law is involved, we would there have requests for additional legislation and we would have gotten it. I remind you also that in those cases there is no jury, and here in a misdemeanor trial there is a jury.

Mr. Chairman, I repeat, this is a modest, carefully balanced approach to a most difficult subject.

There has been some comment on the subject of title III of the committee bill, which requires election officials to retain election records for a 2-year period. Again, it is made a misdemeanor for the willful destruction of such records. I submit that even if presidential electors be considered State officials the reach of the 15th amendment is quite broad enough to cover all State elections. Yet the proposal that the committee has made confines the area with which we are concerned to Federal elections only, with the addition of presidential electors.

Section 2 of the 15th amendment states that Congress shall have the power to enforce this article by appropriate legislation. How else do you enforce these provisions unless you have the records before you with which to lay a basis for determining whether or not there has been a denial of any constitutionally protected right? I repeat that the thrust of this particular provision is toward Federal elections only, as to which the power of the Congress is almost absolute. I submit also that under the 15th amendment if the committee had so wished it could have broadened this provision clear into the area of every State election from a municipal court justice on up.

Most of title IV has been enacted, extending the life of the Civil Rights Commission. There remains two important points dealing with the power to administer oaths and the staffing of the Commission.

Title V is designed to prevent children of the Armed Forces of the United States from being made innocent victims of public school closings. It contains adjustments to already existing statutes, which statutes recognize the responsibility of the United States for the education of children of members of the Armed Forces.

Mr. Chairman, much has been said about amendments to the committee bill. The time will come when we will debate those amendments, one by one, with great care. Suffice it for the time being, at least insofar as my own remarks are concerned, and I have a very limited amount of time, that I say just a word about the so-called voting referee amendment.

We have two proposals. One is the original McCulloch bill, which is the voting referee proposal which the Rules Committee has authorized to be offered as an amendment to the committee bill, and the other is the substitute which will be offered as a clarification of that measure. Without going into detail about differences between the two, let me just say this: no matter which bill you are talking about, the proponents seek to take a meaningful step toward the solution of the problem without doing away with the concept of local administration in this all-important area. Local Federal judges would be used, who would appoint local court-appointed special referees.

I submit there would be nothing constitutionally wrong with a registrar proposal, about which you have also heard. Such a proposal would keep the total administration of this whole subject centered in Washington—the long arm of the Federal Government—which so many fear. But, here the proponents, guided by the principles of modernization, have suggested an amendment which will keep the subject embraced within the arms of the local Federal judge.

Article II, section 2, of the Constitution expressly authorizes the Congress to vest the appointment of inferior executive officers in the courts. When the court appoints a referee to receive applications, make findings and submit a report to the court, he is utilizing the court to perform the same kind of functions that have been exercised by Federal special masters over the years.

I listened with great interest to the remarks of my distinguished and able colleague, the gentleman from Louisiana [Mr. WILLIS] when he said, "Mind you, this is not a new proposal—it has been used before." Of course, it has been used before. It has been used throughout the history of our jurisprudence.

Mr. MEADER. Mr. Chairman, will the gentleman yield at this point for a correction?

Mr. LINDSAY. I am sorry I cannot yield to my colleague since the time is limited, and I would like to complete my remarks.

Mr. Chairman, special masters have been used over the years in areas involving the conduct of human affairs. For example, the holding of corporate elections in stockholder suits. There it is perfectly proper for a special master to be appointed to supervise the whole show—poll watchers, if you will. A

Exhibit 6-3

board of monitors to protect the rights of union members in a dispute involving the union membership and its leadership within the union structure. The supervision of corporate behavior in long-standing and wide-ranging antitrust decrees where the court must, obviously, supervise the conduct of the corporate entity with outsiders and other people who are not parties to an original decree.

The CHAIRMAN. The time of the gentleman from New York [Mr. LINDSAY] has expired.

Mr. McCULLOCH. Mr. Chairman, I yield the gentleman 2 additional minutes.

Mr. LINDSAY. Mr. Chairman, remember that the point is made also: What business is it of the United States to become the private lawyer for a private person? This, my friends, is the same argument that was made against the 1957 Civil Rights Act. Suits under the act are much the same as those instituted by the Government pursuant to the Fair Labor Standards Act to restrain an employer from committing unfair or illegal wage and/or hour practices against his employees and to recover for the benefit of such employees what has been wrongfully withheld. I submit also the Raines case just decided at the end of last month by the Supreme Court of the United States covered this point. It said:

> It is urged that it is beyond the power of Congress to authorize the United States to bring this action in support of private constitutional rights. But there is the highest public interest in the due observance of all the constitutional guarantees, including those that bear the most directly on private rights, and we think it perfectly competent for Congress to authorize the United States to be the guardian of that public interest in a suit for injunctive relief.

It is commonplace for courts to retain jurisdiction until full compliance of their decrees has been obtained.

Let me add, lastly, that the "case of controversy"—article III of the Constitution—is concluded only when the court is satisfied in the affected area that its processes have completely vindicated the public interest in securing freedom from racial discrimination in voting.

So, I say, Mr. Chairman, in concluding, that if the idea of government by consent is the essence of our Republic, then the right to vote and the equal protection of the laws must be safeguarded. Otherwise, we have no claim that our Republic was "conceived in liberty and dedicated to the proposition that all men are created equal."

Lincoln reminds us that the authors of the Declaration of Independence "intended to include all men." Listen to what he said at Springfield on June 26, 1857:

> They meant to set up a standard maxim for free society, which should be familiar to all, and revered by all; constantly looked to, constantly labored for, and even though never perfectly attained, constantly approximated, and thereby constantly spreading and deepening its influence and augmenting the happiness and value of life to all people of all colors everywhere.

The CHAIRMAN. The time of the gentleman from New York has expired.

Mr. HALPERN. Mr. Chairman, I ask unanimous consent to extend my remarks at this point in the RECORD.

The CHAIRMAN. Is there objection to the request of the gentleman from New York?

There was no objection.

Mr. HALPERN. Mr. Chairman, it is a signal privilege to participate in this great debate on the fundamentals of our democratic faith. I am grateful that the Members of Congress are granted the opportunity to consider and act upon legislation to protect the civil rights of all the citizens of the United States.

The American dogma—

Said Mark Twain—

> rightly translated, makes this assertion: That every man is of right born free, that is, without master or owner; and also, that every man is of right born his neighbor's political equal—that is, possessed of every legal right and privilege which his neighbor may attain.

This truly is the priceless endowment of our great Nation. We hold it to be inviolate that every man is born possessed of rights granted by God. These rights pertain to him in his character as a person, as a human being, to be preserved for him and protected against incursions by his fellows or his society.

Positive power to protect these rights is contained in the U.S. Constitution, particularly in the 14th and 15th amendments. This power is residual in nature, to be discharged whenever men are deprived of, or are unable to exercise, the same legal rights and privileges possessed by their neighbors.

In determining whether to wield this power and to what extent, the only reasonable approach is to take a sober, nonpassionate look at the record.

This is what I propose to do. The record is there for all to see. Most of it can be found in the magnificent report issued by the U.S. Civil Rights Commission last summer.

The problem—

The Commission stated in its conclusion—

> is one of securing the full rights of citizenship to those Americans who are being denied in any degree that vital recognition of human dignity, the equal protection of the laws * * *. To a large extent this is now a racial problem * * *. Therefore, the Commission has concentrated its studies on the status of the 18 million Negro American citizens who constitute this country's largest racial minority. If a way can be found to secure and protect the civil rights of this minority group, if a way can be opened for them to finish moving up from slavery to the full human dignity of first-class citizenship, then America will be well on its way toward fulfilling the great promises of the Constitution.

The extent of the problem was then described by the Commission:

> In part this is the old problem of the vicious circle. Slavery, discrimination, and second-class citizenship have demoralized a considerable portion of those suffering these injustices, and the consequent demoralization is seen by others as a reason for continuing the very conditions that caused the demoralization.
>
> The fundamental interrelationships among the subjects of voting, education, and housing—

It continued—

> make it impossible for the problem to be solved by the improvement of any one factor alone. If the right to vote is secured, but there is not equal opportunity in education and housing, the value of that right will be discounted by apathy and ignorance. If compulsory discrimination is ended in public education, but children continue to be brought up in slums and restricted areas of racial concentration, the conditions for good education and good citizenship will still not obtain. If decent housing is made available to nonwhites on equal terms but their education and habits of citizenship are not raised, new neighborhoods will degenerate into slums.

Here, Mr. Chairman, is a résumé of the enormity and the scope of the problem. With the exception of housing which will not be considered in this debate with a remedial end in view, these are the areas where corrective measures are required. Any final bill that we pass must provide firmer protection of rights, not only in the field of the franchise but in the areas of education and human rights as well. If we do not, we will have left the vicious circle largely intact and will have failed in our constitutional responsibility.

We have learned through bitter experience that the way to assure that every individual may possess the same legal rights and privileges as his neighbor is through the backing of law wisely administered with a dependence upon civil court processes and upon mediation, education, and technical assistance, but backed by law. It is only in this way that effective and meaningful progress can be achieved with a minimum of discord and without violence.

What does the record reveal in more detail about the lack of the possession of civil rights and what are the specific provisions we can enact that will give meaning and substance to our constitutional principles?

SCHOOL DESEGREGATION

In 1954 the Supreme Court declared that no person could be refused admission to a public school solely because of his race or color. At the time of the decision 17 States plus the District of Columbia were maintaining segregated school systems. By 1960, 6 years later, "few more than one-fourth of all the biracial school districts in the 17 States had even begun to desegregate." In five States, Alabama, Georgia, Louisiana, Mississippi, and South Carolina, no desegregation had occurred in any such school district.

Integration has been completed in the District of Columbia and West Virginia. It has largely been accomplished in Delaware, Kentucky, Maryland, Missouri, and Oklahoma. It has been started in Texas and Tennessee, where 46,000 of 425,000 Negroes in biracial school districts have been integrated. It has received token acceptance in Arkansas, Virginia, North Carolina, and Florida, where about 500 of 800,000 Negro students are in mixed classes.

Of some 3 million Negroes in biracial school districts in 1959, about 447,000 were in school systems that desegregated, but about half of these, either because of residential segregation or for

Exhibit 6-4

other reasons, were still in all-Negro schools.

The picture is dismaying. In percentage of total numbers, only about 7½ percent of Negroes in biracial school districts that were segregated in 1954 actually attended mixed classes in 1959.

The number of legal blocks that have been created to restrain the pace of integration to a slow crawl are numerous. They include pupil-placement laws, school-closing laws, private-school plans, and harassment of the efforts of the NAACP to battle the resistance through the courts. So-called antibarratry laws have been passed in a number of States—Arkansas, Georgia, Mississippi, South Carolina, and Virginia—which make it exceedingly difficult for lawyers or outside groups to help a particular litigant who might seek to institute a suit for the right to enter a nonsegregated school.

Separate but equal schools have been lauded time and again as providing similar educational advantages to white and Negroes. How often have we heard the statement, "The Negro schools in our area are much better than the white schools"? Perhaps this is so, but then it is rather ironic that when Negroes from these supposedly superior schools attempt to pass literacy qualification tests in order to exercise the right to vote, for some reason they are declared unable to meet the requirements. This is the vicious circle in fierce and shameful operation.

Are there remedies available to enable the process of integration to move faster than the distressing pace of the past 5 years?

One central remedy that was adopted by the House in 1957, but deleted by the Senate, and was included in the legislation studied by the Judiciary Committee, but not reported in H.R. 8610, is that of the so-called title III power. This would authorize the Attorney General to institute in the name of the United States a civil action or proceeding for preventive relief, including an application for injunction or other order, whenever, on a signed complaint, he determines that a person or group of persons is being threatened with the loss of or is being denied the right to equal protection of the laws by reason of race or color and is unable for any reason to seek effective legal protection for that right. Such suits could be instituted against those acting under color of State law or through a conspiracy.

Protection would be provided, among other instances, for those financially unable to bear the expenses of litigation—and to take a case through the Supreme Court costs upward of $25,000 at a minimum—or whose employment or economic activity would be jeopardized by the private institution of such a suit, or who would be subject to physical harm or economic damage.

It is very clear from what has happened in the school desegregation field, that there is absolutely urgent need for some authority in the Attorney General to institute suits in this area. Harassment and threats to individuals, the heavy expense of lawsuits, and antibarratry laws, all combine to reduce any present legal remedies to paper rights.

In areas where "some are more equal than others," enactment of title III would go far to restore a balance of equality among all.

The authority could be used, in addition to enforcing the right to attend a nonsegregated public school, to enforce rights to attend other public facilities such as golf courses, parks, and other public accommodations such as restaurants, and the opportunity to ride on buses and trolley cars and trains: to vote, to serve on juries, and so forth.

As for the authority which this provision would give to the Attorney General to secure injunctive relief, a far more equitable method than enforcing criminal sanctions after a deprivation has occurred, there are 50 Federal statutes in which injunctive relief in suits brought by officers of the Federal Government to carry out the purport of the laws, is authorized.

The effect of a title III power would be that in a representative case in which civil rights are sought to be asserted, the Attorney General would have the duty and the authority fully to protect these rights.

Other remedies that should be enacted are title I of H.R. 8601, which provides that obstruction of U.S. court orders in the field of school desegregation shall constitute a misdemeanor with a fine of up to $1,000 and imprisonment for more than 60 days or both.

Such a provision would deal with the type of situation that occurred at Little Rock where there was great difficulty in reaching the leaders of a disorderly mob who were violating a court injunction due to the limitations of the law with respect to service of or notice of that injunction. It would also result in enabling the FBI to enter a potentially dangerous situation of that kind where Federal court decrees are in danger of being flaunted and to utilize its influence in reducing inflamed passions and the threat of public disorder.

Additional proposals of merit are those, among others, also considered by the Judiciary Committee, which would provide for grants to be made by the Secretary of Health, Education, and Welfare to States, municipalities, school districts, and other local governmental units which maintained segregated schools prior to the Supreme Court decision of 1954, and which wish to desegregate, and, apply to the Secretary for assistance. Such grants could be employed to meet the expenses of the transitional periods when additional teachers, trained personnel, and extra facilities might well be required.

Another provision is that granting authority to the Secretary of Health, Education, and Welfare to provide technical assistance such as furnishing information, preparing surveys, holding conferences, and supplying expert specialists, in order to assist States or local areas to integrate when these latter so request.

Such provisions could prove of inestimable benefit particularly in economically impoverished areas. In addition, since carefully developed local or State plans for desegregation are, in numerous instances, sometimes preferable to plans imposed from the outside, such assistance as these provisions would offer would be of great help to local efforts.

Finally, the provision in H.R. 8601 to provide arrangements for the education of children of members of the Armed Forces in areas where public schools might be closed down by State law to avoid compliance with the Constitution, is of utmost importance. Thirty-eight and three-tenths percent of the U.S. armed services personnel are living in States which have segregated schools. To deny the children of these members of the U.S. Armed Forces a public education is unthinkable. The provision would authorize the U.S. Commissioner of Education to provide for their education when public schools are closed to avoid integration. Little need further be said in support of this meritorious proposal.

These then are the possible remedies that have been submitted by which Congress, under the authority granted to it in the 14th amendment, can effectively advance the right to attend a nonsegregated public school. They are reasonable. In the light of the appallingly slow progress that has been made in this field, they are necessary. They offer a balanced program of legal processes, technical and financial assistance, and utilization of the facilities of the Government other than the courts. I urge that they be adopted by this House.

VOTING RIGHTS

In the area of voting, the story is equally dismal. Despite the enactment of the 1957 measure and despite the existence of other Federal statutes on the books, the advance of voting rights under the 15th amendment has been so slow that it is obvious further laws are needed.

The report of the Civil Rights Commission points out that only about 25 percent of the nearly 5 million Negroes of voting age in the South are registered. This contrasts with about 60 percent of voting-age southern whites who are registered. Percentages vary, of course, from area to area, but the overall statistics are tragically low.

The Commission asked:

Why are so few Negroes in some areas registered?

Apathy—

It stated—

is part of the answer.

However—

It continued—

some of the statistics on their face do suggest something more than apathy. The figures show 16 counties where nonwhites constituted a majority of the voting-age population in 1950 but where not a single Negro was registered at last report. They show 49 other Negro-majority counties with some but fewer than 5 percent of voting-age Negroes registered. These figures indicate somthing more than the lower status and level of achievement of the rural southern Negro. In the six States with officially released racial registration statistics—Arkansas, Florida, Georgia, Louisiana, South Carolina, and Virginia—nonwhites were a majority of the population in 97 counties. Of these counties, 75 had fewer than the State's average proportion of Negroes registered according to the unofficial statistics. All of the 14 nonwhite majority counties in

Exhibit 6-5

Alabama were reportedly below the State's average.

A closer investigation reveals a sickening array of sordid episodes where the right to vote has been thwarted. The report of the Commission is replete with these ugly instances. Fear of reprisals, whether groundless or not, were shown to be a real deterrent to registration. For instance, the story is revealing of the elderly Negro in Gadsden County, Fla., who, when asked why, although he had registered 3 years previously, he had not voted, replied, "I am too old to be beaten up."

Other instances evidence harassment in registering, the ridiculous farce of educated Negroes being declared unable to pass literacy tests, delay, ambiguous standards, and personal vagaries of registration clerks.

The Commission summed it up in this fashion:

The history of voting in the United States shows and the experience of this Commission has confirmed that where there is will and opportunity to discriminate against certain potential voters, ways to discriminate will be found.

Against the prejudice of registrars and jurors—

It graphically declared—

the U.S. Government appears under present law, to be helpless to make good the guarantees of the U.S. Constitution.

The Commission has disclosed that the barriers to full exercise of the right to vote are numerous and involved. These include not only intimidation and fear of reprisals, delay and obfuscation by officials, but destruction of voting records, evasion of registrar responsibilities, and inordinately lengthy legal procedures to establish the right to vote for a particular group or person.

It has become apparent—

The Commission states—

that legislation presently on the books is inadequate to assure that all our qualified citizens shall enjoy the right to vote.

This—

The Commission continues—

is a partial repudiation of our faith in the democratic system. It undermines the moral suasion of our national stand in international affairs. It reduces the productivity of our Nation.

Here again, Mr. Chairman, remedies are available.

The preservation of Federal election records and the granting of authority to the Attorney General to inspect them is a logical step in protecting the right to vote. Certainly, no one can oppose a reasonable provision for this purpose, a provision such as was included in H.R. 8601.

Of prime importance as well, is the creation of a system which will provide the broadest possible participation in voting by all our qualified citizens. The 15th amendment gives Congress ample legislative authority to guarantee the right to vote in State elections as well as in Federal elections. The 14th amendment affords protection against State interference with the equality of opportunity to vote in any election.

Pursuant to the authority granted under these provisions, numerous suggestions have been made for the creation of court or administratively appointed officers to register qualified voters in either Federal or State elections or both, and to oversee that there is no denial of the right to vote after registration.

These bills include provision for Federal registrars, voting referees, or enrollment officers.

They all aim, in one fashion or another, at providing for a relatively rapid means of registering qualified voters with a minimum of lengthy legal procedures.

Their purpose is to provide temporary registration under Federal law where State facilities are either nonexistent or are inadequate for the full and equitable carrying out of the duties laid down in the Constitution.

In legal actions provided for under some of the bills, provision is made for suing States in order to protect the right to vote where State-appointed registrars resign, vacate their office, or otherwise are unable to carry out their duties.

Each of these proposals has merit. No one of them may provide the best solution to the problem. I, myself, have introduced a referee bill, H.R. 11006, as a vehicle for consideration of the problem by the House.

There is no doubt about the need for the passage of legislation in this regard. I feel certain that a workable provision commensurate with the need will be adopted. We can do nothing less.

HATE BOMBING

There is one other area where legislation is sorely required. The Civil Rights Commission did not include it within its investigations, but hearings have been held in regard to it both in the House and Senate in which the need for Federal legislation was plainly demonstrated.

This is the field of antihate bombing legislation.

Between 1954 and early 1959 more than 90 recorded instances of bombings of churches, schools, homes, civic buildings, and business establishments occurred. These took place in some 11 States. They are still occurring.

During the hearings on this subject it was disclosed that many of the bombings were perpetrated by groups moving from State to State.

From the picture it has become evident that if such bombings are to be checked, strong, deterrent Federal legislation is needed.

One form is included in H.R. 8601. This would make it a Federal felony to flee across State lines to avoid prosecution for bombing churches, schools, residences, and so forth, or, to avoid giving testimony in any criminal proceeding relating to such an offense.

The obverse of such a provision is also necessary. The carrying of explosives into a State for the purpose of destroying real or personal property is an essential supplement to any amendment of the Federal fugitive felon law. Numerous bills have been introduced for this purpose and were considered by the Judiciary Committee. No such provision has been included in H.R. 8601.

The purpose of Federal antihate bombing legislation is twofold. As I mentioned, if effective deterrence of this heinous form of racism and bigotry is to be achieved, strong laws are essential.

It is far more feasible to legislate both in respect to the transportation of explosives into a State for hate bombing purposes and to make it a Federal felony for a hate-bomber to flee across a State line after he has perpetrated his loathsome action, than to merely touch one phase of the situation.

The second purpose is to assure that the most effective police work will be done to prevent such occurrences or to arrest the malefactors after a bombing has taken place. There are, of course, differences in the quality of police work across the country. At present, if the FBI is to lend its magnificent facilities to assisting local efforts, it must be by invitation. The adoption of laws in regard to entry with explosives into a State before a bombing, as well as fleeing after a bombing, would assure that the FBI would be available to work with local officers in a coordinated effort. I urgently recommend that this House adopt a provision in connection with the transportation of explosives into a State for the purpose of destroying real or personal property.

Mr. Chairman, this is the record. Significant advances in the guarantees of civil rights have been accomplished in specific areas. The overall picture is, however, one of pathetic slowness, local irresponsibility and in some instances, organized resistance.

The need for firmer legislation has been fully demonstrated.

I have attempted to draw a picture of the dismal progress that has thus far been achieved through reference to a record that is unimpeachable. There is nothing here of flagrant charges or emotion-laden diatribe. This is a sober, factual presentation.

The very fact that this dismal lack of progress can be buttressed so fully by the record makes it all the more appalling. It is not, as the Civil Rights Commission forcefully pointed out, merely a matter of voting or of housing, or of education. It runs across the whole gamut of civil rights.

Here is the need, Mr. Chairman. It is our responsibility to adopt legislation commensurate with it.

I have referred to numerous remedial proposals. I am proud to have sponsored these, among others. I intend to work for their acceptance.

A new breeze is sweeping across the Nation, Mr. Speaker—indeed, across the world. Those who ignore its message do so at the price of inviting unrest and possibly civil disorder. No longer will those, who for years patiently bore their sufferings as second-class citizens, be content with the snail's pace that has been seized upon as a rationalization for progress.

Legislation to give life and meaning to our constitutional guarantees is the inevitable answer where those with the power to act, turn their backs on responsibility. A concerted effort is required to close the dreadful gap between our ideals and reality.

Exhibit 6-6

We are concerned here today with human rights. Our actions will create repercussions not only throughout the United States but in the farflung reaches of the world. Unless we act in a positive and dynamic fashion, our hopes for winning over the uncommitted nations of Asia and Africa to the cause of freedom are doomed.

Failure to enact meaningful and effective civil rights legislation would all but negate President Eisenhower's good will achievements during his recent trip to Asia and Africa and would undermine the effort of our State Department which has eagerly sought to bring the peoples of that part of the world into the orbit of freedom.

The Communists have been quick to use our long and ugly record of racial discrimination as a weapon against us. Indeed, our current apathy on the subject merely adds further fuel to the Communist argument and seriously endangers our world position.

I urge that this House adopt legislation to advance all the guarantees of the 14th and 15th amendments. Under our sworn oaths to uphold the Constitution we can do nothing less.

With malice toward none—

The Great Emancipator beseeched—
with charity for all, with firmness in the right as God gives us to see the right, let us strive on to finish the work we are in.

Mr. McCULLOCH. Mr. Chairman, I yield 5 minutes to the gentleman from California [Mr. JACKSON].

Mr. JACKSON. Mr. Chairman, I ask unanimous consent to speak out of order and to revise and extend my remarks.

The CHAIRMAN. Is there objection to the request of the gentleman from California?

There was no objection.

Mr. JACKSON. Mr. Chairman, it has been said that "there's many a slip twixt the cup and the lip," and it might well be added that there is sometimes a great deal of difference between the headline on a news story and what is contained in the story itself.

Several days ago many of us were shocked to read in the press, headlines which indicated that Francis Cardinal Spellman, Catholic archbishop of New York, had entered the controversy over an Air Force training manual, and had ranged himself with those who contend that there has been no effort on the part of Communists to infiltrate American churches. Further, the headlines tended strongly to imply that the cardinal disavowed any suggestion that a few churchmen might have lent their efforts to Communist causes.

I have no way of knowing what representations were made to the cardinal, or by whom, but it is quite apparent to anyone reading his statement that he was not commenting upon the allegations contained in the Air Force manual, but was rather protesting any suggestion of disloyalty in the Chaplain Corps of the several armed services. It is interesting to note that no such allegation was contained in the manual, nor intimated by any spokesman involved in the controversy on either side of the issue.

Yet, and on the basis of a release totally unrelated to the basic issues in the manual controversy, the cardinal's statement was tortured to the point where it was featured as a defense of those who appear to require defense against some of the allegations contained in the manual.

Here are the verbatim quotes of Cardinal Spellman. The statement is an entirely proper one, and one with which every American of whatever religious persuasion can agree. It is not, however, a statement designed to offer cover for critics of the Air Force manual, nor for those who prefer to close their eyes to the grim record of Communist efforts to infiltrate our church institutions.

Cardinal Spellman said in his original statement:

My position as Military Vicar has given me many occasions, extending over a long span of years that goes back to the beginning of World War II, of meeting and associating with chaplains of the Protestant faith. During these many years of association, I have admired their dedicated loyalty to our country and its purposes. I would deplore it if any unfair deductions from general accusations were interpreted to reflect in any way on their loyalty to our country or on the loyalty of the general body of ministers whom they represent.

It will be noted that nowhere in the cardinal's statement does the phrase "Air Force manual" appear. Yet that bulwark of journalism, the New York Times, frequently pointed out to students of journalism as the greatest example of honest, fair, and objective reporting, took unbridled license in editorializing the headline, and to give the impression to its readers that a great church leader had said something he never said or never intended to say. The headline in question is morally dishonest, factually inaccurate, and intellectually on a par with the journalistic ethics of a throwaway tabloid.

The Times headline of Wednesday, March 9, 1960, reads, "Spellman Scores Air Force Manual," and a subhead proclaims, "Hails 'Dedicated Loyalty' of Protestant Clergymen Criticized in Booklet." That both statements are inaccurate and intended to mislead readers is the most charitable statement that can be made in this instance.

Responsible journalism requires an adherence to facts and to the truth. What a publisher does on his editorial page is one thing—what he does to straight news reports is another.

The Washington Post did but a little better. Its headline stated: "Spellman Wins Thanks for Protestant Defense." As a matter of honest fact the cardinal's clear statement was directed to the loyalty of the Chaplain Corps and the "general body of the ministers whom they represent," a statement completely consonant with those made in the manual, and those delivered on the floor of the House last Thursday by the gentleman from California. No one has ever suggested or implied that the overwhelming body of Protestant churchmen in this land is comprised of anything but dedicated and devoted Americans, although some spokesmen for the National Council of Churches would have it believed that this charge has been leveled.

Concerned with the obvious attempt to twist an important statement by a respected church leader into something quite different from that intended, I sent a telegram yesterday to Cardinal Spellman. In my telegram I said:

His Eminence FRANCIS CARDINAL SPELLMAN,
Archbishop of New York, N.Y.

YOUR EMINENCE: Evidently the statement made by you on yesterday respecting the current controversy over certain statements made in an Air Force training manual were deliberately distorted to indicate a blanket endorsement by you of the entire body of Protestant churchmen relative to their loyalty. The implication written into your perfectly proper message has done grievous harm to the fight being waged by many of us here in the Congress to disclose efforts of the Communist Party to infiltrate American churches and the efforts of a few Protestant ministers to further the cause of Godless conspiracy. As a former combat officer in the U.S. Marine Corps, I share your high regard for the dedicated men of all faiths who have served and are serving in the Armed Forces of the United States. Their loyalty has never been brought into question in any manner, nor do I know of a single instance involving the loyalty of a chaplain. The fight against the common foe has been set back by the improper use of your statement. If it is at all possible to clarify this matter, I sincerely hope it can be done. Believe me to be, most respectfully.

This morning I received a telegram from Cardinal Spellman. The text is as follows:

Congressman DONALD L. JACKSON,
House of Representatives,
Washington, D.C.:

I have received your telegram which I have read with interest. The statement I made was clear and unequivocal. I cannot understand how some of the press distorted my statement. I respect the fact that Congressman WALTER, you and other members of your committee have rendered outstanding service in exposing Communist activities.

FRANCIS CARDINAL SPELLMAN.

There is a sufficient merit on both sides of the current controversy to permit a difference of opinion between honest men. There is not, however, any reason to twist, torture or distort statements made in an effort to make the comments accord with the editorial position taken by a newspaper.

We on the House Committee on Un-American Activities appreciate the prompt action taken by Cardinal Spellman to put this matter in proper focus. It is to be regretted that the treatment accorded his statement in some newspapers required an extension and clarification of a perfectly clear comment.

Mr. McCULLOCH. Mr. Chairman, I would prefer that someone on the other side proceed at this time.

The CHAIRMAN. Does the gentleman from Georgia care to yield time?

Mr. FORRESTER. Mr. Chairman, on behalf of the gentleman from Louisiana [Mr. WILLIS], who is temporarily absent, I yield 15 minutes to the gentleman from Kentucky [Mr. CHELF].

Mr. CHELF. Mr. Chairman, what I am about to say will not please, probably, my good friends of the North, East, or the West, who are inclined to be overly liberal; nor will it cause singing and dancing in the streets of the Deep South.

Exhibit 6-7