into the United States, or transported in commerce and (2) was imported or transported or caused to be imported or transported in commerce by the person so possessing or using it: *Provided, however,* That no person may be convicted under this section unless there is evidence independent of the presumptions that this section has been violated.

"'(d) Whoever, through the use of the mail, telephone, telegraph, or other instrument of commerce, willfully imparts or conveys, or causes to be imparted or conveyed, any threat, or false information knowing the same to be false, concerning an attempt or alleged attempt being made, or to be made, to perform any act prohibited by this section, not more than one year or a fine of not more than $1,000, or both.

"'(e) This section shall not be construed as indicating an intent on the part of Congress to occupy the field in which this section operates to the exclusion of a law of any State, Territory, Commonwealth or possession of the United States, and no law of any State, Territory, Commonwealth, or possession of the United States, which would be valid in the absence of the section shall be declared invalid, and no local authorities shall be deprived of any jurisdiction over any offense over which they would have jurisdiction in the absence of this section.'

"Redesignate the present subsections (a) and (b) as (b) and (c) respectively."

Mr. KEATING. Mr. President, I desire to offer for the RECORD a very brief statement, so that it will follow the actual amendment itself when it is printed.

The amendment adds a new subsection to the section of the Dirksen amendment dealing with bombings. The amendment is almost identical with the amendment which was presented and read in the Senate, offered by me on behalf of myself and a number of other Senators, on March 1, and which is designated, as the clerk has stated, "3–14–60—A," the only substantial difference being that the present amendment would be an addition to, rather than a substitute for, the language of section 2 of the Dirksen amendment.

As it was originally offered, it was a substitute for section 2, and is now offered as an addition to it.

The language of the amendment also is virtually identical to the language of S. 73, which I introduced on January 9, 1959, and which was cosponsored by Senators Javits, Scott, Allott, Beall, Bennett, Bridges, Bush, Case of New Jersey, Cooper, Kuchel, Langer, Martin, Prouty, and Smith.

It is also very similar to the language of and completely similar in objective to the bill, S. 188, which was introduced by the Senator from Massachusetts [Mr. KENNEDY] on January 12, 1959. That bill was cosponsored by Senators Ervin, Allott, Anderson, Bible, Bush, Byrd of West Virginia, Cannon, Carroll, Case of New Jersey, Chavez, Church, Clark, Dodd, Douglas, Engle, Green, Gruening, Hart, Hennings, Humphrey, Langer, Magnuson, Mansfield, Martin, McCarthy, Moss, Murray, Pastore, Randolph, Symington, Yarborough, Young of Ohio, and Young of North Dakota.

In all, Mr. President, a total of 44 Senators have cosponsored one or the other of these bills.

In addition, a similar provision is contained in the civil rights bill introduced by the distinguished majority leader in the first session of this Congress. In other words, the bill of the majority leader likewise dealt with this bombing situation in the manner set forth in this amendment, rather than according to the fugitive felon idea.

Mr. President, I think it is not necessary for me to detain Senators further at this time. It will be my intention to go into more detail on this as soon as it becomes the pending business tomorrow.

## USE OF TELEVISION STATIONS BY PRESIDENTIAL CANDIDATES— EXTENSION OF TIME FOR BILL TO LIE ON DESK

Mr. HART. Mr. President, I ask unanimous consent that S. 3171, to provide for the use of television broadcasting stations by candidates for the office of President of the United States, introduced on March 10 by the Senator from Washington [Mr. MAGNUSON], for himself and other Senators, lie on the desk for an additional 2 days for possible cosponsors.

The PRESIDING OFFICER (Mr. BARTLETT in the chair). Without objection, it is so ordered.

## ADJOURNMENT

Mr. HART. Mr. President, if there is no further business, so far as Senators on the floor are concerned, I move, pursuant to the order previously entered, that the Senate stand in adjournment until 12 o'clock noon tomorrow.

The motion was agreed to; and (at 6 o'clock and 22 minutes p.m.) the Senate adjourned, pursuant to the order previously entered, until tomorrow, Tuesday, March 15, 1960, at 12 o'clock meridian.

## NOMINATION

Executive nomination received by the Senate March 14, 1960:

INTERSTATE COMMERCE COMMISSION

Timothy J. Murphy, of Massachusetts, to be an Interstate Commerce Commissioner for the remainder of the term expiring December 31, 1964, vice Anthony F. Arpaia, resigning.

# HOUSE OF REPRESENTATIVES

MONDAY, MARCH 14, 1960

The House met at 12 o'clock noon.

The Right Reverend Theodore Kojis, abbot of St. Andrews Abbey, Cleveland, Ohio, offered the following prayer:

Almighty God, Heavenly Father, we beseech Thee to continue to bless our leaders so that they may always conscientiously serve the best interests of our Nation and its people and thus remain in the favor of Thy divine providence.

We pray Thee, God of mercy, to mitigate the sufferings of all enslaved victims of brutal communism and, in particular, on this solemn occasion of the 21st anniversary of the Proclamation of Slovak Independence, we implore Thee to grant the same blessings of freedom to the Slovak nation as Thou hast deigned to give us in our United States, so that Slovakia, likewise, could have a "government of the people, by the people, for the people."

Lord, hear our prayers.

And let our cries come unto Thee. Amen.

## THE JOURNAL

The Journal of the proceedings of Friday, March 11, 1960, was read and approved.

## THE LATE FRED H. DOMINICK

Mr. DORN of South Carolina. Mr. Speaker, I ask unanimous consent to address the House for 1 minute and to revise and extend my remarks.

The SPEAKER. Is there objection to the request of the gentleman from South Carolina?

There was no objection.

Mr. DORN of South Carolina. Mr. Speaker, it is my sad duty this morning to announce to the House the passing of a former distinguished and able Member from the district it is my honor to represent, the Honorable Fred H. Dominick.

Mr. Dominick was born in Newberry County, S.C. He represented the Third South Carolina Congressional District from 1917 until 1933, a period of 16 years. He represented his district longer than any other Congressman since the War Between the States. Before coming to Congress, he served as Newberry city attorney, Newberry County attorney, member of the State house of representatives, and as assistant attorney general of South Carolina.

Mr. Dominick was a great Democrat. He was active in the South Carolina Democratic Party and in the national party. He was a delegate to every State Democratic convention since 1900 until recent years with the exception of 1914. For many years, he was Newberry County democratic chairman. As a delegate to the Democratic National Convention in San Francisco in 1920, he supported the nomination of Cox of Ohio for President and Franklin D. Roosevelt as the Vice Presidential nominee. As a delegate to the New York convention in 1924, he supported John W. Davis and Charles Bryan as running mate, brother of William Jennings Bryan.

Mr. Dominick for many years was associated in the practice of law with the late distinguished Governor of South Carolina, and U.S. Senator, Coleman Livingston Blease. He was a colleague in the Congress with the late Senator Benjamin Ryan Tillman, Frank Lever, James F. Byrnes, and many famous South Carolinians.

Congressman Dominick was a man of rare courage. He was one of the few to vote against U.S. participation in World War I. He was forthright and dedicated. In this vote, I believe he was absolutely right. U.S. participation in World War I upset the balance of power in Europe and paved the way for fascism, nazism, and communism.

Mr. Dominick was a man of ability, honor, and unquestioned character. He had a warm personality and leaves a host of sorrowing friends.


AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

**Exhibit 7-1**

While a Member of the House, Congressman Dominick married Alva Seger, the lovely daughter of his colleague in the Congress, the Honorable George Nicholas Seger. Mr. Seger passed away while serving in this august body with distinction and honor.

"They pass on, but their good works do follow them."

Mr. Dominick is survived by his loyal, faithful, and charming wife, two lovely daughters, and one grandchild.

Mrs. Dorn joins in my deepest sympathy to Mrs. Dominick and her wonderful family.

Mr. Speaker, I ask unanimous consent to revise and extend my remarks and that all Members may have 5 legislative days to extend their remarks on the life and character of this distinguished South Carolinian.

The SPEAKER. Is there objection to the request of the gentleman from South Carolina?

There was no objection.

Mr. McCORMACK. Mr. Speaker, I was distressed to read in the Washington papers of the passing of my friend and colleague, the Honorable Fred H. Dominick, a former Member of this body.

I remember well his sincerity, his devotion to duty and his love of country. With his winsome personality and quiet charm, he had many friends and admirers here and in the other body.

Fred Dominick was a leader. His service in the House was exemplified by courage. He stood for the things he knew to be just and right regardless of public opinion. He was no conformist. He was a personal friend of mine, and I join my colleague from South Carolina in expressing my deepest sympathy to Mrs. Dominick and the family.

## CALL OF THE HOUSE

Mr. DAVIS of Georgia. Mr. Speaker, I made the point of order that a quorum is not present.

The SPEAKER. Evidently a quorum is not present.

Mr. McCORMACK. Mr. Speaker, I move a call of the House.

A call of the House was ordered.

The Clerk called the roll and the following Members failed to answer to their names:

[Roll No. 23]

| | | |
|---|---|---|
| Anderson, | Dooley | Macdonald |
| Mont. | Fallon | Metcalf |
| Barden | Granahan | Mitchell |
| Barrett | Grant | Powell |
| Becker | Gray | Siler |
| Bentley | Gubser | Taylor |
| Bolling | Harris | Teller |
| Bow | Hébert | Vanik |
| Bowles | Kasem | Wharton |
| Bray | Latta | Wilson |
| Brown, Mo. | Lesinski | |
| Coffin | McGovern | |

The SPEAKER. On this rollcall, 397 Members have answered to their names, a quorum.

By unanimous consent, further proceedings under the call were dispensed with.

## CIVIL RIGHTS

Mr. CELLER. Mr. Speaker, I move that the House resolve itself into the Committee of the Whole House on the State of the Union for the further consideration of the bill (H.R. 8601) to enforce constitutional rights, and for other purposes.

The motion was agreed to.

Accordingly, the House resolved itself into the Committee of the Whole House on the State of the Union for the further consideration of the bill H.R. 8601, with Mr. WALTER in the chair.

The Clerk read the title of the bill.

The CHAIRMAN. The Chair recognizes the gentleman from Ohio [Mr. McCULLOCH].

Mr. McCULLOCH. Mr. Chairman, I yield such time as he may desire to the gentleman from Pennsylvania [Mr. MILLIKEN].

Mr. MILLIKEN. Mr. Chairman, I rise in support of the civil rights bill, H.R. 8601. I wish to take this occasion to commend the gentleman from New York, chairman of the House Judiciary Committee, for the sterling manner in which he has handled this legislation and set the high tone of this debate.

To anyone acquainted with the facts regarding the lack of private constitutional rights the need for this legislation is overwhelming. This is a Nation which subscribes to the principle of rule of law and equal opportunity for all people. The enactment of this legislation will go far toward the achievement of those principles.

A trend throughout this Nation today is to broaden and protect the civil rights of all our citizens. We here today can provide the means to spur this trend; therefore, Mr. Chairman, I hope the House will meet its responsibility by providing a strong, workable civil rights bill.

Mr. CELLER. Mr. Chairman, I ask unanimous consent that the following Members may have permission to extend their remarks at this point in the RECORD: Mr. MAGNUSON, Mr. FARBSTEIN, Mr. ZELENKO, and Mr. DULSKI.

The CHAIRMAN. Is there objection to the request of the gentleman from New York?

There was no objection.

Mr. MAGNUSON. Mr. Chairman, I rise in support of the pending legislation and the amendments which will be offered to strengthen it.

It has been said a number of times during the course of this debate that the only reason many of us are supporting this legislation is to seek political advantage at home with our constituents in the forthcoming elections.

This is a cynical argument which, I am afraid, does not add to the dignity of the discussion. I might suggest that those who throw in this contention probably themselves are guilty of the very thing they criticize. But I do not want to engage in a cynical exchange of charge and countercharge, because one of the things this whole discussion is about is the fact that we have been cynical too long and too often about the situation of the colored minority groups in this country.

We all have known for a long time that the Negro in the United States is treated as a second-class citizen, that his company is shunned. We know that he is denied the same educational opportunities the rest of us enjoy. We know that the color of his skin is an automatic handicap to his seeking and obtaining job opportunities equal to his ability and training. We know that he is not free with the rest of us to live where he wants to and to travel where he desires. We know that the subtle, silent hand of racial discrimination surrounds him at every turn, blocks his natural human desire to enjoy life, liberty, and the pursuit of happiness.

We know these things, yet we have done little to correct them. We shrug our shoulders and try to forget them. We have all too often cynically told ourselves that this is the way life is, and nothing can be done about it.

And yet we know, in our own hearts, that our cynicism is not a sufficient refuge. At those times when we are honest with ourselves, we know that we cannot fully enjoy our own free lives while living in a society which systematically denies a sizable group of fellow human beings the same freedoms.

Now, I am very much aware that racial prejudice springs from basic human urges. I know that it is as old as man. I understand that we all prefer the company of those who are like us, and we tend to fear and shy away from those who are different. I recognize that the problem is not peculiar to the United States—we have only to look at South Africa, Algeria, and India for other recent examples.

I admit also that we cannot legislate prejudice from the hearts of man. "Thou shalt love they neighbor as thyself" is a moral commandment, not a legal one.

But at the same time I know it is intolerable in a free and democratic society that the organized power of government can be used to hold one group in suppression, to discriminate against individuals on account of the color of their skin.

Three years ago this Congress created the U.S. Commission on Civil Rights. The impartial and sober report of this Commission issued last year documents the fact that in some areas of the Nation the power of the State is being used to deny many Negroes the elemental right to vote, and is being used to frustrate the Supreme Court decision calling for the desegregation of the public schools. It seems clear to me that such State action violates the 14th and 15th amendments to the Constitution. Both of these amendments give Congress the power of enforcement by appropriate legislation.

Soon we shall be called upon to vote on a number of proposals carefully designed to prevent the power of government from being used to preserve the ugly pattern of racial discrimination.

I do not rejoice that we have to consider and approve these proposals. I would much prefer that the basic human problems which we here are attempting to solve did not exist or could be worked out by the voluntary cooperation and effort of men of good faith. I do not believe in legislating for the sake of legislating. It is only with great reluctance that I turn to Federal laws as the instrument to remove this national shame.

**Exhibit 7-2**

**5442**                    CONGRESSIONAL RECORD — HOUSE                    *March 14*

But we cannot wait forever. While the enactment of this legislation will not solve the problem, at least it will move us in the right direction.

Regardless of how each one of us here in his own individual life may satisfy the demands of his conscience, we must remember that we meet not only as individual men and women, but as national legislators charged with the responsibility of shaping the policies of our National Government.

In reaching our decision we must keep faith with the basic thesis of our Nation that all men are created equal, that they are endowed by their Creator with certain inalienable rights, and that to secure these rights governments are instituted among men.

We must keep faith with our oath to uphold the Constitution of the United States, which grants to every citizen the equal rights of citizenship and the equal protection of the laws.

And, in the last analysis, we must keep faith with ourselves.

Mr. FARBSTEIN. Mr. Chairman, I rise in support of H.R. 8601.

A feasible but strong civil rights bill this year will be a step forward in the solution of this country's most pressing domestic problem, discrimination against an entire segment of our population solely on the basis of color. Differences of opinion on this subject divide our country. They add to the difficulties of bringing better health, education, and housing to the American people. They slow down progress on a myriad of social and political problems such as voting rights for the District of Columbia and Federal aid for needed State programs.

Justice and morality alone require the passage of an effective civil rights bill. If the United States were an island isolated from the rest of the world, we would still owe this to the minority of our people who are being deprived of their civil rights. Our Declaration of Independence declares that all men are created equal. Our Constitution guarantees certain rights to all and specifically provides that none of these rights may be denied because of race. The fact that these principles are not in practice in some instances is a national shortcoming which we must admit and do our best to remedy. For the sake of our own democracy and self-respect this measure is imperative.

The fact that we are not an isolated island but live in a complex world adds to the abundant domestic reasons why this bill must be passed. The eyes of the world are focused on the United States to see how determined we are to insure that all our citizens can enjoy the liberty of which we speak so much. Our proclamations that this country is the stronghold of democracy, justice, and freedom will ring hollow in the ears of many as long as some citizens are not permitted to enjoy these blessings fully.

In all countries of the world, even those which have predominantly white populations, there is intense interest in the treatment of the colored minority in this Nation. However, in the countries which have predominantly colored pop-

ulations the interest is direct and overwhelming. A denial of the right to vote to an American Negro is considered a personal affront by millions of Africans and Asians. Each incident such as this can only create resentment against the country which perpetrated or permitted the injustice. For as long as such incidents are allowed to continue, we can scarcely expect the nations of Asia and Africa to have wholehearted faith in the American way of life.

The image of America which is seen by the people of Asia and Africa is not something which we can ignore. These are the newly emerging nations who are in the process of choosing political systems. At the present time many of them are called uncommitted because they have not allied themselves with the free world or with the Communist bloc. However, the Soviet Union is doing everything it can to persuade the uncommitted nations to accept the Communist system. Their success would be a disastrous defeat for the United States and the whole free world.

Nothing is more helpful to the Communists in their propaganda throughout Asia and Africa than any evidence showing continuing discrimination in the United States on the basis of color. The Communists exploit such incidents to the fullest, at the same time professing that under the Communist system all races work together in equality.

We in America know that this country has made great strides in perfecting its democracy. We know that incidents of discrimination on the basis of race are decreasing and do not represent the actions or feelings of the majority of our people. We know that under Soviet communism no person, whatever his color, is as honored and respected as an individual as in the United States. We know that there all persons are servants of the state and none have as much liberty as under our democracy. Nevertheless, we would be foolish to believe that none of the nonwhite people of the world will be deceived by Soviet propaganda.

Just as the unhappy results of racial discrimination are not confined to this country alone, neither would the benefits of a strong civil rights bill be felt only in this country. An extension of civil rights guarantees would be an advance for freedom and democracy everywhere. It is just as much needed in the fight against communism as are strong military defenses and economic assistance. Let us not hesitate any longer to take another step toward strengthening democracy at home and peace and freedom everywhere.

Mr. ZELENKO. Mr. Chairman, I rise in support of H.R. 8601. At this point in our history it must seem awkward even to those in opposition to this most important and long-needed legislation that we here must reaffirm and reemphasize what has been most obvious to the world since the existence of our Nation. I refer to the plain wording and terms of our Constitution.

The expression "civil rights" is, in my opinion, the wrong name for this legislation. It should more properly be called "constitutional rights" and further defined as "human rights."

No technical or strained contention that the rights reserved to our States included any which permitted an individual State to reserve to itself the right to classify a resident American as a second-, third-, or fourth-class citizen, or to classify his individual rights as an American at all.

Is it the contention of those opposing this legislation, upon the ground of States rights, that the Constitution permits a restriction against absolute equality to those American citizens residing within its borders? Do they seriously contend that the Constitution permits a barrier to fence off the equality of the existence of American citizens between one State and another?

However serious and vigorous the opposition to this bill, no argument against it has been advanced on a sound, moral, or legal basis sufficient to persuade this Congress not to reaffirm the rights of a great segment of its citizens. The questions I have just propounded have not been answered satisfactorily nor can they be so answered. Yes, we have heard what amounts to social and economic arguments, but no legal or constitutional ones.

The very persons who now spring to the fore as the protectors of States rights, warning that the Government will by this legislation be enabled to infringe further thereon, and thereupon assume actual control of the State governments and their individual citizens, were recently conspicuous as proponents for the very principle which they now oppose. It was but last year when the labor-management bill was in this House that many, if not all of those opposing the present bill, urged the enactment of a piece of legislation which not only placed the Federal Government into every city, town, and hamlet of every State on matters of labor, but for the first time in our history made the Government part of the internal organization of a nonpolitical and private group of our citizens. I refer to our labor unions. The labor legislation which they so vigorously advocated applied not only to unions national in scope but to each and every union, no matter how small or how local.

Further, those now opposing civil rights on the grounds I have just discussed have advocated, proposed, encouraged, and accepted numerous concepts of Federal beneficence each coupled with Federal regulation and intervention into the local, State, and private lives of all of our citizens. I refer to the laws concerning social security, old-age pensions, widows' pensions, agriculture assistance, small business, big business, oil, highway, dams, rivers, and other items. Each one of these matters just referred to, of course, involves Government regulation of some segment of local affairs and all have some basis in sociology and economics. None are specifically mentioned by name in our Constitution.

**Exhibit 7-3**

It is clear, therefore, that on logic and reason the position now taken by the resisters of this legislation is untenable. Yes, I say to those of my colleagues who oppose this legislation that often in our history the Constitution and the laws properly flowing therefrom cause all of us, at times, in greater or lesser degree, some social, economic, and political inconveniences. In those instances we must adjust to the mandate of the Constitution and not oblige it to adjust to us.

This legislation will surely and shortly become law. Let us resolve, all of us, that we shall at once conform not only to its letter but to its spiritual and moral significance, the greater meaning of which is clear—all Americans are equal. I urge the immediate passage of H.R. 8601.

Mr. DULSKI. Mr. Chairman, I rise in support of H.R. 8601.

What are civil rights in the United States? By definition—the rights of citizens to equal protection under the laws.

Recognition of the right to equal protection of the laws is at least as old as the right to vote. The people, under the Constitution, have the right to vote. Also, in the concept of government and the rule of law is the principal of equal protection of the laws.

Our form of government requires a free and self-respecting electorate, dedicated to the proposition that all men are created equal. By returning to these fundamental principles of our Founding Fathers we can separate ourselves from much of the current dispute about recent decisions of the Supreme Court.

The signers of the Declaration of Independence did consider all men equal in their God-given, hence, unalienable civil rights. Our Constitution is color blind and neither knows nor tolerates classes among citizens.

The right to vote is a right secured by the Constitution.

On the matter of the Supreme Court decision, it may be characterized as wrong, improper, or unwise, but painful as it may be, those who disagree with the Court must, if they are to uphold the Constitution of the United States, accept the decision of the Court as the law of the land.

The legal dispute over the 14th and 15th amendments has been settled by the Supreme Court—the only organ of our Government that can decide such questions—but the human response to these rules is not yet settled. Moreover, in but a few generations of freedom, Negro Americans have made progress in nearly every field of endeavor, and in increasing numbers have reached high levels of educational, professional, artistic, political, and economic achievement.

The right to vote is the cornerstone of the Republic and the key to all other civil rights. It is the most important instrument for securing justice. Every other constitutional right depends upon it. If we can restore and maintain this right to vote, many of the other present discriminations will be self-correcting. There exists today, in parts of our country, brute violence and intimidation, clever manipulation of ballots and ballot boxes, false counting of votes, repeating, illegal arrests the day before election, and the sudden removing of the polls.

And why do there people so earnestly want to vote? Because it is a right and privilege guaranteed them under the Constitution.

It is their duty as citizens and they want to set an example to their children who are growing up in a democracy where they will have the same rights and privileges as other American citizens. The denial of their voting right, as taxpayers, constitutes taxation without representation, and the fact that the Government of the United States is based on the fact that the governed govern, and only as long as people are able to express their opinion through voting, will our country be able to remain the great power that it is.

They have taken part in government as soldiers in war. They want to take part in it as civilians.

I am convinced that qualified American citizens are, because of their race and color, being denied the right to vote. This betrayal of the ideals set forth in the Declaration of Independence is also in clear violation of the Constitution in which the 15th amendment says:

The right of citizens of the United States to vote shall not be denied or abridged by the United States, or by any State on account or race, color, or previous condition of servitude.

And the 14th amendment which says:

No State shall deny to any person within its jurisdiction the equal protection of the laws.

And what can the Government of the United States do about these violations? It can spell out a detailed program for Federal supervision of elections in which Federal officers are chosen.

The right of each State to determine qualifications in order to vote is unquestioned. But, it is not unlimited. Any voting qualifications established by a State must be one which can be applied equally to all persons. The States are specifically forbidden by the 15th and 19th amendments to require that a voter be white or male. The Federal Government has clear legal authority to enforce these provisions in elections involving choice of Federal officers.

Many Americans today, because of race, are denied the right to vote through creation of legal impediments, administrative obstacles, and positive discouragement, engendered by fears of economic reprisals and physical harm.

I, for one, am urgently concerned with this denial of the right to vote. To stand still at this point on civil rights is a backward step, and every right thinking American is looking to Congress to discharge its responsibility fairly and wisely in the matter of civil rights.

Economic pressures, social ostracism, and physical harm must be removed from all of our people, and equal opportunity for all can only be recognized if written into statutory law. Too many of our citizens are denied their right to vote and as long as any one group of our citizens is deprived of any of their constitutional rights, our job will not be done.

I had hopes that the first session of the 86th Congress would produce a civil rights bill, strengthening the law with respect to enforcing a citizen's right to vote, school desegregation cases, mandatory preservation of election records, the extension of the Civil Rights Commission for 2 years.

I am confident that the strong public opinion prevailing on the question of civil rights will force legislative consideration of the entire field of civil rights, and I think another stride forward will be made in this area to bring us a little bit closer to the ideals set forth by our Founding Fathers when they said, "All men are created equal."

Mr. WILLIS. Mr. Chairman, I yield such time as he may desire to the gentleman from South Carolina [Mr. RILEY].

Mr. RILEY. Mr. Chairman, I am strongly opposed to every part of this bill. At the outset, I want to impress upon you that this bill, if it becomes law, will be the law for everyone in this country. This same law will apply in all States as well as those States in the South. The specter of it will someday—maybe not soon, but someday—rise to haunt those of you who now support this bill so vociferously. Some day the pendulum will swing the other way.

Common experience teaches us that no law is enforceable unless a majority of those to whom it applies will it, or support it. In time, people from all sections of this country will tire of your perpetual parading of this matter through the Halls of Congress. In fact, there is already evidence that responsible people outside the South are already tiring of it, even to the extent that some are organizing themselves to do something about it.

Those of you who support this measure will learn someday what we in the South learned long ago and have been trying to tell you for many years. The standing or stature of no race can be increased by law. Such standing or stature must be earned by those who seek it. And it has been earned by many of the race whom you profess trying to help here today. Everyone in my State who has diligently and conscientiously applied himself has prospered and progressed, regardless of his race. We have many citizens of the Negro race who have gained the respect of their fellow man. We have many who have accumulated substantial wealth. But they accomplished these things on their own merits, not because of a Federal law or a Supreme Court edict.

Any race that improves itself does so best under its own leadership, sparked by a pride in its own race. We have proven in the South over scores of years that races can have divided facilities and separate schools and still live together in mutual respect one for the other. Only when the Supreme Court rendered its unconstitutional decison in 1954 did we have discordance between the races.

**Exhibit 7-4**

Despite some current difficulties, I venture to say that race relations in the South today are, as a whole, still better than in most other areas where there are large concentrations of minority groups. Furthermore, this country still allows freedom of movement, and those who are not satisfied in one area are free to seek greener pastures elsewhere. Of course, we know that these greener pastures have not always turned out to be so green as they appeared.

There is an aspect of this matter which I regard as the most unusual phenomenon that I have ever seen. That is the fact that the further one is removed from the South the more expert he becomes on matters affecting that area. Take, for instance, the subcommittee which studied this matter. Although there were many able members from the South on the full committee, not one of these was selected to serve with the panel of "experts" on the subcommittee. Of course, this was nothing new, because the same procedure was followed in 1957.

In an effort to assist the "experts" on this subcommittee, many able Governors, attorneys general, legislators, other State officials, and private citizens from the South appeared before the subcommittee in an effort to explain the true situation in the Southern States. However, the "experts" again refused to heed their testimony, presumably because they already knew all the answers. Or could it be that they merely followed preconceived notions and blinded themselves to every fact which did not support those notions? And will this House do the same thing and allow this bill to become law? I appeal to every Member of this body to heed the advice of us who represent the area toward which this bill is directed and let these matters drop. The constant effort on the part of some Members of this body to thrust these measures on our people serves only to worsen relations between the races. The recent incidents in the South are the work of the NAACP and CORE and were inspired because of similar legislation pending before the Senate. These incidents are continuing and probably will continue so long as we have these measures under consideration in either body. The matters toward which this bill is directed will never be solved by legislation. Legislation is only a hindrance to progress in the field of race relations. And this applies to legislation by the Supreme Court as well as by the Congress.

I am not a lawyer. But the South is not without great lawyers in this body. They have ably shown the legal objections to this bill and the doubtful constitutionality of a large part of it both in the minority report and in debate on this floor. Despite the fact that I am not a lawyer, I do know something about freedom of speech. And I am convinced that title I of this bill, relating to obstruction of court orders in school desegregation cases, is violative of this most basic principle of the Bill of Rights. I am happy that the Senate has seen fit to strike this title from the measure pending before it, although the motive of many who supported this move was different from what mine would have been. Only after this title was amended to apply to affairs in their own bailiwicks did they rise up in righteous indignation. If there had ever been any doubt, and there had not, that this bill was aimed at the South, certainly this action in the Senate proved it convincingly.

To my mind, the legal and practical arguments against this measure are overwhelming. Considered on its merits, I am confident that this body would overwhelmingly defeat this bill. But I am not deluding myself. The urge to appeal to minority elements who mistakenly believe that this bill has some kind of magic element which will transform their lives is too strong for many Members of this body to resist.

Nor will this bill be the last on this subject to come before this body. Some will apparently never be satisfied until the boot of Federal authority is as firmly and as cruelly planted on the neck of the South as in the days of Reconstruction.

The fact that this bill is unnecessary will not, I am sure, deter its proponents in their zeal to establish themselves as crusaders against the South. But I am compelled to point out that no complaints on voting rights were received from my State by the Civil Rights Commission. In fact, I am informed that we have had only one complaint in the last 10 years and that one was satisfactorily resolved by the attorney general of my State. Personally, I know of no one in my State who is qualified to vote under its laws who is being denied the privilege of voting. My State's laws on this subject are adequate and Federal laws already on the books are more than adequate. This bill is necessary only to satiate temporarily the appetites of those who forever demand the scalp of the South.

I appeal to you to divorce yourselves from the passions which always attend the consideration of these so-called civil rights bills and consider this matter on its merits and in an atmosphere of calm deliberation. Such an approach will, I am sure, result in the defeat of this bill.

Mr. WILLIS. Mr. Chairman, I yield such time as he may desire to the gentleman from Georgia, Mr. PILCHER.

### IS THE CONSTITUTION REALLY DEAD?

Mr. PILCHER. Mr. Chairman, there are many people in places of high trust who continuously ignore the Constitution of the United States that, to me, a good question might well be, "Is the Constitution really dead?"

While I ask the question, I for one insist that it is not. I, for one, insist that while it may appear to be dead, it has in my humble opinion only been buried. Even though buried by those who would have you think it is no longer our guide for free government, I must insist that it still breathes life, and will, very soon now, rise from its shallow grave to once again reign supreme as it did for over 150 years. Those who have lowered this vibrant, living document into its dark and murky grave will live to be haunted by its living and breathing soul. Those pallbearers will rue the day that they cast aside its teachings when they are called before the bar of freedom to explain their wicked ways. They will be judged and found wanting; they will be properly cast aside and their places taken upon the throne of freedom by others who were not so careless with its life nor so callous of its teachings.

Regardless of the personal feeling of anyone present here today, we simply cannot subjugate the clearly defined meaning of the 10th amendment of the Constitution in order to enhance those personal feelings. We cannot, in good conscience, or bad, relegate to some forgotten place the intent of that amendment in order to further our ambitions, whether those ambitions be political or moral. The amendment is crystal clear. In fact, it is so definitely clear that it needs no judicial interpretation.

While it is admitted that I am not a lawyer, nor do I claim to be an expert on the Constitution of the United States, I do claim that I can read. I also claim that I can understand most of the things I read. It is no great feat to understand the language contained in the 10th amendment of the Constitution.

It has been said that a smile is a language that even a baby understands. Paraphrasing this, I would like to take it further and suggest that the language of the 10th amendment is language that even a 12-year-old child would understand. Is it necessary for a person to be a lawyer or even a college graduate in order to understand the clear language embodied in the 10th amendment? Why, I often have schoolchildren in the lower grades of our schools in Georgia writing to my office for a copy of the Constitution of the United States, and it is presumed that these students secure a copy of the Constitution for study purposes. I have had youngsters say to me, "If the Constitution does not mean what it says, why should it be taught in our schools?" That is indeed a hard question to answer for these eager youngsters. They read for themselves, and they are taught that the Constitution is the supreme law of the land. They read plain English, mind you, and they accept it as gospel. Then they discover that many of their leaders here in Washington would totally disregard those precepts which they have accepted. And to compound the atrocity, they discover that those changes would be wrought upon all Americans without adhering to the simple pattern for change by amendment as provided in that instrument. They have studied the Constitution and well remember the Constitution provides that the only way the Constitution can legally be changed is for such change to be brought about by a constitutional amendment. They have found absolutely nothing in that great document which would suggest that changes in it could be brought about by court decree or by legislative action unless coupled with ratification. Their minds must be filled with disillusionment when they read in the Constitution that the 10th amendment provides one thing while many of their leaders ignore its meaning. It must fill their strong hearts with consternation to read the provision for changing the Constitution, while at the same time many of their leaders would

**Exhibit 7-5**

ignore same. Can we really expect our future generations to grow up secure in their feelings that they are truly free Americans in every respect, when at the same time it is obvious to them that many of their elders will not adhere strictly to the meaning of the Constitution of the United States of America?

Since I have stated that I believe I can read and apply common sense to what I have read, let me quote the 10th amendment of the Constitution. The language is indeed so clear that I believe everyone present will have no trouble in understanding its intent:

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States, respectively, or to the people.

Regardless of the motives for or against this legislation, I believe that Congress would be going beyond the limits of the powers granted to it under the Constitution, and would be trespassing upon the rights of the States, and such action would of constitutional necessity be null and void in its inception.

I should think that if the Federal Government, or any other source, has information that fraud is being perpetrated in any election in any State, or any political subdivision thereof, that such information should be given to the proper agency in each State, and then that State would in good conscience undertake to right the alleged wrong. While the Constitution does say that the Federal Government can in some cases supervise Federal elections in each State as to the time, place, and manner in which that election is held, it certainly does not contemplate the Federal Government's telling the State who can or cannot properly vote. Moreover, it certainly does not contemplate intervention in purely State races by the Federal Government. It restricts itself to the time, place, and manner of elections pertaining to Members of the House of Representatives of the United States and Members of the Senate of the United States.

When I was sworn in as a Member of Congress, I took an oath which was to me both solemn and binding. I swore, gentlemen, that I would uphold the Constitution of the United States; and as I see it, I believe a vote for this legislation would constitute a breach of that oath.

Mr. CELLER. Mr. Chairman, I ask unanimous consent that the gentleman from New Jersey [Mr. DANIELS] may extend his remarks at this point in the RECORD.

The CHAIRMAN. Is there objection to the request of the gentleman from New York?

There was no objection.

Mr. DANIELS. Mr. Chairman, I rise in support of this legislation, H.R. 8601.

The problem of civil rights, which is the subject matter of this debate, is no doubt the most important domestic problem facing this country today. We must recognize the seriousness of this problem and act affirmatively to guarantee to all citizens their constitutional rights regardless of race, creed, color, or national ancestry. It is our duty as re-

sponsible Members of Congress to enact meaningful legislation which will assure full civil rights for all Americans in all parts of the United States.

We are all aware of the fact that racial and religious discrimination exists within our border, restricting or denying equal opportunity to many of our citizens because of race, color, creed, or national origin, notwithstanding constitutional rights to the contrary. It is a known fact that in some of our States Negroes are denied the right to vote and the right to equal educational opportunities, and in most States they are denied equality in employment and housing. The prejudices, disorders, and tensions created by those who deny colored people their rights as Americans are harmful to our entire Nation. It is most harmful to us in our relationship with the rest of the world. Every incident of racial violence, school closing, segregation, church and school bombing are publicized throughout the world. How can we win the support and respect of other nations who look to America for guidance when we fail to protect the rights of those within our borders? How can we advocate one policy abroad and a different one at home and expect to keep our allies and maintain our prestige? We represent ourselves to the people of the world as a nation advocating justice and equality for all. It is about time we practiced what we preach. Now is the time to consider and pass effective civil rights legislation which will aid greatly to eliminate many international complications. Meaningful civil rights legislation in the area of voting, education, employment, housing, and in other fields are making our struggle for peace and freedom throughout the world easier and helping us in our struggle with world communism. The Communist propaganda has been effective in some parts of the world in smearing our honest interest in peoples of all nations abroad. We can give the lie to this propaganda by enacting meaningful and effective legislation which guarantees freedom of participation in our Nation's political affairs, and equality to every citizen regardless of race, creed, color, or national origin.

Mr. WILLIS. Mr. Chairman, may I inquire how much time I have remaining?

The CHAIRMAN. The gentleman from Louisiana has no more time remaining; he consumed all his time on Friday.

Mr. CELLER. Mr. Chairman, I thought there had been an understanding that an hour had been yielded to the gentleman from Louisiana [Mr. WILLIS].

The CHAIRMAN. Not unless somebody yields it to him.

Mr. CELLER. Mr. Chairman, a parliamentary inquiry.

The CHAIRMAN. The gentleman will state it.

Mr. CELLER. Does that mean I will have an hour of which I can yield half to the gentleman from Ohio?

The CHAIRMAN. Yes; if the gentleman so desires. The gentleman from New York has an hour and 40 minutes remaining.

Mr. CELLER. Mr. Chairman, I yield an hour to the gentleman from Louisiana [Mr. WILLIS].

The CHAIRMAN. To be yielded by the gentleman from Louisiana?

Mr. CELLER. To be yielded by the gentleman from Louisiana as he sees fit.

The CHAIRMAN. The gentleman from Louisiana is recognized for 1 hour, any part of which may in turn be yielded by him.

Mr. HALLECK. Mr. Chairman, a parliamentary inquiry.

The CHAIRMAN. The gentleman will state it.

Mr. HALLECK. Mr. Chairman, do I understand correctly that under the arrangement and agreement arrived at general debate is to continue today for 2 hours, then that will be the end of general debate?

Mr. WILLIS. That is my understanding.

Mr. HALLECK. That is my understanding, too. Is there a unanimous-consent request pending?

The CHAIRMAN. No. There was a unanimous-consent request made by the gentleman from New York, which request has been agreed to. The chairman is now attempting to recognize the gentleman from Louisiana [Mr. WILLIS], to yield a part of the time that the gentleman from New York yielded to him.

Mr. WILLIS. Mr. Chairman, I yield 20 minutes to the gentleman from South Carolina [Mr. ASHMORE].

Mr. ASHMORE. Mr. Chairman, my remarks on this exceedingly important question today must, of necessity, be brief, since sufficient time is not available for all Members who desire to express their opinions. As a member of the House Committee on the Judiciary, I have been impressed by the tremendous amount of misunderstanding regarding the position of southern Members of the House of Representatives on the pending civil rights bills.

The proponents of this bill, and the amendments that will no doubt be offered, along with most of the press, have either deliberately or inadvertently, made it appear that all Members of Congress who are fighting this type legislation are doing so because we do not want the Negro to vote. This is a completely false impression. I, and all of my colleagues who stand with me in opposing these civil rights bills, recognize the Negro's right both to register and vote when he qualifies under the laws of his State.

What I, and millions of people in this country are opposed to, is the Federal Government coming into the various States and taking over the administration, control, and management of the election machinery. Historically and constitutionally, the States have both the right and duty to conduct all elections from the lowest office in the township or school district to governor, U.S. Representative, and Senator. This principle of government is essential to our States rights philosophy, and we must retain these prerogatives on the local level or else the States and the people will ultimately be deprived of one of the most precious and effective means of controlling the Government.

**Exhibit 7-6**

CONGRESSIONAL RECORD — HOUSE *March 14*

In some areas of my home State of South Carolina, the Negro population is 2 to 3 times greater than that of the whites; yet, I am informed the Civil Rights Commission did not receive one single complaint from South Carolina based on a violation of voting rights because of race, color, or religion. Negroes in my State are granted registration certificates and permitted to vote when they meet the same qualifications as white voters. I believe this is generally true throughout the country. Of course, there have been a few isolated instances where discrimination or abuses may have existed. But such abuses were no more than might be expected where thousands of registration and voting officials are required to interpret and administer the law. Where such mistakes have occurred, the existing State and Federal laws have proved completely adequate and sufficient to protect the rights and voting privileges of all citizens of this country. The recent decision of the U.S. Supreme Court, ordering and directing the election officials of one of our States to grant registration certificates to certain Negroes who had been declared unqualified, is ample proof that no additional voting rights legislation is necessary. When the laws we have provide sufficient remedies and punishment for mistakes or willful violations of the law, then it would be a mistake on our part to pass additional and unneeded laws. Too many laws are undesirable, and no statute should be enacted unless there is a specific need for it. This is particularly true today, because we are already constantly confronted with numerous individuals and organizations who agitate and stir up trouble between the races. Unnecessary laws will simply add more fuel to the fires of unrest and ill will. I hope and trust that Congress will act in such a manner as to bring about peace, harmony, and good will among all the people of this land.

There is strong evidence now available to support the contention that recent Negro sitdown demonstrations at lunch counters and elsewhere are sponsored and promoted by the National Association for the Advancement of Colored People. These demonstrations have been in progress for several weeks and have spread to at least seven States. In some instances, fights have resulted between whites and blacks, and in a number of cases, racial clashes approached riot proportions.

For example, in Montgomery, Ala., more than 800 law-enforcement officers were needed to separate crowds of Negroes and whites. In Columbia, S.C., students from a Negro college invaded a nearby drive-in restaurant parking lot at 3:45 in the morning. The students did not enter the restaurant itself and no damage was done to the drive-in property. On the contrary, the students attacked automobiles and the occupants thereof on the drive-in parking lot, breaking automobile windows, windshields, and damaging the cars with sticks, bricks, and clubs. The people occupying the automobiles were customers of the drive-in restaurant and wholly and completely innocent of any and all acts of a provocative nature. The Negro students had no reason whatever to have any ill will toward these patrons of the restaurant. The students shouted, "We are going to take over this place," and proceeded with their unlawful destruction of private property without any cause or justification whatsoever.

A customer of the restaurant said he gunned his car away from the scene as soon as he saw the oncoming Negroes. Only the right front window of his car was broken. Another customer told police the right and left windows of his car were shattered by Negroes with sticks, bricks, and bottles. Fortunately, no serious injuries were received, but such unprovoked attacks on innocent people are certain to result in dire consequences. If permitted to continue, these conditions will inevitably erupt into racial riots.

Yet, the Evening Star of Washington, D.C., for Monday, March 7, 1960, published an Associated Press news item from which I quote:

"Spokesmen for the National Association for the Advancement of Colored People in Virginia and Florida have come out for continued demonstrations by students and adults." One of the leaders said, "We need help on the picket line. The students have done enough. It is time for the adults to participate."

Thus, we have clear evidence that these lunch counter sitdown demonstrations are a planned and concerted effort to agitate, and create dissension to the point of violence. And evidently, those directing the demonstrations thought it wise to stage their publicity stunts while Congress is considering civil rights legislation. This, of course, is just another attempt to exaggerate the need for more civil rights laws.

My colleagues, I ask each of you, is it right for us to strengthen the hand of the National Association for the Advancement of Colored People, or any organization, or any individual, when such person or group is willfully and deliberately fostering, promoting, encouraging, and actually setting the stage for physical conflicts between the races in America?

Surely, no Member would join such an organization or give it financial support, for to do so would be aiding and abetting in all of its programs.

Now, what about legislation that it sponsors? Well, as far as I am concerned, I absolutely refuse to grant intoxicating powers, or even lend encouragement, to any group of agitators and troublemakers. It is both wrong and dangerous to do anything that would increase the influence, prestige or authority of an organization whose activities promote ill will, hatred, and racial conflicts.

Yes; if the proponents wanted nothing more than a fair and constitutional voting rights bill, I dare say such a measure could be passed by this House within a few hours. But they want far more than that. You have heard the distinguished chairman of the House Committee on the Judiciary, the gentleman from New York [Mr. CELLER] state during this debate that he intends to offer "old title III" as an amendment to the pending bill. Permit me to impress upon you, my colleagues, that Congress refused to include this title III in the civil rights bill enacted into law in 1957. On Thursday of last week, my good friend and colleague, the gentleman from Ohio [Mr. McCULLOCH], the ranking minority member on the House Committee on the Judiciary, stated that our committee heard probably 100 witnesses and took more than 900 pages of testimony in 1959 while considering H.R. 8601, the very same bill we now have under consideration. Then, after thorough study and deliberations in executive sessions, the committee struck title III from the bill. Mr. McCULLOCH also said on Thursday that President Eisenhower is opposed to title III. Please remember these facts, my friends, when it comes time to vote on Mr. CELLER'S amendments. It would seem that title III has been sufficiently killed, but my good chairman, Mr. CELLER, is not yet satisfied and will try again to perform a miracle by breathing the breath of life into it. Under the circumstances, I believe his efforts to resuscitate it will fail.

There are numerous reasons why title III should not be in this bill. Primarily, it has no place here because its principal purpose is to bring about forced integration. Certainly school integration has no relationship to voting rights.

I am sure that other amendments will be offered which are just as far removed from voting rights as is school integration. I do not have time to discuss them in detail, but let me say that several of these measures were in the original bill—H.R. 8601—and were not considered worthy of your support and thus were stricken out by your Committee on the Judiciary.

Finally, the most important amendment to be offered is the so-called referee amendment, H.R. 10625, which will be substituted for H.R. 10035. This amendment is dated February 23, 1960, and has never been considered by the House Committee on the Judiciary.

The Civil Rights Commission recommended legislation that would provide for Federal registrars who would be clothed with the duty of protecting voters who were allegedly discriminated against in the election of Federal officials, because of race, creed, or color. The Attorney General of the United States did not like this bill—H.R. 9452—apparently, because it did not take absolute and complete control of the election machinery in the various States and local communities. He wanted a stronger bill than was recommended by the Civil Rights Commission, and, therefore, repudiated the wishes of the Commission with the scathing remarks that Federal registrars would be worth about as much as a ticket to the Dempsey-Firpo championship boxing bout.

So, after this profound and enlightening statement, the Attorney General sponsored H.R. 10035 dated January 28, 1960, which provides for Federal referees. These Federal officials would be granted the necessary authority to, in my opinion, ultimately take over the control and administration of all State and local voting machinery, for all practical pur-

**Exhibit 7-7**

poses, notwithstanding the Constitution of the United States.

After Judge Welch, the Deputy Attorney General, was cross-examined by the House Committee on the Judiciary, H.R. 10035 was suddenly abandoned, and H.R. 10625 substituted therefor. This new bill has not had one single minute's consideration by the House Committee on the Judiciary, but nevertheless, you will be urged to accept it as a part of H.R. 8601, the bill reported by the House Committee on the Judiciary after 6 months' study. As you know, this is contrary to all normal procedure. I think it is not only unwise but a most dangerous precedent to adopt an amendment so far reaching and about which there are so many grave constitutional questions, under the prevailing circumstances.

This is the third bill since January 7, 1960, dealing with Federal registrars and Federal referees. The Attorney General repudiated the registrar bill—H.R. 9452—introduced by Mr. CELLER and recommended by the Civil Rights Commission, then he sponsored and stringently defended H.R. 10035, introduced by Mr. McCULLOCH, and now he has repudiated his own bill, and is asking you to accept a new one—H.R. 10625—even though no committee of this House has had an opportunity to really analyze it. I wonder what would happen if he was put through a gruelling cross-examination by the House Committee on the Judiciary on the merits of this last bill. He might desert it, too, like a sinking ship, and go back to No. 1, or No. 2, or even come up with No. 4. Who knows? Yes; it is amusing, but it also is tragic when the Members of the House of Representatives are forced to legislate in this manner. Obviously, the chief law enforcement officer of the land, the Attorney General, is confused.

If he cannot make up his mind, what are you and I suppose to do? This is not a guessing game, but deadly serious business. If this amendment is adopted and becomes law, State and county officials could be thrown into jail under a statute that I say is unconstitutional.

When you are uncertain—when you have grave doubt—and especially when the Attorney General is uncertain, then you should not pass a bill that will jeopardize the rights and liberties of your constituents.

Therefore, defeat this amendment and let the courts administer the laws we now have on the books. That is all we need to do, enforce the laws we already have. They cover every possible mistake, or willful violation, of a person's voting rights.

The Louisiana case decided by the Supreme Court a few days ago is a perfect illustration of the adequacy of the law.

Mr. JONES of Alabama. Mr. Chairman, will the gentleman yield?

Mr. ASHMORE. I yield.

Mr. JONES of Alabama. Mr. Chairman, I rise in opposition to H.R. 8601, the so-called civil rights legislation, now before the House for consideration. It is becoming increasingly evident that the more this proposed legislation is subjected to analysis and study, the more its imperfections become evident.

No proposed legislation during the past hundred years of our history has served to divide and confuse our people more than has this civil rights measure. At a time when all our people should be presenting a united front against a deadly threat from East, we are engaging in this divisive and constitutionally questionable internal struggle which is shaking our whole governmental structure to its very foundations.

This bill, with all of its ramifications, is fundamentally wrong and can never be rectified. It is bad in principle and sets up procedures that are clearly outside of our constitutional processes of law.

I should like to discuss H.R. 8601 title by title and point out its many imperfections and pitfalls.

Title I makes it a Federal offense to obstruct court orders in school segregation cases. I seriously doubt the constitutionality of this title since it has every indication of violating the right of freedom of speech under the first amendment to the Constitution. In addition, its language is vague and too general.

I am alarmed over the use of the word "endeavors" in the language of title I. Under this section someone may be sent to jail if he "endeavors" to obstruct a court order in school segregation cases. Would this restriction extend to the press, the radio, and television, all of which mediums have at times been critical of court orders in school segregation cases?

A very striking injustice of title I is that it makes the obstruction of Federal court orders in school segregation cases a Federal offense, but it does not apply to any other type of court orders. Since court orders of every type and description are issued by Federal courts throughout the country every day, why should not all court orders be equally protected?

The selection of the court order in school segregation cases is unprecedented. It is a wide-open invitation to multiple prosecutions for the same act. This section is completely inimical to the principle that under our Constitution all individuals shall stand equal before the bar of justice. On the basis of this principle, the citizens of all sections of our country have a right to expect that when Congress acts, it will do so impartially and justly and that no inequality will be visited upon any citizen by Congress or the courts.

Since title I is in clear violation of these basic constitutional concepts, it should be defeated.

Title II of H.R. 8601 makes it a Federal offense for a person to cross State lines in order to avoid prosecution for damaging or destroying by fire or explosion any building, structure, facility, vehicle, dwelling, house, synagogue, church, religious, or educational institution, public or private. I am opposed to title II because it does not belong in this bill. It does not relate to personal civil rights and should be handled in a bill to amend the Fugitive Felon Act of 1934. Several bills to amend the Fugitive Felon Act of 1934 have been introduced for this purpose during this Congress, and it is

my understanding that these bills are now under study by Subcommittee No. 3 of the House Judiciary Committee. Accordingly, the proper course to follow is to let this particular legislation be reported by the Judiciary Committee as separate legislation.

Moreover, title II, as it appears in this bill, has some questionable language in it, such as what constitutes damage to a building, facility or vehicle, and what kind of fire or explosion is involved in this type of litigation. This could be a dangerous piece of legislation as it is now drafted. It certainly needs to be more carefully reviewed and cautiously drafted and then reported as separate legislation by the Judiciary Committee. I, therefore, oppose the inclusion of title II in H.R. 8601.

Title III requires all election records preserved for 2 years in which candidates for the office of President, Vice President, presidential electors, and Members of Congress are voted for, under penalty of fine or imprisonment. All these records must be made available to the Attorney General upon demand. In advocating the adoption of this section, the Attorney General has reversed himself in less than 3 years. In 1957, he told the Congress that he wanted only civil sanctions in connection with election cases. Now, he is asking for criminal penalties.

Under the provisions of the Civil Rights Act of 1957, the Attorney General already has the authority by civil litigation to prevent the deprivation of the right to vote. Now, he has come back to the Congress and asks under title II of this bill that his authority be excessively bolstered, even to the point of very questionable constitutionality. In this bill, we would be granting unlimited power to the Attorney General over State officials and acting without court order. There is strong evidence to the effect that Congress does not have the authority to grant such extraordinary power to the Attorney General over State officials acting under State laws.

While title III purports to be restricted to Federal officers only, under the 15th amendment, the language of this section could be applied to the election of State officials, also. Never before has Congress been asked to adopt such a sweeping and unprecedented proposal. The adoption of title III would be an unwarranted and unconstitutional intrusion of Federal authority into purely State and local elections. In addition, this proposal would place an undue financial burden upon the States, a burden in which the Federal Government would have no share.

In brief, the Attorney General is already clothed with sufficient authority to assure voting rights to all our citizens. We do not need this extraordinary grant of power to him under title III, the faulty and abusive exercise of which could wreck our democratic governmental processes.

Title IV extends the Civil Rights Commission for 2 more years. Under the present law, this Commission has until September 1961 to run, and it was required by law to submit a report on its activities not later than September 9, 1959. No such report has ever been

**Exhibit 7-8**

forthcoming from the Commission. It has submitted copies of its hearings held recently in Alabama in regard to voting. I understand that in addition to undertaking studies of voting, the Commission has also begun studies in housing and education. Yet, after nearly 3 years of existence, the Commission has made no reports on any of these subjects.

Why, then, do we need to extend the Commission—a Commission from which no report has been forthcoming—if we legislators are to proceed on the very same subjects, namely, voting rights and education? Either we need the study and report and, therefore, should await the same, or there is no need for the Commission if titles I, III, and V are necessary. If the experience of the Commission to date is indicative of what will be accomplished during a 2-year extension, it means that nothing will be served by such an extension.

I, therefore, oppose the adoption of title IV of this bill.

Title V of H.R. 8601 would amend Public Laws 815 and 874 of the 81st Congress authorizing Federal aid to local school districts which provide free public education to children whose parents reside or work on Federal property not subject to State or local taxation. Title V would authorize the Commissioner of Education and the armed services concerned to provide for the education of children of military personnel, regardless of where they live, when the public schools are closed to them. This section also authorizes the Commissioner to acquire possession of any school building constructed with the aid of Federal funds when the local educational agency which owns the building is no longer using it for free public education and the Commissioner needs the building to provide education to these children of military personnel or for other children who reside on Federal property.

Under the Supreme Court desegregation decision in the Brown case of 1954, the enforcement of desegregation decrees is left to lower Federal courts. However, in title V of this bill, the Commissioner of Education would be empowered to enter the picture and provide education for children of military personnel whenever he finds no suitable free public education exists. What is the limit of the power vested in the Commissioner in this instance? The exercise of such unlimited power could very well be the opening wedge for the entrance of the Federal Government into eventual control of public school education throughout this land.

Moreover, legislation under title V of this bill comes under the jurisdiction of the House Committee on Education and Labor. It was the House Committee on Education and Labor that reported out the bills in the 81st Congress which became Public Laws 815 and 874. All executive communications on these so-called school impacted area laws have been referred without exception to the Committee on Education and Labor. Now, the Judiciary Committee has usurped the prerogatives and jurisdiction of another committee by grafting title V onto H.R. 8601.

Public Laws 815 and 874 are now working well and effectively throughout the country. Here, we have a good example of cooperative Federal-State relationship in working together in a joint educational endeavor. I speak from considerable firsthand experience on this subject since my congressional district includes Redstone Arsenal at Huntsville, Ala., in and near which thousands of military personnel live. Since Public Laws 815 and 874 were enacted in 1951, Federal grants-in-aid amounting to more than $8 million have been made to local school systems in my district, and thousands of children of Federal impacted families have been educated. I want to point out that this joint endeavor has been accomplished in a wholesome and cooperative manner between the Federal, State, and local school authorities concerned, and up to the present time, no tensions or discordance has appeared anywhere in my district.

Now, if title V of this bill is adopted, much controversy can be stirred up. The Federal Commissioner of Education can assert dictatorial powers, and for all intents and purposes, the good relationship already developed between Federal, State, and local agencies throughout the country in administering Public Laws 815 and 874 can be destroyed and lost.

I sincerely hope that title V of this bill will be defeated.

Finally, Mr. Chairman and my colleagues, I urge the House to reject this ill-conceived and dangerous piece of legislation. In each of its five titles, as I have discussed with you in detail, there are basic imperfections and unconstitutional provisions. It is a most intemperate and divisive measure. It surely will breed racial troubles of untold proportions. It certainly will harm and tear down more than it could possibly help and build up.

There is already adequate legislation on our Federal and State statute books to correct any abuses or injustices for which this bill allegedly has been prepared to correct. We do not need a further pyramiding of Federal authority in the field of civil rights. We do not need at this time to further incite race against race and reopen old wounds. Let us rather seek to use those legal means already at hand and in a spirit of greater understanding and national unity here at home, move forward and devote our energies toward resolving more pressing problems that now confront us. Let us in all good faith, therefore, defeat H.R. 8601 and lay aside this pernicious bill.

Mr. CELLER. Mr. Chairman, I yield myself 15 minutes.

Mr. ANDREWS. Mr. Chairman, will the gentleman yield?

Mr. CELLER. I yield.

Mr. ANDREWS. Mr. Chairman, I am opposed to the impending civil rights bill and I would like to share with my fellow Members of Congress the valid reasons for that opposition.

As a boy, I lived in the rural country of southeast Alabama. During my childhood, race relations in that area were warm and friendly. There were no riots, no brawls in lunch counters, and no bitter hatred between black men and white. In that period, Negroes and whites lived in harmony and worked together for their mutual benefit. Many southern children were reared by Negro "mammies" and it was not uncommon for Negro and white friends to hunt and fish together. The Negroes were a happy, carefree race and they knew they could depend on their white friends in times of need. This happy relationship has been blemished in recent years.

World War II inflicted the first damage on southern race relations. There were no violent flareups in my home district, but it became obvious that the Negroes were growing restless. During the war, they had been exposed to the first racial agitators since the Reconstruction era. The unrest seethed quietly beneath the surface until May 1954 when the U.S. Supreme Court outlawed the South's traditional "separate but equal" education system.

"Black Monday," as that date is known in the South, was the cue for race agitators to descend upon our homeland. With the full endorsement of America's highest Court, the merchants of hate have stirred the southern whites and Negroes into a state of near-violent eruption. The slightest encouragement from the Federal Government, such as a strong civil rights law, may trigger bloody rioting at any place in the South.

Mr. Chairman, please believe me when I say this is no exaggeration. We southern Members of Congress have been pleading with our colleagues to accept our judgment and to understand what we have experienced firsthand. We have lived with this situation all our lives and we are absolutely serious when we say that a harsh, punitive act by the Federal Government, like the civil rights bill, may ignite such a violent reaction that the bloodshed and hatred may surpass that of any period in our history.

The passage of this bill can do nothing but trigger the latent violence in the South. I ask you, Mr. Chairman, why cannot this brilliant group of legislators devote their thoughts to a plan which will unite the people of leadership in the North and the South? Are we not trying to solve the problems of race relations? I submit to you that this is the most important question in our Nation today. Why, then, can we not consider a suggestion which would be a simple and effective solution? I have such a plan and I submitted it to the Congress 6 years ago without success. My plan called for the establishment of a Federal Commission on Human Resettlement, which would grant loans to Negroes in segregated areas who wish to move to nonsegregated areas. My plan was not acceptable to the proponents of civil rights. The bill has been pending in the House Judiciary Committee for 6 years, even though I begged the chairman to give it a hearing. I offered it as an amendment to the Civil Rights Act of 1957, but the chairman made a point of order that the bill was not germane to the civil rights bill. My amendment was stricken.

Mr. Chairman, I say to the proponents of civil rights that if they are sincerely

**Exhibit 7-9**

interested in helping the southern Negro, then they should enact legislation which encompasses the ideas put forth in my human resettlement bill.

Let me illustrate the seriousness of the race problem in the South by quoting an editorial of March 11, 1960, in the Dothan Eagle, the largest daily newspaper in my district:

One of these days—we can't predict when but we hope it won't be too late—the politicians and nest-featherers in Congress are going to wake up to the fact that so-called civil rights legislation doesn't have the political mileage they think it does. The dawning will come with the realization that the clamor has been artificially rigged by agitators and agitating leaders of minorities who don't actually speak for those they profess, by self-appointment, to represent. There were a couple of straws in the wind the other day. Senator KENNETH B. KEATING, of New York, who has introduced more civil rights bills than any other Member of Congress, save his colleague from New York, Senator JACOB K. JAVITS, and is running him a close second, was beating his breast on the Senate floor about his "sacred mission." Its volume turned out to be small, a relative trickle instead of the flood one would expect from the way he carries on. If the Senator would remove the mote from his eye, he would see how hypocritical he is and has been and, furthermore, that he is whooping it up for an issue more imaginary than real among his constituents.

The other straw was turned up by Representative JOHN BELL WILLIAMS, of Mississippi. He told the House that he has queried 11 medium and small cities in districts of Congressmen yelling so much for civil rights and expressing great concern for Negroes on just one question, Would they accept some Negro families? The inquiries went to cities in Pennsylvania, Illinois, Connecticut, New York, Ohio, Minnesota, New Jersey, Montana, Maine, and Massachusetts.

He received only one reply that could be considered an answer. The mayor of Arnold, Pa., declined, explaining his town was "entirely built up with only a few vacant lots remaining" and all existing housing occupied. The mayor of Deerfield, Ill., acknowledged receipt of the inquiry but that was all.

Other than this, said Representative WILLIAMS, "my inquiry was wholly ignored, indicating perhaps that it was just too hot for them to handle and indicating, also, that if an affirmative reply could not be sent, they preferred to duck the issue."

The congressional agitators probably would confess privately that they have to perform as they do for political reasons even if it makes them hypocrites. But they should remember that hypocrisy is a vice without any virtue.

Such editorials are found in almost every southern newspaper. They reflect the feeling of the South toward the so-called civil rights legislation.

The biggest percentage of my mail pertains to civil rights. Each day, I receive letters from citizens in my district who are afraid of the impending violence and terrified that the heel of Federal intervention may crush down upon the modern South, as it did during the Reconstruction period. The spectacle of bayonet-wielding paratroops in Little Rock, Ark., has remained a symbol of horror to all southerners.

Our stand is simply this, we want the right to govern ourselves and to handle the problems which are peculiar to our own area. We do not feel that the U.S. Government should enact laws which authorize outsiders to step in and dictate the solutions to those problems. We southerners have no desire to tell New York, Chicago, or Detroit how to solve their rampant and persistent crime problems and racial strife. We do not feel qualified to give such advice because we do not know the local situations. By the same token, we want no unqualified advice from outsiders in handling our own problems.

Very few people in the North would be affected by the passage of a civil rights bill, but in the South, where a disproportionate number of Negroes exist, it might mean that southern children would be forced to attend school with a ratio of 10 Negroes to 1 white child, a percentage that is unacceptable to most northerners, according to accurate surveys; and white people would be under the political domination of Negro legislators, public officials, and law enforcement officers. The elevation of Negroes to such unaccustomed positions of leadership proved to be an absolute failure during the Reconstruction era.

The Negro has long been a burden to the southern white man. We have struggled for years to maintain acceptable standards in our society for both races. During this struggle, the North has offered little but criticism and interference. I suggest, Mr. Chairman, that the members who are backing the proposed civil rights legislation should turn to the problems of their own areas and apply their zeal and determination to solving matters with which they are familiar.

The South wants to make its own decisions and we do not like the current strong-arm tactics being recommended against us.

Mr. CELLER. Mr. Chairman, I shall try to put in proper perspective and remove some of the ambiguity that has been thrust into the argument, especially as to the constitutional basis of the powers of Congress, first, as to voting procedures, and second, as to voting records, as the same applies to H.R. 8601 and proposed amendments.

First, we have the 15th amendment which I shall briefly read:

The right of citizens of the United States to vote shall not be abridged or denied by the United States or by any State on account of race, color or previous condition of servitude.

The right to vote, therefore, shall not be denied or abridged by the United States or any State because of color or race. The abridgment or denial must be under color of law and it must be based upon race or color. It is the right to vote in any election that is guaranteed by the 15th amendment—any election, Federal, State, or local—for Congressman, for presidential electors, for Governor, for game warden, for mayor, for dog catcher.

The second section of the 15th amendment says:

The Congress shall have the power to enforce this article by appropriate legislation.

Therefore, Congress has the power to implement by appropriate legislation the question of the abridgment or denial of the right to vote. That language is crystal clear. That language is of panoramic broadness. It envisages wide as possible implementation. But, aside from the 15th amendment, Congress may pass legislation reasonably designed to protect citizens in any right guaranteed by the Constitution. In my extension of remarks, Mr. Chairman, I shall cite cases of the Supreme Court in that regard.

The right to participate in the election of Federal officers is a constitutional right. I refer to article I, section 4. The times, places, and manner of holding elections for Senators and Representatives shall be prescribed in each State by the legislature thereof, but—and it is a very important "but"—the Congress may at any time by law make or alter such regulations except as to the places of choosing Senators. Thus, Congress can preempt the authority of the State to determine manner and time of elections of Representatives and Senators. Note, the word "manner" is as broad as a barn door. The widest remedies are within the orbit of the word "manner."

Then we have article I, section 8, clause 18, which reads:

The Congress has the right to make all laws which shall be necessary and proper for carrying into execution the foregoing powers and all other powers vested by the Constitution in the Government of the United States or in any department or officer thereof.

Thus the Congress can make all necessary and proper laws to carry out those powers. The all-embracing words are "all laws necessary and proper." That is the widest kind of control. Under such authority the Congress can control the registration of voters in Federal elections and may control the preservation of records. Although Congress may not control the qualification of the voters, as is indicated in article I, section 2. Indeed, under article I, section 2, and section 4, it appears that the Federal Government through the Congress can take action even against private individuals, as well as against those acting under power of law. The Supreme Court has held the right to vote for Senators and Federal Representatives is a Federal right. Where else could the voting franchise come from? The vote did not exist before the Constitution, and only exists because of the Constitution. The Constitution determines the manner of voting. It said Congress would have the last word as to how its Members were to be elected.

Mr. ROGERS of Colorado. Mr. Chairman, will the gentleman yield?

Mr. CELLER. I yield.

Mr. ROGERS of Colorado. Is there any word in the proposed legislation in your bill, in the substitute or in any amendment that would in any manner infringe upon the right of the State to say who qualified voters are?

Mr. CELLER. I do not think so.

Mr. ROGERS of Colorado. And it was not the intention of anyone who appeared before the committee that Congress should prescribe who should or should not vote. Was there anything advocated like that before our committee?

Mr. CELLER. No.

**Exhibit 7-10**

5450        **CONGRESSIONAL RECORD — HOUSE**        *March 14*

Mr. ROGERS of Colorado. And you do not advocate it?

Mr. CELLER. I do not. But if the State prescribes qualifications, then those qualifications must be applicable to all alike. They cannot be applicable to one and not to another; that is, the objective of this legislation that we are citing has prescribed the qualification the there be equal application to every person in the State who may qualify. In other words, the application cannot be the result of whim or caprice. It must be as a result of evenhanded justice. All must be treated alike when the qualifications are applied.

The preservation of election records for Senators and Representatives must be a safeguard of the right to vote. It is ancillary to the right to vote, to inspect the records and have the records preserved. They complement each other like the reverse and obverse side of a coin. One is necessary to the other as tongue to cheek. If the records cannot be inspected, if the records are unavailing, how can you know whether the votes were even actually cast, much less counted.

U.S. against Classic, with reference to the voting records, was held constitutional.

In *Ex parte Siebold*, 130 U.S. 71, the Court held that a Federal statute requiring that the preservation of the voting records in any election for a Member of Congress was constitutional.

A similar ruling was held in *Ex parte Clark*, U.S. 100,399, and *Coy*, 127 U.S. 731.

We passed the Hatch Act which gave Congress very broad powers concerning the election and election records.

As to the election of President and Vice President a different issue arises, since article 1, sections 2 and 4, refer only to Members of Congress. Presidential electors are covered by article 2, section 1, clause 2.

It should be noted, however, that for practical purposes, there is no real problem, since presidential electors would be elected at the same time as are Members of Congress. Congress can determine the time of electing Congressmen; so the procedural constitutionality as to registration and election of Members of Congress would be the same as for presidential electors. However, as a matter of law, the inclusion of presidential electors can be sustained on a constitutional basis; that is, the inclusion in the legislation before us.

The constitutional vindication is found in the 15th amendment. That amendment, as I said before, extends to all elections, all elections of Members of Congress, to presidential electors; in fact, to any election whether Federal, State, or local.

Thus it is only essential to show a functional connection between the preservation and inspection of voting records and the protection of the right to vote from racial discrimination. The discrimination must always be under color of law. But there is full foundation for these rights; namely, the 14th amendment; and the 14th amendment reads in part:

No State shall make or enforce any law which shall abridge the privileges or immu-

nities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The Supreme Court has ruled—and this is important, Mr. Chairman—the Supreme Court has ruled that the 14th forbids all States not merely from enacting laws which are fair on their face but administered in a manner which is discriminatory to a given class of persons, but also from administering laws in a manner which is discriminatory or unequal with respect to that given class.

The legislation before us and the proposed amendments as to voting and registration and safeguarding and preservation of records are "appropriate legislation" under section 4 of the 14th amendment.

If more bedrock foundations are needed for this legislation, we have the inherent powers of the Congress. It is one of the inherent powers of Congress to insure purity of elections—*Burroughs* v. *United States* (290 U.S. 534). In a case involving the Corrupt Practices Act the Court relied upon the inherent power of the United States to protect the quality and high standard of its political institutions from corruption and said:

Congress undoubtedly possesses the power, as it possesses every other power essential to preserve the departments and institutions of the Federal Government from impairment or destruction, whether threatened by force or corruption.

The Court quoted from Ex parte Yarbrough:

That a government whose essential character is republican, whose executive head and legislative body are both elective, whose most numerous and powerful branch of the legislature is elected by the people directly, has no power by appropriate laws to secure this election from the influence of violence, of corruption, and of fraud, as a proposition so startling as to arrest attention and demand the gravest consideration.

Thus the power to control and insure purity of elections is one of the inherent powers of Congress and need not be based upon any special provision of the Constitution.

Similarly the Federal Government has the inherent power to insure that elections be free from bigotry and racial discrimination. Yes; the State may determine the qualifications of voters under article 1, section 2, for election of Congressmen, but the qualification, the criteria must be applied uniformly.

Otherwise there is the denial of equal protection of the laws as guaranteed by the 14th amendment. Otherwise, the qualifications could be, as I said before, according to whim and caprice, to tyranny and to intemperate discrimination, all repugnant to a republican form of government.

Mr. Chairman, our Constitution must be viewed as a whole, not by parts here and parts there. Viewed as a whole there is the essentiality to guard well the franchise. Otherwise representative government cannot be made to maintain law and order. It is argued that the 15th amendment is not a positive declaration of a right. It simply says the right to vote cannot be abridged

or denied. But how can you abridge anything, how can you deny anything if it does not exist?

The CHAIRMAN. The time of the gentleman from New York has expired.

Mr. CELLER. Mr. Chairman, I yield myself 5 additional minutes.

Thus the amendment presupposes the right of ballot does exist. But beyond that other provisions of the Constitution set up the right. The bill at hand is clearly sanctioned by the 14th and 15th amendments. As to the election of Senators and Representatives, article 1, sections 2 and 4, and of the 17th amendment clearly sustain. Finally, we can rely upon the inherent power of Congress.

Mr. Chairman, just as the Stradivarius violin is useless unless played upon, so the Constitution must have a bow, as it were, drawn across its strings to make it play. Otherwise the Constitution may, like the violin, just remain in a box, an antique piece of old parchment with dead language. In the protection of civil rights for all people the instrument becomes vibrant and alive.

Unfortunately, the Constitution sometimes is like a foreign language, to many of us mispronounced, to many of us misinterpreted.

At the sessions of the Constitutional Convention at the back of the President's chair on the wall a sunburst was painted and as the last Members signed the Constitution on September 17, 1787, Benjamin Franklin said in his report:

"I have often and often in the course of the session, and the vicissitudes of my hopes and fears as to its issue, looked at that behind the President without being able to tell whether it was rising or was setting. But now at length, I have the happiness to know that it is a rising and not a setting sun."

We must keep that sun from setting. We can, if in amity and accord we resolve our differences, having the courage to admit our frailties and our wrongs but have beyond all else the determination to erase the wrongs.

This bill will help erase the wrongs. The bill before us is not a bill calling for revolutionary changes. It has properly been called mild and palatable. It will not suit diehards and those who profess to resist even to the last outpost. But to those who understand, to those who realize that continued resistance and skirmishing are useless and that which cannot be cured must be endured, to the knowledgeable, to the reasonable and especially to those who are willing to doubt a little their own infallibility, this bill is acceptable.

I know that for decades the Supreme Court ruled on the Constitution in a way that did not displease some of you. "Separate but equal" was the lodestar that guided. But this guide post is gone. A different route has been set.

The Constitution and its amendments were not made for any particular generation. That is why its terms were wisely couched in general language.

They were made for all generations. It anticipated changes. A change has come. That change is like the closing of the door of one room only to enter into another room. We are in the other

**Exhibit 7-11**