UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>STEVE SIMON, in his official capacity as Secretary of State for the State of Minnesota, and the STATE OF MINNESOTA,<br><br>Defendants. | Case No. 25-cv-3761-KMM-EMB<br><br>DECLARATION OF ERIC NEFF IN SUPPORT OF THE DEMAND TO COMPEL PRODUCTION OF RECORDS PURSUANT TO 52 U.S.C. § 20701, *et seq.* |

## DECLARATION

I, Eric Neff, declare, pursuant to 28 U.S.C. § 1746, that:

1.    I am currently Acting Chief to the Voting Section within the Civil Rights Division of the United States Department of Justice. I am fully and personally familiar with the facts stated herein. I make this declaration in support of the United States's motion to compel production of election records pursuant to the Civil Rights Act codified at 52 U.S.C. § 20701, *et seq.*

2.    The Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, *et seq.*, requires each state to perform voter-list maintenance to ensure that only eligible voters remain on the statewide voter registration list. Under Section 401 of HAVA,

1

the Attorney General is charged with the responsibility for enforcement of the list maintenance requirements. *See* 52 U.S.C. § 21111. This enforcement responsibility has been delegated to the Civil Rights Division by Congress.

3.    One of the Justice Department's responsibilities is monitoring states' compliance with the requirements of HAVA, including the filing of enforcement actions for noncompliance.

4.    On June 25, 2025, the Civil Rights Division sent a request pursuant to 52 U.S.C. § 21083(a)(2) to Secretary of State, Steve Simon, requesting, *inter alia*, an electronic copy of Minnesota's statewide voter registration list ("SVRL"), containing all fields.

5.    On July 25, 2025, Secretary Simon, did not provide the SVRL containing all fields, and requested instead that the Attorney General provide a legal basis for the request and sufficient information to show that data will be protected.

6.    On August 13, 2025, the Attorney General replied detailing the Department's authority to request a copy of Minnesota's SVRL under Section 401 of HAVA and addressed privacy protections.

7.    In the August 13 Letter the Attorney General made a demand pursuant to the Civil Rights Act, for the electronic copy of the SVRL specifying that it

includes each registrant's Driver's License number or last four digits of the social security number as required by HAVA for federal registration.

8.      The letter also informed Secretary Simon that the purpose of the demand for these records was to ascertain Minnesota's compliance with the list maintenance requirements of federal laws, specifically HAVA.

9.      The letter further explained that HAVA specifies that "the last four digits of a social security number... shall not be considered to be a social security number for purposes of Section 7 of the Privacy Act of 1974 (5 U.S.C. § 522a note)." 52 U.S.C. § 21083. The demand also instructed that any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. §2721(b)(1), is exempted, when the disclosure is for use by a government agency in carrying out the agency's enforcement authority, which the Department of Justice is now endeavoring to do.

10.      The letter also explained to Secretary Simon that the Attorney General would keep all data received secure and treat it consistently with the Privacy Act. The Justice Department's requests came with instructional information for the secure transmission of the statewide VRLs to the Justice Department by way of encryption. (*See* August 13 Letter).

11.    On August 21, 2025, Secretary Simon refused to provide the Attorney General with an electronic copy of Minnesota's statewide VRL.

12.    True and correct copies of the Justice Department letters dated June 25, 2025, and August 13, 2025; and the letters in response by Secretary Simon dated July 25, 2025, and August 21, 2025 are attached to the Memo in support of this Motion. Exhibits 1-4.

13.    A true and correct copy of the Order denying a temporary injunction in *Crook v. S.C. Election Comm'n*, No. 2025-CP-40-06539 (Richland Cty. Comm. Pleas Oct. 1, 2025) as cited in the Memorandum of Support is attached hereto as Exhibit 5.

I declare under the penalty of perjury that the above statements are true and correct. Executed on December 22, 2025.

Dated: December 22, 2025, at Washington, DC.

        /s/   Eric Neff
        Eric Neff

4

# Exhibit 1

**U.S. Department of Justice**

Civil Rights Division

_____

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC  20530*

June 25, 2025

The Honorable Steve Simon
Secretary of State
Veterans Service Building, Suite 210
20 W 12th Street
Saint Paul, MN 55155
secretary.state@state.mn.us

Dear Secretary of State Simon:

The Help America Vote Act ("HAVA") establishes minimum standards for states to follow in several key aspects of administration of federal elections, including voting systems, provisional ballots, voter information posters on election days, first-time voters who register to vote by mail, and statewide voter registration databases. HAVA is codified at 52 U.S.C. § 20901 to 21145. In particular, HAVA imposes certain list maintenance obligations on states as part of the uniform statewide database requirements of Section 303(a)(2) of HAVA, 52 U.S.C. § 21083(a)(2), including coordinating the computerized statewide voter registration list ("statewide voter registration list") with state agency records on felony status and death.

Please provide the following information regarding the State's HAVA compliance:

(1) Describe how the State processes new applications to register to vote for elections for federal office, as required by HAVA Section 303.

(2) Describe the process by which Minnesota assigns a unique identifier to each legally registered voter in Minnesota, as required by HAVA Section 303(a)(1)(A).

(3) Describe how the statewide voter registration list is coordinated with the databases of other state agencies, as required by HAVA Section 303(a)(1)(A). Provide the name of each state database used for coordination, and describe the procedures used for the coordination as well as how often the databases are coordinated with the statewide voter registration list.

(4) Describe the process by which any duplicate voter registrations are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(B)(iii). Please include an explanation of how the State determines what constitutes a duplicate voter registration record.

(5) Describe the process by which voters who have been convicted of a felony are identified and, if applicable under state law, removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(I).

(6) Describe the process by which deceased registrants are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(II).

(7) Describe all technological security measures taken by the State to prevent unauthorized access to the statewide voter registration list, as required by HAVA Section 303(a)(3).

(8) Describe the process by which voters who have moved outside the State and subsequently register to vote in another state are identified and removed from the statewide voter registration list, under HAVA Section 303(a)(4)(A).

(9) Describe the process by which registrants who are ineligible to vote due to non-citizenship are identified and removed from the statewide voter registration list.

(10) HAVA requires states to verify voter registration information by mandating that applicants provide certain information under HAVA Section 303(a)(5). Please provide a copy of the voter registration application(s) utilized for in-person voter registration, a link to the State's online voter registration application, and, if applicable, the voter registration application used for same-day registration.

(11) Please describe the verification process under HAVA Section 303(a)(5) that election officials perform to verify the required information supplied by the registrant. Please describe what happens to the registration application if the information cannot be verified.

(12) Provide a copy of the current agreement, under HAVA Section 303(a)(5)(B)(i), between the chief State election official and the State's motor vehicle authority.

(13) Provide a copy of the current agreement between the official responsible for the State's motor vehicle authority and the Commissioner of Social Security Administration under HAVA Section 303(a)(5)(B)(ii).

(14) Under HAVA Section 303(b), describe the State's requirements for an individual to vote if the individual registered to vote by mail and has not previously voted in an election for federal office in the State.

(15) Please send us Minnesota's current statewide voter registration list. Please include both active and inactive voters.

Please provide this information within 30 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

2

If you have any questions, please email voting.section@usdoj.gov. We very much appreciate your cooperation in our nationwide efforts to monitor HAVA compliance.

Sincerely,

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

cc:    Paul Linnell, Director, Elections Division
       Veterans Service Building, Suite 210
       20 W 12th Street
       Saint Paul, MN 55155
       secretary.state@state.mn.us

3

# Exhibit 2



**STATE OF MINNESOTA**
Office of Minnesota Secretary of State
Steve Simon

July 25, 2025

Maureen Riordan
Acting Chief, Voting Section
U.S. Department of Justice
950 Pennsylvania Avenue NW – 4CON
Washington D.C. 20530

Dear Acting Chief Riordan:

I write in response to your June 25, 2025 request for information regarding Minnesota's compliance with the Help America Vote Act (HAVA). Minnesota has a series of longstanding safeguards that meet or exceed the standards of that act. They are largely codified in Minnesota Statutes Chapter 201 and Minnesota Rules Chapter 8200 and are discussed in greater detail below.[1] They are responsible for an elections system that is accurate, fair, open, accessible, and widely trusted by Minnesotans.

Minnesota's HAVA safeguards are also subject to rigorous internal and external review. Local election officials conduct post-election reviews after each state general election. The Office of the Legislative Auditor (OLA) published an extensive report on Minnesota's voter registration practices in 2018 and will be publishing an update to that report in the spring of 2026. Each year, Minnesota's county attorneys report to the Office of the Secretary of State (OSS) the number of investigations and prosecutions related to election misconduct, including unlawful voter registration. The number of cases they report is exceedingly small and, of the few reported, nearly all the perpetrators are caught in the verification stage, before they can actually register to vote. Just recently, local election officials used these verification tools to identify and refer to law enforcement two individuals who were attempting to submit voter registration applications with fictitious names. The OSS worked with local partners, the Federal Bureau of Investigation, and the United States Attorney for the District of Minnesota to

---

[1] As part of this discussion, it should be noted that since Minnesota is exempt from the National Voter Registration Act of 1993 because it has provided election-day registration since August 1, 1994, 52 U.S.C. § 20503(b)(2), certain obligations of that act that are cross referenced in HAVA apply differently to Minnesota compared to other states. *See e.g.*, 52 U.S.C. § 21083(a)(2)(A)(iii).

ensure these crimes were prosecuted.[2] As a result, the OSS is confident that Minnesota's HAVA safeguards are functioning exactly as they should.

## I.    Registration

Several of your inquiries (request numbers 1, 2, 7, and 10) relate to the manner in which voter registration applications are processed, secured, and entered into the statewide voter registration database. Any Minnesota resident may register to vote if they are 18 years or older,[3] are a United States citizen, have lived in Minnesota for at least 20 days, and are not incarcerated for a felony offense or subject to a court order revoking their right to vote. Minn. Stat. § 201.014. Eligible Minnesotans may register to vote in several ways, including online at https://mnvotes.sos.mn.gov/VoterRegistration/index; by submitting a paper application to their county auditor or the OSS;[4] at their polling place on election day; or when they return an absentee ballot. Minn. Stat. §§ 201.061, 203B.04. In addition, eligible Minnesotans who provide citizenship affirming documentation when they apply for or renew their driver's license or state identification card are automatically registered to vote. Minn. Stat. § 201.161.

Regardless of the method of registration, the applicant must, at a minimum, provide their name, birth date, address, signature, and driver's license or state identification card number. Minn. Stat. § 201.071, subd. 3. If an applicant does not have a driver's license or state identification card, they may instead provide the last four digits of their Social Security number. *Id.* If they do not have a Social Security number, they may submit a certification to that effect. Minn. R. 8200.9310, subp. 2. Each applicant must also attest that they meet all the criteria to be eligible to vote, including that they are a United States citizen. Minn. Stat. § 201.071. Voters must again attest to their eligibility when they cast a ballot. Minn. Stat. § 204C.10.

The voter registration application is then sent to the county auditor of the county where the applicant resides. Minn. Stat. § 201.121. If the voter completed the application before election day, the auditor has 10 days to enter the information into the statewide voter registration system (SVRS). *Id.* If the voter completed the application on election

---

[2] *See* https://www.mprnews.org/story/2025/07/10/couple-admits-submitting-hundreds-of-fake-voter-registration-forms.
[3] Individuals between 16 and 18 years old may preregister to vote if they meet all the other eligibility requirements.
[4] The paper application to register in advance of an election can be found here: https://www.sos.mn.gov/media/5975/minnesota-voter-registration-application.pdf. The paper election day registration application (which is also used for people registering to vote when they return an absentee ballot) can be found here: https://www.sos.mn.gov/media/uivlj5kq/election-day-voter-registration-application.pdf. The application for Minnesotans in the military or living abroad is located here: https://mnvotes.sos.mn.gov/uocava/index. Those individuals can also register using the federal post card application.

day, the auditor has 42 days to enter the information, unless the county requests, and the OSS grants, an extension of 28 additional days. *Id.*

The SVRS is Minnesota's centralized statewide voter registration list. It contains the registration information of each person who has registered to vote in Minnesota. Minn. Stat. § 201.021. It automatically generates a unique identifying number for each person when their data is entered into the system.[5] The OSS is responsible for maintaining and administering the SVRS, while the county auditors are the chief registrars of voters in their respective jurisdictions. Minn. Stat. §§ 201.021 – .022.

Maintaining the security of the voter registration system and protecting the privacy of voters are two of the OSS's highest priorities. Accordingly, the OSS has taken extensive measures to protect the SVRS from unauthorized access. The SVRS can only be used by state and local election officials who have a government-approved email address and whose access is subject to two-factor authentication. Before any local election official can access the SVRS, they must provide the OSS with the IP address they will be using to access the system. IP addresses that have not been approved in advance are blocked. Users are also subject to role-based access controls so that they can only access the data necessary to carry out their duties. In addition, audit logging is automatically enabled to track any changes made within the system.

The OSS also engages regularly with cybersecurity experts, including the federal Cybersecurity and Infrastructure Security Agency, Elections Infrastructure Information Sharing and Analysis Center, and Minnesota IT Services, to improve its security protocols and identify potential vulnerabilities. The OSS's security protocols include firewalls, secondary and concurrent layer protection, ongoing intrusion protection, penetration testing, encryption of application traffic, and ongoing analysis of the system logs for abnormal activity. If abnormal activity is found, the source IP address is denied at the firewall.

## II.    Verification

You also ask about the ways (requests numbers 11, 12, 13, and 14) in which Minnesota verifies the information provided by those registering to vote. After the county auditor enters the applicant's data into the SVRS, the OSS verifies the applicant's identity by providing their name, date of birth, and driver's license or state identification card number to the Minnesota Department of Public Safety's Driver and Vehicle Services Division (DVS) or, if the applicant provided only the last four digits of their Social

---

[5] For applicants who certify they do not have a driver's license, state identification card, or Social Security number, this number is used to identify the applicant for registration purposes.

4

Security number, to the Social Security Administration (SSA).[6] Minn. Stat. § 201.121. These two entities determine whether the information provided by the applicant matches the data in their respective systems. If the data cannot be verified, the OSS notifies the county auditor, who attempts to again match the data against the DVS or SSA database. Minn. R. 8200.9310. If the county auditor cannot do so, they must attempt to contact the applicant to obtain the information necessary for verification. *Id.* If the applicant cannot be verified after 10 days, and they are not a first-time voter for federal office in Minnesota who is registering by mail, the county auditor must mark the applicant's registration as incomplete and challenge their record.[7] Minn. Stat. § 201.121. The applicant must then clear the challenge at least 21 days before the next election or at the polling place on election day. *Id.*

If the applicant is a first-time voter in a federal election who is registering by mail, the county auditor must notify them that their application is incomplete. Minn. Stat. § 201.061, subd. 1a. The applicant must complete their registration by presenting a document authorized for election day registration either to their county auditor before election day; registering to vote in person on election day; or following the election day registration procedures for absentee voters. *See id.*, subds. 1a, 3 (listing documents that satisfy this standard). The applicant may also choose to register to vote in person at any time.

The county auditor then verifies the applicant's address by sending them a non-forwardable post card. Minn. Stat. § 201.121. If the card is returned as not deliverable with no permanent forwarding address, the county auditor must challenge the applicant's record.[8] *Id.* The county auditor may then send a second post card, no sooner than 60 days after the first one, to the same address. Minn. Stat. § 201.12 If the second notice is returned, the county auditor must inactivate the applicant's record. *Id.*

If the post card is returned with a permanent forwarding address, the county auditor must inactivate the person's record and, if the new address is located in Minnesota, send a copy of the card to the county auditor where the new address is located. Minn. Stat. § 201.12. The county auditor receiving the card must update the voter's information and again attempt to verify the applicant's address. *Id.* If the voter's new address is outside Minnesota, the county auditor must send a notice to the voter informing them that their record in the SVRS will be inactivated unless the voter notifies the county auditor

---

[6] A copy of the agreement between the OSS and DVS is attached. Information regarding the sharing of information between DVS and the SSA can be obtained by contacting DVS.

[7] Information about the challenge process is available at Minnesota Statutes section 204C.12 and pages 34 and 35 of the OSS's election judge guide, available at https://www.sos.mn.gov/media/4905/election-judge-guide.pdf.

[8] Individuals who register on election day are verified after the election and are referred to the county attorney for investigation and potential prosecution if they cannot be verified.

within 21 days that they are retaining their former address as their permanent residence. *Id.*

If both the applicant's identity and address can be verified through this process, the applicant is registered to vote and listed as an active voter in the SVRS.

### III.    Maintenance

In addition, you ask (request numbers 3, 4, 5, 6, 8, and 9) about the ways in which Minnesota maintains the SVRS to ensure that only eligible individuals are registered to vote, duplicate registrations are eliminated, and voter names and addresses are updated when appropriate. The SVRS is updated daily and subject to rigorous checks to maintain its accuracy. These checks are the result of extensive efforts by the OSS and its county partners to ensure that only eligible people are registered to vote. As part of this process, state and local election officials rely on extensive reporting from several federal and state agencies. *See* Minn. Stat. §§ 201.13, .145. They include:

-    A monthly report from the Minnesota Department of Corrections listing the name, address, last known residential address that is not a correctional facility, and date of birth of all individuals ages 16 years or older who are ineligible to vote under Minnesota law because they are currently incarcerated for a felony offense;[9]

-    A monthly report from the Minnesota Department of Health containing the name, address, date of birth, and county of residence for all individuals 18 years or older who have died since the previous report;

-    A monthly report provided by the Electronic Registration Information Center (ERIC)[10] listing all the people on the Social Security Death Index since the previous report;

-    A report provided each business day by the Minnesota State Court Administrator containing the name, address, date of birth, and, if available, the driver's license number, state identification card number, or the last four digits of the Social Security number of each individual who is either subject to a guardianship order prohibiting them from voting or who has been found legally incompetent to vote; and

---

[9] The OSS also receives periodic reports from the U.S. Department of Justice on individuals who have been convicted of federal felony offenses.

[10] ERIC is a nonprofit, nonpartisan organization comprised of 25 states and the District of Colombia that provides data matching services to its members to help maintain accurate voter records.

- A monthly report from the Minnesota Department of Public Safety listing the name, address, date of birth, driver's license or state identification card number, and, if available, the last four digits of the Social Security number of each individual the Department of Public Safety has identified as having temporary lawful status in the United States.

Each agency submits its report to the OSS, which compares it with data in the SVRS to determine whether any person listed in the report is a registered voter. *Id.* If so, the OSS notifies the appropriate county auditor so they can review and take appropriate action. *Id.* The auditor must challenge the record of each individual who is incarcerated, subject to a guardianship order, legally incompetent to vote, or listed as possessing temporary lawful status. *Id.* They must inactivate the record of each individual who has passed away. *Id.* In addition, the auditor must also refer any person who has been reported to have registered to vote while possessing temporary lawful status or voted while incarcerated to the county attorney. *Id.* Those cases are investigated for potential prosecution.

The OSS and its county partners also take extensive steps to update the SVRS when voters change their address or name. Each month, ERIC provides the OSS a list of voters who: (1) moved from Minnesota to another ERIC member state; (2) moved within Minnesota; or (3) filed a change of permanent address with the U.S. Postal Service. Any person appearing on any of the above lists has their record updated in the SVRS and their new address verified the same way as a person registering to vote for the first time. In addition, as part of Minnesota's automatic voter registration program, DVS provides the OSS with the addresses of all individuals who are eligible to vote when they apply for or renew their driver's license or state identification card. Minn. Stat. § 201.161. The OSS compares that data to data stored in the SVRS. If any of those individuals are already registered to vote, but have reported a new address to DVS, their voter record is updated and their new address verified. *Id.* With regard to name changes, the OSS receives a daily report from the State Court Administrator containing the name, address, and driver's license or state identification card number of each individual 18 years or older who changed their name. Minn. Stat. § 201.14. The OSS notifies county auditors of this information, and county auditors update each individual's voter record. *Id.*

Finally, the SVRS has several safeguards in place to prevent and eliminate duplicate voter registrations. If a county election official enters a new voter record or modifies an existing record, the SVRS checks to see if the driver's license or state identification card number or name, address, and date of birth match another record in the system. If

it does, the SVRS automatically generates an error message notifying the official they need to review the potential duplicate record before proceeding.

In addition, ERIC provides the OSS with a monthly report of all voters with duplicate registrations within Minnesota. The OSS distributes those names to the county auditor so they can remove the duplicate entries. County officials must also run an SVRS-generated report before and after each election that identifies potential duplicate registrations based on six different criteria, including name, address, driver's license number, state identification card number, and the last four digits of a Social Security number. County officials must compare all the data in the potential matches and merge any duplicate entries. And, at the end of each calendar year, the OSS inactivates any voter who has not voted or updated their registration in the previous four years. Minn. Stat. § 201.171.

The measures outlined above, which are the result of extraordinary partnerships between the OSS, county officials, and several other entities, not only meet or exceed HAVA standards, they have also resulted in one of the most secure and accurate voter registration systems in the country. Public trust in this system is exceedingly high, as evidenced by the fact that Minnesota routinely leads the nation in voter turnout. The OSS is proud to have a system that encourages voting while maintaining the safeguards necessary to preserve fair and accurate elections.

## IV.    Voter Registration List

Finally, you ask (request number 15) that the OSS provide a copy of Minnesota's statewide voter registration list, including both active and inactive voters. That list contains sensitive personal identifying information on several million individuals. The OSS takes seriously its obligations under state and federal law, including HAVA, to protect that data from unauthorized use. *See generally* Minn. Stat. § 201.091 (placing restrictions on the sharing of voter registration data); 52 U.S.C. § 21083(a)(3). As a result, it is the long-standing practice of the OSS not to disclose any information contained on its statewide voter registration list unless expressly required by law.

The OSS also believes in public accountability and scrutiny of our systems and will share voter registration information when required by law. For example, the OSS is fully cooperating with the nonpartisan OLA in its review of Minnesota's voter registration practices and will be providing them with full access to any data they require to conduct that evaluation, as required by Minnesota Statutes section 3.978. More information about the OLA's review is available here: https://www.auditor.leg.state.mn.us/announce/2025-Voter-Registration-System-OSS-focus.pdf.

The Department of Justice did not, however, identify any legal basis in its June 25 letter that would entitle it to Minnesota's voter registration list. Nor did it explain how this information would be used, stored, and secured. It is unclear, for example, if this information would be subject to the Freedom of Information Act, 5 U.S.C. § 552, or whether the Department of Justice would share the data with other federal agencies. The OSS will require clear legal justification for the data and sufficient information to show that the data will be protected and used properly before it can consider whether it is appropriate to share Minnesota's voter registration list.

Please feel free to contact me with any questions. I can be reached at justin.erickson@state.mn.us or 651-201-6895. Thank you for your attention to this matter.

Sincerely,

Justin R. Erickson
General Counsel

# Exhibit 3



**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General*          *Washington, D.C. 20530*

August 13, 2025

<u>Via Mail and Email</u>

Justin R. Erickson
General Counsel
Veterans Services Building
20 W 12th Street, Suite 210
St. Paul, MN 55155
Justin.Erickson@state.mn.us
Phone: (651) 201-6895

Re:     **Minnesota's Voter Registration List**

Dear Mr. Erickson:

We are writing in response to your letter of July 25, 2025, concerning the United States Department of Justice's request for a copy of Minnesota's statewide voter registration list ("VRL"), including both active and inactive voters.[1]

Despite Minnesota's exemption from the National Voter Registration Act ("NVRA"), Minnesota is subject to the Help America Vote Act ("HAVA"). HAVA provides independent authority for the Justice Department to seek the State's VRL through Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide VRL requirements. *See* 52 U.S.C. § 21111.

In addition to the Attorney General's authority to enforce HAVA, the Civil Rights Act of 1960, codified at 52 U.S.C. § 20701, *et seq.*, requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for a period of 22 months after any federal general, special, or primary election.

52 U.S.C. § 20703 provides that *all* records or papers required to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection,

---

[1] *See* Letter from Justice Department sent to Registrar-Recorder/County Clerk Dean C. Logan on July 9, 2025.

reproduction, and copying at the principal office of such custodian by the Attorney General or his representative.

   To that end, this letter serves notice that the Attorney General is making a demand pursuant to 52 U.S.C. § 20703 for a complete copy of the state of Minnesota's statewide VRL. The purpose of this request is to ascertain Minnesota's compliance with the list maintenance requirements of HAVA under 52 U.S.C. § 21083(b)(4)(A) and (B). The VRL is to include all fields, including all identifiers, including the registrant's full name, date of birth, residential address, and the last four numbers of each registrant's social security number and the full state driver's license number, as required by HAVA at 52 U.S.C. § 21083(a)(5)(A)(i).

   HAVA specifies that the last 4 digits of a social security number shall not be considered a social security number for purposes of section 7 of the Privacy Act of 1974. (52 U.S.C. § 522(a) note; see 52 U.S.C. § 21083(c)). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority. In charging the Attorney General with enforcement of the VRL maintenance requirements in the Act, Congress plainly intended that the Justice Department be able to conduct an independent review of each state's list.

   To allay any concerns, Section 304 of the CRA also provides, "Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury."

   Accordingly, please provide the requested electronic Voter Registration List[2] to the Justice Department within seven days or by August 21, 2025. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). Please be advised that failure by Minnesota to provide its statewide voter registration list may result in legal action. Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

                                                      Regards,

                                                      Harmeet K. Dhillon
                                                      Assistant Attorney General
                                                      Civil Rights Division

---

[2] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, their state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

# Exhibit 4



**STATE OF MINNESOTA**
Office of Minnesota Secretary of State
Steve Simon

August 21, 2025

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW – 4CON
Washington D.C. 20530

Dear Assistant Attorney General Dhillon:

I write in response to the United States Department of Justice's (DOJ) second request for information regarding Minnesota's compliance with the Help America Vote Act (HAVA). I understand that the DOJ is seeking Minnesota's complete voter registration list, including the name, date of birth, residential address, and either the driver's license number or the last four digits of the Social Security Number for all active and inactive voters. The DOJ has requested that the Office of the Secretary of State (OSS) provide this highly sensitive data on millions of Minnesotans within seven days. The DOJ's request is unprecedented in its scope and timing. Given the accelerated deadline, the OSS offers the following non-exhaustive list of concerns with the DOJ's request.

As I indicated previously, before sharing any data contained in Minnesota's voter registration list, the OSS will require (1) clear legal justification for the data request and (2) sufficient information to show that it will be used and protected appropriately. This is because both state and federal law place significant restrictions on the distribution of such sensitive information. Minnesota law, for example, prohibits the OSS from providing a voter's date of birth or any portion of their Social Security Number, driver's license number, state identification card number, military identification number, or passport number to law enforcement or in response to a request for public inspection. Minn. Stat. § 201.091, subd. 9.[1] Federal law also requires the OSS to take steps to prevent unauthorized access to this information. 52 U.S.C. § 21083(a)(3). While the OSS has carefully reviewed the information the DOJ provided in its most recent letter,

---

[1] Individuals who violate this law may face criminal charges. *See* Minn. Stat. § 201.27.

Veterans Service Building, Suite 210 | 20 W 12th Street | Saint Paul, MN 55155
Phone: 651-201-1324 or 1-877-600-8683 | Fax: 651-215-0682 | MN Relay Service: 711
E-mail: secretary.state@state.mn.us | Web site: www.sos.mn.gov

it still fails to address the concerns that the OSS previously raised. Accordingly, the OSS cannot disclose Minnesota's voter registration list at this time.

### I.      The DOJ has not provided adequate justification for amassing highly sensitive information on millions of Minnesotans.

The DOJ identified two provisions of federal law as the legal bases for obtaining Minnesota's voter registration list: Section 401 of HAVA and Section 303 of the Civil Rights of Act of 1960 (CRA). Neither provision provides the clear legal basis necessary for the OSS to turn over private data on several million individuals.

Section 401 of HAVA states that the Attorney General may bring a civil action "to carry out [HAVA's] uniform and nondiscriminatory election technology and administration requirements." 52 U.S.C. § 21111. Section 401 says nothing about granting the Attorney General access to voter registration information (or any other data for that matter) before bringing such an action. Had Congress wanted to grant the Attorney General such authority, it could have easily done so. While there are many provisions of federal law that authorize the DOJ to obtain information from third parties before bringing a civil action, none of those provisions relate to HAVA. *See, e.g.*, 42 U.S.C. § 1997a-1 (authorizing access of information via subpoena under the Civil Rights of Institutionalized Persons Act); 15 U.S.C. § 1312 (authorizing access to data via civil investigative demand under the Antitrust Civil Process Act); 15 U.S.C. § 78dd-2(d)(2) (authorizing the production of information under the Foreign Corrupt Practices Act); *Fresenius Medical Care v. United States*, 526 F.3d 372, 375 (8th Cir. 2008) (requiring authority for agency to issue subpoenas). Section 401 does not grant the DOJ access to Minnesota's voter registration list.

Section 303 of the CRA also does not grant the DOJ access to this data for purposes of assessing Minnesota's compliance with HAVA. The purpose of Section 303, and Title III of the CRA more generally, is to provide the DOJ access to the records necessary to conduct investigations "on complaints of a denial [of the right] to vote because of race" and ensure that voter registration practices "conform to constitutional principles." H.R. Rep. No. 86-956, at 7 (1959); *Kennedy v. Lynd*, 306 F.2d 222, 225 (5th Cir. 1962). Section 303 also requires the DOJ to provide a statement of the basis and purpose of its demand. Neither of the DOJ's letters seeking information about compliance with HAVA satisfy these requirements. The DOJ's demand does not relate to any potential violation of federal civil rights law or constitutional principle. Nor has the DOJ provided any reason to suggest that Minnesota is not in compliance with HAVA. As a result, the DOJ's statement does not constitute a valid demand under the CRA. *See Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d

683, 690 (D.C. Cir. 2017) (affirming denial of civil investigative demand because agency did not provide adequate notice of the conduct it was investigating).

Furthermore, any DOJ demand for data must be made in good faith and reasonably related to the stated purpose of the DOJ's inquiry. *E.g.*, *United States v. Powell*, 379 U.S. 48, 58 (1964); *see also In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). This is particularly true when an agency seeks highly sensitive data on individuals who are not the subject of the government's inquiry, as is the case here. *In re McVane*, 44 F.3d 1127, 1138 (2d Cir. 1995). Equally concerning is the possibility that the DOJ will use the data inappropriately and the fact that the DOJ does not appear to have complied with the necessary legal requirements to obtain or use data on several million people.

At this stage, the OSS cannot conclude that the information the DOJ seeks (Minnesota's voter registration list) is reasonably related to the DOJ's stated purpose (evaluating Minnesota's compliance with the list maintenance provisions of HAVA) or any other legitimate purpose. HAVA requires that Minnesota maintain a "system of file maintenance" "in accordance with state law" that makes a reasonable effort to remove registrants who are ineligible to vote from the voter registration list. 52 U.S.C. § 21083(a)(2)(A)(iii), (4). Courts evaluate a state's compliance with federal list maintenance requirements not by looking at the entirety of a state's voter registration list on any single day, but by assessing whether the state is taking steps to remove ineligible voters "on a regular and ongoing basis." *See, e.g., Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 627 (6th Cir. 2025) (discussing list maintenance requirements in the context of the National Voter Registration Act of 1993). Minnesota's voter registration list would not reasonably assist the DOJ in reviewing whether Minnesota has complied with HAVA.

In its previous letter, the OSS extensively outlined the list-maintenance procedures that it conducts on a regular basis. The DOJ has not asked any questions or sought further information about any of those practices. As a result, the OSS is concerned that the DOJ intends to use the voter registration list for purposes not identified in the DOJ's letter, including potentially unlawful data matching or disclosing this data to other persons or entities who do not have a legal right to access such information. If the DOJ is interested in learning more about Minnesota's compliance with HAVA, then the OSS would appreciate discussing this matter further to determine what information the OSS could provide to educate the DOJ regarding Minnesota's safe and secure voter registration practices. But as of now, the DOJ has not identified how the accumulation of personal identifying information on millions of Minnesotans is reasonably related to the DOJ's role in enforcing HAVA, let alone a permissible use of its authority under the CRA.

4

## II.    The DOJ has not provided adequate assurances that it will treat the data appropriately.

The OSS also asked the DOJ to provide information to show that it would appropriately use, store, and secure Minnesota's voter registration list. In response, the DOJ stated that it would use the data only as permitted by Section 304 of the CRA, which allows data to be shared with Congress, any government agency, and with a court or grand jury. *See* 52 U.S.C. § 20704. The DOJ's response does not adequately address the OSS's concerns. The data the DOJ seeks are entitled to far more protection under federal law.

In addition to Section 304 of the CRA, voter registration data must also be treated in accordance with the Privacy Act of 1974. This Act provides substantive privacy protections for the public by requiring that federal agencies carefully and deliberately consider the collection and use of sensitive data in a transparent way. To comply with the Privacy Act, the DOJ must publish a System of Records Notice (SORN) explaining how voter registration data will be stored, accessed, used, or disclosed before the DOJ collects this information. 5 U.S.C. § 552a(e)(4). The DOJ must also provide advance notice and the opportunity for comment before making any significant change to the way the DOJ treats or collects this information, or before the DOJ increases the scope of data that it intends to collect. Off. of Mgmt. & Budget, Circular No. A-108, *Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act* 5 (Dec. 23, 2016) (OMB Circular No. A-108).[2] These requirements ensure that the federal government does not collect private data on individuals without a valid reason or weaponize the collection of such data for inappropriate purposes. *Garris v. Fed. Bureau of Investigation*, 937 F.3d 1284, 1296 (9th Cir. 2019).

The DOJ has not identified which SORN it relies on. The OSS has reviewed the SORN for the DOJ's Civil Rights Division, which has the authority to enforce HAVA. Privacy Act of 1974; System of Records, 68 Fed. Reg. 47610, 47611 (Aug. 11, 2003). Nothing in the SORN relates to voter registration lists. Moreover, even assuming that the data in voter registration lists are considered information on the subjects or witnesses of a potential DOJ investigation, nothing in the SORN suggests that the DOJ case files ordinarily include private identifying information on several million people. Consequently, the OSS does not believe that the DOJ has complied with the necessary requirements of federal law in order to obtain Minnesota's voter registration list.

In addition, both Section 304 of the CRA and the DOJ Civil Rights Division SORN state that the DOJ may share data with other government agencies, such as the Department of Homeland Security (DHS). The OSS is concerned that any agencies with

---

[2] Available at https://perma.cc/S5KW-PCRC.

whom the DOJ shares this data will use it for data-matching purposes prohibited by the Privacy Act. For example, in March 2025, President Donald Trump issued an executive order instructing the DHS and Department of Government Efficiency to obtain each state's voter registration list and compare it against federal immigration databases. Since that order, the DHS has modified its Systematic Alien Verification for Entitlements (SAVE) program (which previously allowed government entities to verify the eligibility of individual applicants for certain public benefits using a unique immigration identifier, such as an Alien Number) to allow Social Security Numbers to be matched against Social Security Administration data for purposes of verifying whether a person is eligible to vote. Given the timing of the DOJ's request and the executive order, the OSS has reason to believe the DOJ is likely to turn the data over to the DHS for the purpose of matching Minnesota's voter registration list against data in the SAVE program.[3]

Such an action would violate the Privacy Act. This is because despite DHS's significant changes to the SAVE program, it does not appear that the DHS has gone through the necessary legal process to update the corresponding SORN and provide transparency to the public. The current SORN describes the program as a "fee-based service" that verifies citizenship and immigration status of naturalized citizens and those with derivative citizenship by matching unique identifiers on "immigration-related document[s]" against DHS data. Privacy Act of 1974; System of Records, 85 Fed. Reg. 31798, 31798-99 (May 27, 2020).[4] It does not address the new uses of the program, which include searching for data on natural born citizens, using datasets outside the DHS, and conducting searches in bulk. Each modification constitutes a substantial change that requires the DHS to update its SORN. The OSS cannot turn over its voter registration list until the DOJ provides adequate assurances that the DOJ will not use the data for a purpose prohibited by law.[5]

Accordingly, the OSS asks that the DOJ either withdraw its request or provide additional information to show the DOJ intends to use Minnesota's voter registration list for a purpose permitted by law. In particular, the OSS asks that the DOJ identify

---

[3] The OSS is aware that just this week, the Centers for Medicare and Medicaid Services confirmed that it shared Medicaid data with DHS to run through the SAVE program, adding further support to the OSS's concern regarding DOJ's true intentions for the requested data.

[4] Available at https://www.govinfo.gov/content/pkg/FR-2020-05-27/pdf/2020-11390.pdf.

[5] In addition, data matching against the SAVE program would not produce useful results. Eligible Minnesota voters need only provide the last four digits of their Social Security Number to register to vote. It is the OSS's understanding, based on briefings from the DHS, that the SAVE program cannot yet verify a person's citizenship using the last four digits of their Social Security Number. The OSS also does not have Social Security Number information for many of its voters because registrants must only provide that information if they do not have a driver's license or state identification card number, as required by HAVA. Even if these issues were resolved, the DHS has not yet provided adequate information for the OSS to assess whether the data matching in this program is accurate or reliable.

how it plans to use the data; what other agencies the DOJ intends to share the information with; what, if any, data matching the DOJ would conduct with the data (including what databases would be used to conduct that matching); and how its proposed uses are justified by federal law. The OSS also asks that the DOJ explain why its current Privacy Act disclosures related to HAVA justify obtaining personal identifying information on several million people. It would also be helpful to know, as part of this request, whether the DOJ has made demands of similar scope before and the context in which it made those demands. Please feel free to contact me if the DOJ would like to discuss these requests further.

### III. Minnesota's Public Information List is available consistent with Minnesota law.

Finally, while the OSS will not disclose private information on millions of Minnesotans at this time, Minnesota's public information list is available for purchase by any registered Minnesota voter who certifies they will use the list only for purposes related to elections, political activities, or law enforcement, and agrees not to distribute that list to any other person or entity or publish that information online. Minn. Stat. § 201.091, subd. 4. The public information list contains the name, address, year of birth, and voting history of each registered voter. *Id*. Information about purchasing the public information list is available at https://www.sos.mn.gov/election-administration-campaigns/data-maps/registered-voter-list-requests/.

Please feel free to contact me with any questions. As I stated above, the OSS would appreciate the opportunity to discuss this matter further with the DOJ in order to determine whether there are ways to address the DOJ's concerns without unnecessarily disclosing private data on millions of Minnesotans. Thank you for your attention to this matter.

Sincerely,

Justin R. Erickson
General Counsel

# Exhibit 5

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF RICHLAND | FIFTH JUDICIAL CIRCUIT |
| | Civil Action No. 2025-CP-40-06539 |
| ANNE CROOK, | |
| *Plaintiff,* | |
| vs. | **ORDER** |
| SOUTH CAROLINA ELECTION COMMISSION A/K/A STATE ELECTION COMMISSION, | |
| *Defendant,* | |
| HENRY DARGAN MCMASTER, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF SOUTH CAROLINA, | |
| *Intervenor-Defendant.* | |

This matter is before the Court on a Motion for Temporary Injunction filed by Plaintiff, Anne Crook. The motion seeks to prevent or limit the Election Commission's dissemination to DOJ of certain information from the South Carolina statewide voter registration list (VRL), containing Plaintiff's personal information. The Court heard this matter on September 26, 2025, and took the matter under advisement. For the reasons stated below, the Motion is **DENIED**.

<u>**Introduction**</u>

Plaintiff is requesting an injunction to prevent the South Carolina Election Commission (Election Commission) from releasing any protected election data to the Department of Justice (DOJ) until there is a memorandum of understanding (MOU) between the two parties. Additionally, Plaintiff requests that this Court review any MOU. In the Election Commission's memorandum in opposition, as well as at oral arguments by their counsel, they have stated point-

blank that they will not release the data to the DOJ without an MOU between the two government agencies. Additionally, counsel stated that the contents of the MOU would be discussed and voted on in open session by the commissioners. This Court denies the drastic remedy of granting injunction for several reasons.

**First**, Plaintiff has failed to prove she will suffer an irreparable harm because the Election Commission has stated it will not release the data without an MOU containing necessary security safeguards to ensure the proper and confidential use of that data and its transmission.

**Second**, Plaintiff has failed to prove there are no adequate remedies at law because she could avail herself to the state and federal tort claims acts if any data is negligently handled in the future.

**Finally**, Plaintiff is not likely to succeed on the merits for several reasons. **1**. The Election Commission is statutorily authorized to engage in the conduct she seeks to enjoin; specifically, South Carolina law vests the Election Commission with the authority to enter data sharing agreements to disclose securely certain voter registration data. **2**. The "right to privacy" constitutional provision does not encompass the sharing of data between the State and the federal government to secure federal elections. **3**. Requesting this Court to mandate an MOU and to assess its adequacy would improperly entangle the judiciary in the routine operations of the Election Commission, which would offend foundational separation of powers principles. **4**. Federal law likely requires the Election Commission to provide the requested information to DOJ.

## Factual Background

On August 6 and 14, 2025, the Department of Justice Civil Rights Division (DOJ) sent letters to the Election Commission, requesting, in sum, South Carolina's VRL. Specifically, in the second letter, DOJ requested "an electronic copy of the statewide voter VRL[, which] should contain *all fields*, which means, [the] state's VRL must include the registrant's full name, date of birth, residential address, [and] his or her state driver's license number or the last four digits of the registrant's social security number . . . ." *See* Compl. at 7–11 (Letter from Harmeet K. Dhillon, Assistant Attorney General Civil Rights Division to Howard Knapp, then-Executive Director, State Election Commission).

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

On August 27, 2025, the Election Commission met to address DOJ's requests. Wooten Aff. ¶ 4. Specifically, the Election Commission directed its staff to confer with DOJ about the prospect of entering into a data sharing agreement as authorized by section 7-5-186(C) of the South Carolina Code of Laws. *Id.* After additional communications with DOJ, on September 3, 2025, the Election Commission and DOJ held a conference call to discuss a possible data sharing agreement. *Id.* ¶ 5. Based on that conference call, the Election Commission understands that DOJ is currently developing a Memorandum of Understanding (MOU) that identifies the requested information and addresses the security and privacy concerns raised by the Election Commission. *Id.* ¶ 6. The Election Commission has not yet received the MOU. *Id.* The Election Commission has stated that it will not share any data without a proper MOU in place.

Contesting dissemination of the VRL to DOJ, Plaintiff filed a complaint with a request for injunctive relief and a declaratory judgment in Calhoun County. Ultimately, the case was transferred to Richland County and assigned to the Honorable Daniel M. Coble. The Election Commission filed its Answer on September 25, 2025.

## Legal Standard

An injunction is a "drastic" remedy that "ought to be applied with caution." *Strategic Res. Co. v. BCS Life Ins. Co.*, 367 S.C. 540, 544, 627 S.E.2d 687, 689 (2006). A plaintiff "must establish three elements" to obtain a preliminary injunction: (1) irreparable harm, (2) likelihood of success on the merits, and (3) no adequate remedy at law. *Compton v. S.C. Dep't of Corr.*, 392 S.C. 361, 366, 709 S.E.2d 639, 642 (2011).

### 1. Irreparable harm

Plaintiff submits to the Court that she would suffer irreparable harm "if either 1) more of her [personal information] is shared than is permissible under the law or 2) the information is shared without adequate protection." Motion for Temporary Injunction at 11 (Sept. 23, 2025). Transmitting her personal information within the defined confines of an MOU protects against either scenario. Therefore, Plaintiff has failed to identify any sufficient harm—let alone an irreparable harm—she would suffer absent an injunction.

The Election Commission stated in court and in the filings with this Court that they will enter into an MOU with the DOJ that complies with all state law and ensure the protection of any

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

personal information. Additionally, the Election Commission stated that the contents of the MOU would be discussed and voted on at an open hearing. The Election Commission stated in their Memorandum in Opposition to Plaintiff's Motion for a Temporary Injunction:

> Specifically, in recognition of the significant privacy concerns involved, the Election Commission will fulfill its statutory obligations to protect private information and share voter information with DOJ only pursuant to an MOU containing necessary security safeguards to ensure the proper and confidential use of that data and its transmission. Indeed, this explains why the Election Commission has not transmitted the requested information since DOJ first inquired in early August. To appease her concerns, Plaintiff need not look any further than to the MOUs into which the Election Commission routinely perfects when exercising its statutory authority to share voter registration data to carry out its obligation "to maintain accurate voter registration records." *See* Wooten Aff. ¶ 4; S.C. Code Ann. §§ 7-3-20(D)(11), 7-5-186(A). As is standard practice, those MOUs outline the limited purpose for which the shared voter information will be used and the steps taken to protect the confidentiality of that data upon disclosure. For example, such documents ordinarily set forth data use limitations and provide secure transmission protocols and storage and destruction procedures. Any perfected MOU with DOJ should be no different.

Memorandum in Opposition to Plaintiff's Motion for a Temporary Injunction at 5 (Sept. 26, 2025).

Further, Plaintiff's alleged irreparable harm rests on the premise that the Election Commission will not act in good faith or properly carry out the law. Public officials are, absent evidence to the contrary, presumed to act in good faith and follow the laws. *S.C. Jurisprudence*, Evidence § 29 (1999*); see also Toporek v. S.C. State Election Comm'n*, 362 F. Supp. 613 (D.S.C. 1973) (stating that without an evidentiary basis, courts will not assume that state election officials will act arbitrarily in the future). The only evidence in this case is that the Election Commission has acted in good faith in enacting the MOUs with other states to fulfill its statutory duty to maintain accurate voter lists—that is, to prevent voter fraud. Plaintiff has not alleged, and the Court cannot assume, that the Election Commission will do anything other than adhere to state law in any negotiations with DOJ.

## 2. Adequate remedies

Actions for injunctive relief are equitable in nature. *Grosshuesch v. Cramer*, 367 S.C. 1, 4, 623 S.E.2d 833, 834 (2005) (citation omitted). Generally, equitable relief is available only where there is no adequate remedy at law. *Santee Cooper Resort, Inc. v. S.C. Pub. Serv. Comm'n*, 298

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

S.C. 179, 185, 379 S.E.2d 119, 123 (1989). Specifically, "An 'adequate' remedy at law is one which is as certain, practical, complete and efficient to attain the ends of justice and its administration as the remedy in equity." *Id.* In the unlikely event that Plaintiff's private information somehow falls in the hands of a "bad actor" as a result of the Election Commission's fulfillment of its statutory obligations under S.C. Code Ann. § 7-5-186(C) as she hypothesizes, she could avail herself to the state and federal tort claims acts. Such claims are more than adequate vehicles for relief such that an injunction is improper.

### 3. Success on the Merits

#### *Statutory Authorization*

Because the Election Commission is statutorily authorized to engage in the conduct she seeks to enjoin, Plaintiff cannot possibly establish she is likely to succeed on the merits. More specifically, South Carolina law vests the Election Commission with the authority to enter data sharing agreements to disclose securely certain voter registration data.

The South Carolina Constitution mandates the General Assembly to enact legislation providing for the regulation of elections (article II, section 1), the registration of voters (article II, section 8), and "the fulfillment and integrity of the election process" (article II, section 10). Pursuant to that authority, the General Assembly enacted Title 7 of the South Carolina Code of Laws, in turn establishing the Election Commission to oversee the administration of elections and to maintain fair and fraud-free elections. *See* S.C. Code Ann. § 7-3-10(F) (charging the Election Commission with "promulgat[ing] regulations to establish standardized processes for the administration of elections and voter registration that must be followed by the county boards of voter registration and elections").

To that end, relevant here, section 7-5-186(A) requires the Election Commission to establish and maintain a statewide voter registration database and to "conduct an annual general registration list maintenance program to maintain accurate voter registration records in the statewide voter registration system." S.C. Code Ann. § 7-5-186(A). Included in that list is the information the Election Commission collects pursuant to its statutory mandate for contents of voter registration applications. In particular, the application (and therefore the VRL) must contain a registrant's name, sex, race, social security number, date of birth, residential address and may

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

also include driver's license numbers, state-issued identification numbers, telephone numbers, email addresses, mailing addresses, location of prior voter registrations, voter registration agencies, and other data incident to voter registrations. S.C. Code Ann. § 7-5-170(2); *see also* S.C. Code Ann. § 7-5-185(B)(5) (requiring the same information for electronic applications for voter registration).

Furthermore, section 7-5-186(C) expressly provides,

The State Election Commission *may enter into agreements to share information or data* with other states or groups of states, *as the commission considers necessary*, in order to maintain the statewide voter registration database established pursuant to this section. Except as otherwise provided in this subsection, the commission shall ensure that any information or data provided to the commission that is confidential in the possession of the state providing the data remains confidential while in the possession of the commission. *The commission may provide such otherwise confidential information or data to persons or organizations that are engaging in legitimate governmental purposes related to the maintenance of the statewide voter registration database.*

S.C. Code Ann. § 7-5-186(C) (Emphasis added). The plain language of the statute permits the Election Commission to share the requested information with "organizations" such as DOJ. Before perfecting the agreement, the Election Commission determines whether the DOJ MOU meets the state's statutory requirements for disclosure of voter personal information. If it does not, the Election Commission will not enter the agreement or share the VRL.

Much of the Family and Personal Identifying Information Privacy Protection Act is not relevant to this action. For instance, it requires state agencies to have privacy policies and to inform people that collected information might be disclosed, and it prohibits anyone from using personal information obtained from a government agency from using that information for commercial solicitation. *See* S.C. Code Ann. §§ 30-2-20, -40, -50(A). Specific to the section Crook cites in the heading of her motion, section 30-2-20 permits agencies to share personal information to "fulfill a legitimate public purpose." *Id.* § 30-2-20. Surely protecting the voter rolls fits that description. *See id.* § 7-3-10(G) (Commission must "comply with applicable state and federal election law").

Put simply, the statute's plain text authorizes the Election Commission to engage in the conduct Plaintiff hopes to enjoin. *See Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) ("Under the plain meaning rule, it is not the province of the court to change the meaning of a clear and unambiguous statute.").

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

### *Right to Privacy*

A statute gives a plaintiff the right to sue only if the General Assembly intended to create that right. *Denson v. Nat'l Cas. Co.*, 439 S.C. 142, 151, 886 S.E.2d 228, 233 (2023). "Generally, when a statute does not expressly create civil liability, a duty will not be implied unless the statute was enacted for the special benefit of a private party." *Id.* at 151–52, 886 S.E.2d at 233. Nothing in section 7-5-170 (or section 7-5-186) is for any special benefit of an individual. Instead, these statutes provide the framework how voters register and how the Election Commission handles the voter registration database. Bolstering this conclusion are other parts of Title 7, which expressly provide a person the right to challenge certain Election Commission actions. *See, e.g.*, S.C. Code Ann. §§ 7-5-230(C), 7-5-240.

Because there is no private cause of action conferred under these election statutes, the Plaintiff's standing hinges on whether or not her "right to privacy" has been implicated under South Carolina's Constitution. Article I, section 10 prohibits "unreasonable invasions of privacy." S.C. Const. art. I, § 10. That provision was intended "to take care of the invasion of privacy through modern electronic devices." Committee to Make a Study of the Constitution of South Carolina, 1895, *Minutes of Committee Meeting* 6 (Sept. 15, 1967). It sought "to protect the citizen from improper use of electronic devices, computer data banks, etc." Committee to Make a Study of the Constitution of South Carolina, 1895, *Final Report of the Committee to Make a Study of the South Carolina Constitution of 1895*, at 15 (1969). As originally understood then, this provision has nothing to do with the sharing of data between the State and the federal government to secure federal elections.

This constitutional provision's current jurisprudence is not precisely clear, and there is limited case law on the issue. Therefore, this Court must look to several recent cases to ascertain and interpret the provision in light of the facts of this case. In *Planned Parenthood I*, the South Carolina Supreme Court interpreted the right to privacy as more than merely a search or seizure related protection. However, *Planned Parenthood I* was not directly overruled, but it was clearly supplanted by *Planned Parenthood II*. The first case's two dissenting opinions viewed the right to privacy in a more limited fashion, with Justice James' opinion keeping the provision within the search and seizure framework. *Planned Parenthood II* made it clear that while the majority

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

opinion ruled that the right to privacy encompassed more than the search and seizure context, it did so only for the purposes of that opinion.

> Second, *Planned Parenthood I* is a highly fragmented decision with five separate opinions. …we likewise decline to revisit the fragmented decision regarding the proper scope of the privacy provision. Rather, in the interest of unity, we will assume only for purposes of our analysis and decision **today** that the privacy provision reaches beyond the search and seizure context to include bodily autonomy. Accordingly, we go no further **today** than referencing *Singleton v. State*, which held that the interests protected by the privacy clause extend to bodily autonomy and integrity.

*Planned Parenthood S. Atl. v. State*, 440 S.C. 465, 481, 892 S.E.2d 121, 130 (2023), *reh'g denied* (Aug. 29, 2023) (emphasis added). The Supreme Court made clear that in that case they were not making a definitive ruling as to the interpretation of the history and meaning of the constitutional provision in question. *Id.* at 481 n.9 ("We elect not to address those threshold differences: for purposes of our analysis and decision today, we will cast aside a review of the history and relevance of the 1971 amendments to the state constitution that included the privacy provision, including the work of the West Committee.").

Courts will attempt to avoid making legal interpretations when they are unwarranted and superfluous to the ultimate decision. The judiciary is not in the business of creating business but rather tasked with the simple job of making decisions related to past conduct and stating rules for predictability of future conduct. It is often not necessary – and usually unproductive – to create more rules, more interpretations, and more disagreements on issues that are not directly impacted by the ultimate decision. However, because the standing of this Plaintiff hinges on whether or not her right to privacy could be violated, this Court must draw an interpretation as to what the constitutional provision means.

This trial court will never say what the law is or what it ought to be – but it will say what it believes the law is as promulgated by the South Carolina Supreme Court and the South Carolina General Assembly. Following along the lines of the several opinions in *Planned Parenthood I*, in conjunction with prior precedent, this Court does not believe that this provision is implicated with the sharing of election data. In his well-reasoned and thoroughly analyzed opinion, Justice James walks through the history and times of the constitutional amendments during the 1960s and 1970s, and particularly, how the right to privacy provision came about. Without quoting verbatim the

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

opinion, this Court notes several passages to explain why it believes the right to privacy does not encompass the voter election data at issue in this case.

First, in a letter from the attorney general to West Committee Staff Consultant Robert H. Stoudemire, the attorney general explains the reason why the right to privacy needed to be added to the constitutional protections:

> In the first paragraph, General McLeod acknowledged that the proposed privacy provision "relate[d] to interception of communication which is generally done by electronic means." Letter from Daniel R. McLeod, S.C. Att'y Gen., to Robert H. Stoudemire, Staff Consultant, Comm. to Make a Study of the S.C. Const. (Oct. 2, 1967), 1967 WL 12658, at *1. He then noted an "additional factor [that] may be taken into consideration" is the "protection of privacy in areas such as information gotten through data processing." *Id.* The letter as a whole speaks solely in terms of "securing individual privacy in the field of data processing" and in terms of protecting against intrusions into privacy occasioned by (1) interception of communication and information by electronic means, (2) mass collection of data, (3) unguarded income tax and health information, and (4) unguarded information stored in computers. *Id.*

*Planned Parenthood S. Atl. v. State*, 438 S.C. 188, 339–40, 882 S.E.2d 770, 851–52 (2023), *reh'g denied* (Feb. 8, 2023).  Second, the final report related to this constitutional provision discusses the purpose of the added language:

> **Section J. Searches and seizures.** The Committee recommends that the historic provision on searches and seizures be retained. In addition, the Committee recommends that the citizen be given constitutional protection from an unreasonable invasion of privacy by the State. <u>This additional statement is designed to protect the citizen from improper use of electronic devices, computer databanks, etc.</u> Since it is almost impossible to describe all of the <u>devices</u> which exist or which may be perfected in the future, the Committee recommends only a broad statement on policy, leaving the details to be regulated by law and court decisions.

*Planned Parenthood S. Atl. v. State*, 438 S.C. 188, 338, 882 S.E.2d 770, 850–51 (2023), *reh'g denied* (Feb. 8, 2023).

But even as expanded in *Singleton v. State*, 313 S.C. 75, 89, 437 S.E.2d 53, 61 (1993), article I, section 10 still does not reach the sharing of the voter registration list. That case holds no more than that this provision might extend to "bodily autonomy and integrity." *Planned Parenthood S. Atl. v. State*, 440 S.C. 465, 481, 892 S.E.2d 121, 130 (2023). This Court would thus break new ground by applying article I, section 10 to the voter registration list—and with no way

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

to reconcile that conclusion with the "intent of [article I, section 10's] framers and the people who adopted it." *State v. Long*, 406 S.C. 511, 514, 753 S.E.2d 425, 426 (2014).

And of course, article I, section 10 "draws the line at *unreasonable* invasions of privacy." *Planned Parenthood S. Atl.*, 440 S.C. at 482, 892 S.E.2d at 131 (emphasis added). So even if this provision were implicated by the sharing of voter registration lists, this provision would be violated only if the Commission would act unreasonably to provide information to the federal government. This Court does not believe there would be an unreasonable invasion of privacy for the Election Commission to turn over its data to the DOJ.

### *Separation of Powers*

Plaintiff seeks an injunction preventing the Election Commission from sharing any such information absent an "adequate" MOU, subject to review by this Court. This Court cannot supersede the Election Commission's discretion to enter such agreements specifically conferred by statute. In a similar vein, in the first instance, the Election Commission alone is charged with ensuring that an MOU "adequately protects" the rights of the South Carolina electorate, including Plaintiff. Requesting this Court to mandate an MOU and to assess its adequacy would improperly entangle the judiciary in the routine operations of the Election Commission. Such involvement would offend foundational separation of powers principles (article 1, section 8 of the South Carolina Constitution) and undermine the independence of the executive agency by inserting judicial oversight into the Election Commission's discharge of its statutory duties and responsibilities. *State ex rel. McLeod v. McInnis*, 278 S.C. 307, 312, 295 S.E.2d 633, 636 (1982) ("One of the prime reasons for separation of powers is the desirability of spreading out the authority for the operation of the government. It prevents the concentration of power in the hands of too few, and provides a system of checks and balances. The legislative department makes the laws; the executive department carries the laws into effect; and the judicial department interprets and declares the laws.").

### *Federal law*

Federal law likely requires the Election Commission to provide the requested information to DOJ, and while DOJ has also pointed to the National Voter Registration Act and the Help America Vote Act, Title III alone is sufficient to reach that conclusion. Title III requires that, for

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

22 months after a federal election, a state election official "retain and preserve" "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Title III has long been understood to "encompass[], among other things, voting registration records," *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985), which is not surprising given the scope of the statutory text. And since HAVA's enactment two decades ago, registration records must include either "the applicant's driver's license number" or "the last four digits of the applicant's social security number." 52 U.S.C. § 21083(a)(5)(A). The Attorney General (or his representative) may demand in writing "[a]ny record or paper" that a state election official must keep under § 20701. *Id*. § 20703. That demand must simply "contain a statement of the basis and the purpose therefor." *Id*.

DOJ's request for South Carolina's voter registration list fits comfortably within this legal framework. For starters, the voter registration list from the 2024 election is a "record" in a state election official's possession "relating to" the "registration" of voters for the 2024 election. *Id*. § 20701. And that registration now includes either a driver's license number or the last four digits of a Social Security number. *Id*. § 21083(a)(5)(A). DOJ made this request "in writing" and explained its "basis" and "purpose" of ensuring that the State was complying with HAVA and the NVRA. *Id*. § 20703; *see* Compl. Exs. 1 & 2 (DOJ letters).

## Conclusion

### *State Sovereignty*

This Court finds that federal law likely preempts state law in this area simply because of how this Court has to frame the issue. This case is about whether a citizen can likely succeed on the merits of challenging a State action in compliance with its own interpretation of federal law. And the State at this point has interpreted the law as requiring compliance with the federal request. It is not framed as the State *challenging* the federal request to a state agency. This Court has grave concerns about federal overreach and encroachment over this State's sovereignty. However, because this Court rules on the issue at hand, it does not discuss this issue further. As stated by Chief Justice John Roberts of the United States Supreme Court:

> Outside the strictures of the Supremacy Clause, States retain broad autonomy in structuring their governments and pursuing legislative objectives. Indeed, the

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539

Constitution provides that all powers not specifically granted to the Federal Government are reserved to the States or citizens. Amdt. 10. This "allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States." *Bond v. United States,* 564 U.S. ——, ——, 131 S.Ct. 2355, 2364, 180 L.Ed.2d 269 (2011). But the federal balance "is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *Ibid.* (internal quotation marks omitted). More specifically, " 'the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections.' " *Gregory v. Ashcroft,* 501 U.S. 452, 461–462, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991)

*Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 543, 133 S. Ct. 2612, 2623, 186 L. Ed. 2d 651 (2013).

For the reasons stated above, the Motion for Temporary Injunction is **DENIED**. The Governor's Motion to Dismiss is continued.

**AND IT IS SO ORDERED.**

_____

The Honorable Daniel McLeod Coble

October 1, 2025

ELECTRONICALLY FILED - 2025 Oct 01 11:15 AM - RICHLAND - COMMON PLEAS - CASE#2025CP4006539



Richland Common Pleas

**Case Caption:**     Anne  Crook vs   South Carolina Election Commission , defendant, et
al
**Case Number:**     2025CP4006539

**Type:**     Order/Other

So Ordered

s/ Daniel Coble, 2774

Electronically signed on 2025-10-01 11:10:17    page 13 of 13