## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | Case No. 0:25-CV-03761-KMM-EMB |
| Plaintiff, | |
| v. | |
| STEVE SIMON in his official capacity as Secretary of State for the State of Minnesota, and the STATE OF MINNESOTA, | **MEMORANDUM OF THE UNITED STATES IN OPPOSITION TO MOTIONS TO DISMISS (DOCS. 63-65, 78-80, 83-86)** |
| Defendants. | |

## <u>MEMORANDUM OF LAW</u>

## **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.    BACKGROUND .................................................................................................. 3

III.    THE UNITED STATES IS ENTITLED TO PRODUCTION OF THE FEDERAL
ELECTION RECORDS IT HAS DEMANDED UNDER TITLE III OF THE CRA. ................... 5

    A.    The Federal Rules of Civil Procedure, including the motion to dismiss standard, are
inapplicable to orders to compel under Section 305 of the CRA. ............................................. 6

    B.    Title III of the CRA does not require allegations that the federal election records
demanded are needed to investigate race-based denial of voting rights. .................................... 8

    C.    Minnesota's SVRL falls within Section 301's broad definition of "all records and papers"
relating to registration to vote in federal elections....................................................................11

    D.    Movants cannot challenge the Attorney General's basis and purpose to investigate
Minnesota's HAVA compliance. ............................................................................................ 14

    E.    The United States is entitled to unredacted "reproduction" and "copying" of Minnesota's
federal election records, including its SVRL. .......................................................................... 17

IV.    THE UNITED STATES IS COMPLYING WITH APPLICABLE FEDERAL PRIVACY
LAWS……………………………………………………………………………………21

V.    THE UNITED STATES HAS VALID CLAIMS UNDER HAVA………………..24

VI.    CONCLUSION.................................................................................................... 26

# **TABLE OF AUTHORITIES**

**Cases**

*Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960) ................................ 7, 8, 12, 20

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013)................................................... 4

*Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020) ...................................................................11

*Brunner v. Ohio Republican Party*, 555 U.S. 5 (2008)................................................................. 25

*Carolina Tobacco Co. v. Bureau of Customs & Border Prot.*, 402 F.3d 1345 (Fed. Cir. 2005) ... 21

*Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025) ......................................................................................................................... 20

*Coleman v. Campbell*, 208 F. Supp. 199 (S.D. Miss. 1962) ............................................... 10, 16

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) ................................................... 7, 10, 16, 19

*Ebert v. Poston*, 266 U.S. 548 (1925) .......................................................................................11

*Ex Parte Siebold*, 100 U.S. 371 (1879) ...................................................................................... 4

*Foster v. Love*, 522 U.S. 67 (1997) ............................................................................................ 4

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)................................................................... passim

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995) ............................................................ 4

*United States v. Armstrong*, 517 U.S. 456 (1996) ..................................................................... 21

*United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846 (W.D. La. 1960)........ 7, 8, 25

*United States v. Great N. Ry. Co.*, 343 U.S. 562 (1952)..............................................................11

*United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269 (1929) ......................................................... 10

*United States v. Owen*, 500 F.3d 83 (2d Cir. 2007)................................................................... 10

**Statutes**

44 U.S.C. § 3101 ..................................................................................................................... 22

5 U.S.C. § 552a ....................................................................................................................... 23

52 U.S.C. § 20701 .............................................................................................................. passim

52 U.S.C. § 20703 .............................................................................................................. passim

52 U.S.C. § 20704 ................................................................................................................... 18

52 U.S.C. § 20705 ........................................................................................................... 2, 4, 14

52 U.S.C. § 21083 ................................................................................................................ 4, 19

52 U.S.C. § 21111 ................................................................................................................ 4, 25

CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960)............................................................. 9, 10

The Privacy Act of 1974, Pub. L. No. 93–579, 88 Stat. 1896 (1974)........................................ 24

**Other Authorities**

64 Fed. Reg. 73585-02 (Dec. 30, 1999)...................................................................................... 23

66 Fed. Reg. 8425-02 (Jan. 31, 2001) ....................................................................................... 23

68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003).............................................................................. 22

70 Fed. Reg. 43904-01 (July 29, 2005) ............................................................. 22
74 Fed. Reg. 57194 (Nov. 4, 2009) ................................................................... 23
82 Fed. Reg. 24147-01 (May 25, 2017) ....................................................... 22, 23
82 Fed. Reg. 24151 (May 25, 2017) ................................................................ 23

**Regulations**

28 C.F.R. § 0.50 ............................................................................................. 22
28 C.F.R. § 0.51 ............................................................................................. 22

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 ............................................................................ 3

**Legislative Materials**

106 Cong. Rec. 7767 ...................................................................................... 10
148 Cong. Rec. S10512 (daily ed. Oct. 16, 2002) ......................................... 25
H.R. Rep. 107-329, pt. 1 (2001) .................................................................... 11

Plaintiff United States of America respectfully submits this Memorandum of Law in in opposition to: (1) the Motion to Dismiss by Defendant State of Minnesota ("Minnesota") (Doc. 65); (2) the Motion to Dismiss by Intervenor-Defendant Minnesota Alliance for Retired Americans Educational Fund ("The Alliance Intervenors") (Doc. 80); and (3) the Motion to Dismiss by Intervenor-Defendant League of Women Voters of Minnesota ("LWV Intervenors") (Doc. 86). Collectively, the moving Defendants and Intervenors are referred to as "Movants." [1] The United States submits this consolidated memorandum in support in opposition to all motions to dismiss to facilitate the Court's review of the duplicative and overlapping arguments made by the Movants. *See* L.R. 7.1(c).

## I.    INTRODUCTION

The Attorney General of the United States brought this case as part of her investigation of Minnesota's list maintenance practices under the Help America Vote Act ("HAVA"). The United States engaged in correspondence with Defendants, requesting their cooperation in providing federal election records necessary to its assessment in a manner consistent with federal privacy law. Defendants refused to produce records as mandated by federal law and necessary to evaluate their compliance with federal election laws. This action followed. *See* Compl., Doc. 1.

Title III of the Civil Rights Act ("CRA") provides the principal statutory authority for the United States to immediately obtain federal election records including Minnesota's

---

[1] Intervenor Defendant Minnesota Alliance for Retired Americans Educational Fund (the Alliance") includes Misael Hernandez throughout this document.  Further, Intervenor Defendant League of Women Voters of Minnesota ("LWV Intervenors") includes Common Cause, Jennifer Compeau, and Valerie Manskau throughout this document.

statewide Voter Registration List ("SVRL"). Those provisions broadly authorize the Attorney General to compel production of "all records and papers" that "come into … possession" of the defendants relating to registration or other acts requisite to voting in federal elections. 52 U.S.C. § 20701; *see also* 52 U.S.C. § 20705 (authorizing the Attorney General to bring an action to compel the production of federal election records demanded under Section 303 of the CRA). In that manner, Title III is unique because it is purely an investigative tool. As such, it enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).[2] The United States will focus most of its response on its CRA claim to compel production of federal election records it requires to complete its investigation of Defendants' list maintenance practices under HAVA.[3]

As explained below, a motion to dismiss is not appropriate for the CRA claim. The CRA restricts the Court to a "severely limited" inquiry: (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act

---

[2] Caselaw addressing the CRA in any depth is confined to courts within the Fifth Circuit in the early years following the CRA's enactment. Since then, courts have not had occasion to revisit the issue. The United States is unaware of any courts disagreeing with the Fifth Circuit's approach to the CRA.

[3] The United States will briefly address its HAVA claims, which likewise authorize the Attorney General to obtain federal election records. The record production requirements of those statutes are subject to litigation procedures inapplicable to Title III of the CRA.

requisite to voting in federal elections including voter registration; (3) did the officer(s) of election fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that she satisfied the first three elements. *Lynd*, 306 F.2d at 225-26; *see also* 52 U.S.C. § 20703. The record before the Court demonstrates that the United States has established each of these requirements. In contrast, Movants have wholly failed to establish that there remains any "matter[] open for determination" which would provide a basis for their respective motions to dismiss. *Lynd*, 306 F.2d at 226. Therefore, the United States the motions to dismiss should be denied.

## II.    BACKGROUND

While the United States Constitution invests states with broad powers over the conduct of federal elections, it also explicitly authorizes Congress to override those state choices.[4] The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained that the Elections

> Clause is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices …. Thus, it is well settled that the Elections Clause grants Congress 'the power to

---

[4] Defendant Minnesota argues otherwise but fails to cite any controlling authority recognizing the primacy of state law over federal in the conduct of federal elections. *See* Minnesota Mot., Doc. 65-1 at 1.

override state regulations' by establishing uniform rules for federal elections, binding on the States.

*Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832-33 (1995)) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex Parte Siebold*, 100 U.S. 371, 384 (1879)); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 & n.1 (2013) (discussing the breadth of the Elections Clause).

Congress enacted broad regulations over the conduct of federal elections in the two statutes at issue in this litigation. Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA).

4

As explained in greater detail in the Order to Show Cause, the United States sent letters on June 25, 2025, and August 13, 2025 to Secretary of State, Steve Simon, requesting an electronic copy of Minnesota's current SVRL used for federal elections, including both active and inactive voters. (cite to OSC Memo ECF No. 72 at 9-12)  The August 13 Letter explained that the CRA provided the basis of the request and that the purpose of the request was to enforce the list maintenance provisions of HAVA.  Minnesota responded in an August 21, 2025 letter where it refused to provide an unredacted copy of the SVRL.

On September 25, 2025, the United States filed the instant action seeking to compel production of the federal election records that it demanded, including Minnesota's SVRL with the HAVA identifying numbers. *See* Compl., Doc. 1. The Complaint included two counts requiring production under the CRA and HAVA, respectively. *Id.* at 13-15. As discussed below, the United States believes it is unnecessary for the Court to address its claims under HAVA, which mandate production through the normal litigation process. Rather, the United States' CRA claim is dispositive of all the relief that it seeks through Title III's "severely limited inquiry" in a "summary proceeding." *Lynd*, 306 F.2d at 226.

## III. THE UNITED STATES IS ENTITLED TO PRODUCTION OF THE FEDERAL ELECTION RECORDS IT HAS DEMANDED UNDER TITLE III OF THE CRA.

Movants misapprehend the nature of a CRA claim by erroneously suggesting the Court should apply the motion to dismiss standard to it. They incorrectly maintain that Title III of the CRA applies to investigation of only a narrow category of federal election laws. They ask the Court to ignore caselaw under the CRA and allow an impermissible challenge

to the basis and purpose of the Attorney General's written demand. Likewise, they assert that the Court should undermine the Attorney General's enforcement authority by rewriting the congressional mandate in the CRA. In place of producing all election records requisite to voting in federal elections, Movants invite the Court to narrow the mandate to encompass only publicly available records.[5] For the reasons discussed below, Movants' respective motions should be denied and the United States' demand for production of Minnesota's unredacted federal election records, including its SVRL, should be granted.

**A.    The Federal Rules of Civil Procedure, including the motion to dismiss standard, are inapplicable to orders to compel under Section 305 of the CRA.**

Each of the Movants contend that the Court should apply the motion to dismiss standard to the United States' CRA claim seeking an order to compel production of federal election records. *See* Minnesota's Mot., Doc. 65 at 8-9; Alliance Intervenors' Mot., Doc. 80 at 8-9; LWV Intervenors' Mot., Doc. 86 at 8. Illustrative of their approach, the LWV Intervenors argue that the Court must apply the *Iqbal* and *Twombly* standards and find that to secure relief under the CRA, the United States must allege in its Complaint a claim— presumably, a substantive violation of HAVA—and all known facts that support it. *See* LWV Intervenors' Mot., 86 at 8-9. They are mistaken. Movants repeat what the Fifth Circuit has described as "a basic misconception… concerning a Title III proceeding." *Lynd*, 306 F.2d at 225. The "chief purpose" of Title III "is to facilitate the investigation of the

---

[5] A "publicly available" record would never need to be "produced." The Attorney General would simply be able to access it in the same manner as any other member of the public. If that were the rule, CRA's provisions mandating production would essentially be rendered meaningless.

records *before suit is filed*." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is… purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). It does not require known violations of federal law. In that manner, Title III enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228. Contrary to what the Movants argue, no factual allegations of a substantive violation of federal law are required. Instead, "Congress has specifically committed the investigative responsibility to the Attorney General and has equipped [her] with machinery thought suitable for the effective fulfillment of that obligation" through Title III of the CRA.[6] *Id.* at 230. That approach makes sense. The United States cannot be expected to effectively enforce federal election laws such as HAVA if the Attorney General is required to allege facts from federal election records that state officers of election have denied to her. *See id.* at 227 (the Attorney

---

[6] Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Bisceglia*, 420 U.S. 141, 148 (1975). The Supreme Court has recognized that statutes that vested investigative powers in Executive Branch agencies provide such agencies with grand jury-like powers and latitude. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (same with respect to the Federal Trade Commission). The investigative powers that the Attorney General derives from Title III fall comfortably within this paradigm.

General's "right to records does not require that [she] show [she] could win without them").

The Attorney General's filing of an application for an order under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Id.* at 225. It is "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Id.* In structuring the statute in this way, Congress has indicated that the Federal Rules of Civil Procedure are inapplicable. "Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-26; *see also Gallion*, 187 F. Supp. at 854 (comparing applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations"). The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate *pre-suit* investigation. *Citizens Councils*, 187 F. Supp. at 847. In stark contrast, "[t]he chief purpose of Rule 34… is to give a party litigant the right to have records produced *after* suit has been filed." *Id.* (emphasis added). To summarize, "[t]here is no place for any other procedural device or maneuver," including the motions to dismiss presently before the Court, in response to a CRA claim. *Lynd*, 306 F.2d at 226; *see also* Fed. R. Civ. P. 81 (summarizing other federal claims to which the Federal Rules of Civil Procedure do not apply).

### B. Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights.

Title III of the Civil Rights Act of 1960 is entitled "Federal Election Records." CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960). This "sweeping" obligation requires officers of election to preserve and, on request, to produce registration records pertaining to federal

elections. *Lynd*, 306 F.2d at 226. Section 301 provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election …." 52 U.S.C. § 20701. Section 303 authorizes the Attorney General of the United States to compel any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying … by the Attorney General or [her] representative." 52 U.S.C. § 20703.

Notwithstanding the CRA's plain language, Movants argue that the Court must go outside the text of the statute to the sparse legislative history and find that Title III is limited to those records of which only address "racially discriminatory voting practices." Minnesota Mot., 65 at 20. Other Movants make similar arguments contending that the CRA is limited to "racial discrimination" despite the absence of any language in Title III supporting their position. *See* the Alliance Intervenors'. Mot., Doc. 80 at 11. LWV Intervenors' Motion suffers from a similar infirmity. *See* LWV Intervenors' Mot., Doc. 86 at 10.

Title III functions as "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd*, 306 F.2d at 225. The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible violations of a Federal statute." *Coleman II*, 313 F.2d at 868 (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also Coleman v. Campbell*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") (a

sufficient purpose to examine federal election records is "to see if any Federal laws were violated"). The United States clearly has satisfied that requirement by informing the officers of election in the August 13 Letter that "the purpose of the request is to ascertain Minnesota's compliance with the list maintenance requirements of HAVA."[7] Doc. 73. Ex. 3 to Neff Decl. at 2.

Requiring more than that by engrafting a requirement of racial discrimination that does not exist in the statute would violate the clear congressional mandate. Where, like here, the language of an enactment is clear, "the words employed are to be taken as the final expression of the meaning intended." *United States v. Owen*, 500 F.3d 83, 89 (2d Cir. 2007) (quoting *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929)). Well-established principles of statutory construction foreclose federal courts from rewriting a statute in a manner that better suits a litigant. As the Supreme Court explained, "[t]he judicial function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554-55 (1925). "[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a

---

[7] Congress has explained why list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote. For example, passage of HAVA was intended to "reduce the incidence of voters appearing at a polling place only to discover that no record of their registration can be found." H.R. Rep. 107-329, pt. 1, at 36 (2001).

construction that adds to or takes from the significance of the words employed." *Mo. Pac.*, 278 U.S. at 278 (citations omitted). In that manner, the "judicial function [is] to apply statutes on the basis of what Congress has written, not what Congress might have written." *United States v. Great N. Ry. Co.,* 343 U.S. 562, 575 (1952). "After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process…." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020).

As a result, the United States respectfully submits that the Court must decline Movants' invitation to rewrite the CRA to add a requirement of racial discrimination that simply does not exist in Title III. *See id*.

**C.    Minnesota's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in federal elections.**

The scope of federal election records covered by Title III of the CRA is broadly established by Congress. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election. 52 U.S.C. § 20701 (emphasis added). This language is unequivocal in its breadth.

The federal courts that have applied Section 301 have concluded that Congress meant what it said in the statute. It does not exclude electronic records or records created

by the officer of election. Nor does it allow redacting of said electronic records.  One court

explained in detail why a similar effort to impede the Attorney General's enforcement of

federal election laws failed:

> There is nothing uncertain about that part of the Act requiring
> preservation and production of all records and papers which are in the
> possession of an election official … if those records and papers relate
> to the acts requisite to voting…. Regardless of when these records
> came into the possession of the election official, under Section 301
> they must be retained and preserved for a period of twenty-two
> months 'from the date of any general, special, or primary election…'
> if they relate to acts requisite to voting in such election.

*Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701). In *Lynd*, the Fifth Circuit

likewise recognized that "the papers and records" covered by Section 301 "have been

specifically identified by Congress." 306 F.2d at 226. This requirement "is sweeping." *Id.*

It applies to "all records and papers," as the statute provides, *Id.*  Despite the arguments by

LWV Intervenors stating "…the CRA does not *prohibit* redactions…" - for the Court to

allow redactions would fly in the face of not only the CRA clear and unambiguous

language, but also the federal court precedents. *See* LWV Intervenors' Mot., Doc. 86 at 18.

In a similar vein, "there is no question for judicial determination as to how far back

the records go. This, too, is fixed by the statute." *Id.* "[T]he Attorney General's right of

inspection and copying extend as far back as the earliest date of any such record or paper

which bears on the eligibility of any currently listed voter to vote" in a federal election. *Id.*

at 227. To put it even more succinctly: Section 301 means what it says in requiring

production of "all records and papers" relating to registration to vote in a federal election,

including Minnesota's SVRL. 52 U.S.C. § 20701. As *Lynd* made clear, "All means all."

306 F.2d at 230. Therefore, the argument to provide public or redacted SVRL's by Defendants and all Intervenors' fails as a matter of law.

Finally, the United States previously has pursued successful matters, including in litigation, to obtain statewide voter registration lists under Title III of the CRA. For example, in two of those matters against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers and SSN4s, to evaluate compliance with the NVRA, including that Act's list maintenance requirements.[8] To ascertain whether a jurisdiction engages in practices that violate federal law (whether the Voting Rights Act or HAVA or any other one), the Attorney General needs to examine both applications to register to vote *and* the final voting rolls, including the SVRL, so as to assure herself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced. Thus, the Attorney General needs to examine both the records created by third parties that then "come into possession" of election officials and the records created by election officials themselves. Limiting the Attorney General's ability solely to the first type of records or to redact those records would make it nearly impossible for her to carry out the duties assigned to her by Congress. Because suggested statutory

---

[8] *See* Compl., *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), doc. 1. The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See Georgia*, *supra*, at Doc. 4 (filed Oct. 27, 2006). The Texas matter was resolved by a Memorandum of Understanding. *See* U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), *available at* https://www.justice.gov/media/1173461/dl?inline (last visited Jan. 6, 2026). For the Court's convenience, the three documents are provided as Exhibits 1-3, Docket No. 102 (attached to this Memorandum in Opp. To Motions to Dismiss).

construction would lead to absurd results that no rational legislator could have possibly intended, the Court should reject it.

**D.    Movants cannot challenge the Attorney General's basis and purpose to investigate Minnesota's HAVA compliance.**

The CRA establishes a straightforward requirement for the Attorney General to make a written demand to officers of election for federal election records. As explained in the preceding discussion, it covers "all records and papers" which come into possession of an officer of election that relate to any prerequisite to voting in a federal election, including voter registration applications and records. 52 U.S.C. § 20701. Pursuant to Section 303 of the Act, to obtain those federal election records, the Attorney General need only make to an officer of election with custody, possession, or control of those records a "demand in writing" for "inspection, reproduction, and copying," accompanied by "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. After that written demand has been made, and the officer of election has rejected it, the Attorney General may seek an order from the federal court "to compel the production of such record or paper." 52 U.S.C. § 20705.

In the August 13 Letter, the Attorney General made a written demand under Section 303 of the CRA for Minnesota's federal election records, including its SVRL. The letter specifically cited Section 303 of the CRA, stating that "…the Attorney General is making a demand pursuant to 52 U.S.C. § 20703 for a complete copy of the state of Minnesota's statewide VRL. The purpose of the request is to ascertain Minnesota's compliance with the

list maintenance requirements of HAVA under 52 U.S.C. § 21083(b)(4)(A) and (B)." Doc.
No. 73, Ex. 3 to Neff Decl. at 2.

Nevertheless, the Movants argue that the United States failed to provide a sufficient
statement of the basis and purpose of its request for federal election records. Movants
criticizes the Attorney General's stated basis and purpose of the need for the records in
order to assess the state's compliance with HAVA. *See* Minnesota's Mot., 65 at 22; LWV
Intervenors Mot., 86 at 11-18; The Alliance Intervenors Mot., 80 at 12-14. The state argues
that the letter was required to explain "…a specific basis for believing a civil rights
violation has occurred and it can only use the sought records for the stated purpose."
Minnesota's Mot., 65 at 22. The other Movants make related arguments. *See* LWV
Intervenors' Mot., Doc. 86 at 11-12; The Alliance Intervenors' Mot., 80 at 12-13.  (arguing
that a factual basis for the demand must be included). To the extent that Movants assert the
demand needs to include facts showing an *extant* violation of federal law, that argument
fails as a matter of law. *See supra* Part III(A) (describing why the investigative nature of a
demand under Title III forecloses any requirement that a specific allegation of a violation
of federal law be included in that demand).

Federal courts have rejected contentions that parallel those made by Movants.
Section 303's requirement that the written demand "contain a statement of the basis and
the purpose therefor," 52 U.S.C. § 20703, "means only that the Attorney General [must]
identify in a general way the reasons for [her] demand." *Coleman II*, 313 F.2d at 868
(citation omitted). "Clearly a sufficient statement would be the assertion that the demand
was made for the purpose of investigating *possible violations* of a Federal statute." *Id.*

15

(emphasis added); *see also Coleman I*, 208 F. Supp. at 200 (the written demand need only indicate the records were needed "to see if any federal laws were violated"). The United States plainly satisfied that requirement by stating, "[t]he purpose of the request is to ascertain Minnesota's compliance with the list maintenance requirements of HAVA." Doc. No. 73, Ex. 3 to Neff Decl. at 2.

Contrary to what Movants argue, they are prohibited from using "any procedural device or maneuver," including their motions to dismiss, to challenge or "ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd*, 306 F.2d at 226. No discovery or other tools ordinarily available under the Federal Rules of Civil Procedure may be used to question or examine "the reasons why the Attorney General considers the records essential…" *Id.* "Questions of relevancy or good cause or other like considerations" that may be assessed under other statutes to which the Federal Rules of Civil Procedure are applicable "are completely foreign to the summary proceeding" under Section 304 of the CRA. *Id.* at 228. Congress vested the Attorney General with broad authority to obtain federal election records under Title III of the CRA. *Coleman I*, 208 F. Supp. at 200-01. In sum, "the factual foundation for, or the sufficiency of, the Attorney General's" written demand under Section 303 "is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226. Movants' motions to dismiss the CRA claim for not meeting an elevated showing of statement of "the basis and the purpose" fail under the plain language of the statute, as applied by federal courts. Therefore, their motions should be denied.

**E.    The United States is entitled to unredacted "reproduction" and "copying" of Minnesota's federal election records, including its SVRL.**

Section 303's language provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or her representative stating the basis and purpose, "be made available for inspection, reproduction, and copying…." 52 U.S.C. § 20703. "The incorporated standard of [Section 301] is sweeping." *Lynd*, 306 F.2d at 226. The question is only "open for determination" by the Court if "a genuine dispute… arises as to whether or not any specified particular paper or record comes within this broad statutory classification of 'all records and papers… relating to any… act requisite to voting'…." *Id.*

Nevertheless, the Movants ask the Court to legislate limitations conspicuously absent from Title III. Federal courts have concluded that Section 303 requires reproduction and copying. For example, in *Lynd*, the court rejected a "mechanical objection" in which copying federal election records "would, at one time, have been a formidable thing." *Lynd*, 306 F.2d at 231. There, the court observed that "[m]odern photostating equipment will make short order of most of these demands…." *Id.* Minnesota's SVRL is required by HAVA to be in electronic form. It is axiomatic that providing the United States with an electronic copy of its SVRL will be much less burdensome than physical copying of every individual registration record—which the state describes as records of "*millions* of Minnesotans"—if, indeed, complete physical records even exist outside of their electronic form.[9] Minnesota's Mot., 65 at 1 (emphasis added).

---

[9] According to the data that Minnesota reported to the U.S. Election Assistance

17

The other Movants make similar arguments and contend that unredacted information does not have to be provided under the CRA, that state privacy laws take precedent, and that redacting may be needed to comply with the First Amendment. *See* LWV Intervenors' Mot., Doc. 86 at 18-22; The Alliance Intervenors' Mot., Doc. 80 at 14-15.  Movants ignores that Congress has overridden any state laws that conflict with the CRA. *See supra,* Part II. Moreover, all the Movants ignore the plain language of Section 304 of the CRA, which prohibits the United States from "disclos[ing] any record or paper produced" pursuant to Title III, including "any reproduction or copy," except for narrow purposes including "the presentation of any case or proceeding before any court or grand jury." 52 U.S.C. § 20704. The United States specifically referenced this restriction in its August 13 Letter, along with other federal protections including the Privacy Act that limit use, dissemination, and disclosure of records produced to the Attorney General. *See* Ex. 3 to Neff Decl.  It goes without saying that the United States will strictly abide by these statutory limitations. The unredacted SVRL and other responsive federal election records

---

Commission, it is doubtful that millions of federal voter registration records exist in any medium other than electronic form. A large percentage of voter registration transactions were reported as being through e-mail, online, and in-person, and through computer entries at designated voter registration locations. *See* U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2024 Comprehensive Report at 158, 162 (June 2025), *available at* https://www.eac.gov/research-and-data/studies-and-reports (last visited Jan. 6, 2026).

can certainly be produced to the United States consistent with these federal privacy protections through a protective order stating those protections.[10] *Lynd*, 306 F.2d at 230.

Finally, if the Movants' position were to be adopted, it would eviscerate Title III. The Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA (and the NVRA in other states) by having access to the voter identification numbers required by federal law. For each voter, that includes their driver's license number, their SSN4, or other HAVA identifying number. *See* 52 U.S.C. § 21083(a)(5)(A). That information is necessary to identify duplicate registration records, registrants who have moved, and registrants who have died, or who are otherwise no longer eligible to vote in federal elections.[11] There is no question that enforcement of the list maintenance requirements of HAVA (and the NVRA in other states) are for "the purpose of investigating possible violations of a Federal statute." *Coleman II*, 313 F.2d at 868.

The data the United States has requested under the CRA is the same that twenty-five states (including Minnesota) and the District of Columbia routinely share through the

---

[10] As of January 6, five states have provided their SVRLs without any MOU. Two states – Texas and Alaska – have agreed to provide their SVRL under the terms of the MOU. Seven other states have indicated their intention to provide the SVRLs in the near future. *Id.* ¶ 19.

[11] *See generally* 52 U.S.C. § 20507(a)(4) ("In the administration of voter registration for elections for Federal office, each State shall – (4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A) the death of the registrant; or (B) a change in the residence of the registrant…"); 52 U.S.C. § 21083(a)(4) ("The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including… (A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters….").

Electronic Registration Information Center, ("ERIC"), to facilitate their compliance with federal list-maintenance requirements.[12] More importantly, Minnesota clearly admits to giving out private and protected information to ERIC stating "Further, that the state *may* share voter data under certain circumstances does not mean it *must* share the data under all circumstances." Minnesota Mot., 65 at 12. (italics in original). Minnesota, in making said admissions, proves that Minnesota already shares such data with private a private entity.

Similarly, private parties have been granted access to even more detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights. *See Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025) (ACLU compelled production of "[a] copy of the New Hampshire statewide voter database and all documents concerning the use of the statewide voter database, including instruction manuals or other guides concerning the data fields contained in the database and their correct interpretation."), *appeal docketed*, No. 25-1585 (1st Cir. June 17, 2025).

Consequently, the United States is entitled to reproduction and copying of Minnesota's unredacted SVRL under the unambiguous language of Section 303 of the CRA. *See* 52 U.S.C. § 20703; *see also Gallion*, 187 F. Supp. at 855-56 (granting the Attorney General "an order to require the production of records for inspection, reproduction and copying"); *Lynd*, 306 F.2d at 231 (same).

---

[12] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited Jan. 6, 2026).

## IV.    THE UNITED STATES IS COMPLYING WITH APPLICABLE FEDERAL PRIVACY LAWS

Defendant Movants make a variety of arguments and references throughout their Memorandums in Support that privacy laws require dismissal of the United States' efforts to compel production of Minnesota's federal election records. They are mistaken. The United States does not dispute that the requirements of the Privacy Act and Section 304 of the CRA apply here, and it is complying with those requirements. The First Amendment does not prohibit the collection of voter information by the United States to assess compliance with HAVA (and the NVRA in other states.) Similarly, the Driver's Privacy Protection Act does not limit the United States' ability to conduct list maintenance activities. Each of these arguments will be addressed briefly in turn.

Defendant Movants argue that the United States must comply with the Privacy Act, and the United States is doing that. *See* Defendants Mot., Doc. 65 at 7; LWV Intervenors' Mot., Doc. 86 at 22.  Not surprisingly, however, there is no requirement in federal law requiring that the United States plead its compliance with the Privacy Act in every complaint it brings in which it may obtain records that contain personally identifiable information.[13] Rather, the Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use.

---

[13] Indeed, governmental compliance with relevant laws is, absent a showing to the contrary, presumed. *See, e.g.*, *Carolina Tobacco Co. v. Bureau of Customs & Border Prot.*, 402 F.3d 1345, 1350 (Fed. Cir. 2005) ("Government officials are presumed to do their duty, and one who contends they have not done so must establish that defect by 'clear evidence.'") (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).

21

The voter information that the Department is collecting is maintained according to the Privacy Act protections explained in the Civil Rights Division's Privacy Policy, which it has published online.[14] The full list of routine uses for this collection of information, which include investigations and enforcement actions, can be found in the Department of Justice's systems of records notices ("SORN"), most of which are identified with their citations in U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148-24,151.[15]

The statutes cited for routine use include HAVA and the Civil Rights Act of 1960. *See* Privacy Policy, *supra* n.16. The United States made its requests pursuant to those statutes. *See* Doc. No. 73, Ex. 3 to Neff Decl. at 2.

The records in the system of records are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

Also, contrary to what some of the Movants contend through third-party hearsay, the records the United States is seeking to compel under the CRA are not "…to create a national voter voter list…." The Alliance Intervenors' Mot., Doc. 80 at 6.  Rather, the

---

[14] *See* U.S. Dep't of Just., Civ. Rts. Div., Privacy Policy ("Privacy Policy"), *available at* https://civilrights.justice.gov/privacy-policy (last visited Jan. 6, 2026).

[15] Additional SORNs issued by the Civil Rights Division to supplement the Department-wide privacy practices are titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003); and 70 Fed. Reg. 43904-01 (July 29, 2005). Movants fail to recognize any of the Department-wide SORNs that permit the Department's collection of its SVRL, as was done previously in the Georgia and Texas examples discussed *supra* note 10.

records being sought from Minnesota are necessary to perform an individualized assessment of the State's efforts to comply with HAVA. The extent of the litigation necessary to obtain those records, in this case and in others, reflects a coordinated effort to impede federal enforcement of those statutes that is unprecedented in its scale.

Similarly, to the extent that Defendant Movants are concerned about the transport of such data to the United States, the Department of Justice uses a secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs.[16]

Moreover, the Privacy Act does not bar the disclosure of Minnesota's SVRL to the United States, as LWV Intervenors contends. LWV Intervenor's Mot., Doc. 86 at 22. The Privacy Act regulates federal agencies' collection, maintenance, and disclosure of information within their own systems of records—it does not restrict the ability of state actors to share information with federal agencies. The statute's plain language confirms that it applies only to federal "agencies" as defined in 5 U.S.C. § 552a(a)(1), meaning "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government."

---

[16] *See* JUSTICE/DOJ-014, Department of Justice Employee Directory Systems, last published in full at 74 Fed. Reg. 57194 (Nov. 4, 2009), and modified at 82 Fed. Reg. 24151, 24153 (May 25, 2017); JUSTICE/DOJ-002, Department of Justice Computer Systems Activity and Access Records, last published in full at 64 Fed. Reg. 73585-02 (Dec. 30, 1999), and modified at 66 Fed. Reg. 8425-02 (Jan. 31, 2001) and 82 Fed. Reg. 24147-01 (May 25, 2017).

State and local entities fall outside that definition. The Privacy Act "erects certain safeguards for an individual against an invasion of personal privacy," Pub. L. No. 93–579, § 2(b), 88 Stat. 1896 (1974), only within the scope of federal agency record systems. There is no basis for Defendants to fail to disclose information to a federal agency for law enforcement purposes, particularly here, where the United States is complying with the provisions of the Privacy Act.

## V.    THE UNITED STATES HAS VALID CLAIMS UNDER HAVA

Movants argue that the Court should dismiss the HAVA claims brought by the United States to obtain federal election records, including Minnesota's SVRL, necessary to investigate and assess Minnesota's compliance with those statutes. *See* Minnesota's Mot., Doc. 65 at 8-28; LWV Intervenors' Mot., Doc. 86 at 9-23; The Alliance Intervenors' Mot., Doc. 80 at 9-14. As explained in the United States' introduction and its discussion of its CRA action, the claim under the CRA is dispositive of the relief being sought. The summary nature of an action to compel federal election records under Section 305 of the CRA, and the sweeping scope of that provision, obviate the need for additional relief under HAVA. If the Court agrees, the United States stipulates that it is appropriate to dismiss without prejudice its records requests under HAVA, which would be mooted by a CRA order of production. Nevertheless, the United States will briefly address its other two records claims.

Turning to HAVA, the only enforcement provision in HAVA authorizing a cause of action in federal court is found at Section 401, which provides that enforcement of the Act

is vested solely in the Attorney General. *See* 52 U.S.C. § 21111. Senator Dodd of Connecticut, a HAVA conferee and sponsor, recognized that the Act did not have a private right of action. *See* 148 Cong. Rec. S10512 (daily ed. Oct. 16, 2002). As a result, the Supreme Court has held that private parties may not enforce Section 303, including requests for records under that provision. *See Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (per curiam) ("Respondents, however, are not sufficiently likely to prevail on the question whether Congress has authorized the District Court to enforce § 303 in an action brought by a private litigant to justify the issuance of a TRO."). Congress unsurprisingly did not include a public disclosure requirement, such as the one included in Section 8(i) of the NVRA, because unlike the NVRA, private parties cannot enforce HAVA.

However, that does not leave the United States without recourse to seek list maintenance records under HAVA. Rather, it may do so through the ordinary discovery process necessary to prosecute its Section 303 claim. Here, the CRA cases are instructive. Under the CRA, election officials are required to preserve and produce federal election records "to facilitate the investigation … before suit is filed." *Citizens Councils*, 187 F. Supp. at 847. By comparison, the demand for records that the United States has made under HAVA falls into the conventional realm of discovery: "The chief purpose of [Federal] Rule [of Civil Procedure] 34 … is to give a party litigant the right to have records produced after suit has been filed." *Id.* That is all the United States is doing in this case. It seeks records necessary to establish a claim under HAVA, following its investigation into whether Defendants are violating the list maintenance requirements in Section 303(a)(4) of the Act. Again, the expedited and comprehensive nature of relief under the CRA renders the HAVA

claim unnecessary if the Court enters an order compelling production of the federal election records.

## VI.    CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant its motion to compel production of federal election records under Section 305 of the CRA, and to deny the Motions to Dismiss by Movant Defendants Minnesota (Doc. 65) and by LWV Intervenors (Doc. 86) and The Alliance Intervenors (Doc. 80).

Dated: January 21, 2026                    Respectfully submitted,


                                           HARMEET DHILLON
                                           Assistant Attorney General
                                           Civil Rights Division

                                           ERIC V. NEFF
                                           Acting Chief, Voting Section
                                           Civil Rights Division


                                           /s/ *Brittany E. Bennett*

                                           JAMES TUCKER
                                           BRITTANY E. BENNETT
                                           Trial Attorneys, Voting Section
                                           U.S. Department of Justice
                                           4 Constitution Square
                                           150 M Street NE, Room 8.141
                                           Washington, D.C. 20002
                                           Telephone: (202) 704-5430
                                           Email:  Brittany.bennett@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 21, 2026 a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.


/s/ *Brittany E. Bennett*

JAMES TUCKER
BRITTANY E. BENNETT
Trial Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that Plaintiff's two filed Memorandums (Docket No: 72 and Docket No: 102) comply with Local Rule 7.1(f) and (h). Both Memorandums combined word count total 8,290 words as determined by Microsoft Word "Word Count" and is formatted in 13-point Times New Roman font.

<u>/s/ <i>Brittany E. Bennett</i></u>

BRITTANY BENNETT
Trial Attorney, Voting Section
U.S. Department of Justice

29