UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Civil No. 25-cv-03761 (KMM/EMB) |
| Plaintiff, | |
| vs. | **STATE DEFENDANTS'** |
| | **MEMORANDUM OPPOSING** |
| Steve Simon in his official capacity as | **MOTION TO COMPEL** |
| Secretary of State for the State of | |
| Minnesota, and the State of Minnesota, | |
| Defendants. | |

The federal government is not investigating the State of Minnesota for any civil-rights violations regarding how it administers elections. Yet the United States brought a lawsuit fashioned as a civil-rights enforcement action. It now moves the Court to order the state to produce sensitive voter data on millions of Minnesotans, seeking to forgo the Federal Rules of Civil Procedure and fast-track its way to the ultimate relief sought in the complaint. (ECF 70.) The Court should deny the motion because it is procedurally improper. The Civil Rights Act of 1960's record-inspection provision does not create a special procedural process that precludes discovery or other procedural safeguards attendant to litigation.

And even if procedurally proper, the motion fails on the merits. The records demand is facially deficient because it lacks a purpose within the scope of the Civil Rights Act. And the United States does not even claim to have a basis for the demand. Finally, if the demand

were ostensibly within the act's scope, the defendants are entitled to discovery to assess whether the demand is made in good faith and for a legitimate purpose.

**FACTS**

In the summer of 2025, the U.S. Department of Justice (DOJ) wrote to Minnesota Secretary of State Steve Simon's office, asking for information about how the state maintains its voter-registration list and seeking non-public data on millions of registered voters. ECF 66-1 at 1-3; *see also* Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build a National Voter Roll Using State Data*, N.Y. TIMES, Sept. 10, 2025, at A12 (noting DOJ's intent to make similar requests of all fifty states), available at https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html. DOJ did not identify any purpose for doing so, instead generally referring to the Help America Vote Act (HAVA). (*Id*.) Nor did it claim Minnesota was violating HAVA. (*Id.*) The Secretary's office provided detailed information about the state's processes but declined to provide underlying registration data. (*Id.* at 4-11.)

DOJ then sent a second request. (ECF 66-2 at 1-2.) For the first time, DOJ cited the Civil Rights Act of 1960, 52 U.S.C. § 20703, as authority for its demand. (*Id.* at 1.) But it identified the purpose of the request as ensuring HAVA compliance. (*Id.* at 1-2.) It did not identify any concerns with Minnesota's processes or a basis for believing that Minnesota is not HAVA-compliant. (*Id.*) Rather, it demanded Minnesota's unredacted voter-registration list data—including driver's license numbers, dates of birth, and social-security numbers—in electronic form. (*Id.*) The Secretary's office again declined the request, but

2

reminded DOJ it could obtain a broad amount of data by requesting the state's public-information list under Minn. Stat. § 201.091, subd. 4. (*Id.* at 3-8.)

In late September 2025, the United States sued the Secretary and the State of Minnesota, alleging a violation of the Civil Rights Act of 1960 and HAVA.[1] (ECF 1.) The allegations are based solely on the refusal to produce registration data. (*Id.* ¶¶ 28-44.) The United States does not allege underlying discrimination or an investigation into discriminatory practices—racial or otherwise—as the basis for the data demand. (*E.g.*, *id.*) As its relief, the United States asks the Court to order the defendants "to provide the United States with Minnesota's current statewide voter registration list, including active and inactive voters and containing all fields, including the registrant's full name, date of birth, residential address, and either their State driver's license number or the last four digits of their social security number." (ECF 1 at 15-16.)

In December, the state defendants and the intervenor-defendants all moved to dismiss the complaint for failing to state a claim. (ECF 63, 78, 83.) Because of the pending motions, the magistrate judge deferred issuing a scheduling order. (ECF 91.) More than three months after filing the complaint, the United States moved to compel production of the entirety of Minnesota's voter data. (ECF 70.) The United States alleges that the only

---

[1] Since the state defendants filed their motion to dismiss, the United States sued three more states (Arizona, Connecticut, and Virginia) over voter data, bringing the total number of lawsuits to 25. *See United States v. Fontes*, No. 2:26-cv-666 (D. Ariz. Jan. 6, 2026); *United States v. Thomas*, No. 3:26-cv-21 (D. Conn. Jan. 6, 2026); *United States v. Beals*, No. 3:26-cv-42 (E.D. Va. Jan. 16, 2026); *see also* ECF 65 at 8 n.1 (listing related litigation).

purpose for its demand is to assess Minnesota's compliance with HAVA. (ECF 72 at 6, 14.) It does not claim that it has a basis to believe Minnesota is violating HAVA. (*Id.*)

## ARGUMENT

The Court should deny the motion because it is procedurally and substantively improper. The United States essentially seeks early summary judgment without the Court's permission and without waiting for the Court to assess whether the complaint even states a claim. Even if procedurally sound, the Court should deny the motion on its merits because the United States' records demand is outside the scope of the Civil Rights Act and the United States fails to identify a basis for its request. Finally, even if the request is facially permissible, the Court should deny the motion because the defendants are entitled to discovery to develop a factual record. The course of proceedings and public statements by federal officials provide grounds for believing that the data demand was not made in good faith or for a legitimate purpose. And discovery is also necessary to permit the defendants to raise overbreadth and federal privacy law defenses.

## I.    THE FEDERAL RULES OF CIVIL PROCEDURE APPLY TO THIS CASE AND THE UNITED STATES' MOTION IS A PREMATURE SUMMARY-JUDGMENT MOTION.

The Court should deny the United States' motion because it is a premature motion for summary judgment and inconsistent with the rules of civil procedure. The United States seeks to short-circuit all process to obtain the complete relief it seeks in the complaint. The Civil Rights Act does not create a special statutory proceeding in which defendants have no recourse to challenge a demand for records. This case is subject to the Federal Rules of

Civil Procedure and the United States did not obtain leave to bring an early summary judgment motion.

### A.     The Civil Rights Act Does Not Create a Special Statutory Proceeding.

The United States initiated this case as standard civil litigation, subject to the Federal Rules of Civil Procedure. The parties have similarly treated it as routine civil litigation: the case was initiated by a complaint laying out claims, parties have intervened and moved to dismiss, and the Court issued a briefing schedule on the various motions. The current motion, however, departs from those rules, immediately demanding the ultimate relief sought in the complaint: compelled production of Minnesota's sensitive, unredacted voter data. The Civil Rights Act's record-inspection provision does not authorize this truncated process. Because Congress did not create a special statutory proceeding, the Federal Rules of Civil Procedure apply. And under that lens, the United States' motion is a premature summary judgment motion.

Unless otherwise specified by rule or statute, the Federal Rules of Civil Procedure govern "all civil actions and proceedings" in federal district courts. Fed. R. Civ. P. 1. The presumption that the rules apply includes cases involving the federal government's attempts to enforce subpoenas demanding documents. *Becker v. United States*, 451 U.S. 1306, 1307-08 (1981); Fed. R. Civ. P. 81(a)(5). Unless a statute expressly authorizes a different process, courts are "extremely reluctant" to impose processes more summary than the rules provide. *N.H. Fire Ins. Co. v. Scanlon*, 362 U.S. 404, 407-08 (1960); *see also Daly v. United States*, 393 F.2d 873, 876 (8th Cir. 1968) (cautioning that,

absent express statutory language, summary processes should be used "only in narrowly defined special situations").

When a statute merely refers to an "appropriate process," it does not create a special statutory proceeding. *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964). For example, in *Powell*, the IRS sought production of tax records. *Id.* at 49-50. The Supreme Court held that the Federal Rules of Civil Procedure applied because the statute authorized enforcement by "appropriate process" and did not otherwise specify a procedure once in court. *Id.* at 52 n.10, 58 n.18; *see also In re Application of Chevron Corp.*, 736 F. Supp. 2d 773, 786 n.56 (S.D.N.Y. 2010) (observing that rules of civil procedure applied when statute authorized court to compel information but did not specify particular court process). On the other hand, when Congress intends a special statutory proceeding, it will use more specific statutory language, identifying "procedures and remedies specifically tailored to a limited subset of cases, usually one brought under a particular statute." *N.Y. Times v. Gonzales*, 459 F.3d 160, 166 (2d Cir. 2006); *see also Katzenbach v. McClung*, 379 U.S. 294, 296 (1964) (noting that Title II of Civil Rights Act of 1964 created special statutory process).

Applying this standard to the Civil Rights Act of 1960, the Court should deny the United States' motion as premature. Title III of the act, which includes the record-inspection provision, gives federal district courts "jurisdiction by appropriate process" to compel production of records subject to the act. 52 U.S.C. § 20705. Because the statute uses the phrase "appropriate process" and does not otherwise specify a process, the Federal Rules of Civil Procedure control. A court reviewing Title III processes in a nearly identical

case recently reached the same conclusion. *United States v. Weber*, No. 2:25-cv-9149, 2026 WL 118807, at *8 (C.D. Cal. Jan. 15, 2026).

The United States relies primarily on a Fifth Circuit case, *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), to argue that Title III creates a special statutory proceeding where defendants have few, if any, rights. (ECF 72 at 6.) In that case, the U.S. Attorney General applied for an order to show cause under Title III. *Lynd*, 306 F.2d at 226. The court concluded that filing an application rather than a complaint rendered the case a "special statutory proceeding" to which rules of civil procedure did not apply. *Id.* at 225-27. This Court should not follow *Lynd*. It is not binding on this Court, is inconsistent with the statute's plain language, and predates *Powell*'s conclusion that a statutory reference to "appropriate process" does not create a special statutory proceeding. Instead, the Eighth Circuit follows *Powell*. *Daly*, 393 F.2d at 875-76.[2] Further, a claim of a special process is at odds with how the United States has litigated this case: it filed a standard complaint, took no steps to expedite any motions, and waited nearly three months to then claim that a special process exists.

---

[2] As supplemental authority, the United States provided an order to show cause issued in similar litigation in Connecticut. (ECF 92-1.) The order is not binding, contains no analysis of issues the defendants raise, and primarily appears to be a scheduling order. (*Id.*) Similarly, the South Carolina state district court case that the United States cites on the merits is irrelevant. (ECF 72 at 16 (citing *Crook v. S.C. Election Comm'n*, No. 2025-CP-40-06539 (Richland Cty. Comm. Pleas Oct. 1, 2025)).) After DOJ demanded South Carolina's voter data, a private individual sued the state election commission, seeking to enjoin it from complying with the demand (which the commission had not planned to do). (ECF 73 at 31, 38.) In denying a preliminary injunction, the court emphasized that the demand's validity was not before the court. (*Id.* at 39.) Still, the court noted its "grave concerns about federal overreach and encroachment over [the state's] sovereignty." (*Id.*)

**B.     The Court should Deny the Motion as a Premature Summary-Judgment Motion.**

Viewed through the proper lens of the Federal Rules of Procedure, the United States is effectively seeking summary judgment by asking the Court to conclude that, as a matter of the law, the United States is entitled to the ultimate relief it seeks in its complaint. The Court should deny the motion because it is premature. "Unless a different time is set by local rule or the court orders otherwise," a party may move for summary judgment at any time until 30 days after discovery closes. Fed. R. Civ. P. 56(b). This Court prohibits parties from moving for summary judgment before the discovery deadline without the Court's permission. Hon. Katherine M. Menendez, *Practice Pointers and Preferences* 4, https://www.mnd.uscourts.gov/sites/mnd/files/KMM.pdf.

The Court has not yet set the discovery deadline because of the pending motions to dismiss. (ECF 91.) Nor did the United States seek leave to file an early summary-judgment motion. And a summary-judgment motion at this stage is inappropriate. The Court will hear three motions to dismiss on March 3. The defendants anticipate that those motions will resolve the case and render the current motion moot. But if any claims survive, the case will proceed to discovery and then final disposition. And more significantly, if the state defendants must answer, they intend to raise counterclaims or affirmative defenses concerning the United States' compliance with federal privacy laws. (Barr Decl. ¶ 6.) As detailed in section III below, the defendants would need to conduct fact discovery on both the United States' claims and the defendants' counterclaims or affirmative defenses. Granting the United States' motion would deny the defendants' right to that process.

## II.    THE UNITED STATES' DEMAND IS FACIALLY DEFICIENT.

Even if the Court considers the United States' motion, it fails on the merits. The underlying records demand exceeds the scope of Title III of the Civil Rights Act of 1960. As one court recently concluded, the sweeping request for voter data is "unprecedented and illegal." *Weber*, 2026 WL 118807, at *1. Title III is not an unchecked tool for gathering records for any reason. Rather, the United States must identify the purpose and the basis for the demand, and they must relate to an alleged civil-rights violation. And even then, the law does not permit unfettered access to sensitive private data.

### A.    The United States Lacks a Purpose and Basis Within the Scope of Title III.

The merits of the Civil Rights Act claim have been extensively briefed across the three pending motions to dismiss. (ECF 65 at 20-28; ECF 80 at 16-20; ECF 86 at 19-32.) The state defendants briefly recap those arguments here. Title III's record-inspection provision provides:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. *This demand shall contain a statement of the basis and the purpose therefor*.

52 U.S.C. § 20703 (emphasis added). Consequently, a proper records demand must identify the civil-rights-related purpose of the demand and identify the basis for believing a civil-rights violation may exist. In making its demand, DOJ lacked a proper purpose and identified no basis. The United States does not and cannot cure these defects in its motion.

First, DOJ lacked a purpose within the scope of Title III. As shown by its placement in the Civil Rights Act of 1960, the purpose of a records demand must relate to a civil-rights violation. Congress enacted the records-inspection statute to facilitate investigations of racial discrimination after government entities interfered with federal investigations by destroying or withholding records. *E.g.*, ECF 67-1 through 67-8; *see also Weber*, 2026 WL 118807, at *2, 9 ("Congress's intent was clear—ensuring that all Americans, regardless of race, are able to vote without fear or distress."). A records request must therefore have a civil-rights related purpose.

The United States has never articulated a purpose within Title III's scope. Rather, it claims to need the data to assess HAVA compliance. But HAVA does not have a record-disclosure provision; its focus is establishing minimum election-administration standards. Pub. L. 107-252, 116 Stat. 1666 (2002). And relative to list-maintenance, it requires only that states have a "general system of file maintenance" that makes "reasonable efforts" to remove ineligible registrants while also having safeguards against removing eligible ones. 52 U.S.C. § 20183(a)(4). Title III is not a backdoor mechanism for demanding records related to HAVA. *Weber*, 2026 WL 118807, at *1 (concluding that records-inspection provision was "not passed as an unrestricted means for the Executive to collect highly sensitive information about the American people."). It is intended to "detect voting-related racial discrimination." *Id*. at *8.

Second, the United States entirely reads out the statutory obligation to identify the *basis* for the request. DOJ's demand to the Secretary's office identified no reason to believe the state is violating HAVA. (ECF 66-1, 66-2.) And even in the current motion, the United

States identifies only the claimed purpose without ever citing a basis. (*E.g.*, ECF 72 at 6, 14.) Thus, even if HAVA compliance fell within the scope of the Civil Rights Act, the United States' claim fails because it lacks a basis for believing a HAVA violation exists.

The United States cites a series of cases within the Fifth Circuit from the early 1960s as support for its demand and contends that "courts have not had occasion to revisit" them. (ECF 72 at 5 n.1.) Since the United States filed its motion, one court has affirmatively rejected its position: A California court recently dismissed the United States' similar lawsuit against that state, concluding that Title III requires a purpose and basis related to race-discrimination. *Weber*, 2026 WL 118807, at *8. And an Oregon federal court recently signaled it will likely dismiss the United States' complaint. *See* Courthouse News Service, *Judge Rules Oregon Won't Need to Hand Over Unredacted Voter Rolls to Trump Admin* (Jan. 14, 2026) (reporting tentative oral ruling at hearing in *United States v. Oregon*, D. Or. No. 6:25-cv-1666), https://courthousenews.com/judge-rules-oregon-wont-need-to-hand-over-unredacted-voter-rolls-to-trump-admin/.

But even setting aside the recent decisions, that the handful of cases addressing Title III were all decided in the early 1960s and within the Fifth Circuit underscores Title III's purpose. Courts have not had occasion to revisit the record-inspection provision because Congress enacted it to facilitate a particular kind of investigation into a particularly pernicious civil-rights violation that was evading effective review and enforcement: racial discrimination in election administration. The lack of cases in the intervening decades also

underscores the unprecedented nature of the current wave of cases. DOJ has never sought to wield Title III to amass sensitive data for purposes unmoored to civil rights.[3]

Further, even the Fifth Circuit cases recognized the need for a civil-rights-related purpose and a basis specific to the jurisdiction being investigated. Between 1960 and 1963, courts within the Fifth Circuit construed Title III as granting access to records for civil-rights investigations. *See Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963); *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962); *Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962); *In re Gordon*, 218 F. Supp. 826 (S.D. Miss. 1963); *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Attorney General,* 285 F.2d 430 (5th Cir. 1961). For example, in *Gallion*, the district court upheld the constitutionality of Title III's record-inspection provision for a civil-rights investigation *because* Congress enacted the provision using its authority under the Fifteenth Amendment. 187 F. Supp. at 853-54. The court did not uphold the authority as a tool available for any purpose, instead construing it as a tool for "enforcing and protecting the right to vote regardless of color, race, religion, or national origin." *Id.* at 854.

In *Lynd*, the Fifth Circuit similarly emphasized Title III's context of racial discrimination. The court described record demands as a way for the United States to

---

[3] In an amicus brief in the California voter-data litigation, seventeen former DOJ attorneys—who collectively have about 230 years of DOJ experience (including more than 120 years in DOJ's Voting Section)—confirmed that DOJ's present quest for sensitive personal data on voters across the country "is inconsistent with prior DOJ practice and cannot be justified by any of the authorities it has invoked." Brief for Amici Curiae Former Employees of the U.S. Department of Justice at 1, 1a-2a, *United States v. Weber*, No. 2:25-cv-9149 (C.D. Cal. Dec. 22, 2025), Dkt. No. 121.

determine whether it has grounds to initiate a "§ 1971 Suit" (later recodified at 52 U.S.C. § 10101). 306 F.2d at 226. That statute, in turn, prohibits racial discrimination, literacy tests, and other improper denials of the right to vote. 52 U.S.C. § 10101(a). The *Lynd* court highlighted the central purpose of Title III's records provision: enabling the U.S. Attorney General to "assemble all of the voter record information . . . relating to all persons as to whom there is a question concerning infringement or denial of their constitutional voting rights." *Lynd*, 306 F.2d at 228; *see also Bruce*, 298 F.2d at 861 (reflecting DOJ based its records demand on belief that county's voting and registration practices discriminated based on race).

The United States selectively quotes *Lynd* to sidestep the scope of Title III. In quoting *Lynd*'s pronouncements about summary procedures, the United States omits the final sentence of the paragraph. (ECF 72 at 18.) That sentence emphasized that the subject of a Title III investigation involves "the names, identities or addresses of persons thought to have received discriminatory treatment, whether favorable or adverse, and the like." *Id.* at 226. The court recognized that it is the required basis and purpose of an investigation that unlocks the records-demand authority. The line of cases within the Fifth Circuit therefore reinforces that a proper Title III demand must relate to a civil-rights-related purpose.

### B.    The Civil Rights Act Does Not Entitle the United States to Unredacted or Electronic Data.

Even if DOJ could demand some voter data under Title III, two other flaws infect the United States' motion. First, it insists that it is entitled to unredacted data to assess

HAVA compliance. Second, it demands the data in electronic form. Both attempt to create obligations under Title III that do not exist.

As to the first, even if HAVA compliance fell within the scope of Title III and some data production were warranted, it should not include unredacted sensitive data. Title III aimed to give DOJ access to "public records which ought ordinarily be open to legitimate reasonable inspection," not "confidential, private papers and effects." *Lynd*, 306 F.2d at 231; *see also Weber*, 2026 WL 118807, at *9. Federal law did not even require voters to provide driver's license numbers and partial social-security numbers until Congress enacted HAVA in 2002. 52 U.S.C. § 20183(a)(5)(A)(i). These types of data therefore could not have been Congress's focus when enacting Title III in 1960. *See Weber*, 2026 WL 118807, at *9 (concluding that even if compliance with National Voter Registration Act (NVRA) were valid purpose, "DOJ's access to voters' sensitive information is not automatic").

Indeed, even when states must produce voter data under the NVRA's public-disclosure provisions (which do not apply to Minnesota), courts have recognized that states may redact sensitive data. *E.g.*, *Pub. Int. Legal Found. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *Pub. Int. Legal Found. v. N.C. State Bd. of Elections*, 996 F.3d at 257, 264 (4th Cir. 2021); *Project Vote v. Kemp*, 208 F. Supp. 3d 1320, 1344-45 (N.D. Ga. 2016); *True the Vote v. Hosemann*, 43 F. Supp. 3d at 693, 736-39 (S.D. Miss. 2013).

The United States suggests that the Supremacy Clause prevents the defendants from relying on state privacy laws to withhold data. (ECF 72 at 16.) It does not. The Supremacy Clause applies only when state and federal laws conflict. Here, no federal law conflicts

with state law. HAVA contains no data-disclosure provision, and HAVA expressly leaves compliance procedures to states' discretion. 52 U.S.C. § 20185. Courts have also recognized that, barring an express conflict, HAVA's obligation to have a system of list maintenance does not preempt state law. *Am. Civil Rights Union v. Phila. City Comm'rs*, 872 F.3d 175, 183 (3d Cir. 2017) (holding that HAVA's requirements about reporting felony convictions did not preempt state law processes for removing individuals from voting rolls); *Colón-Marrero v. Vélez*, 813 F.3d 1, 14 (1st Cir. 2016) (holding that HAVA preempted state law when HAVA provision provided more protection against removal than state law). Because no part of HAVA mandates producing voter-registration lists, the Secretary's office appropriately considered state law governing access to voter-registration data and offered DOJ the public-information list (which it implicitly rejected).

The United States also does not reasonably explain why unredacted, sensitive personal data is relevant to determining whether Minnesota has a "general system of file maintenance" that makes reasonable efforts to maintain accurate registration records. The United States does not allege that Minnesota lacks a general system of file maintenance. And lest there be any doubt, Minnesota's publicly available laws and rules—not individuals' dates of birth, social security numbers, and driver's license numbers—would show whether it has a system. (ECF 66-1 at -10 (identifying relevant state statutes and rules).) Similarly, DOJ claims to need the data to establish compliance with HAVA's requirement that registrants provide a driver's license, social-security, or other identifying number. 52 U.S.C. § 20183(a)(5)(A); ECF 72 at 14. Minnesota's publicly available laws and application plainly require those numbers. Minn. Stat. § 201.071; Minn. R. 8200.1200

(2023); *see also* Off. of Minn. Sec'y of State, *Minnesota Voter Registration Application*, https://www.sos.mn.gov/media/5975/minnesota-voter-registration-application.pdf    (last visited Jan. 21, 2026).

The United States seems to imply that it wants to do its own list-maintenance. But barring a federal law deeming otherwise, states have primary authority over election administration. U.S. Const. art. I, § 4. While HAVA requires certain general standards, it did not alter the states' authority. HAVA instead leaves the details of registration and list-maintenance processes—including whether to remove specific voters—to the states, not the federal government. 52 U.S.C. § 20185.

As to the second flaw, the United States insists it is entitled to the electronic transfer of voter data. Even if Title III applies, it does not mandate electronic data. Rather, records must only "be made available for inspection, reproduction, and copying at the principal office" of the records' custodian. 52 U.S.C. § 20703. Accordingly, the United States would not be entitled to an electronic transfer of the data.

Because the Title III demand for records is fatally flawed, the Court should deny the motion to compel records.

**III.    EVEN IF THE UNITED STATES' MOTION IS NOT PROCEDURALLY OR SUBSTANTIVELY BARRED, THE DEFENDANTS HAVE THE RIGHT TO DISCOVERY BEFORE THE COURT RULES ON THE MOTION.**

Regardless of whether the Court treats the United States' motion as one for summary judgment or some form of summary proceeding, the state defendants are entitled to discovery before the Court rules on it.

If viewed as a summary-judgment motion, then the Court should deny the motion without prejudice because Minnesota can "show[] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). If construed as a summary proceeding, deferring and permitting Minnesota to conduct discovery is appropriate because there is "a substantial preliminary showing of abuse of the court's process." *United States v. Lask*, 703 F.2d 293, 300 (8th Cir. 1983); *see also Fed. Election Comm'n v. Comm. to Elect Lyndon La Rouche*, 613 F.2d 849, 862 (D.C. Cir. 1979) ("To rule otherwise . . . would render it virtually impossible for a summonee to prove that a facially valid summons was, in fact, issued for an improper purpose.") When a respondent "raises colorable allegations of an improper purpose and seeks to prove those allegations," the enforcement court must afford "at least some opportunity" to substantiate them. *La Rouche*, 613 F.2d at 862 (collecting cases); *see also United States v. Am. Target Advert., Inc.*, 257 F.3d 348, 355 (4th Cir. 2001) (recognizing discovery is proper where there was indication agency has permitted or encouraged the abuse of its investigatory function). Under either standard, the defendants are entitled to discovery.

Even when the government has authority to demand records, the demand must be for a legitimate purpose and made in good faith. *Powell*, 379 U.S. at 58; *see also Media Matters for Am. v. Fed. Trade Comm'n*, No. 25-5302, 2025 WL 2988966, at * 6 (D.C. Cir. Oct. 23, 2025) (denying stay of preliminary injunction when pattern of litigation and information demands did not suggest good faith by federal agency). An improper purpose may include demanding information to use in collateral matters unrelated to the enforcement authority under which the demand is made. *Powell*, 379 U.S. at 58. To ensure

these requirements are met, when the government comes to court to enforce a demand, parties can challenge the demand on any appropriate ground, such as whether it is made for a proper purpose, whether the government has a good-faith basis for believing that it would uncover evidence of wrongdoing, whether it is overbroad, or whether it violates federal privacy laws. *Powell*, 379 U.S. at 58; *Blue Ribbon Quality Meats, Inc. v. Fed. Trade Comm'n*, 560 F.2d 874, 876 (8th Cir. 1977); *see also,* e.g., *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984) (breadth); *Nat'l Lab. Rels. Bd. v. N. Bay Plumbing, Inc.*, 102 F.3d 1005, 1009 (9th Cir. 1996) (federal Privacy Act); *Weber*, 2026 WL 118807, at *17-19 (federal Privacy and E-Government Acts).

Here, the United States seeks to enforce a demand for records under Title III to (according to the United States) assess HAVA compliance. As previously discussed, HAVA does not authorize the demand. And while this case is still in its early stages, the limited information currently available gives reason to doubt that the sweeping demand for Minnesota's voter data was made for a permissible purpose or in good faith. That information establishes the preliminary showing to permit discovery. The defendants have also made a sufficient preliminary showing that they have overbreadth and federal privacy-law defenses that require discovery.

### A.   The Defendants Are Entitled to Discovery on Whether the United States is Acting for a Permissible Purpose and in Good Faith.

There is substantial reason to conclude that DOJ seeks voter data for an improper purpose and lacks a good-faith basis for its demand. Accordingly, the defendants are entitled to discovery on those issues.

***Permissible Purpose***

Title III requires DOJ to identify "the" basis and purpose of the demand. 52 U.S.C. § 20703. Accordingly, even if DOJ could demand Minnesota's entire voter list under that provision, it would be required to identify the purpose of the collection in advance and be limited to using the data for that purpose. DOJ's shifting justifications for its demand, as well as contrary public statements by DOJ officials, indicate that DOJ seeks voter data for an improper purpose and does not intend to limit its use of data to any claimed purpose.

When it initially requested the data, DOJ provided *no* reason for its demand. (ECF 66-1, at 1-3.) Although that initial demand noted Minnesota's HAVA obligations, there was no statement that the information sought would be used to assess HAVA compliance. (*Id.*) Nor did the letter invoke Title III. (*Id.*) Only in DOJ's second demand did it invoke Title III and indicate it sought data to supposedly ascertain Minnesota's HAVA compliance. (ECF 66-2 at 1-2.) And DOJ has never even claimed that it has any reason to believe Minnesota is not complying with HAVA. The Secretary's office's detailed explanation of Minnesota's processes was met with silence, with DOJ fixating only on gathering sweeping amounts of unredacted voter data. (ECF 66-1, at 1; ECF 66-2, at 2.) Assistant Attorney General for Civil Rights Harmeet Dhillon has publicly derided providing any justification for the demands or explaining how the federal government might use states' voter data. She boasted, "The attorney general doesn't have to show her homework as to what she's going to do with it, and I'm her designee, so I get to ask for that information and [states] have to give it." Independent Institute, *Harmeet Dhillon |*

*Trump DOJ: Ensuring Election Integrity and Fixing Immigration | Part 2/2*, at 2:43-2:52 (Dec. 9, 2025).[4]

Additionally, over the past year DOJ officials have admitted to seeking voter data for reasons entirely unrelated to their pretextual HAVA-compliance justification. In March 2025, the President ordered the Department of Homeland Security to review each state's voter registration list and voter list maintenance activities alongside federal immigration databases. Exec. Order No. 14,248, 90 Fed. Reg. 14005, 14006 (Mar. 25, 2025). And in September, the administration confirmed a purpose unrelated to state list-maintenance processes: sharing state voter data with the Department of Homeland Security to look for noncitizens. Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists with Homeland Security*, STATELINE (Sept. 12, 2025), https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security/. This purpose, which has nothing to do with HAVA compliance or the Civil Rights Act, was not disclosed in DOJ's demands, its complaint, or its motion to compel.

The public record also suggests another undisclosed purpose unrelated to assessing Minnesota's list-maintenance procedures: creating a federal voter roll on which DOJ would perform its own list maintenance program. DOJ has stated that the data it is seeking would be "screened for ineligible voter entries." Miles Park, *The Justice Department Sues Maine and Oregon, Ratcheting Up Demands for Voter Data*, N.P.R. (Sept. 17, 2025), https://www.npr.org/2025/09/17/nx-s1-5544354/voter-data-lawsuit-oregon-maine.    And

---

[4]    Available    at    https://www.independent.org/multimedia/2025/12/09/harmeet-dhillon-trump-doj-ensuring-election-integrity-and-fixing-immigration-ep-61.

just last week, the Social Security Administration confirmed that Department of Government Efficiency employees may have engaged in the unauthorized use of social-security data for that purpose. Notice of Corrections to the Record at 5, *Am. Fed'n of State, Cnty., & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 1:25-cv-00596 (D. Md. Jan. 16, 2026), Dkt. No. 197. As explained in the state defendants' memorandum supporting its motion to dismiss, federal usurpation of states' list-maintenance activities violates the Elections Clause. (ECF 65, at 9-14.) Thus, collecting Minnesota's voter data for that reason—in addition to not being a disclosed purpose—is also not permissible.

These undisclosed purposes, the unsubstantiated nature of the United States' proffered purpose, the lack of any identified basis for believing Minnesota is not complying with the law, and DOJ officials' public statements expressing contempt for having to identify or be cabined into *any* purpose or use raise substantial questions about the propriety of the demand. Those questions justify permitting discovery in this case to determine whether there is a proper purpose for the voter-data demand. (Barr Decl. ¶¶ 2-3.)

***Good-Faith Basis***

The state defendants also have reason to believe that the records demand is not in good faith. "It is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924). Instead, before demanding Minnesota's voter data, the United States must have at least some good-faith basis to believe that the data will reveal some evidence of a violation. *Powell*, 379 U.S. at 58.

The United States' dragnet approach to seeking voter data reflects a lack of good faith. If DOJ were seeking data to assess HAVA compliance, one would expect it to identify *some* basis to believe that Minnesota is not complying with HAVA. But it has not done so. DOJ ignored the Secretary's office's detailed walk-throughs of how Minnesota's list-maintenance procedures comply with HAVA, and instead the United States brought this case. But again, neither the complaint nor the motion to compel even suggest there is a HAVA-compliance problem.

Moreover, the public record shows that the demand is part of a larger DOJ fishing expedition. In August 2025, then-deputy assistant attorney general Michael Gates stated that DOJ would be requesting voter rolls from all fifty states. Barrett & Corasaniti, *Trump Administration Quietly Seeks to Build a National Voter Roll*, N.Y. TIMES, Sept. 10, 2025, at A12. These wide-ranging requests—particularly when paired with the lack of any alleged HAVA violation and the institution of similar lawsuits across the country—suggest that the United States has no good-faith basis to believe that Minnesota is violating HAVA. Based on DOJ official's public statements to the contrary, Minnesota should be permitted to conduct discovery to determine whether such a basis exists. (Barr Decl. ¶ 4.)

**B.     Minnesota Is Entitled to Discovery on Its Defenses.**

Discovery is also necessary to allow the Court to fully consider Minnesota's potential defenses, including whether the demands are overbroad or violate federal privacy laws. Because the merits of these issues are not before the Court, the state defendants briefly outline the relevant laws justifying discovery.

***Overbreadth***

As previously explained, providing the data would not enable DOJ to assess HAVA compliance because HAVA only requires a general system of file maintenance that makes reasonable efforts to update voter rolls. But even accepting the dubious premise that providing the data would enable DOJ to assess HAVA compliance, DOJ's demand likely exceeds the information necessary for it to do so. An investigative demand is overly broad if it seeks information not relevant to the investigation. *McLane Co., Inc. v. Equal Emp. Opportunity Comm'n*, 581 U.S. 72, 77 (2017).

The defendants are entitled to discovery on DOJ's methods of assessing HAVA compliance to determine whether DOJ truly needs all the highly sensitive data it seeks. The data DOJ seeks includes information like which elections an individual voted in (which can include presidential primaries), as well as sensitive identification numbers. Minn. Stat. § 201.071, subd. 1; Minn. R. 8215.0300, subp. 2, 8200.9315(E). That highly sensitive information, however, has nothing to do with whether Minnesota has a HAVA-compliant list-maintenance system. Minnesota is entitled to discovery on what DOJ intends to do with the data so that the Court can assess whether all the information sought is relevant. (Barr Decl. ¶ 5.)

***Privacy Act***

The federal Privacy Act also precludes DOJ from obtaining the data. And if this case proceeds beyond the motion to dismiss, Minnesota anticipates bringing a counterclaim or raising an affirmative defense alleging that DOJ has not complied with that act. The Privacy Act's purposes include preventing "the secret gathering of information on people

or the creation of secret information systems or data banks on Americans by employees of the departments and agencies of the executive branch." S. Rep. No. 93-1183 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6916, 6917. To prevent that evil, the Privacy Act requires the government to provide public notice of how it collects and uses data before doing so. And it limits the collection of data relating to the exercise of First Amendment rights except in limited circumstances. DOJ's demands violate both prohibitions.

First, DOJ's apparent failure to comply with System of Records Notice (SORN) requirements warrants discovery. Whenever a federal agency creates or modifies a "system of records," it must first publish notice in the Federal Register. *Id.* § 552a(e)(4). That notice must include (among other things) the categories of individuals on whom records are maintained, the categories of records maintained, each routine use of the records in the system—including the purpose of such use, and the agency's policies regarding storage, retrievability, access controls, retention, and disposal. *Id.* § 552a(e)(4)(B)-(E). The agency also must give impacted people thirty days to submit written comments on the notice. *Id.* § 552a(e)(11).

The United States claims that three SORNs cover its collection of Minnesota's voter data. (ECF 1, ¶ 44.) They do not permit the collection. Two SORNs are not even arguably relevant because they address sharing information after an investigation is closed and disclosures after data breaches. *Privacy Act of 1974; System of Records*, 70 Fed. Reg. 43904, 43904 (July 29, 2005); *Privacy Act of 1974; System of Records*, 82 Fed. Reg. 24147, 24147-48 (May 25, 2017). The remaining SORN fares no better. It addresses "[s]ubjects of investigations, victims, [and] potential witnesses," and the most arguably relevant use

provides that data may be used to "indicate[] a violation or potential violation of law." *Privacy Act of 1974; System of Records*, 68 Fed. Reg. 47610, 47611-12 (Aug 11, 2003). But this SORN does nothing to provide notice that DOJ is maintaining a searchable database of the personal information of every registered voter in the country. *See id*. And it certainly does not provide notice that such personal information may—as the federal government has conceded it seeks to do—be shared with the Department of Homeland Security for immigration purposes. *See id.*

Second, the Privacy Act also prohibits federal agencies from maintaining records describing how any individual exercises rights guaranteed by the First Amendment unless (1) expressly authorized by statute, (2) expressly authorized by the individual, or (3) the record is pertinent to and within the scope of an authorized law enforcement activity. 5 U.S.C. § 552a(e)(7). DOJ has not complied with these requirements. Electoral activities implicate the First Amendment. *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999); *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 69, 75-76 (1990). And information sought by the DOJ includes election participation, including the particularly sensitive information of which party's presidential primary a voter chose to participate in. *See* Minn. R. 8215.0300, subp. 2, 8200.9315(E). Collecting this information violates the Privacy Act's prohibition on collecting information on the exercise of First Amendment rights.

The United States dismisses these Privacy Act concerns on the theory that, under HAVA, the last four digits of social-security numbers are not "considered a social security number" for purposes of section seven of the Privacy Act. (ECF 72, at 11.) This argument

lacks merit for three reasons. First, that section of the Privacy Act only addresses government entities' ability to deny rights, benefits, or privileges when someone refuses to provide a social security number; it does not address whether collection of that data is subject to the Privacy Act's protections. *See* 5 U.S.C. § 552a note; Pub. L. No. 93-579, § 7, 88 Stat. 1896, 1909 (1974). Second, the HAVA carveout from the Privacy Act cross-references two HAVA subsections governing voter-registration procedures; it does not create a general exception to the Privacy Act when DOJ seeks social-security numbers for other purposes. 52 U.S.C. § 21083(c). Third, even if partial social-security numbers were not social-security numbers under the Privacy Act, that would not alter DOJ's obligations to have an appropriate SORN in place and to limit its collection of data about First Amendment activities.

As of the filing of this memorandum, at least one other federal court has dismissed the United States' claims because of (among other reasons) these Privacy Act violations. *Weber*, 2026 WL 118807, at *17-18. At a minimum, the likely violations preclude the Court from granting the United States' motion to compel without giving Minnesota the opportunity to conduct discovery. (Barr Decl. ¶ 6.)

**E-Government Act**

The E-Government Act also precludes DOJ from obtaining the voter data. Under that act, federal agencies must conduct a "privacy impact assessment" before initiating a new collection of information that includes "information in an identifiable form permitting the physical . . . contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons." E-Government

Act of 2002, Pub. L. No. 107-347, § 208(b)(1)(A)-(B), 116 Stat. 2899, 2921-22 (2002). This requirement ensures that there are "sufficient protections for the privacy of personal information." *Id.* § 208(a), 116 Stat. at 2921; *see also id.* § 208(b)(2) (describing required content of privacy impact assessment). Minnesota's voter-registration records are the results of identical questions posed to more than ten people. Yet there is no indication that DOJ complied with requirements to collect this data en masse. Minnesota is entitled to take discovery to confirm whether DOJ has complied with this requirement. (Barr Decl. ¶ 7.)

***Driver's Privacy Protection Act***

Absent a permissible purpose, the Driver's Privacy Protection Act (DPPA) prevents obtaining "personal information" received from the Minnesota Department of Public Safety in connection with a "motor vehicle record." 18 U.S.C. §§ 2721(b), 2722(a). Permissible purposes include state agencies carrying out their functions. *Id.* § 2721(b)(1). Minnesota's statewide voter registration database includes information received directly from the Department of Public Safety. For example, the Secretary's office receives information if a person registers to vote while applying for a driver's license, and his office uses the agency's data to verify the accuracy of voter registrations. Minn. Stat. § 201.1615; Minn. R. 8200.9320. His office can use the data because the office's functions include maintaining voter rolls and encouraging voter registration. But the DPPA does not permit DOJ to obtain the data because DOJ has not explained how gathering that sensitive information would aid with assessing HAVA compliance. Absent such an explanation, DOJ's data collection would violate the DPPA. Accordingly, the defendants are entitled to discovery on how DOJ's data collection would comply with that act. (Barr Decl. ¶ 8.)

* * *

Whether treated as an early summary judgment motion or a summary proceeding, the United States is not entitled to an order compelling production at this stage of the case. Instead, even if the Court denies the state defendants' motion to dismiss, it should give them the opportunity to conduct discovery to gather the evidence necessary to show that DOJ's demand lacks a proper purpose, was not made in good faith, is overbroad, and violates the Privacy Act, E-Government Act, and Driver's Privacy Protection Act.

## CONCLUSION

The Court should deny the United States' motion. It fails on procedural and substantive grounds and, if any claim survives the defendants' motions to dismiss, the defendants are entitled to conduct discovery before the Court decides the motion to compel.

Dated: <u>January 21, 2025</u>                    Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

<u>s/**Angela Behrens**</u>
ANGELA BEHRENS, No. 0351076
LINDSEY MIDDLECAMP, No. 0392589
ALLEN COOK BARR, No. 0399094
Assistant Attorneys General
445 Minnesota Street, Suite 600
St. Paul, MN 55101-2125
(651) 757-1204 (Voice)
(651) 297-1235 (Fax)
angela.behrens@ag.state.mn.us
lindsey.middlecamp@ag.state.mn.us
allen.barr@ag.state.mn.us

ATTORNEYS FOR DEFENDANTS

|#6275733