UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Civil No. 25-cv-03761 (KMM/EMB) |
| Plaintiff, | |
| vs. | **DEFENDANTS' REPLY MEMORANDUM SUPPORTING DISMISSAL** |
| Steve Simon in his official capacity as Secretary of State for the State of Minnesota, and the State of Minnesota, | |
| Defendants. | |

The federal government made sweeping demands for voter data across the country—demands that one court recently deemed "unprecedented and illegal" and another called "deeply troubling" and "chilling." *United States v. Oregon*, No. 6:25-cv-01666, 2026 WL 318402, at *10 n.5, 13 (D. Or. Feb. 5, 2026); *United States v. Weber*, No. 2:25-cv-9149, 2026 WL 118807, at *1 (C.D. Cal. Jan. 14, 2026). This Court should reach the same conclusions. The United States effectively concedes that it alleged no HAVA violation, and it stretches Title III of the Civil Rights Act of 1960 far beyond congressional intent. Because the complaint fails to state claims, the Court should grant Defendants Steve Simon and the State of Minnesota's motion to dismiss.

### FACTS

The correspondence between the Secretary of State's office and the Department of Justice (DOJ) that preceded this litigation is undisputed. (ECF 102 at 7.) The defendants note three developments since filing their principal memorandum.

First, the United States appears to concede that its June letter was not a proper demand under Title III. When arguing that it made a proper demand, it cites only its August letter. (*E.g.*, *id.* at 9, 14, 18, 22.)

Second, relevant to related litigation, the United States sued three more states for voter data, bringing the number of cases to twenty-five. *See United States v. Fontes*, No. 2:26-cv-000666 (D. Ariz. Jan. 6, 2026); *United States v. Thomas*, No. 3:26-cv-00021 (D. Conn. Jan. 6, 2026); *United States v. Beals*, No. 3:26-cv-42 (E.D. Va. Jan. 16, 2026); *see also* ECF 65 at 8 n.1 (listing related cases). Two courts recently dismissed the complaints for failing to state claims. *Weber*, 2026 WL 118807, at *1; *Oregon*, 2026 WL 318402, at *1.[1]

Third, in recent weeks the federal government sent a surge of immigration officers to Minnesota, prompting clashes in the streets and courts. *E.g.*, *State v. Noem*, No. 26-cv-190, 2026 WL 253619, at *1 (D. Minn. Jan. 31, 2026); *see also Minn. Bureau of Criminal Apprehension v. Noem*, No. 26-cv-628, 2026 WL 266463, at*1 (D. Minn. Feb. 2, 2026). Against this backdrop, the U.S. Attorney General recently wrote to Minnesota's Governor.[2] Second Erickson Decl. ¶ 2, Ex. 1. She emphasized her commitment to enforcing immigration law and demanded that Minnesota "partner" with the administration. *Id.* at 3.

---

[1] The Georgia case was dismissed for lack of jurisdiction and then refiled. *United States v. Raffensperger*, No. 5:25-cv-548, 2026 WL 184233, at * 3-4 (M.D. Ga. Jan. 23, 2026); *United States v. Raffensperger*, No. 1:26-cv-485 (N.D. Ga. Jan. 23, 2026).

[2] The Court may take judicial notice of the letter. The Attorney General has publicly stood behind her "very strong letter," reiterating that she ties its demands to supporting law enforcement. *E.g.*, Fox News Channel, *A.G. Pam Bondi on Minnesota CBP Shooting*, at 4:30-5:03 (Jan. 24, 2026), https://www.foxnews.com/video/6388244159112. The defendants cite the other litigation only as general context for the letter.

In listing actions that would "support ICE officers," she demanded that Minnesota give DOJ its voter-registration data. *Id.* at 2-3.

## ARGUMENT

The Court should dismiss the complaint because it fails to state a claim. Contrary to the United States' arguments, the Federal Rules of Civil Procedure apply because no federal statute creates a different process. Applying those rules, the United States' claims fail. It alleges no HAVA violation. And its Title III claim fails because DOJ lacked both a civil-rights related purpose for its records demand and a basis for believing that Minnesota violated HAVA. Finally, even if a permissible purpose and sufficient basis could be inferred in DOJ's prior demand, the U.S. Attorney General's recent letter revealed the demand's illegitimacy.

### I. THE RULES OF CIVIL PROCEDURE APPLY TO THIS CASE.

The Federal Rules of Civil Procedure presumptively apply to all civil proceedings. Fed. R. Civ. P. 1. In response to a complaint, a defendant may seek dismissal based on the failure to state a claim. *Id.* 12(b)(6). The United States asks the Court to disregard these rules. (ECF 102 at 2, 10-11.) While conceding that the rules apply to its HAVA claim, it argues that the rules do not apply to Title III demands. (*Id.* at 10.) It argues that Title III claims are "summary proceedings" that defendants cannot meaningfully oppose. (*Id.* at 9.) In doing so, the United States essentially attempts to collapse the motion to dismiss with its motion to compel, which the parties briefed separately. (ECF 70-75, 103-106.) The defendants briefly recap the central points of that briefing here.

3

Proceedings to compel records under Title III must follow an "appropriate process." 52 U.S.C. § 20705. When a statute uses "appropriate process" without establishing a specific process, the court proceeding is subject to the Federal Rules of Civil Procedure. *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964). The rules therefore apply to Title III proceedings.

In arguing otherwise, the United States primarily relies on *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) and other early-1960s cases from the Fifth Circuit. (ECF 102 at 7, 9-11.) These cases are not binding, predate *Powell*, and lack textual statutory support. The United States asserts that it is unaware of any court rejecting the Fifth Circuit's approach. (ECF 102 at 6 n.2.) But a week before making this assertion, a California federal court rejected the approach, granted the state's motion to dismiss, and held Title III did not require a summary proceeding. *Weber*, 2026 WL 118807, at *8 & n.15. And the Oregon federal court recently did the same. *Oregon*, 2026 WL 318402, at *8. This Court should, too.

The United States also attempts to avoid the rules of civil procedure by likening Title III demands to grand-jury proceedings. (ECF 102 at 11 n. 6.) The analogy is inapt. Grand juries are part of criminal proceedings. In civil investigations the government is generally subject to more limited avenues of investigation without the "extraordinary powers" of grand juries. *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 423, 434-35 (1983), *superseded in part by statute* 18 U.S.C. § 3322. The three cases that the United States cites do not establish otherwise. (ECF 102 at 11 n. 7.) The first case, *Powell*, applied the rules of civil procedure to a statute that—like Title III—referred to an "appropriate

4

process." *Powell*, 379 U.S. 48, 58 n.18. The other two cases involved agencies' authority to issue summonses under other statutes. They stand for the unremarkable proposition that some statutes expressly give some agencies broad civil investigative authority. *United States v. Bisceglia*, 420 U.S. 141, 148-49 (1975); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950); *see also Pilselli v. IRS*, 598 U.S. 432, 444 (2023) (discussing congressional response to *Biscelgia* to provide more process). They do not establish that courts cannot apply the rules of civil procedure to Title III claims.

As civil matters, court proceedings to enforce a Title III demand are most akin to other proceedings seeking to enforce information demands, like administrative subpoenas. Those proceedings are subject to the rules of civil procedure. Fed. R. Civ. P. 81(a)(5); *Becker v. United States*, 451 U.S. 1306, 1307-08 (1981).

Finally, the United States claims that the rules do not apply because defendants cannot challenge the asserted purpose and basis of a Title III demand. (ECF 102 at 18.) As detailed in response to the United States' motion to compel and in Section II.B.3 below, parties can raise such challenges. (ECF 103 at 17-18.) Even if some inquiries might be more limited in the investigative-demand context, those issues go to the *scope* of discovery, not to whether the rules apply.

Because the rules of procedure apply, the motion-to-dismiss standard applies to the defendants' motions.

## II. THE UNITED STATES FAILS TO STATE CLAIMS UNDER HAVA AND TITLE III.

The Court should dismiss the complaint for failing to state claims. The United States largely tries to skirt its HAVA claim by focusing on its Title III claim. But understanding

the problems with the HAVA claim is pivotal given the United States' reliance on HAVA for why it purportedly needs the data. HAVA provides no basis for the demand, and attempts to bootstrap HAVA onto Title III fail. Further, the U.S. Attorney General's recent letter to the Governor leaves no doubt that the demand was not made for a legitimate purpose or in good faith.

### A. The United States Fails to State a HAVA Claim.

The defendants' principal memorandum explained that HAVA has no records-disclosure requirement. (ECF 65 at 15-18.) It requires only that states have a "general system of file maintenance" that makes "reasonable efforts" to remove ineligible voters and retain eligible voters. 52 U.S.C. § 20183(a)(4). The United States does not dispute these points. It concedes that it did not allege a HAVA violation, instead casting its claim as "a records request under HAVA" and asserting a right to discovery to investigate whether a violation exists. (*E.g.*, ECF 102 at 28-29.) This position has no legal basis.

### 1. Plaintiffs Cannot Conduct Discovery Without Stating Claims.

Complaints are not docks to launch fishing expeditions in hopes of finding claims. A complaint must plausibly allege a violation of law and establish entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). The rule 8 and 12 standards prevent "needless discovery." *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989). Absent a plausible claim, parties have no right to discovery. *Ashcroft*, 556 U.S. at 678-79; *First Com. Tr. Co. v. Colt's Mfg. Co.*, 77 F.3d 1081, 1083 n.4 (8th Cir. 1996). A plaintiff cannot rely on hypothetical information it could gain in discovery as the basis for bringing a lawsuit. *See*

*Weber*, 2026 WL 118807, at *15 (characterizing United States' position as a "telltale fishing expedition").[3]

To support its position, the United States cites *United States v. Association of Citizens Councils of Louisiana*, 187 F. Supp. 846 (W.D. La. 1960). (ECF 102 at 10-11.) That case did not involve HAVA and does not support its position. Rather, the court made a passing reference to a discovery motion, noting that rule 34 gives litigants the right to records after a lawsuit has been filed. *Citizens Council*, 187 F. Supp. at 847. The court did not conclude that the rule excuses parties from having to state claims to reach discovery.

### 2. HAVA Does Not Provide General Audit or Investigative Authority.

At its core, the United States essentially seeks to audit voter-registration data and perform its own list maintenance to assess HAVA compliance. (ECF 102 at 14, 23.) Congress did not grant this authority. HAVA's general audit authority is limited to auditing states' use of HAVA grants. 52 U.S.C. § 21142(b). As established in the defendants' principal memorandum, Congress knows how to pair investigative and enforcement authority, and it has taken different approaches for different statutes. (ECF 65 at 18-19.) While it gave DOJ HAVA enforcement authority, it elected not to provide broader investigative powers. (*Id.*)

The United States suggests that it is unfair that it cannot compel records to search for HAVA violations or sue first and then try to develop claims. (*E.g.*, ECF 102 at 11.) But

---

[3] In *Weber*, the United States claimed California's voter-registration list had "anomalies." 2026 WL 118807, at *16. The United States does not even allege Minnesota's list has any problems.

this is the same position as any prospective plaintiff. And the United States has litigated HAVA matters under its current authority. (ECF 65 at 17 & n.5.) If the United States seeks broader investigative powers, those are policy arguments for Congress, not the Court.

### 3. Sensitive Voter-Registration Data Are Irrelevant to Whether Minnesota Has a "General System of File Maintenance."

Finally, while it does not state a claim under HAVA, the United States' claimed need for data bears mention. The United States claims sensitive data like social-security and driver's license numbers are necessary to determine whether Minnesota's voter-registration list contains any ineligible or duplicate voters. (ECF 102 at 23.) This argument conflicts with HAVA and the data would not establish what the United States envisions.

First, HAVA requires only a general system of list maintenance that makes reasonable efforts. The United States does not dispute Minnesota has this system. The United States' desire to conduct further list maintenance also conflicts with HAVA. States, not the federal government, are responsible for performing list maintenance and deciding whether to remove voters. 52 U.S.C. §§ 21083(a)(5)(A)(iii), 21085.

Second, courts have rejected the "spot check" method of assessing voter-registration lists to determine compliance with list-maintenance obligations. *See, e.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 626-27 (6th Cir. 2025) (rejecting argument that allegedly ineligible voters on list established lack of reasonable list-maintenance efforts), *petition for cert. filed* (U.S. Oct. 9, 2025) (No. 25-437); *Bellito v. Snipes*, 935 F.3d 1192, 1205-07 (11th Cir. 2019) (emphasizing that state need not exhaust every source of data and recognizing that summary information about removals established sufficient list-maintenance process);

*Weber*, 2026 WL 118807, at *16 (rejecting argument that "anomalies" on list established list-maintenance problem).

Voter-registration lists are inevitably fluid as people move, die, or otherwise have life events affecting voter eligibility. Minnesota has processes for catching these changes and updating statuses on routine intervals. (*E.g.*, Erickson Decl. Ex. 1 at 8-10.) A static list from a single day says nothing about whether Minnesota has a general system of file maintenance that makes reasonable efforts to update its list.

The United States does not allege any flaw in Minnesota's processes that could contradict HAVA. And to the extent that DOJ wants to review voter information, Minnesota's public information list or summary information is sufficient. It does not need sensitive data on every Minnesota registered voter. *See, e.g.*, Brief for Amici Curiae Former Employees of the U.S. Department of Justice at 13-15, 17, 30, *United States v. Weber*, No. 2:25-cv-9149 (C.D. Cal. Dec. 22, 2025) (explaining how data requests deviate from past DOJ practices and claimed legal authorities), Dkt. No. 121.

### B. The United States Fails to State a Title III Claim.

The United States' Title III claim also fails. Contrary to the United States' arguments, Title III demands must be tethered to the act that authorizes them. (ECF 102 at 8-11.) And they must identify the basis and all purposes for which they are made. Moreover, even if the DOJ's demand were facially valid, the Court should not order production of voter data because the defendants would be entitled to discovery.

### 1. DOJ's demand was not for a civil-rights purpose.

The defendants explained why Title III demands must have a civil-rights related purpose. (ECF 65 at 20-28.) The United States does not identify any such purpose in its response. Instead, it argues that Title III allows DOJ to obtain records to assess HAVA compliance, even though that purpose is untethered to the civil-rights legislation that granted inspection authority. (ECF 102 at 8-11.) This broad reading is contrary to Title III's text.

The United States first argues that Title III does not cabin the scope of "purpose." (*Id.* at 8-9.) But Congress is presumed not to include statutory language without a reason. *Fischer v. United States*, 603 U.S. 480, 496 (2024). Title III's requirement that demands contain "the" purpose and basis must have substantive implications. 52 U.S.C. § 20703. The most natural reason to include these requirements is to ensure that Title III demands are for a legitimate purpose; otherwise, there would be no reason to require a stated purpose. *See Oregon*, 2026 WL 318402, at *9-10 (interpreting Title III to require civil-rights-related purpose); *Weber*, 2026 WL 118807, at *8-10 (holding that assessing list maintenance was not proper purpose for Title III demand). This means that some purposes are illegitimate. Further, Congress enacted Title III under its authority to enforce the Fourteenth and Fifteenth Amendments. *See, e.g.*, *South Carolina v. Katzenbach*, 383 U.S. 301, 326 (1966). Applying it in non-civil-rights contexts could raise constitutional problems, which courts avoid when interpreting statutes. *United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 369 (1971).

The defendants also outlined how other parts of the Civil Rights of Act and its legislative history reflect the need for a civil-rights purpose. (ECF 65 at 22-28.) The United States does not address these arguments. (ECF 102 at 8-11.)

### 2. DOJ did not identify the basis and true purpose of its demand.

Even if Title III demands could be made for non-civil-rights purposes, the United States' claim fails. DOJ identified no basis for its demand. Nor did it identify all the demand's purposes. As a result, the United States' claim fails because the demand was invalid.

As established in the defendants' principal memorandum, Title III requires a civil-rights "purpose," which identifies how data will be used, and a "basis," which means the reason for believing a violation may exist. (ECF 65 at 21-23.) By using the definite article "the" before both terms, Title III precludes DOJ from relying on any basis or using records for unarticulated purposes. (*Id.* at 22.)

Neither of the United States' responses is persuasive. First, it argues that DOJ identified a basis by citing Title III. (ECF 102 at 5.) This reasoning is circular. Title III provides legal authority for demands, not their factual basis. *Oregon*, 2026 WL 318402, at *8-9. Otherwise, DOJ could always cite Title III as a basis, making the command to state a basis superfluous.

Second, the United States argues that DOJ was not required to show an extant violation. (ECF 102 at 15.) Title III is an investigative tool. But the United States takes this a step further, demanding records without any suspicion of a violation. Such fishing expeditions are not allowed. *Acosta v. La Piedad Corp.*, 894 F.3d 947, 953 (8th Cir. 2018).

11

The Fifth Circuit cases cited by the United States reinforce the need to provide a basis. Each case involved investigations of racial discrimination. And the Attorney General articulated clear reasons for the record demands. For example, the United States cites *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). There the Attorney General explained that he had information tending to show racial discrimination in voting and registration. *In re Coleman*, 208 F. Supp. 199, 199 (S.D. Miss. 1962). The same was true in *Lynd*. 306 F.2d at 229 n.6. And both demands identified their purpose of "examin[ing] the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred." *Lynd*, 306 F.2d at 229 n.6; *Coleman*, 208 F. Supp. at 199-200. The cases did not involve the issue here: DOJ's lack of a civil-rights-related purpose and failure to state any factual basis.

Turning to purpose, the United States argues that DOJ satisfied Title III by citing HAVA compliance. (ECF 102 at 14-15.) Even if this non-civil-rights purpose were permissible, the demand would still be invalid because it failed to identify all its purposes. The Attorney General recently declared that the purpose of collecting Minnesota's voter data is to support ICE. (Second Erickson Decl. Ex. 1.) DOJ did not disclose this purpose and it comes on the heels of Civil Rights Division's head disclaiming the need to be limited to *any* purpose. Independent Institute, *Harmeet Dhillon | Trump DOJ: Ensuring Election Integrity and Fixing Immigration | Part 2/2*, at 2:43-2:52 (Dec. 9, 2025) (claiming Attorney General "doesn't have to show her homework as to what she's going to do with it . . . .").[4]

---

[4] Available at https://www.independent.org/multimedia/2025/12/09/harmeet-dhillon-trump-doj-ensuring-election-integrity-and-fixing-immigration-ep-61.

The Attorney General's statement confirms various statements by other officials, both before and after the demand, indicating that DOJ seeks the data for immigration-related and other purposes such as conducting a federal list-maintenance program. *E.g.*, Exec. Order No. 14,248, 90 Fed. Reg. 14005, 14006 (Mar. 25, 2025) (ordering comparison of voter data with immigration databases); *DOJ Is Sharing State Voter Roll Lists with Homeland Security*, STATELINE (Sept. 12, 2025), https://perma.cc/EW3Y-J9GD; Miles Parks, *The Justice Department Sues Maine and Oregon, Ratcheting Up Demands for Voter Data*, N.P.R. (Sept. 17, 2025) (discussing plans to screen voter lists), https://perma.cc/XC9X-94MK.

In the related litigation, other courts have cited these representations to conclude that DOJ failed to state its true purpose. Noting that it did "not take lightly DOJ's obfuscation of its true motives," the California court refused to let DOJ collect sensitive information "under the guise of a pretextual investigative purpose." *Weber*, 2026 WL 118807, at *12. Similarly, the Oregon court held that the federal government's conduct negated any presumption of regularity. *Oregon*, 2026 WL 318402, at *11. This Court should do the same.

### 3. Even if the United States states a claim, the defendants are entitled to discovery.

The United States argues that the Court must order production of the data, precluding defendants from any discovery. (ECF 102 at 14-16.) Even if the Court denies the motion to dismiss and concludes that the Attorney General's letter is not sufficient evidence of an illegitimate purpose at this stage, the defendants are entitled to discovery.

13

Discovery is proper when there is "a substantial preliminary showing of abuse of the court's process." *United States v. Lask*, 703 F.2d 293, 300 (8th Cir. 1983); *see also FEC v. Comm. to Elect Lyndon La Rouche*, 613 F.2d 849, 862 (D.C. Cir. 1979). Enforcement proceedings are also the appropriate venue to challenge whether the government has a good-faith basis for believing that it would uncover evidence of wrongdoing, whether a demand is overbroad, or whether it violates federal privacy laws. *Powell*, 379 U.S. at 58; *Blue Ribbon Quality Meats, Inc. v. FTC*, 560 F.2d 874, 876 (8th Cir. 1977).

As explained in opposing the United States' motion to compel, based on the various public statements noted above, the defendants have substantial reason to believe the demand was made for improper purposes and without good faith. (ECF 103 at 19-22.) The demand is also likely overbroad relative to DOJ's claimed purpose. (*Id.* at 23.)

Finally, the United States argues that its demand complies with the Privacy Act. (ECF 102 at 22.) The defendants did not raise this issue in their motion to dismiss. But if complaint proceeds, they anticipate raising federal privacy-law counterclaims or affirmative defenses, including the Privacy Act, the E-Government Act, and the Driver's Privacy Protection Act. (ECF 103 at 23-27.) The Court need not reach these issues to grant the motion to dismiss. But the laws provide further grounds for permitting discovery should the Court deny the motion. The defendants briefly respond to the United States' arguments.

As to the Privacy Act, the law requires the government to provide public notice— through a System of Records Notice (SORN)—about how it collects and uses data before doing so. 5 U.S.C. § 552a(e)(4). The United States cites a SORN that includes data usage

for "investigations and enforcement actions." (ECF 102 at 22.) But this SORN limits its coverage to "[s]ubjects of investigations, victims, [and] potential witnesses." *Privacy Act of 1974; System of Records*, 68 Fed. Reg. 47610, 47611 (Aug 11, 2003). It does not include all registered voters. As to the Driver's Privacy Protection Act, the United States appears to concede its data collection implicates the law but does not explain how it complies. (ECF 102 at 21-24.)

### C. HAVA and Title III Do Not Preempt State Privacy Laws.

The United States also argues that HAVA and Title III preempt state-law privacy protections for accessing voter data. (ECF 102 at 3-4.) They do not.

As explained in the defendants' principal memorandum, states have presumptive authority over election administration barring congressional action. (ECF 65 at 9-14; *contra* ECF 102 at 3 n.4.) State law is the "default" for federal elections. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013). Federal election laws preempt state laws only when they conflict. *Id.* With respect to HAVA, the United States identifies no conflict with state privacy laws. (*See generally* ECF 102 at 24-26.) It cites only its general enforcement authority. (*Id.*) That authority, however, does not mandate turning over voter lists (let alone unredacted lists) to the federal government.

Title III fares no better. While it mandates producing records in some instances, it does not apply unless DOJ articulates the civil-rights purpose of, and basis for, a records demand. Moreover, federal courts have recognized that Title III does not override state privacy protections. *Lynd*, 306 F.2d at 231 (concluding Title III focuses on ordinarily public records); *Oregon*, 2026 WL at *10 nn.4-5, 12-13; *Weber*, 2026 WL 118807, at *9

15

(rejecting claimed right to unredacted data). Indeed, states did not have to collect driver's license or social-security numbers until HAVA was enacted decades after Title III. And based on federal privacy laws enacted in the interim, Congress could not have had gathering such information in mind when enacting Title III. As a result, Title III does not override state privacy protections of that information.

## CONCLUSION

Because the United States fails to state any claims, the Court should dismiss the complaint.


Dated: <u>February 6, 2026</u>                    Respectfully submitted,

                                                  KEITH ELLISON
                                                  Attorney General
                                                  State of Minnesota

                                                  s/**Angela Behrens**
                                                  ANGELA BEHRENS, No. 0351076
                                                  LINDSEY MIDDLECAMP, No. 0392589
                                                  ALLEN COOK BARR, No. 0399094
                                                  Assistant Attorneys General
                                                  445 Minnesota Street, Suite 600
                                                  St. Paul, MN 55101-2125
                                                  (651) 757-1204 (Voice)
                                                  (651) 297-1235 (Fax)
                                                  angela.behrens@ag.state.mn.us
                                                  lindsey.middlecamp@ag.state.mn.us
                                                  allen.barr@ag.state.mn.us

                                                  ATTORNEYS FOR DEFENDANTS

|#6272162