UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | | |
|---|---|---|
| United States of America,<br><br>Plaintiff,<br><br>vs.<br><br>Steve Simon, in his official capacity as Secretary of State for the State of Minnesota, and the State of Minnesota,<br><br>Defendants. | ) | File No. 25-cv-3761 (KMM/EMB)<br><br>Minneapolis, Minnesota<br>March 3, 2026<br>9:27 a.m. |

---

BEFORE THE HONORABLE KATHERINE M. MENENDEZ
UNITED STATES DISTRICT COURT JUDGE
**(MOTION HEARING)**

Proceedings reported by certified stenographer; transcript produced with computer.

**APPEARANCES:**

For the Plaintiff:
U.S. Department of Justice
JAMES T. TUCKER, ESQ.
BRITTANY E. BENNETT, ESQ.
950 Pennsylvania Avenue NW
Washington, DC 20530

For the Defendants:
Minnesota Attorney General's Office
ANGELA BEHRENS, ESQ.
ALLEN BARR, ESQ.
LINDSEY E. MIDDLECAMP, ESQ
445 Minnesota Street
Suite 600
St. Paul, MN 55101

For Intervenor Defendants Minnesota Alliance for Retired Americans Educational Fund and Misael Hernandez:
Greene Espel PLLP
KATHERINE M. SWENSON, ESQ.
KSHITHIJ SHRINATH, ESQ.
222 South Ninth Street
Suite 200
Minneapolis, MN 55402

Elias Law Group LLP
ROBERT GOLAN-VILELLA, ESQ.
UZOMA N. NKWONTA, ESQ.
250 Massachusetts Avenue NW
Suite 400
Washington, DC 20001

For Intervenor Defendants Common Cause, League of Women Voters of Minnesota, Valerie Mangskau and Jennifer Compeau:
Stoel Rives LLP
ANDREW J. PIEPER, ESQ.
HEATHER CHANG, ESQ.
MARIAN SRODULSKI, ESQ.
33 South Sixth Street
Suite 4200
Minneapolis, MN 55402

ACLU of Minnesota
DAVID P. McKINNEY, ESQ.
2828 University Avenue SE
Suite 160
Minneapolis, MN 55414

ACLU of Minnesota
TERESA J. NELSON, ESQ.
P.O. BOX 14720
Minneapolis, MN 55414

**APPEARANCES (Continued):**

| | |
|---|---|
| For Amicus Defendant Former Employees of the U.S. Department of Justice: | Goetz & Eckland PA<br>ANDREW H. MOHRING, ESQ.<br>615 First Avenue NE<br>Suite 425<br>Minneapolis, MN 55413 |
| For Proposed Intervenors NAACP and Cynthia Wilson: | Lathrop GPM LLP<br>PIERCE ROSE, ESQ.<br>AMY E. ERICKSON, ESQ.<br>GABRIELLE JACKSON, ESQ.<br>80 South Eighth Street<br>Suite 3100<br>Minneapolis, MN 55402 |
| Court Reporter: | PAULA K. RICHTER, RMR-CRR-CRC<br>300 South Fourth Street<br>Box 1005<br>Minneapolis, Minnesota 55415 |

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT: All right. Good morning, everyone. We are here for oral argument in United States versus Simon.

Let's get counsel's names on the record, first on behalf of the United States.

MR. TUCKER: Good morning, Your Honor. James Tucker and Brittany Bennett on behalf of the United States.

THE COURT: Welcome to both of you. And which of you are going to be presenting argument today?

MR. TUCKER: I will be, Your Honor.

THE COURT: Okay, very good.

Hang on just one second. You can be seated, sir, sorry. I just realized I left part of my notes on the printer. Can you grab them? Thanks, Brian.

And on behalf of the State of Minnesota and Mr. Simon?

MS. BEHRENS: Good morning, Your Honor. Angela Behrens, and with me are Allen Barr and Lindsey Middlecamp.

THE COURT: Okay. Welcome to all of you. And, Ms. Behrens, my notes suggest you're going to be presenting argument?

MS. BEHRENS: Yes.

THE COURT: Okay, very good.

And on behalf of the Intervenors Minnesota

Alliance for Retired Americans Educational Fund.

MS. SWENSON: Good morning, Your Honor. Katherine Swenson from Greene Espel law firm. With me today is my colleague, Kshithij Shrinat, and then from the Mark Elias law firm, Uzoma Nkwonta and Robert Golan-Vilella.

THE COURT: Okay, great. Welcome to all of you.

And, Ms. Swenson, I'm not certain there's going to be a lot of opportunity for argument for intervenors, but we will see. I tend to handle argument with questions, as you probably know, and then if there are questions that remain after my discussion with the primary defendants, I'll give you an opportunity to chime in.

MS. SWENSON: Thank you, Your Honor.

THE COURT: And Intervenors Common Cause, League of Women Voters, and two individuals.

MR. PIEPER: Good morning, Your Honor. Andy Pieper with the Stoel Rives firm. With me from my firm today are Heather Chang and Marian Srodulski, and also with us today is my co-counsel from the ACLU of Minnesota, David McKinney and Teri Nelson.

THE COURT: Okay, great. Welcome to all of you.

And same goes for you, Mr. Pieper. We'll see what we need.

MR. PIEPER: Thank you.

THE COURT: Thank you.

Anybody else need to make an appearance today?

MR. MOHRING: Good morning, Your Honor. Andrew Mohring. There is a pending motion for leave to file an amicus brief. I'm here as well on behalf of a collection of former employees.

THE COURT: Okay. Thank you very much, Mr. Mohring. I think that motion was granted, actually.

MR. MOHRING: It was. There was an opposition. There was a reply.

THE COURT: I know all about that. Thank you.

Yes.

MR. ROSE: Good morning, Your Honor. Pierce Rose and my colleagues, Amy Erickson and Gabrielle Jackson on behalf of proposed intervenors, the NAACP and Ms. Cynthia Wilson.

THE COURT: Okay, great. Thank you. Thank you, all.

Let's go ahead and get started. I think I will begin with Ms. Behrens. Do you want to come up to the podium?

Okay. Have there been any decisions other than *U.S. v. Oregon*, *U.S. v. Weber*, and *U.S. v. Benson*?

MS. BEHRENS: Not that I'm aware of. I checked this morning and did not see anything new that came out.

THE COURT: Which other cases are furthest along?

MS. BEHRENS: My understanding is that there are four that are pending decision, so --

THE COURT: Sorry to interject right after you're answering a question that I asked you, but the four that are pending decision, are those similarly postured in terms of pending decisions on motions to dismiss?

MS. BEHRENS: Yes. And those are all cases where it's been fully briefed, and my understanding is the courts will not be holding oral argument, and those states are New York, New Mexico, Nevada, and Pennsylvania.

And then my understanding is there will be about five hearings on motions to dismiss within the next month or so, and those are Connecticut, Maine, Rhode Island, Hawaii, and Nebraska.

THE COURT: Okay. Thank you.

A couple of procedural thoughts before we get started in some substantive questions that I have. First, with respect to the point that Mr. Mohring just made about the amicus, I had granted the motion for amicus, understanding that the United States and the parties did not object. Then there was a change of -- response from the United States expressing an opposition to amicus following the completion of briefing.

I'm going -- I'm not going to strike or deny the amicus, but I am going to give the United States the

opportunity to file a letter brief in response to anything it wishes to address related to the amicus that's been filed. You can have up to ten pages, and you can have two weeks to do so. If you have any points you'd like to make, they can be made then.

MR. TUCKER: Thank you, Your Honor.

THE COURT: Okay, great.

MS. MORRISON: There's no objection, Your Honor, obviously.

THE COURT: Okay. Thank you. I assumed so.

The second matter is that in *United States vs. Benson*, the district judge engaged with an argument related to the scope of records covered by the Civil Rights Act. It is, I believe, raised somewhat in a briefing from the League of Women Voters, but I would like additional briefing on that matter in the wake of the Michigan decision.

We'll include details in a brief text-only order or in the minutes from today's hearing. We'll give everyone plenty of time. It will be simultaneous briefing from both sides. I'd like one brief from the defendants, so you all put your heads together about who takes the lead on that and what that looks like, and one brief from the United States.

So I'm not going to discuss that argument today. My questions aren't going to focus on that argument today. I want to dive a little more deeply into that issue once I

receive the briefing, unlikely to set a second argument, although I guess it's always possible if there's a lot of questions that come to mind.

But I just thought I'd put those two procedural issues out there right away. Anything you want to address about either of those on behalf of the State defendants?

MS. BEHRENS: No, Your Honor.

THE COURT: Okay. How about on behalf of the United States, before we get back to substance?

MR. TUCKER: Your Honor, so just to clarify, those would be due simultaneously and you'll specify the date that they are due in the order?

THE COURT: Precisely.

MR. TUCKER: Okay. Thank you, Your Honor.

THE COURT: And they don't have to be simultaneously like to the hour, but just on the same day. They're not going to be back and forth motion practice. Okay. Very good. Sorry to have interrupted myself.

So let's get started with some of the substance related to the Civil Rights Act. You appear to raise a few arguments about the Department of Justice's request with respect to the Civil Rights Act.

First, you suggest that under the CRA, it just doesn't work like this and you don't get to use the Civil Rights Act to seek information regarding compliance with

HAVA. Can you articulate this argument for me as best you can?

MS. BEHRENS: Certainly. So that goes to the requirement that there be a statement of the purpose. And first, it's within the Civil Rights Act, so the need to state a purpose -- the purpose indicates there is a substantive limit and it is the purpose therefore, which means the data can only be used for that reason.

And this is within the Civil Rights Act. The obvious reading of that is that it needs to have a connection to the Civil Rights Act -- to a civil rights investigation.

Certainly there could be cases where evidence that data gathered because of HAVA is relevant to a civil rights investigation, but it's not about HAVA itself. And the legislative history particularly shows that the Civil Rights Act records provision was targeted to rampant racial discrimination and registration practices at the time and that's historically how it's been used. And the Fifth Circuit cases around the time the most contemporaneous case law shows that very specific use of targeted investigations towards specific jurisdictions where the Attorney General was indicating he had evidence of some racial discrimination and registration practices and was gathering information relevant to that purpose.

THE COURT: Has there been a case where that provision was used where the articulation is something related to the purposes of the Civil Rights Act but no proffer has been made about specific concerns related to the information? For example, maybe a kind of rote articulation: This information is being sought pursuant to the Civil Rights Act for the purposes of enforcing its provisions but without saying, We believe that X jurisdiction or Y state has done something that runs afoul of those protections. Were there any cases at any point, either shortly after the passage or more recently, that did that?

MS. BEHRENS: Not that I'm aware of. And some of the examples cited from the -- in the United States' brief and from the amicus brief from the former DOJ employees, a lot of these appear to have been settled, so we don't necessarily have litigation expanding on what the correspondence was with the jurisdiction. But the examples in the amicus brief are particularly enlightening because it shows even if they were suggest -- gathering data that was collected under HAVA, it was still to investigate discriminatory practices related to denial of the right to vote.

THE COURT: Are you aware of any instance in which this information-gathering provision of the Civil Rights Act

has been used for an articulated basis or purpose outside of the Civil Rights Act?

MS. BEHRENS: I am not.

THE COURT: One could suggest that part of the Civil Rights Act is about voting, not just about civil rights and discrimination but also about election integrity. Do you think that that allows the Civil Rights Act to be used more broadly in an election setting somewhat untethered from the racial discrimination history of the act?

MS. BEHRENS: I wouldn't say it necessarily has to be racial discrimination, but it does need a civil rights hook. And certainly there could be hypothetical cases. We're not saying there could never be an avenue for potentially gathering data collected under HAVA.

But in terms of just general HAVA compliance, there's a mismatch. HAVA just sets minimal election standards for election administration. It directs states to have a centralized list, so in Minnesota we don't have 87 counties doing their own thing in terms of registration processes. And then it directs routine list maintenance processes.

If Congress had intended the United States to be able to just generally collect all voting data collected under HAVA, essentially conducting an audit, it presumably would have said so. But everything about HAVA, it has those

general guidelines about centralized lists and list maintenance, but it really takes a hands-off approach and keeps states in the driver's seat.

It's states and local officials that define and maintain and administer it. It's states and local officials that perform list maintenance, states and local officials that decide whether information is sufficient to register, and states that generally have control over the methods of implementation. And when HAVA talks about sharing information or access, it's still referring to states sharing with state agencies or local officials.

THE COURT: Okay. Do you think that the CRA contemplates a role for me in tailoring the information requested to the purpose of the request?

MS. BEHRENS: Yes.

THE COURT: And what's your best authority for that idea?

MS. BEHRENS: Well, *Powell* and some of the other cases, *Becker*, essentially the case law that's developed since those Fifth Circuit cases establish that when the government comes to court trying to enforce a demand for documents or information, judicial review can look at the facial validity, so whether the government complied with the statute, and the substantive legitimacy, so ensuring that the federal government is not abusing its authority. And

that can go to whether there's a good faith, legitimate purpose or a pretextual basis, and relevance and overbreadth and compliance with other laws.

THE COURT: It feels like we've got this flurry of law from shortly after the passage of the act culminating with *Powell* and the note that you cite, and then not a lot of law illuminating the scope of my role in the decades since then. Am I right about that or am I missing something?

MS. BEHRENS: As to this specific provision, that is correct, but I think the general principles about government demands for data equally apply here.

THE COURT: Okay. You also suggest that I shouldn't credit the Department of Justice's statement that it wants the unredacted lists for HAVA-related reasons. In other words, you and the intervenors suggest that there are other sort of more nefarious or certainly more outside the purposes of either the CRA or HAVA objectives for trying to get these lists.

Are you making that argument, and if so, how am I supposed to assess that? Point me to something that gives me the authority to try to divine the true motivation of the executive.

MS. BEHRENS: We are making that argument, that even if the demand is facially valid, there are substantive

problems. And again, *Powell* provides that a party can challenge on any appropriate ground.

And the record here -- and I want to say, the State does not make these arguments lightly. We certainly appreciate a state government, the importance of agencies being able to investigate, but we also know that investigation has to be done within the scope of an agency's authority and in good faith and for a legitimate purpose.

And here, what starts as just the fundamental mismatch between the claimed purpose and the request. The claimed purpose is for HAVA compliance, HAVA simply requires maintenance processes be in place and that states routinely update their list. But here, that's about process, but they want data.

Second, they repeatedly ask for the statewide voter registration list, but then also say, Include active and inactive. Well, by definition, inactive voters will not be on the voter registration list because they are not registered voters.

And then second, the public events and the reporting and public documents that the Court can take judicial notice of, they're difficult to ignore. If you watch the trajectory from about a year ago, in early 2025, through last month, what starts as perhaps rumors or whispers really crescendoes into a roar. We have the

executive orders from last March talking about the federal government gathering voter data. Then in the summer we have a dragnet approach of asking every single state to turn over its voter data. That indicates there is no individualized suspicion, so that, again, goes to the lack of -- not only did the government not state a basis, it's clear there's not a basis for believing there's a violation here. So there is no good faith.

THE COURT: A violation of the Civil Rights Act, a violation of HAVA, or either?

MS. BEHRENS: Either.

And then through the late summer and the fall, public reporting about voter data potentially going to the Department of Homeland Security, running through the SAVE Act and perhaps running national list maintenance or a national voter role.

By the end of December, the head of the civil rights division, in an interview that we cited, is saying the Attorney General doesn't have to show her homework on what she's going to do with it, which is also contrary to the Civil Rights Act because even if it is a legitimate purpose, you have to be cabined to that purpose.

And then in January --

THE COURT: What's your best -- let me interrupt you there. What's your best authority for the idea that the

purpose cabins the use of the information, and sort of second-tier question, that I have some role in enforcing the cabining of the use of the information to the stated purpose?

MS. BEHRENS: The plain text of the Civil Rights Act, it refers to "the basis" and "the purpose," so those are two distinct concepts. That's underscored by the repetition of the definite article, so this wasn't -- basis and purpose isn't sort of a single phrase. They're distinct concepts.

And then the use of "the." It's a definite article. It has to be "the." And then the phrase is "the purpose therefor," and it's the therefor without the E at the end, which is the definition is, "For that reason." So the statute itself cabins the use of the data.

THE COURT: So then point me to my authority to administer the cabining of the data.

MS. BEHRENS: Well, I think on its face, some of these events, they're enough to dismiss for failure to state a claim. *Powell* and, again, the authorities on just government demands in general give the Court that opening. Certainly if this were a worst-case scenario and the Court were ordering production of data, it would be through a robust protective order and use of that, but the data itself. And that is the role of courts. That's why

Congress also built in judicial review into the Civil Rights Act, that there is a role for the courts to determine what the law is and how far the department can go in -- the Department of Justice can go in making demands under the Civil Rights Act.

THE COURT: One of the things that I have been considering is the suggestion in the briefing that a demonstration of compliance with HAVA doesn't require the personal identifiers or the -- you know, the Social Security information, the very specific individual voter-level information.

Do you think that there is some basis that I could order the disclosure of the information with those things redacted? And I understand perhaps this information has already been offered. But do you think that that is within my power, those sorts of limitations? And if so, what is the strongest thing you can point me to for that authority? Is it the same idea that it's part of my general power in cabining government data requests? Is it *Powell*? What would be the hook there?

MS. BEHRENS: Yes, it would be the *Powell* line of cases. And I think the hook for that, too, is just relevance and overbreadth, that this information is not relevant. And as you noted, the information has been offered, so if that information is not relevant, that would

support outright dismissal.

THE COURT: So what do you make of the decision in *Benson* not adopting your sort of statutory reading that creates this limit on the use of the Civil Rights Act?

MS. BEHRENS: I think that decision is an outlier, and we'll certainly provide the supplemental briefing you noted at the outset, and those arguments hadn't been here. I think that provides a more unduly narrow read of record, and what is instructive are the cases under the National Voting Rights Act, which uses similar language about all records where the First Circuit and the Fourth Circuit and numerous district courts have recognized that states can redact sensitive private data. And those cases have been out there for a while, and Congress certainly has not amended the law or spoken otherwise and said that the information cannot be redacted, so that analogy I think provides strong authority.

THE COURT: All right. Let me get back to my list. Hang on one second.

So let's have a hypothetical here. Let's imagine that under the Civil Rights Act the Department of Justice informed Minnesota that it had reason to suspect that Minnesota -- the election systems in place were discriminating against people on the basis of race, so kind of a classic objective of the Civil Rights Act, and that it

wanted the full voter registration list to assess those concerns. Is it still appropriate for a court, if the articulation is right in the wheelhouse of the purpose of the act, to assess the stated purpose and whether it is valid?

MS. BEHRENS: Assuming, with the hypothetical, and assuming there were no concerns of good faith or pretext or any of that, then we agree that the -- it is an investigative tool. It's not about trying the case within the case. But if there is -- a party is able to come forward with evidence, that is one of the central reasons for judicial review. If there is a lack of good faith or a pretext, then it is open for judicial scrutiny.

THE COURT: So in your reading, it's not sort of a magic word invocation. It would have to be a magic word invocation unburdened by a suggestion of a contrary motivation.

MS. BEHRENS: Correct. And that's what those cases from the Fifth Circuit, what you saw were just outright stall tactics and the counties trying to obstruct the investigation. In *Lynd,* the county was demanding the names of every witness the United States had. In *Bruce*, where the county tried to shortcut the investigation and just submit an affidavit and say, Well, no black people have tried to register; you can't ask any questions. That's not

what we have here. With the list of events, we just -- I rattled off there in terms of other public statements, there's enough here to raise suspicion.

And there are -- it's worth emphasizing, again, this is sensitive data on millions of Minnesotans, people who have given that information to vote, not for the State to hand it over to the federal government indiscriminately.

THE COURT: The Department of Justice indicates that it will safeguard the information that it is seeking and has identified some intention and plan to do so. Why isn't that sufficient to alleviate your concern about privacy?

MS. BEHRENS: Well, one, the Department of Justice seems to concede that the Privacy Act applies to it, but it has not identified any system of record notice that would apply.

And then second, going back to the same sort of events I listed, there's just -- there's not a lot of confidence there. And I think the Oregon decision talked about that, why there's not a presumption of regularity anymore on this issue.

And a couple of other more recent events I did not list before was in January, the Social Security Administration made a court filing where it admitted DOGE employees had entered some type of agreement with an

election integrity group and given Social Security data.

And then we have, very close to home in Minnesota, the Attorney General writing to Minnesota's governor and tying giving the voter role to immigration enforcement.

So there's certainly a record at a minimum that would open the door to discovery on good faith and a legitimate purpose on this record.

THE COURT: Okay. So you're suggesting that if I do not grant the motion to dismiss and I do not grant the motion to compel, that the next step would be proceeding to discovery, the purpose of which would be to explore the basis and the purpose?

MS. BEHRENS: Correct.

THE COURT: Okay. And do you have any cases where a Civil Rights Act request led to discovery like that?

MS. BEHRENS: Not that I'm aware of. Again, I think we're all sort of reading the same four or five cases from the 1960s where -- and there was no evidence that those counties made those arguments, so it just hasn't been reached. But I think the general principles from all the other cases about abuse of process and government demands for information would apply here.

THE COURT: Why did all this litigation come to a screeching halt in the early '60s? Do you think it's because of *Powell*, or do you think it's -- I mean, it's

certainly not that civil rights problems were fixed.

MS. BEHRENS: I don't know. I know some of the intervenors expand a little bit on the history of Voting Rights Act and some of the other stronger tools, that this may not be the needed go-to tool anymore, or it could be that they're just not getting litigated because there's compliance and consent decrees.

THE COURT: Okay. What do you think about the *Benson* court's analogy of these requests to an administrative subpoena?

MS. BEHRENS: They're similar in that it is the government asking for documents, but Congress did not use those words. We know Congress knows how to use the language of subpoena within various statutes. It's notable that HAVA did not give the DOJ any investigative authority. But at the end of the day, I think it gets us back to the same place and that if this were the equivalent of a subpoena and there had been an attempt for judicial enforcement, we would be back here making the exact same arguments.

THE COURT: Okay. I think those are my questions for you. What else do you think you'd like to point out or highlight?

MS. BEHRENS: I think we've covered most of the points I'd intended to make. I would just add, I realize the phrase "fishing expedition" gets thrown out a lot in

litigation, but it really fits the bill here. We have a sweeping and unprecedented demand for state voter data where there's no hint of an underlying violation, and the demand is hitched to statutes that are far removed from this type of use.

THE COURT: Okay. Thank you.

MS. BEHRENS: Thank you.

THE COURT: All right. Ms. Swenson or Mr. Pieper, do either of you want to jump in on anything that I haven't already sufficiently hinted at with co-counsel?

MS. SWENSON: Yes, my co-counsel will be addressing that, Your Honor.

THE COURT: Okay, great. Come on up. And if you could remind me of your name.

MR. GOLAN-VILELLA: Sure. Good morning, Your Honor. Robert Golan-Vilella on behalf of the Alliance intervenors.

THE COURT: Great.

MR. GOLAN-VILELLA: I'd like to focus -- most of the discussion up to this point has been in the area of the Civil Rights Act purpose demand, but I'd like to focus the Court's attention briefly on what we think are the other two simplest and most straightforward grounds on which this case can and should be resolved. And those are, first, the simple failure to provide not just a basis but anything that

could be considered a basis in DOJ's demand letter. And second, the failure to provide any allegations of a HAVA violation for the other claim, which we haven't discussed so far.

THE COURT: My perception of the -- I don't really want to talk about the HAVA claim right now.

MR. GOLAN-VILELLA: Understood.

THE COURT: After I speak with opposing counsel, if they are relying on it in ways that I don't believe they are right now, we'll pivot back to you, but let's go ahead with your first point about no basis being articulated in the demand letter.

MR. GOLAN-VILELLA: Certainly, Your Honor. So as the California and Oregon courts have well articulated, we believe that basis must mean a factual basis. And you can see this in a few different ways.

If you were to take DOJ's interpretation, which is that the basis is the Civil Rights Act itself in its Civil Rights Act demand, the phrase would simply become meaningless because it would be automatically satisfied in any case in which a demand was made under the CRA at all, and there is --

THE COURT: Well, isn't that kind of the federal government's argument here, that I have no role in grappling with the veracity, persuasiveness, or foundation of the

basis? It is -- I mean, the closest analogy I've been able to come up with in my head is the Stored Communications Act, where the government can seek certain communications by articulating of sort of rote standard. We have reason to believe this might be relevant for an investigation or something similar to that. And if they say those magic words, that my duty when I was a magistrate judge was to make sure they said those magic words and then sign. What is your support for the idea that something more robust is permitted to me and, therefore, required of the showing?

MR. GOLAN-VILELLA: Several points on this, Your Honor.

First, even in DOJ's own cases, you know, some of them have provided the statements of basis and purpose that were used at the time. *Kennedy v. Lynd* is one example of them. Even there, the government provided separate statements of basis and purpose so must have understood them to be two separate and independent requirements.

We'd also point to the general principle that, you know, Congress is generally not presumed to enact meaningless statutes. This ought to have some meaning.

And we'd point to *Powell* and the more modern line of cases that the State discussed which suggest that the review has to have some meaning.

In addition to the criteria that the State pointed

to, you know, that the purpose is legitimate, that the inquiry is relevant to that purpose, that the Court's process not be abused, and that the underlying statute be satisfied, I'd like to point Your Honor to one case that is cited in our briefing which is a case called *CFPB v. ACICS*, and the cite for that is 854 F.3d 683. So that's a case involving a civil investigative demand. And the Court in that case not only denied it because the statement that the government made was too perfunctory to allow it to be addressed, but it actually said that the review of the demand or the request that is made cannot be so lax as to drain the underlying statute that authorizes the request of its meaning.

We think that principle has direct application here. Basis and purpose have to mean something. In this particular instance, basis, because the government has provided no basis at all. And an interpretation of the law that allows the Court to be totally hands-off and not review it at all drains the underlying statute of its meaning.

THE COURT: What circuit was *CFPB*?

MR. GOLAN-VILELLA: That's a D.C. Circuit case, Your Honor.

THE COURT: Thank you. Okay. Anything else?

MR. GOLAN-VILELLA: No, Your Honor.

THE COURT: Okay. Thank you. Very helpful.

MR. GOLAN-VILELLA: Thank you.

THE COURT: And, Mr. Pieper.

MR. PIEPER: I'll ruin the microphone setup for everybody.

Good morning, Your Honor.

THE COURT: There's a button on the --

MR. PIEPER: That's okay. I'll be fairly brief. I think that we bring a unique perspective on behalf of the intervenors that I represent with the ACLU of Minnesota, and I want to just briefly introduce them.

So obviously we represent Intervenors League of Women Voters, which is a nonpartisan nonprofit, that has been around for more than a hundred years protecting voting rights through voter education engagement activities, particularly through voter registration efforts. And the Minnesota executive director, Amy Perna, is in the courtroom today.

Common Cause is another intervenor that we represent which has likewise been engaged for many years in election protection work.

And we also represent, importantly, individual intervenors, Minnesotans themselves, Valerie Mangskau and Jennifer Compeau, and they're in the courtroom as well. And I want to highlight them because they're both Minnesotans who value their right to vote so much so that though they

were formally disenfranchised on account of past felony convictions, their voting rights were recently restored, both through litigation advocacy and policy advocacy in part due to their extensive efforts to secure the right to vote for former formally convicted felons on behalf of the entire class of Minnesotans who fall within that.

And so while we in our briefing echo all of the same types of legal issues that you were just discussing with counsel, Your Honor, I think there is one overarching concern that applies here specific to these intervenors, and that is that the basis and the purpose, or the stated basis and purpose, is effectively pretext for the federal government to collect and compile politically sensitive private voter information, specifically information that's descriptive of voters' conduct protected under the First Amendment into presumably some type of federal national voter database, which is prohibited by the Privacy Act.

And I know you talked briefly about the Privacy Act with counsel for the State, but I would like to just simply highlight that issue which we've raised in our brief, that disclosure of the State's unredacted voter database would inevitably lead to Privacy Act violations.

All of this, the failure to state a justifiable -- or any basis, as counsel for the other intervenors just articulated, and a justifiable purpose for this demand, the

pretextual nature of the basis and purpose and the fact that HAVA itself does not provide --

THE COURT: What -- whoa, whoa. What do I use -- so this isn't the first recent case involving the federal government where I've been asked to consider motivations. What do I use -- what framework do I apply, what lens do I look through, to determine the true motivation of a multifaceted executive branch?

MR. PIEPER: Yeah. And I appreciate that question, Your Honor, and I completely understand the position that you're in to ferret all of this out both in this case and the other cases that are on your docket.

THE COURT: You're going to have to slow down about half.

MR. PIEPER: Okay. Will do.

We've obviously cited and referenced in our brief extensive public record, a public reporting regarding the nature of the public discussion about the way in which these voting records -- or the rationale for why these voter records are being requested, and you can simply line that up against what is -- how this request or this demand was made or the pretextual purpose of it.

The public discussion of the rationale for collecting and vacuuming up private voter data across the country does not relate to basic compliance with the

administrative requirements of HAVA. If that were the case, you wouldn't need this type of sensitive voter data.

And you can see that both in the reporting, but also in the actions of the DOJ itself with respect to the proposed memorandum of understanding that it has offered to various other states which include provisions by which the federal government, in adjusting this information or receiving this information as a condition of that, would effectively be granted a right to challenge whether voters are proper or not.

And we also cannot just accept the government's assurances at face value that they will effectively protect this data or use it solely for the purpose of establishing a HAVA-compliant voting system in Minnesota when we've also cited to executive orders that have been issued by the Trump administration related to -- or really requiring the federal government administration-wide to share data across agencies. And we've seen how that has occurred time and time again where poor data practices have -- within the federal government, have created instances in which voter -- or excuse me, which private citizen data has been unlawfully shared across agencies.

THE COURT: Okay.

MR. PIEPER: And we've highlighted -- with respect specifically to the Privacy Act, Your Honor, I know this is

in the briefing, but the prohibition on compiling individual voter data that -- or excuse me, individual data that reflects a citizen's protected activities under the First Amendment, that is under 5 U.S.C. 552a(e)(7), and that states, "An agency shall not maintain any record of how any individual exercises rights guaranteed by the First Amendment."

There is no statute that authorizes the collection of data into a national federal database, and there is no authorized law enforcement activity that's at issue here as to an individual voter that would allow the government to collect individual data on millions of voters in Minnesota.

So with that, Your Honor, I have nothing further, unless you have any questions for me.

THE COURT: I don't think so. Thank you.

MR. PIEPER: Thank you, Your Honor.

THE COURT: All right. Time for Mr. Tucker? Okay, great.

MR. TUCKER: Yes, Your Honor.

THE COURT: Any update you want to provide to opposing counsel's sort of rundown of what other cases are percolating with similar issues, the New York, New Mexico, Nevada, Pennsylvania, and the states with hearings coming, any that you think should be on my radar screen besides those?

MR. TUCKER: There is one, Your Honor, and I don't think I can reveal what the state is yet, but the State contacted us this morning indicating that it's one of the cases we filed, and they are going to negotiate a settlement with the United States and provide the requested statewide voter registration list. I do believe I'll be able to provide that certainly in the supplemental briefing because I think it will be concluded then, but given the fact that the State has just informed us and we don't have -- we don't have a final agreement, I don't think it would be appropriate for me to identify the state yet.

THE COURT: And is that going to be similar to the consent decrees in Texas and Georgia?

MR. TUCKER: I'm not exactly sure.

THE COURT: I don't mean in content. I guess I mean more, when you talk about a settlement, do you mean something like that in the consent decree realm or you don't even know that yet?

MR. TUCKER: I believe it will be along those lines. I mean, typically what we've been doing is we've been looking at the MOU that other counsel have mentioned.

What I will also mention is that one of the other developments is that in the discussions with the states, many of the states have objected to what they refer to as kind of a poison pill, which is what was referred to, in

terms of requiring that within I believe it's 45 days that they have to take certain action if the United States identifies that there are ineligible voters on the list. The United States and the communications with those states indicated that we're certainly willing to enter into an MOU without that language.

And I will also just add that of the 15 states, so far to date that have already provided us with the data, 13 have provided their statewide voter registration lists with no agreement, two have provided subject to a memorandum of understanding, and then there are three more, plus the additional state that are presently in negotiations to provide that data. But they've been receptive to it, and we expect that they're going to provide the data.

THE COURT: So with the 13 that have been provided with no constraint, what is the government doing with those?

MR. TUCKER: It's a very good question because it certainly goes to the heart of the Privacy Act. The United States is in full compliance with the Privacy Act and its SORNs. It is treating these individual data that are coming in. They are completely separated and kept separate and distinct from the data of any other state. They are subject to very severe constraints even within the civil rights division. Even the attorneys within the civil rights division who are working on these cases, such as myself,

it's very constrained in terms of who has access to that. It's only those individuals who have a need to know, again, consistent with the Records Information Management System and, again, the Privacy Act provisions that apply to the United States.

THE COURT: But I guess my question is: What are the needs to know? Are they being reviewed for immigration enforcement? Are they being reviewed for other purposes? Are they being disseminated to other agencies that have a need to know?

MR. TUCKER: So there are two fundamental purposes that they're being used for. And, again, this really -- this was expressed in the letter. It's certainly something that's consistent with how we've been managing the data that we've been getting.

The first is section 303(a)(5) of HAVA. Section 303(a)(5) is the provision of HAVA that requires a state to ask in this order for either a driver's license or state identification number. If that's not available, the last four of the Social. If that's not available, to assign a unique identifier for that individual.

THE COURT: So they're being used to confirm that that information has been gathered?

MR. TUCKER: Yes, for the individual records. And the reason, again, is because it goes back to the North

Carolina litigation that the United States brought and resolved last year. That was a facial violation of Section 303(a)(5). There the State of North Carolina used a non-HAVA-compliant voter registration form that said, you don't have to provide it. They made it optional.

THE COURT: But we don't have that here.

MR. TUCKER: No, but what we do have is half of -- potentially, we don't know, but it could potentially be half of what we found in North Carolina. Through the course of state litigation, the statewide voter registration list had been produced through state litigation, and what the State identified was that over 200,000 voter registration records, active registered voters, were lacking the HAVA identifier. Roughly 103,000 of those were because they were just simply never required to provide it.

THE COURT: And you're talking still about North Carolina?

MR. TUCKER: Yes, but --

THE COURT: So presumably you could get that information with something other than looking at the number yourself. For instance, an attestation from Secretary Simon that, you know, only -- however many did not provide that information.

MR. TUCKER: We really can't because it's the other half. Like North Carolina, slightly more than half of

those records lacking it were voters who had actually filled it out, gave the information, and through clerical mistakes, the data simply not being entered by county clerks, it wasn't in there. And that was something that we could not get directly from them. We certainly understand and appreciate that, you know, the State did provide a robust response, but it's a response that really requires the United States to verify that the information is correct.

THE COURT: Where in HAVA is your authority to verify that the information is correct?

MR. TUCKER: So obviously, as you know, Your Honor, we did bring the claim -- just general records claim under HAVA. We've indicated that we can't dispute the fact that HAVA doesn't have a records production requirement like the NVRA does or like the CRA. And we also found that it was, frankly, just confusing the issues. The CRA does clearly provide a means for us to get these -- get the statewide voter registration list.

I will add that historically it's not been limited to the purpose that counsel says in terms of just the Fifth Circuit cases and the district court cases from the '60s. The United States obtained a statewide voter registration list from Texas through an MOU in the early 2000s and also obtained one through litigation with the State of Georgia where the State of Georgia entered into a consent decree for

the very same basis and purpose that's been stated here to assure compliance with the list maintenance requirements. And that case was within the NVRA.

THE COURT: And where in the record are citations to the requests made in the Texas and Georgia instances in the early 2000s?

MR. TUCKER: So some of the exhibits that are attached to ECF Document Number 102, which were the supplemental declaration that we submitted.

THE COURT: Thank you. I think I have a couple of additional questions for you.

So tell me what you think -- what's your response to the arguments about the Supreme Court's decision in *Powell*?

MR. TUCKER: So the issue with *Powell*, and this is where *Benson* got it right looking at it, *Powell* does not necessarily stand for the proposition that it's been cited for. It does say it in footnote 18, that there the -- you know, the Court said that it was appropriate to apply -- you know, to apply the Federal Rules of Civil Procedure to what was functionally an administrative summons, and it was also appropriate under those circumstances to look at the specific reasons that were given.

THE COURT: You've got to slow down a little, too.

MR. TUCKER: Yes. But what ended up -- what is

omitted from the discussion, and it's certainly been omitted in the briefing, is that *Powell* goes much further to explain why that was required there. And specifically the Supreme Court pointed out that Section 7605(b) of the Internal Revenue Code required that the Internal Revenue Service not engage in any kind of investigatory procedure that was harassing or unnecessary vis-à-vis a particular taxpayer. And for those reasons, it's completely dissimilar because we don't have any similar limitation of the Civil Rights Act.

THE COURT: Does the Court expressly in *Powell* invoke that basis to justify the footnote, so to speak?

MR. TUCKER: It does through the text of the discussion.

And I think the other key quote that comes directly from *Powell*, and this is where the Supreme Court was quoting another Supreme Court decision, the *Morton Salt* decision, which was at 338 U.S. at 642 through 43. The Court in *Powell* says that "These sorts of requests" -- and again, this was under the Internal Revenue Code -- "does not depend on a case or controversy for power to get evidence but can investigate merely on assumption that the law is being violated" -- and this is the key language -- "or even because it wants assurance that it is not."

That is exactly what is happening here. The United States is conducting -- to use counsel's words, it is

unprecedented in one respect. HAVA enforcement has occurred by the Department of Justice previously, but it's been limited to three areas. Initially when HAVA was passed, the very early HAVA cases focused solely on --

COURT REPORTER: I'm sorry. I need you to repeat. I have "the very early HAVA cases focused solely on."

MR. TUCKER: Whether states and local jurisdictions, but in particular states, had created a computerized statewide voter registration list as the statute required. In addition, there were some cases early on that were enforcing the provisional ballot requirements that some states simply weren't complying with it.

The third area was focused on the accessibility provisions of HAVA. Never before has there been an effort, certainly individually or on a national scale, to look at whether or not states are doing what they are required to do under Section 303(a)(5), which is that they've gotten the HAVA identifiers and that they are using those appropriately, that they ensure that clerks are entering the data so that everyone has a unique identifier.

THE COURT: But if this is a purpose of HAVA, what am I supposed to do with the reality that Congress did not vest the United States with the power it's now using a statute that was passed 60 years before HAVA for a totally different purpose to achieve that goal? If Congress wanted

the DOJ to be able to make sure that each state was applying the correct HAVA identifiers, requiring or creating the correct HAVA identifiers, they could have said so.

MR. TUCKER: Well, Congress did in two ways. First, Congress gave the Attorney General the exclusive authority under Section 401 of HAVA, which is at 52 U.S.C. 21111, to enforce provisions -- four provisions, including Section 303.

THE COURT: But they could have said, in order to fulfill this enforcement requirement or this enforcement power, we also give the federal government the right to do what you're doing here, which is demand this specific information. You've been very candid, they didn't do anything like that.

MR. TUCKER: They didn't need to, Your Honor, because of the Civil Rights Act. And specifically, the reason why --

THE COURT: Does anybody anywhere in the HAVA legislative history or discussions about HAVA or the text of HAVA or any regulations implementing HAVA talk about that idea, that they didn't need to do that because the Civil Rights Act gave that power?

MR. TUCKER: What they do talk -- not directly. Indirectly, they do. And, again, it's in a footnote that question cite. It's footnote 7 at page 10 of our brief at

ECF 102. And, again, we were quoting language from the House Report.

And this gets to the point that counsel has made suggesting that HAVA -- somehow this provision of HAVA is not about protecting individual voting rights. It absolutely is. And what that House Report was referring to is it was quoting language from the Ford-Carter Commission report that was issued a year before HAVA was passed in 2001. And there they were specifically talking about the problem that happened during the 2000 presidential election where voters were showing up to vote, the jurisdiction -- the clerk had purged voters, had removed voters through list maintenance procedures, but had removed the wrong Joseph Smith.

And so part of what Congress was doing when it passed HAVA was, this is a violation of the fundamental right of that individual voter to cast a ballot --

THE COURT: So this is your argument, that the reference to purging a wrong voter constitutes an implicit awareness that the Civil Rights Act gives information-gathering power to the federal government?

MR. TUCKER: No, Your Honor. I'm just simply trying to tie it into the fact that this is tied directly into the -- you know, consistent with why the Civil Rights Act Title III was passed to begin with, which is protecting

the individual right to vote. HAVA is part of that, just as the NVRA is part of that.

THE COURT: Okay. Aside from the arguable convergence of HAVA protecting voting rights, is there anything in the legislative history of HAVA that suggests that its authors did not believe that enforcement -- or that information-gathering power needed to be given to the executive because that was already covered by the Civil Rights Act?

MR. TUCKER: The only thing that's in HAVA that talks about that is specifically explaining why there was no public disclosure requirement, and the reason is simple. It's because there's no private right of action under HAVA. And that's the difference. That's why you have in Section 8(i) of the National Voter Registration Act, there is a public disclosure provision because individuals or private organizations can also enforce, you know, the requirements, particularly with respect to voters under Section 5 of the NVRA who are registering to vote.

THE COURT: So there is no mention in the legislative history of HAVA that suggests that the authors understood that they didn't need to provide information-gathering authority to the executive because that was covered by the Civil Rights Act?

MR. TUCKER: I'm unaware of any, but I will also

say -- I think this is one of the really important points that I do need to make in terms of just focusing on what role legislative history plays here. This is where the Eighth Circuit's relatively recent decision in the Arkansas branch of *NAACP vs. Arkansas Board of Apportionment*, which is the 2023 decision that focussed on the private right of action --

THE COURT: I'm aware of the Eighth Circuit's general thoughts about legislative history. I'm trying to understand what your position is that the Civil Rights Act from a very long time before HAVA was -- and I could pull up my realtime -- was that they didn't say anything in HAVA specifically because it was covered by the Civil Rights Act. I think you suggested that, so I was looking for any support anywhere for the idea that that is true.

MR. TUCKER: I can certainly fess up that I have not read the comprehensive history of HAVA, but to my knowledge, I'm unaware of any that would do that.

THE COURT: Okay. So you're just surmising that that's what they all had in mind.

MR. TUCKER: Yes, Your Honor, again consistent with the text that they adopted and also comparing, obviously, the differences in the text with the National Voter Registration Act.

THE COURT: Okay. Why does the Department of

Justice need the HAVA-specific identifiers, as opposed to needing information of whether those identifiers were collected, even down to a voter-by-voter list?

MR. TUCKER: So it's for the very same reason that we talk about in our briefing, and that is it's the reason why certain states, including Minnesota, subscribe or participate in ERIC, which is basically the collective with 25 -- between 25 states and the District of Columbia to basically compare notes, basically compare voter registration files to see whether or not there's been appropriate list maintenance.

Now, what we're talking about, because contrary to what counsel from Common Cause is --

THE COURT: Wait, wait, wait. I'm sorry.

MR. TUCKER: Yes.

THE COURT: You say that you need to have the specific identifiers so that you can compare state to state to make sure that HAVA-compliant lists are being gathered by Minnesota?

MR. TUCKER: No, Your Honor. I need to correct that. I was just simply saying that that's what ERIC does.

THE COURT: Okay. I understand. Why does the Department of Justice need the list with the specific numbers to ensure compliance with HAVA as opposed to a list that indicates whether those numbers were collected and if

so, which of the satisfying numbers it is?

MR. TUCKER: So one of the reasons, for example, is that one of the things the United States will do in assessing this -- and again, this is not for the United States -- for purposes of the United States doing list maintenance itself but simply to identify whether or not the State of Minnesota is engaged in reasonable list maintenance practices. The United States will enter into a use agreement with the Social Security Administration to basically run those numbers, the Social Security numbers, the last four, based upon the addressing information against the Social Security's death index. That's a way to determine if, for example, there are individuals who are deceased who should not be on the rolls who are still on the rolls. That's the purpose.

THE COURT: And HAVA requires list maintenance by each state. Does HAVA specify that the federal government has this role in ensuring compliance with individual voter comparisons to death rolls?

MR. TUCKER: It does. And our complaint actually quotes much of the language, and there are approximately five paragraphs in our complaint that talk about how HAVA tried to do it within the structure of federalism, to recognize that, as the State correctly points out, the primary role for doing this and responsibility for doing

this is the state, but Congress also said the federal government has a role to play, too, again, under the Elections Clause of the Constitution.

And that is, again, consistent with what I had said earlier, it's trust but verify. We trust the states to do it, but it's necessary and the role of the Attorney General through Section 401 of HAVA is to verify that they're, in fact, doing it and to make a determination at that point whether or not it's appropriate to enter -- to have an enforcement action. In some cases, it's not. If it's a minor infraction, if there are things that, you know, perhaps may be a little sloppy, the Department of Justice in the past, and certainly going forward, works with the states to identify that, allows the states to correct it.

But in other cases we're finding, again, North Carolina is one, there are a couple of additional states where we've also already found that there are issues and, again, we have to assess whether or not it's appropriate under those circumstances to bring an enforcement action, as Congress charged the Attorney General to do.

THE COURT: Is the information that's been gathered from other states being used for immigration enforcement?

MR. TUCKER: Not to my knowledge. Now, no. No, Your Honor. And, again --

THE COURT: Is the information that's being gathered -- that's been gathered from other states going to be used for immigration enforcement?

MR. TUCKER: So I need to break this down into two responses to that because it's really important to draw the distinction. Some of the briefing talks about data that has been transmitted for purposes of the SAVE Act, which is still pending legislation, and there's a reference to 47 million records being transmitted. The distinction I want to draw is that those were actions by the states themselves to work with Homeland Security to go through their rolls and determine whether or not there were individuals who are noncitizens on their list. And that's a decision, again, that the states themselves have made because the SAVE Act is not yet law.

The United States right now, again, we are focused solely on the two purposes that we have stated, which is to look at Section 303(a)(5), compliance, and also to look at list maintenance compliance under Section 303(b)(4) of HAVA.

I would also add, again, consistent with the discussion that counsel had said in terms of what the Court's inherent authority is, that the Court, of course, can craft a protective order to ensure that it is used only for that purpose and, of course, the United States would comply with that.

THE COURT: You mentioned that you're focused right now on HAVA compliance with the data that you've already received. Is there an intention to use this data to conduct immigration enforcement?

MR. TUCKER: Not to my knowledge, no, Your Honor, not with the data that we are getting. Now, again, there are some instances in which you have local U.S. Attorney's Offices at the state level that are working with Homeland Security. Some of the discussion -- you know, the references to allegedly building a national database that have been reported in the national media are reporting -- they're conflating all of these different purposes. All these different things that are happening by the U.S. Attorney's Offices is conflating with what we're doing, conflating with what Homeland Security is doing. We are completely --

THE COURT: But I'm mindful that it's not just you personally and the civil rights division of the Department of Justice that will have access to this information. You described a need to know. Presumably Attorney General Bondi, for example, could say that she has a need to know and could access the lists that have already been provided and use them for some other purpose, correct?

MR. TUCKER: I don't believe -- I don't know that that's correct in terms of the Privacy Act. Again, the

Privacy Act is very constraining. We have very well laid out procedures on that.

THE COURT: But the Privacy Act has exceptions for law enforcement. So, for instance, if Attorney General Bondi said, I'd like to use these records to look at every person who has voted in the country and see whether they did so legally, that would be allowed?

MR. TUCKER: Your Honor, I can honestly say I do not know the answer to that. And it was on this particular point that what I would suggest is, again, if, as we believe, the United States has demonstrated that it is entitled to the motion to compel, to the extent that the Court has further questions like that, it would actually be appropriate I think under the circumstances for the privacy officer at the civil rights division, who's in a much better position than me, to be able to answer those. I simply can't because it's outside of the purview of what we even do in the voting section, but we do have a privacy office that does specifically focus on these questions. And they're fair questions and they should be answered, especially in terms of what the request is.

THE COURT: Okay. Let me see if I have any additional questions for you.

In response to the motion to dismiss, you focus primarily on the Civil Rights Act as your vehicle for

obtaining this information. You do not invoke HAVA as a basis for obtaining this information. You reference HAVA as one of the -- as the primary purpose of getting this information. You've described two different ways that you intend to confirm HAVA compliance, both sort of granularly and process-wise.

Are you relying on HAVA specifically at your HAVA claim from the complaint to resist the motion to dismiss?

MR. TUCKER: Your Honor, I'm not in a position to say anything in that respect other than the United States believes a dismissal without prejudice would be appropriate if the Court finds that that claim is moot because the records that we're seeking can be and should be produced pursuant to the Civil Rights Act.

THE COURT: What do you mean you're not in a position to say anything?

MR. TUCKER: Just in terms of the United States does not want to dismiss that claim, but the United States also recognizes it's duplicative of what we've already asked for under the Civil Rights Act and it would be -- you know, it would be mooted out, effectively, if we end up getting the relief that we've requested under the Civil Rights Act.

THE COURT: Okay. So you're not pointing -- you're not raising any argument through the HAVA claim to defend against the motion to dismiss, and you're not

invoking the HAVA claim in support of your motion to compel, but you're not conceding that it should go away.

MR. TUCKER: That's correct, Your Honor. But obviously the United States would concede, as counsel pointed out, that HAVA does not have a records production provision.

THE COURT: Okay.

MR. TUCKER: And so for that reason, again, the statute -- we've obviously taken a very strict textualist approach to this, and the text of HAVA is clear, there is no records production requirement, like there is for the NVRA or the CRA.

THE COURT: Which segues to my next question. The NVRA doesn't apply to the State of Minnesota. Aside from the ways that you've kind of compared and contrasted what HAVA provides from what the NVRA provides in terms of record gathering and dissemination, do you think that that has any -- what other work does the NVRA do in this case for my decisions?

MR. TUCKER: It doesn't have any bearing other than that HAVA basically incorporates some of the provisions, a very limited set of provisions from the NVRA into it. And what I would just -- I can provide the Court with a citation to a First Circuit case that talks about that where it involved Puerto Rico, the Commonwealth of

Puerto Rico, which is also, like Minnesota, is NVRA exempt. And the name of the case is *Colon-Marrero vs. Velez*, and it's at 813 F.3d 1, and the key cites are right around pages 13 to 14, and it's a First Circuit 2016.

THE COURT: Thank you. I think those are my questions for you. Anything else you need to share?

MR. TUCKER: I think just really a couple of points, because I know we've had quite a lengthy discussion on this, and I appreciate that, Your Honor.

Just in terms of, again, focusing on the text and structure, the CRA, all of the discussion about looking at legislative history is concordant with what the Eighth Circuit encountered in the Arkansas apportionment case, where the Court specifically noted that advocacy groups are urging us to look elsewhere, and the Court said that that was wrong. And that's at 86 F.4th at 1211.

Here, the way that they're doing it is manyfold. They're ignoring Section 304 of the Civil Rights Act altogether, which is the privacy provision. And the reason why that matters here is because they're suggesting that the United States is only entitled to a redacted version of the list. If that were true, Congress wouldn't have found that it was appropriate to include privacy provision if it intended that the data that -- it was only going to be public data that the United States would get.

THE COURT: But isn't the information that was collected at the time of the Civil Rights Act and presumably that informs the meaning that we attach to the act, what the adopters intended at the time it was adopted, the information was so much less comprehensive and intrusive, it didn't have the last four of Social Security number, it didn't have even a driver's license number, it certainly didn't have a HAVA identifier. I'm not even sure if they had dates of birth, but maybe they did. They probably had names and addresses. The privacy protections contained in the Civil Rights Act were going to something very, very different from the scope of information that you're seeking that is required to be collected by HAVA.

MR. TUCKER: But the information, Your Honor, is talked about, again -- I think that's largely correct. I believe from the records we've seen, it did include dates of birth. But that information was highly -- it's what we would call personally identifiable information today, and it was highly dangerous to -- you know, for that to be made in the public, because one of the things that was happening in the 1960s is you would have individuals or in some cases you would even have election officials, that would publish in newspapers the names and addresses of all those black voters who had registered to vote specifically so they would be targeted. They would lose their jobs. They would suffer

economic retaliation. They would suffer physical retaliation and intimidation.

So there was a reason. And Congress, again, had very good reason to believe that that information -- even though today we would consider that readily available because you can go on the Internet and get all of that information, that was not true at the time that the CRA was passed.

And so there is an analogy, again, a direct analogy tied in with the information that's being sought today. And, again, I think it's consistent with what the *Benson* Court said where the *Benson* Court indicated there's no temporal limitation on statutory construction that somehow a statute that's passed a long time ago has to take into consideration every statute that follows, and I think that's true here as well.

THE COURT: Okay. Thank you. Thank you very much.

MR. TUCKER: Thank you, Your Honor.

THE COURT: Okay. I promised intervenors that they could -- if there was something that I missed, but I think we kind of covered that.

MR. PIEPER: Yes, Your Honor. Nothing further from us.

MR. GOLAN-VILELLA: Yeah, nothing further.

THE COURT: Okay. I think we're done for the day. Thank you, all, very much for being here. I really appreciate the argument.

We will get some guidance to you about additional briefing that we're seeking, and we'll turn to this as soon as we can.

Thank you, all, very much. We're in recess.

(Court adjourned at 10:40 a.m.)

* * *

I, Paula K. Richter, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by: *s/ Paula K. Richter*

Paula K. Richter, RMR-CRR-CRC