**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STEVE SIMON in his official capacity as Secretary of State for the State of Minnesota, and the STATE OF MINNESOTA,<br><br><br>Defendants. | Case No. 0:25-CV-03761-KMM-EMB<br><br><br>**UNITED STATES' SUPPLEMENTAL BRIEF CONCERNING *UNITED STATES V. BENSON*** |

Per the Court's Order (Doc. 157), the United States respectfully submits this supplemental brief to address the court's interpretation of 52 U.S.C. § 20701 in *United States v. Benson*, No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789, at *9-11 (W.D. Mich. Feb. 10, 2026) *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27, 2026).

**MEMORANDUM OF LAW**

The present case presents materially the same question addressed in *Benson*: whether a State must produce its statewide voter registration list in response to a lawful demand by the Attorney General of the United States under Title III of the Civil Rights Act. The court in *Benson,* held that "The CRA aids the Attorney General in assessing states' compliance with federal election law and protecting voting rights; the NVRA is a federal election law that protects voting rights." *Id.* at *8. *Benson* further held that "Thus, the DOJ may use the CRA to investigate possible violations of the NVRA." *Id.* at *8. *See also*

*United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) (administrative subpoena should be enforced 'if the inquiry is within the authority of the agency')." *Id.*

In *Benson*, as well as this case, the defendant refused to comply with the Attorney General's request. While the analysis in the *Benson* decision largely supports the United States' position—including its recognition of the statute's breadth and the legitimacy of the Department's purpose—it ultimately errs in a narrow respect by adopting an atextual limitation on what qualifies as a covered "record." That limited error does not withstand scrutiny and should not be followed here.

## I.   The *Benson* Court Erred in Excluding an SVRL from Title III of the Civil Rights Act.

52 U.S.C. § 20701 of the CRA requires an election official to "retain and preserve, for a period of twenty-two months from the date of any" covered election, "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." *Id.* Those same records or papers are subject to demand by the Attorney General or his representative. *Id.* § 20703.

Minnesota's statewide voter registration list is perhaps the archetypical example of a "record" that "relat[es] to" voter "registration." 52 U.S.C. § 20701. "When a term goes undefined in a statute, we give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). And "[t]he ordinary meaning of" the term "relating to," the Supreme Court has explained, "is a broad one." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). This term means "'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Id.*

2

(quoting *Black's Law Dictionary* 1158 (5th ed. 1979)); *see also Milner v. Dep't of Navy*, 562 U.S. 562, 567 n.1 (2011) (the term "related" is "expansive"). As a statewide voter registration list ("SVRL") is the method by which a State records who has registered to vote, one cannot seriously dispute that such a list "has 'a connection with, or reference to,' the topics the statute enumerates," *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 96 (2017) (quoting *Morales*, 504 U.S. at 383)—namely, voter "registrations," 52 U.S.C. § 20701.

According to the *Benson* court, the SVRL is not such a "record[]" or "paper[]" because it is self-generated by the State and therefore does not "come[] into [the] possession" of election officials. *Benson*, 2026 WL 362789, at \*9. In the district court's view, 52 U.S.C. § 20701 applies only to those "documents that people submit to the State as part of the voter registration process, not a document like the voter registration list that is created by state officials." *Id*. This reading, which even the district court acknowledged "may seem needlessly pedantic," *Id*. at \*10, is both novel and incorrect.

Nothing in Section 20701 restricts "all records and papers" to only those records and papers submitted by voters; even assuming that the examples of documents in the statute each "refers to something that the voter submits or does," *Id* at \*9, that does not mean that every record or paper "relating to" those examples, 52 U.S.C. § 20701, likewise comes from a voter. *See United States v. Mississippi*, 380 U.S. 128, 134 (1965) (stating broadly that "records of voting registration [must] be kept" under Title III); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (Section 301 "encompasses, among other things, voting registration records, poll lists, applications for absentee ballots, ballot

3

envelopes, tally sheets, computer programs used to tabulate votes, as well as the ballots themselves.").[1]

Limiting Section 301 to materials that a state election official has acquired from a third party would undermine the statute's purpose. Interpreting Section 301 to exclude materials that state election officers have created themselves—including statewide voter registration lists—would subvert that purpose by frustrating the Division's ability to acquire evidence that could shed light on whether a violation of the law has occurred. And courts "have rejected rules that would 'thwart and defeat [an agency's] appropriate investigatory powers." *United States v. Clarke*, 573 U.S. 248, 254 (2014) (quoting *Donaldson v. United States*, 400 U.S. 517, 533 (1971)); *accord N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 419–20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes.").

Similarly, federal courts have rejected similar attempts to limit the scope of voting records under other statutes. In *Judicial Watch, Inc. v. Lamone*, the defendants argued that a "voter list is not a 'record' under Section 8(i)" of the NVRA, and even if it was, Maryland law allowed election officials to "limit the production of voting-related records more strictly than the NVRA." 399 F. Supp. 3d 425, 434 (D. Md. 2019). The court disagreed. It explained that Maryland misunderstood the NVRA's requirements and the plaintiff was entitled to the registered voter list because "a voter list is simply a partial compilation of

---

[1] Moreover, today many voter registration applications likely are only in electronic form in a SVRL. *See* U.S. Br., Doc. 102 at 17-18. Excluding records in the SVRL would effectively carve out vast numbers of federal election records, which was plainly not the intention of Congress in passing such "sweeping" legislation. *Lynd*, 306 F.2d at 226.

voter registrations" encompassed by the Act. *Id*. at 442 (internal quotation marks omitted). The court also was persuaded that the "focus on the information sought" was significant "rather than the particular language used to characterize that information." *Id*. at 440 (citing *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1329 (N.D. Ga. 2016) (court rejected defendant's argument that plaintiff could not obtain voter list)); *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 336 (4th Cir. 2012) (finding "all records" under Section 8(i)(1) included voter registration records).

Moreover, there is no reason to attribute such a "pedantic distinction" to Congress. *Benson*, 2026 WL 362789, at 10. The plain terms of Section 20701 dictate otherwise. An officer "come[s] into . . . possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. Webster's New World Dictionary of the American Language 291 (8th coll. ed. 1960); at 1140 (defining "possess" and "possession"). Secretary Simon acquired the relevant records from individual voters in the course of carrying out his duties as Secretary of State. The Secretary "comes into . . . possession" of a covered "record" every time an individual voter adds or changes their registration information electronically, at the DMV, at a local polling place, or through a volunteer voter drive. By coming into possession of those individual records, Secretary Simon merely aggregates them together into a simple record, the SVRL. Because Minnesota requires voters to cancel via "written request" to an election official, the voter registrar processes a voter registration cancellation, and the moment that it is reflected in the SVRL, Secretary Simon has then "come[] into . . . possession" of that voter's record.

5

Even if one were to accept the limitation that SVRLs are self-generated or "created" documents, the word "come" cannot create a carve-out for self-generated documents. *See* 2026 WL 362789, at *9 (contrasting "come into possession" with "in the possession of"). Congress used the phrase "come into his possession" rather than "are in his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on how and when the officer gains possession of the records or documents in the first instance. *See* Webster's Third New International Dictionary 453 (1966 ed. unabridg.) ("to enter upon or into possession of: acquire esp. as an inheritance"). Numerous statutes use similar phrases to regulate acquiring information or property through improper means or to trigger duties to act based on acquiring information or property at a particular time. Following this focus on the how and when an individual gains possession of a record or paper, 52 U.S.C. § 20701 places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision—and then only "for a period of twenty-two months from the date" of that same election.

The distinction between records "com[ing] into [one's] possession" and being "in [one's] possession," then, is a temporal one—not a distinction between obtaining records from an outside source and through self-generation—as is shown by the very example that the district court cites as "draw[ing] an explicit distinction between possessing something and having something come into one's possession," *Benson*, 2026 WL 362789, at *9 (citing 8 U.S.C. 1454). Section 1454(a) of Title 8 imposes dual obligations: If a certificate of naturalization or declaration of intention is lost, "the applicant or any other person who

6

shall have" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who . . . may come into possession of it" at a later time must likewise surrender the document. 8 U.S.C. 1454(a). Thus, the phrase "come into possession" implies a temporal change in circumstances. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person," 8 U.S.C. § 1454(a), create a declaration of intention for a separate declarant. *See* 8 U.S.C. § 1445(f), 1449.

Even if one accepted the district court's premise that "self-generated" records are excluded, the SVRL would still fall within the statute's scope in most circumstances. Sections 20701 and 20703 apply to "officer[s] of election" and to any "person having custody, possession, or control" of covered records. Thus, even if one official were deemed to have "generated" a record, any other official who later acquires or maintains that record would have "come into . . . possession" of it and would be obligated to retain and produce it. The statute's focus on custody and control ensures that records cannot be shielded from disclosure based on internal processes. The district court's interpretation fails to account for that structure.[2]

---

[2] The Civil Rights Act's House Report suggests that drafters of Section 303 understood it to encompass "all records and papers in the possession of election officers," not just materials received from others. H.R. Rep. 86-956 (1959), *reprinted in* 1960 U.S.C.C.A.N. 1925, 1944.

The United States' interpretation is consistent with how the Attorney General has used Title III to obtain records necessary to enforce a range of federal election laws, including statutes governing voter registration and list maintenance. As mentioned in earlier briefing, the United States has used the CRA to obtain statewide voter lists to assess list maintenance in Georgia and Texas. *See* U.S. Br., Doc. 168-1, at 2. Similarly, in 2007, the United States entered into a Consent Decree with the State of Maine regarding HAVA compliance and list maintenance. *United States v. Maine*, No. 1:06-cv-00086, 2007 WL 1059565 (D. Me. April 4, 2007). Paragraph 9(e) of the consent decree required Maine to "provide to the United States in July 2007 and again in January 2009 an electronic copy of voter information from the CVR (computerized statewide voter registration system) that includes the voter's full name, *unique identifier*, date of birth, address, voter jurisdiction, active or inactive status, and (in January 2009 only) whether the voter participated in the 2008 federal election." Ex. 1 (emphasis added).[3] The United States entered a similar Consent Decree with the State of Indiana to enforce voter registration list maintenance and paragraph 8 of that Consent Decree required the State of Indiana to "retain voter registration and list maintenance records related to the terms of this agreement for the time periods provided by… [Section 20701]." Ex. 2.

---

[3] Paragraph 11 of the Consent decree explicitly invokes the CRA at 42 U.S.C. § 1974. 42 U.S.C. § 1974 was recodified at 52 U.S.C. § 20701. *See also McIntyre v. Morgan*, 624 F.Supp. 658, 664 (S.D. Ind. 1985) (42 U.S.C. § 1974 requires preservation of election records)

8

## II.   CONCLUSION

The *Benson* court dismissed the United States' Title III claim based solely on its conclusion that the statewide voter registration list is not a covered "record[]" or "paper[]." In doing so, however, the court correctly recognized several key points that support the United States' position: that Title III imposes a broad obligation to preserve and produce election records; 52 USC §§ 20701, 20703, that the Attorney General has authority to request such records for the purpose of assessing compliance with federal election laws, including the NVRA and HAVA; *See* 52 U.S.C. § 20501(a)(1), and that the Attorney General's stated basis and purpose for its request were sufficient and not subject to judicial second-guessing. *See Benson,* 2026 WL 362789, at *8. The court's ultimate dismissal thus rests on an unduly narrow reading of what qualifies as a covered record. Properly construed, Title III of the CRA entitles the Attorney General to inspect and copy such records, and the statute's text, structure, and purpose all confirm that Minnesota's SVRL falls within its scope. This Court should decline to adopt that limitation and instead apply the statute as written.

9

Dated: April 3, 2026

Respectfully submitted,

HARMEET DHILLON
Assistant Attorney General
Civil Rights Division

ROBERT J. KEENAN
Acting Deputy Assistant Attorney
General

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

/s/ *Brittany E. Bennett*

JAMES T. TUCKER
BRITTANY E. BENNETT
Trial Attorneys, Voting Section
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
E-mail:  James.T.Tucker@usdoj.gov
E-mail:  Brittany.Bennett@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ *Brittany E. Bennett*

JAMES T. TUCKER
BRITTANY E. BENNETT
Trial Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that Plaintiff's foregoing Memorandum complies with Local Rule

7.1(f) and (h).  The Memorandum word count total of 2,621 words as determined by

Microsoft Word "Word Count" and is formatted in 13-point Times New Roman font.

/s/ *Brittany E. Bennett*

BRITTANY BENNETT
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice